**ORIGINAL**

U S DISTRICT &
BANKRUPTCY COURTS

01 APR 18 PM 5: 36

FILED DEPOSITORY IDAHO
Cameron S. Burke, Clerk

JAMES L. MARTIN, ISB NO. 4226
MOFFATT THOMAS BARRETT ROCK
   & FIELDS, CHTD.
U.S. Bank Plaza Building
101 S. Capitol Blvd., 10th Flr.
P.O. Box 829
Boise, Idaho 83701-0829
Telephone: (208) 345-2000

MARK R. MCDONALD
ASAKO SAKAI
MORRISON & FOERSTER LLP
555 West Fifth Street
Suite 3500
Los Angeles, California 90013-1024
Telephone: (213) 892-5200

Attorneys for Defendants
HERBALIFE INTERNATIONAL, INC.,
and HERBALIFE INTERNATIONAL OF
AMERICA, INC.

## UNITED STATES FEDERAL DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| MARY LYNN FALLOW, | ) | CASE NO. CIV 01-0073-N-EJL |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANTS' REQUEST FOR** |
| v. | ) | **JUDICIAL NOTICE IN SUPPORT OF** |
| | ) | **THE MOTION TO DISMISS** |
| HERBALIFE INTERNATIONAL, INC., a | ) | |
| Nevada Corporation; HERBALIFE | ) | |
| INTERNATIONAL OF AMERICA, INC., a | ) | |
| California Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pursuant to Federal Rules of Evidence 201(d), Defendants Herbalife International, Inc.

and Herbalife of America, Inc. (collectively, "Herbalife") respectfully request that this Court

take judicial notice of the following documents in support of their Motion to Dismiss Complaint:

1.     Amended Complaint For: Breach of Contract, Quantium Meruit, Intentional Interference With Contract, Fraud, Conversion, Racketeering, Punitive Damages, filed in the Superior Court of the State of Arizona, in *Fallow v. Herbalife International, Inc.*, Case Number CV 96-03558, a true and correct copy of which is attached hereto as Exhibit A.

2.     Judgment entered on July 22, 1999 by Superior Court Judge John Foreman in the Superior Court of the State of Arizona in the County of Maricopa, in *Fallow v. Herbalife International, Inc.*, Case Number CV 96-03558, a true and correct copy of which is attached hereto as Exhibit B.

3.     Supplemental Judgment entered on November 22, 1999 by Superior Court Judge John Foreman in the Superior Court of the State of Arizona in the County of Maricopa, in *Fallow v. Herbalife International, Inc.*, Case Number CV 96-03558, a true and correct copy of which is attached hereto as Exhibit C.

4.     Reporter's Transcript of the trial proceeding in the Superior Court of the State of Arizona, in *Fallow v. Herbalife International, Inc.*, Case Number CV 96-03558, a true and correct copy of which is attached hereto as Exhibit D.

Dated this 18th day of April, 2001.

> JAMES L. MARTIN
> MOFFATT THOMAS
> BARRETT ROCK & FIELDS, CHTD.
>
> MARK R. MCDONALD
> ASAKO SAKAI
> MORRISON & FOERSTER LLP
>
> By: _____
> James L. Martin
> Attorneys for Defendants
> HERBALIFE INTERNATIONAL, INC.
> and HERBALIFE OF AMERICA, INC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of April, 2001, I caused to be served a true copy of the foregoing **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE MOTION TO DISMISS** by the method indicated below, and addressed to the following:

Ford Elsaesser
Joseph Jarzabek
ELSAESSER JARZABEK ANDERSON
MARKS & ELLIOTT, CHTD.
Third & Lake Streets
PO Box 1049
Sandpoint, ID  83864

( ) U.S. Mail,
( ) Postage Prepaid
( ) Hand Delivered
(✓) Overnight Mail
( ) Facsimile

James L. Martin

# EXHIBIT A

**WARNICKE & LITTLER, P.L.C.**
2020 North Central Avenue
Fifth Floor
Phoenix, Arizona 85004-4506
(602) 256-0400
FAX (602) 256-0345

Ronald E. Warnicke/SBN 001791
Thomas E. Littler/SBN 006917
Mark J. Giunta/SBN 015079

Attorneys for the Plaintiffs

**RECEIVED**

**APR 30 1997**

Paul, Hastings, Janofsky & Walker LLP

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| CLINT S. FALLOW, MARY LYNN FALLOW, and DANIEL S. FALLOW,<br><br>Plaintiffs,<br><br>vs.<br><br>HERBALIFE INTERNATIONAL, INC., a Nevada Corporation, TONNI and JAY RILEY, Husband and Wife,<br><br>Defendants. | No.  CV 96-03558<br><br>**AMENDED COMPLAINT FOR:**<br>**BREACH OF CONTRACT**<br>**QUANTUM MERUIT**<br>**INTENTIONAL INTERFERENCE WITH CONTRACT**<br>**FRAUD, CONVERSION**<br>**RACKETEERING**<br>**PUNITIVE DAMAGES**<br><br>**(Jury Trial Demanded)**<br><br>**(Assigned to the Honorable Colin F. Campbell)** |

Plaintiffs Clint S. Fallow, Mary Lynn Fallow, and Daniel S. Fallow for their amended complaint against Defendants Herbalife International Inc., and Herbalife of America, Inc. (together "Herbalife") and Tonni and Jay Riley by and through counsel undersigned, hereby allege as follows:

**I.      PARTIES**

1.      Plaintiff Clint S. Fallow is a resident and citizen of Maricopa County, Arizona.

2.      Plaintiff Mary Lynn Fallow is a resident and citizen of Sandpoint, Idaho.  At relevant times, Mary Lynn Fallow was married to and then divorced from Dan S. Fallow, Clint Fallow's father   At relevant times herein, she was a resident of Maricopa County, Arizona.

EXHIBIT____A____ PAGE___3___

3.     Plaintiff Daniel S. Fallow is a resident and citizen of Sandpoint, Idaho.  At relevant times herein, he was a resident of Maricopa County, Arizona.

4.     Defendant Herbalife International Inc. has, and at all relevant times had, its principal place of business in Southern California.  Nonetheless, it is a Nevada corporation.  Herbalife is the holding company for Herbalife of America Inc.

5.     Defendant Herbalife of America Inc. has, and at all relevant times had, its principal place of business in Southern, California.

6.     Upon information and belief, at all times relevant herein Herbalife of America and Herbalife International Inc. acted in concert and as agents of each other.

7.     Defendants Tonni and Jay Riley, husband and wife, are believed to be residents of Prescott, Arizona, doing business in Maricopa County.  At relevant times herein, they were residents of Maricopa County.

8.     Herbalife does, and at all relevant times has been doing, business in Maricopa County Arizona, and collects sales tax for the State of Arizona (which may or may not be paid over to the State, and which may form the basis for a later class action claim).  Herbalife has solicited consumer sales in Arizona, shipped large amounts of products to Arizona, and has solicited thousands of Arizona residents to become sales agents for Herbalife.

9.     At all relevant times, Mark Reynolds Hughes, has been and is the Founder and President of Herbalife International.

10.     Mary Fallow began her Distributorship for Herbalife while a resident of Maricopa County, Arizona.  Mary operated the Distributorship in Maricopa County from April of 1984 to mid 1987.

11.     Clint Fallow began his Distributorship for Herbalife while a resident of Maricopa County, Arizona.  Clint operated the Distributorship in Maricopa County, Arizona, at all relevant times herein.

12.     Dan Fallow began a Distributorship with Mary in Maricopa County, Arizona, and operated

— Page 2

that Distributorship with Mary in Maricopa County until 1987.

## II. GENERAL ALLEGATIONS

A.   Facts Relating To the Business of Herbalife

1.   The Herbalife Promises: Income Limited Only By Individual Effort.

13.   Herbalife sells the idea of success, the ability to get rich quick, and to enjoy a lavish lifestyle and unlimited income. Herbalife recruits Distributors through a series of video tapes, offering the promise of new homes, dream vacations and quick cash  designed to lure more and more people into filling out the bottom of the Herbalife pyramid, necessary to support the avarice of the those at the top.

14.   The contrivance for Herbalife's pyramidal get rich quick scheme is the sales and distribution of overpriced herbal weight loss, nutritional and personal care products. The products cannot be purchased through retail outlets. Rather, they are sold exclusively through a network of persons employed as independent "Distributors."

15.   Plaintiff Dan Fallow has recently gained information which makes him believe that Herbalife is able to offer its Distributors the promise of large returns because the mark-up on its products is over seven times the cost of manufacturing. For example, its "Protein Power" weight loss drink is believed to cost approximately $2.50 a can to manufacture. Herbalife sells it for $20.00 a can -- all of which is profit. Herbalife recoups its costs by tacking on other charges, marking up UPS or other freight charges over actual cost, and adding a superfluous 6% packaging and handling charge on every order. Upon information and belief, Herbalife funds its recently announced "infinite bonus" payments to the highest level of Distributors by the packaging and handling charge. Prior to implementing this bonus system, Herbalife had never charged packaging and handling.

16.   In its promotional materials, Herbalife offers the example of Founder and President, Mark Hughes as someone who became rich selling Herbalife, and drives a Rolls Royce and lives in a $20 million dollar Beverly Hills mansion. However, upon information and belief, a large portion of Hughes' current income is not earned through sales of Herbalife products through Distributorship, but is earned from sales

EXHIBIT A   PAGE 5

made to Herbalife by supplier companies in which Hughes has an equity interest. According to recent 10-Q report filed with the SEC in May of 1995, Hughes earned almost $5,000,000 in 1994 from these companies, one of which has a requirements contract, obligating Herbalife to purchase all of its products from it.

17.     An applicant for a Herbalife Distributorship becomes a Distributor when the person purchases a "Distributor Kit" and "when [his] completed application has been accepted and processed by Herbalife World Headquarters."   Once the application has been accepted, the "contract with Herbalife becomes effective immediately, giving [the Distributor] all the rights and responsibilities of a Distributor."

18.     Herbalife induces persons to become Distributors by promising opportunity and income limited only by the Distributor's individual effort.  Herbalife promises its Distributors that its "sales and marketing plan has been designed" to "maximize his success" if "he applies dedication, hard work and perseverance."  Herbalife promises that "the rewards you receive as a Distributor operating your own business will be directly proportionate to the time and effort you put into your business."  By sponsoring others, the Distributor had "the opportunity to grow as fast as [he] want[s] to" and "may sponsor people anywhere" and "earn a profit on their sales activities."

19.     Herbalife Distributors are also promised the ability to operate his or her Distributorship as their "own business".  Herbalife promises "a freedom of choice in [his] earning potential . . . It is our belief that each person should have the inherent right to choose the manner in which they live, the work they perform and the amount of money they want to earn."

20.     Pursuant to this philosophy that each Distributor operates his or her own business, each Herbalife Distributor is required to bear all the expenses of running the operation, including advertising, travel, entertainment, office or home space, hotel meeting room rentals, etc.  Herbalife bears no part of these expenses, regardless of the profit to Herbalife.

21.     Additionally, Herbalife Distributors make sales of "Distributor Kits" and literature for Herbalife for which they receive no compensation.  As royalties are paid only on certain items, sales of non-

EXHIBIT   A   PAGE   6

royalty items are profit to the company, but earn no profit to the Distributor.

22.     Distributors, Herbalife proclaims, earn money by making retail sales to "all those persons with whom they come into contact."  Additionally, Distributors "who sponsor others into their specific Distributor network can earn royalty override bonuses based on the individual sales of the persons that they have sponsored."

23.     In addition to income from personal retail sales, and royalties from sales of others sponsored by the Distributor, Distributors also receive "bonus" payments tied to a complex system of tiered production levels.

> ### 2.     The Reality: Herbalife Arbitrarily and In Violation Of Its Own Rules Takes Away Earned Income.

24.     Despite these representations, after a Distributor has attained some success, quit other employment and has received some large royalty and bonus checks, Herbalife has a pattern and practice of arbitrarily and capriciously taking away income from its Distributors and withholding it, or redistributing that income to other persons more favored within the organization.

25.     Herbalife also has a pattern and practice of arbitrarily reducing checks without explanation and then refusing to account for the deficiencies.  Herbalife's accounting is so confusing and unexplained that a Distributor never has all the information needed to determine whether he or she has been paid as promised. This purposeful lack of access to information give Herbalife the ability to arbitrarily withhold income.

> ### 3.     Herbalife's Stated Organizational Structure.

26.     Herbalife also promises that "[e]ach and every Distributor begins in the same position with an equal opportunity for success and advancement.

> ### 4.     Herbalife's Actual Organizational Structure.

27.     Despite this outward protestation of a meritocracy, the truth is that not all Herbalife Distributors are created equal.  In reality, Herbalife is a dictatorship run by its founder and a small group of favored sycophants.  As demonstrated by what happened to these Plaintiffs, and as they have observed

EXHIBIT_____A_____PAGE____7

happen to others, Plaintiffs now know that the chosen few are allowed to violate the stated rules and are given favored treatment.

### 5.    The Herbalife Rules.

#### a.    Rules Regarding Married Couples.

28.    Married couples who wish to be Distributors must work under the same Sponsor, and cannot sponsor each other.  If Distributors marry each other, one must relinquish his or her distributorship, unless either Spouse has achieved "Supervisor" status, in which case, each may maintain their separate distributorship in the original line of Sponsorship.

29.    Any Herbalife Distributor may resign at any time by submitting his or her notarized resignation letter to Herbalife  headquarters.  At relevant times herein, Distributors were told that he or she must wait six months before re-applying for another Herbalife Distributorship under any Sponsor other than the original Sponsor.  Herbalife later increased the six month requirement to twelve months.

#### b.    The Reality: The Rules Are Bent or Broken To Favor Certain Sponsors.

30.    Despite these written rules, and even if Distributors follow these rules, as demonstrated by what happened to these Plaintiffs, the rules are broken in order to benefit certain favorite sponsors at the expense of Distributors who suffer the misfortune of being targeted by the favorite few.

#### c.    The Rules Barring Unfair Sales Practices.

31.    Rule 8 of the Rules of Conduct for Herbalife Distributors provides that:

> No Distributor shall attempt to induce any other Herbalife Distributor, whom he does not personally sponsor, to sell Herbalife products.  The purpose of the rule is to ensure that the rights of other Sponsors are honored at all times.

#### d.    The Reality: These Rules Are Ignored When It Benefits The Favored Few.

32.    Despite these written rules, demonstrated by what happened to violating Distributors under one of these Plaintiffs, if certain Distributors break these rules, the violations are ignored if enforcing the rules would result in less income for favorite sponsors -- even though the failure to enforce the rules resulted in a

-- Page 6

EXHIBIT   A   PAGE   8

huge income loss to Plaintiff.

e.   **Herbalife Promises Due Process Prior To Cutting A Distributor's Income**.

33.   Rule 13 of the Rules of Conduct for Herbalife Distributors provides that:

Every Distributor has the duty and responsibility to investigate and properly report any and all violations of the Distributor Rules of Conduct.

34.   The Herbalife Enforcement Procedures provide a "step-by step summary of the methods by which Herbalife Distributors may deal with violations of the Rules of Conduct.

Step 1. Upon learning of a violation, a Distributor should inform the violator of the appropriate section in the Rules of Conduct and discuss the matter with him. Point out the purpose behind the particular rule. Be sure that the alleged violator knows how his conduct broke the rule and what the proper conduct should have been. Most violations are due to a lack of understanding; a discussion usually settles the matter.
If the violator understands the rule and agrees to comply, then is not necessary to inform the Company of the violation. However, a Distributor should always ensure that his Supervisor is aware of the problem.

Step 2. If the alleged violator shows by word or conduct that he is unwilling or refuses to cooperate, then the Distributor should send a letter to the company stating the nature of the complaint; names, addresses, and telephone numbers of all persons involved; dates; times; places; etc. The letter must be signed by the Distributor(s) reporting the violation. Anonymous complaints cannot be made the basis for disciplinary action.
After the letter has been mailed, the Distributor should maintain contact with the violator and report any changes in the situation. The utmost care must be taken to ensure that the complaint is accurate and truthful -- knowingly making a false complaint is a violation of the Rules of Conduct. The Company considers all complaint information to be strictly confidential.

Step 3. When the complaint is received by the Company, it will be handled accordingly to set Company procedures. All parties will be afforded the opportunity to present evidence and argument in writing to the Company. No decision will be rendered until all parties have been notified and an opportunity to appeal the fairness of the decisions has been made available. Although the Company bears the primary responsibility for enforcement of the Rules of Conduct, Supervisors and occasionally Sponsor may be called upon to implement and enforce these decisions.

f.   **The Reality: Herbalife Denies Due Process When It Suits It**.

EXHIBIT____A____PAGE____9

Despite this outwardly fair facade, as demonstrated by what happened to these Plaintiffs, Herbalife does not offer due process when it targets disfavored Distributors to advantage favored Distributors. In fact, on at least one occasion, Herbalife conducted a secret, damaging and rumor filled investigation, then withheld income and forced a Distributor out of business, without so much as a chance to explain, much less the process described above.

        6.     The Real Rules: Whatever Herbalife Wants At The Moment.

35.    Despite these Rules, as demonstrated by what happened to these Plaintiffs and others, Herbalife, has a pattern of either ignoring them, or making up new ones, in order to withhold income, and/or redistribute income to other persons more favored within the organization. As demonstrated by testimony given by Founder Mark Hughes in a recent deposition taken on November 29, 1995, in Los Angeles, California, Herbalife also has unwritten rules it enforces at will without notice.

36.    Herbalife is no doubt aware that giving large rewards and fast dollars generates loyalty. Apparently, however, even that promise is not enough to generate the kind of control over its Distributors Herbalife insists upon. Plaintiffs have information that makes them believe that, on many occasions, Herbalife has exercised its power to turn off a Distributors' income stream, and/or significantly reduce it, to force successful Distributors to bend to its will, whether or not Herbalife's demand is within Herbalife's stated rules or policies. Herbalife uses this coercion tactic to gain a level of control over its Distributors not afforded by its contractual rights.

37.    In one example of this coercive control, a Southern California Distributor's income was terminated when she began to generate income from selling direct mail literature to her down line Distributors. There is no Herbalife Rule preventing the sale of literature which does not use the Herbalife name or trademarks.

38.    Favoritism also results in broken rules. Herbalife represents that it will now allow Distributors to sell into foreign countries which are not yet "open" by Herbalife. The truth is that, on at least

-- Page 8

one occasion, it has allowed a favored Distributorship, John and Susan Peterson, to sell and establish Distributorship in an unopened country, Mexico, prior to allowing competition by any other Distributors. This favoritism allowed the Petersons to gain an immense advantage and a much greater income than the normal Distributor who was bound by the no-selling limitation.

39.   While the favored prosper, the disfavored suffer.  In one instance, one Texas million dollar distributor was terminated when he began to sell competing products.  Another Southern California distributor was terminated when her husband began to sell competing products.  Yet, as described herein, Herbalife has also chosen to turn a blind eye to identical behavior when it benefited the favored.  Plaintiffs are currently investigating other such examples of disparate treatment among Distributors.

C.   The Fallows Join Herbalife.

1.   Mary And Dan Become a Distributorship.

40.   On or about April 13, 1984, Dan Fallow, Clint's Father, and Mary Fallow, while residents of Mesa, Arizona, signed an   "Application for Distributorship", No. 545212,   with Herbalife under the Sponsorship of favored John O. Peterson of Harris County, Texas.

41.   In 1984, the Fallows lived Herbalife, working seven days a week and 12 hour days.  Their activities included: paying all their own expenses, advertising for Distributors by distributing flyers on car and telephone poles, posting notices in grocery stores, laundries, placing advertisements in the newspaper, handling calls from people interested in the product or becoming Distributors, setting up to twenty appointments a day with potential Distributors in their home, selling the product retail, holding sales training and motivational meetings three times a week with people who had become Distributors, holding meetings in rented hotel rooms at which as many as 500 people would attend on the weekends, following up on referrals, and having their house constantly filled with people.

42.   That first year, the Fallows earned as much as $30,000 a month and more than $300,000 for the year.

-- Page 9

EXHIBIT A   PAGE 11

43.   However, the second year Herbalife experienced problems with the FDA which Herbalife represented as the FDA's insistence that Herbalife change its labeling.  Herbalife refused and instead instituted suit against the FDA.  The negative publicity surrounding the fight made it extremely difficult for the Fallows, despite constant effort.  Hotel meetings which had previously been attended by as many as 500 people now dwindled.  The Fallows paid for and held a few meetings where no one came.  Their income plummeted from $30,000 a months to $30,000 for the entire second year.  The Fallows lost their home, their credit rating and their security.

44.   Rather than leave the organization as others began to do, the Fallows remained committed.  They agreed to move to Colorado for six months and then to Mexico for six months to follow better markets.  Sales and Distributorship were much more difficult, but the Fallows persisted and began to rebuild.

45.   It was in Mexico that the Fallows first noticed how  favoritism ran Herbalife.  Although the Mexican market was not officially "open" to Herbalife Distributors, Herbalife allowed the favored John and Susan Peterson to sell and establish Distributorship in advance of allowing competition from other Distributors.  Before any other Distributor could make sales, the Petersons were sending product by the plane full to Mexico.

2.   Dan and Mary Divorce, Dan Resigns, His Distributorship Ends, and the Distributorship Becomes Mary's Alone.

46.   As a result of suffering injuries in an automobile accident, on or about March 21, 1988, Dan Fallow sent Herbalife headquarters a notarized letter and resigned his distributorship with Herbalife.

47.   On or about January 16, 1989, Dan and Mary Fallow received a decree of divorce.  The Fallows and Herbalife agreed that the Distributorship was to belong to Mary Fallow alone.

48.   Herbalife confirmed that the Distributorship had been reassigned to Mary Fallow alone.

49.   Dan then met the stated Herbalife requirements for inactive Distributorship, severing himself from his former sponsor, the favored John and Susan Peterson.  For at least the next twelve months after this resignation, Dan Fallow was inactive in the Herbalife business.  He did not become a Distributor  He did not

-- Page 10

participate in any way in the operation, training, selling or recruiting of Mary Fallow's or any other Herbalife Distributorship.

**D.**    <u>Dan's Son, Clint S. Fallow Joins Herbalife</u>.

50.    Dan's son, Clint had recently gotten out of the Armed Forces. Impressed by the success in Herbalife of Dan and Mary, on or about April 25, 1992, while living in Tempe, Arizona, Clint Fallow applied for and became an Herbalife Distributor. Warned away from Sponsorship of John and Susan Peterson by Dan joined under the sponsorship of David J. Peterman of Spokane Washington.

51.    There is no Herbalife rule which requires the son of a former Distributor to sign with any particular sponsor. Clint, on Dan's advice, chose the sponsorship of David Peterman.

52.    At the time Clint Fallow applied for Distributorship, his father, Dan Fallow was not an Herbalife Distributor.

53.    Clint Fallow followed the Rules to become a Distributor. He paid for and received his Distributor kit. On April 28, 1992, Herbalife sent Clint Fallow an Herbalife Distributor Processor Notice welcoming him to Distributorship.

54.    In paragraph 6 of that Application, Herbalife represented that if a Distributor fails to comply with the terms of this agreement, Herbalife may revoke this Distributorship. There is no provision allowing Herbalife to revoke or terminate a Distributorship for any other reason.

55.    Clint Fallow's sponsor, Dave Peterman, trained and assisted Clint Fallow in establishing and developing his Herbalife Distributorship. Clint Fallow threw himself into the business and sold Herbalife product in Arizona and signed up new Distributors under his sponsorship. Clint Fallow achieved the advanced level of Herbalife "Supervisor."

56.    Thereafter, Peterman discussed opportunities in Germany with Clint Fallow. Another Distributor had recently relocated there and was very successful. Clint had been in the service there and believed he could build Distributors. However, Clint also wanted to return to college and finish his education.

57.     When Clint was unable to travel to Germany, Peterman invited Dan Fallow on the trip. Dan Fallow agreed to go to assist Clint. Thereafter, Dan Fallow began to assist his son in the German and later European part of Clint's Distributorship. Dan did not then re-apply to be a Distributor. Instead, he worked solely as an agent of his son.

58.     Upon information and belief, Herbalife was then aware of Dan Fallow's assistance to his son. Dan and Clint were open about the arrangement and explained it to every Distributor they signed up. It was also made public knowledge at the Barcelona Extravaganza Herbalife convention in early 1993.

59.     Despite this awareness, during the time Clint was building his Distributorship with Dan's assistance, in 1992, 1993 and the first half of 1994, Herbalife never objected. Herbalife never suggested that Dan's assistance to Clint would or could affect Clint's right to payment.

60.     The German/European part of Distributorship was extremely successful, resulting in income of $7,000 to $8,000 to Clint per month throughout 1993. Perhaps the Distributorship was too successful, as it then caught the eye of the favored John and Susan Peterson.

61.     In 1994, favored Distributors John or Susan Peterson, the Sponsors of Mary Fallow and former sponsor of Dan Fallow, sent in certified letters to Herbalife and complained to Herbalife that Clint Fallow's Distributorship should somehow be credited to them, and not to Clint's sponsor, David J. Peterman.

62.     In the spring of 1994, Herbalife then conducted an unprecedented "investigation" of Clint Fallow's Distributorship -- ignoring its own rules of due process. During that investigation, Herbalife contacted several of Clint Fallow's down line Distributors and Supervisors, spreading rumors and implying that Clint was guilty of wrongdoing. The campaign damaged the relationship between Clint Fallow and those persons, upset Clint's Distributors, and resulted in a significant decline of business and loss of income.

63.     As a result of this campaign of misinformation, royalties to Clint Fallow from the German/European part of the Distributorship declined to approximately $1,000 a month.

64.     On or about July 6, 1994, Herbalife wrote to Clint Fallow and informed him that his

-- Page 12

distributorship "was in fact a distributorship of Dan Fallow, former husband of Mary Fallow" and required to be under the sponsor, John Peterson." As a result of this determination, Herbalife transferred the Distributorship of Clint Fallow and the lineage developed under that Distributorship to John Peterson. Herbalife further determined that approximately $79,371.97 would be deducted from the earnings of the Clint Fallow Distributorship to repay John Peterson for adjusted "Royalty Override and Production Bonus Adjustments." By the time Herbalife transferred part of Clint's income to the Petersons, Clint's income was down to approximately $1,000 a month. The Petersons are believed to have been making as much as $175,000 a month.

65. Prior to this determination, and contrary to the Step 1 of the Herbalife Enforcement Procedures, neither Herbalife or John Peterson made any attempt to contact or discuss the matter with Clint or Dan Fallow, or inform them that anyone believed a Rule was being broken.

66. Prior to this determination, and contrary to Step 3 of the Herbalife Enforcement Procedures, Clint Fallow was not "afforded the opportunity to present evidence and argument in writing to the Company" or an "opportunity to appeal the fairness of the decision" prior to the time this decision was rendered.

67. This summary "termination" of Clint Fallow's Distributorship was totally unjustified by Herbalife's Rules or policy. It was in direct contravention of Clint's Fallows rights as a Distributor and Herbalife's representations which induced Clint Fallow to begin and build his Distributorship.

68. Nothing in Herbalife's Rules, literature or memoranda provided to Clint Fallow prohibited him from using agents to assist him. To the contrary, Herbalife went to great lengths to inform its Distributors that they are "independent contractors" and not employees, with freedom to run "their own business."

69. At the time Herbalife made this determination, it had no rule or policy which required the son of a former Distributor (who had previously resigned his Distributorship) to become a Distributor under the original sponsor of his father or under the sponsorship of his father's wife who was no blood relation to him.

70. Just as there was no reason to bind Clint Fallow to sponsorship under the Petersons, there

EXHIBIT ___A___ PAGE ___15___

was no reason to bind even Dan Fallow to sponsorship under the Petersons.   Under the then operative Herbalife Rules, once Dan Fallow resigned from Herbalife in 1988, divorced, and then waited more than two years becoming active again in Herbalife, Dan Fallow had the right to re-apply as a Distributor under a new sponsor, different from Peterson.  Dan Fallow's past relationship with Herbalife was not grounds for "taking" Clint Fallow's Distributorship.

71.   At the time Herbalife made this determination, Herbalife also had no rule or policy which prevented a Herbalife Distributor from using a former Distributor to assist him in his business, or which would cause the Distributor to lose his Distributorship as a result of that assistance.

72.   Herbalife's arbitrary and sudden taking of Clint Fallow's Distributorship was so without precedent and unprincipled that it apparently confused even Herbalife.

73.   Herbalife first informed Clint that it would take only half of his check to send to the Petersons.  However, it withheld entire checks or sent checks for a lesser amount without explanation.

74.   In 1994 and 1995, after Herbalife officially determined that Clint had no Distributorship because it belonged to Dan, Clint Fallow continued to operate the Arizona portion of his Distributorship.  Herbalife sent Clint letters recognizing his right to operate his Distributorship -- at the same time they withheld moneys to send to the Petersons.

75.   Dan and Clint also continued work on the German/European part of Clint's Distributorship.  In early 1995, through persistent effort, Dan Fallow and a Danish Distributor were able to revive a portion of the German/European part of the Distributorship and increase the royalties and bonuses back up to $15,000 a month (which were sent to the Petersons).  But for Herbalife's actions, the value of the German/European part of the Distributorship would have continued to increase.

76.   In 1995, the Fallows hired an attorney to investigate and restore their rights.  In response to this inquiry, Herbalife began to manufacture reasons to cut the Fallow's income.  Inconsistent with its determination that Clint Fallow's Distributorship had been reassigned to Peterson, and was no longer held by

-- Page 14

Clint (or Dan, who was not recognized as having any Distributorship), Herbalife sent a notice to Dan Fallow, at his address, that the Distributorship had not generated enough sales volume to qualify for "Supervisor Status", preferred treatment and greater payments. Mary Fallow received a similar letter regarding her Distributorship. If Herbalife had treated the two entities as one Distributorship, as it claimed it was required to do, both would have been entitled to preferred treatment and greater payments.

77.     Throughout 1995, Herbalife continued their schizophrenic treatment of Clint, deducting payments while recognizing his Distributorship --at both his and Dan's address. Although Herbalife claimed that Clint's Distributorship was in fact Dan's, Clint's name and Distributor ID number were never deleted from the Herbalife Distributor list. Clint's Distributorship was never transferred to Dan's social security number, but remained under Clint's number. On or about February 26, 1995, Mark Hughes, Founder and President of Herbalife sent Clint Fallow, a letter recognizing that he had "re-qualified as an Herbalife Supervisor." In October of 1995, Herbalife sent another letter to "C.S. Fallow" at Dan's address, informing him that the Distributorship needed to re-qualify to be considered a supervisor and was in danger of losing all of his down-line organization. To avoid this loss, the Distributorship was forced to buy a large amount of product to again re-qualify.

78.     Events continued to turn for the worse. In the spring of 1995, Herbalife stopped purporting to offset the royalty checks against the moneys purportedly owed to Peterson, and upon information and belief, the distributorship was transferred to Peterson directly. This transfer is in direct contravention of Herbalife rules which provide that any deleted Distributorship is to be merged with the old line, (in this case that of Mary Fallow) rather than given directly to Fallow's sponsor, the favored John Peterson. Upon information and belief, this departure from Herbalife rules was done to benefit John Peterson at the expense of the Fallows.

79.     Simultaneously, Peterson and his wife had contacted some of Clint Fallow's European Distributors and have continued to harm the growth of the German/ European part of the Distributorship.

EXHIBIT___A___PAGE___17

Through a conference call arranged by Herbalife in July of 1994 (at which neither Clint or Dan Fallow were allowed to participate), and through other contacts, the Petersons informed the Distributors that Clint Fallow was no longer their Sponsor, but that they would report to the Petersons. The Petersons stated or implied that Dan or Clint Fallow, or Clint's sponsor, Dave Peterman were guilty of wrongdoing which had necessitated the change in sponsorship. This announcement caused Distributors, who did not wish to be associated with the taint of wrongdoing, to quit Herbalife.

80.     The Petersons further damaged the business when they began implementing a new authoritarian and condescending management style which was not well received. The Petersons humiliated and alienated Distributors, who then left Herbalife.

81.     Despite all efforts to rebuild, Herbalife's diversion of Clint's income proved disastrous. Clint Fallow was unable to maintain the cash flow necessary to purchase the volume of product necessary to keep the Distributorship producing at its prior levels. A drop in production meant an exponential drop in income. As a result, Clint Fallow lost considerable production and income.

82.     Eventually the problems became too much for Clint to overcome. He lost his town home, his credit rating, and his VA loan eligibility. His possessions were put into storage. He later lost them too when he could no longer pay to store them.

83.     To date, Clint Fallow's damages, not including the present value of his future royalty income stream and the damage to the growth of that future royalty income stream, are in an amount exceeding $356,000. His lifetime earnings would have exceeded $3,600,000.

**B.     Facts Relating To the Claims of Mary Fallow**

84.     As discussed above, Mary and Dan Fallow began their Distributorship in 1984, operating in Maricopa County Arizona for the first three years. As discussed above, Mary and Dan parted, and the Distributorship became hers alone.

85.     Mary's "sponsor" for her Distributorship was John O. Peterson then residing in Houston,

-- Page 16

Texas and now residing in Denver, Colorado.

86.    While an Herbalife Distributor, Mary sponsored the Distributorship of a couple, Tonni and Jay Riley, then residents of Maricopa County, Arizona.   Tonni Riley, then Tonni Lukavics, signed a Distributorship contract with Herbalife which named the Fallows as her "sponsors" and "supervisors" or third party beneficiaries of that contract.   Tonni Riley later married Jay Riley and her joined her in the Distributorship.  At all times relevant herein, the Rileys were acting on behalf of, and as agents for each other and for their marital community.

87.    On or about 1990, Tonni and Jay Riley began violating Herbalife Rule in two ways: (1) by "cross-sponsoring" persons in Herbalife in violation of Rule 8 of the Rules of Conduct; and (2) by trying to recruit other Distributors in Mary Fallow's Distributorship to another competitive organization selling diet and nutrition products called "Genesis 2000."  Upon information and belief, the Rileys developed, marketed and distributed the Genesis 2000 products.

88.    Herbalife's long-standing and continuing practice had been to sanction such behavior by deleting the violator's interest in their Distributorship and transferring the interest to the violator's immediate sponsor.

89.    However, when Herbalife learned of the Riley's actions in cross sponsoring, Herbalife merely withheld the Riley's royalty checks until the Riley's promised to stop their violations.  Herbalife then resumed payment to the Rileys.  This departure from policy cannot be understood, except for the fact that the Riley's presence was extremely profitable to the Petersons.

90.    Almost immediately after promising to behave, the Riley's started a rival enterprise called Genesis 2000 Company and recruited persons in Mary Fallow's Distributorship.

91.    On our about March 24, 1992, Mary Fallow caused a letter to be sent to Herbalife, detailing the complaints about the Rileys, (and attaching inconvertible evidence of the Riley's defection, a flyer with a photograph and testimonial by the Rileys promoting Genesis 2000) and asking that the Riley's distributorship

EXHIBIT____A____PAGE____19

be canceled and reassigned to Mary Fallow as was then Herbalife's established policy.

92.    Despite the complaint and evidence, in contravention of Herbalife policy, Herbalife took no action other than to harass Mary in subtle ways.

93.    Herbalife began to take strange and unexplained deductions from Mary's check. When she attempted to get relief, no one at Herbalife would return her telephone calls.

94.    Mary's financial losses were horrendous. From 1992 through January of 1995, Herbalife's failure to delete the Riley's interest in their distributorship caused Mary Fallow to lose approximately $3,240,000 in monthly royalties and bonuses to date (which was diverted to the favored Petersons), and lifetime earning exceeding $12,000,000.

95.    From June of 1991 to January of 1992, Mary lost monthly royalties of approximately $17,000 a month for a total of $119,000. From January of 1992 to September of 1995, Mary lost monthly royalties of $18,000 a month for those 44 months for a total of $710,000. But for the Rileys, her "Infinite Level Bonuses" for 1992 would have been $284,000; $800,000 for 1993 and 1994, and $185,000 for 1995. But for the Rileys, her year end bonuses would have been $200,000 for 1993 and $100,000 for 1994.

C.    Facts Relating To the Claims of Dan Fallow

96.    At about this time, Dan Fallow discovered that Herbalife had an unwanted competitor in Europe who claimed to own the right to use the Herbalife name in certain countries. Fallow informed Herbalife that this competitor proposed to produce a knock-off product and label it identically or almost identically to Herbalife. At the time, Herbalife estimated that the competitor could cost it tens of millions of dollars.

97.    Herbalife was understandably looking for a way to shut this operation down and was willing to use unethical means to accomplish this. Herbalife, through its "safety and security department", which was in reality a dirty tricks department designed to solve business problems outside of legal channels, resolved to stop the competitor.

EXHIBIT____A____ PAGE 20

98.   Herbalife proposed to set up a phony manufacturer of products, approach the competitor and induce it to make a large order.  Herbalife would then simply keep the money and never deliver product, driving the competitor out of business.

99.   In 1994, Herbalife began to pressure Dan Fallow to assist it in shutting down the competitor. In early September, faced with huge losses to Clint and Mary, and coerced with the threat that these losses would continue unless he cooperated, Dan Fallow agreed to pose as the phony manufacturer and gather intelligence about the competitor.

100.   At the direction of David Addis, Herbalife's head counsel, and Bill Gillespie, its Director of Security, and with Herbalife funding, Dan Fallow traveled to Europe and began the operation.

101.   As conditions of Dan Fallow's coerced cooperation, Herbalife promised to pay him time and expenses, to enforce its policy regarding Distributors Tonni and Jay Riley, rolling up their royalties to Mary Fallow, and to reinstate Clint's Distributorship, and/or restore the lost moneys in the form of a bonus.

102.   During its investigation of the competitor, Herbalife learned that the Herbalife product in Russia was controlled by the Russian Mafia, and that organization could prevent any legitimate Herbalife operations in Russia without payment to the Mafia.  Herbalife pressured Dan Fallow to contact the Russian Mafia and gain its permission for product distribution, paying the Mafia if necessary, and/or using the Mafia to put the competitor out of business "quietly."  Although Dan Fallow feared for his life and asked Herbalife to provide protection for him, it refused to do so.

103.   Herbalife also asked Dan Fallow to work with a U.S. products manufacturer believed to be supplying knock off product.  Fallow was able to catch the manufacturer in damaging admissions which formed the basis for a lawsuit which neutralized the manufacturer's threat.  In that lawsuit, Herbalife's counsel drafted an affidavit for Dan Fallow to sign, without allowing Fallow an opportunity to add clarification to the statements.  Herbalife then used the affidavit to its advantage in the suit.

104.   After Dan Fallow traveled all over Europe for Herbalife, risked his life, and posed as its front

-- Page 19

man in this distasteful scheme, and signed Herbalife's affidavit, Herbalife broke its promises. Herbalife paid Dan Fallow for his time and expenses only until it no longer needed him. After Fallow ceased to be useful, Herbalife refused to pay time or expenses. It did not enforce its policy with regard to the Rileys Distributorship, or "roll up" those and the attached down-line royalties to Mary Fallow, or restore the lost moneys to Clint, in contravention of their agreement with Dan Fallow.

## III. CAUSES OF ACTION

### COUNT ONE
### BY CLINT FALLOW AGAINST HERBALIFE FOR
### BREACH OF CONTRACT

105. Plaintiff Clint Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

106. Herbalife and Clint Fallow entered into a contract in 1992 whereby Clint Fallow would act as a Distributor for Herbalife and Herbalife would compensate him as detailed above. At all times relevant herein, Clint Fallow performed all which was required of him under his contract with Herbalife to the mutual profit and satisfaction of both parties.

107. Herbalife additionally promised that if Clint Fallow followed the Herbalife Rules, his Distributorship would not be revoked and that he would be able to maximize his income, limited only by his own individual effort.

108. Herbalife additionally promised that prior to taking action against any Distributorship, it would follow the due process procedure set forth above.

109. Herbalife additionally promised that Clint Fallow would be allowed to run his own business, and that all Distributors would be treated equally.

110. Herbalife breached its contract with Clint Fallow in that it did not pay him as promised, did not allow him to maximize his income, withheld income arbitrarily, revoked his Distributorship even though he had followed all applicable Rules, conducted an "investigation" in violation of its own rules which

EXHIBIT____A____ PAGE 22

damaged Clint, revoked his Distributorship without the promised due process, interfered with his ability to run his own business, and failed to treat him equally with other Distributors.

111.    As a result of these breaches, Clint Fallow has been damaged in an amount not less than $356,000 in damages accruing to date, and lifetime damages exceeding $3.6 million to be proven at trial.

### COUNT TWO
### BY CLINT FALLOW AGAINST HERBALIFE FOR
### QUANTUM MERUIT

112.    Plaintiff Clint Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

113.    At the inducement of Herbalife, Clint Fallow enriched Herbalife by acting as an Herbalife Distributor and by selling product, signing up Distributors and paying expenses relative to that effort.

114.    As a result of this effort, Herbalife has been enriched in an amount not less than $3,600,000 to be proven at trial after discovery.

### COUNT THREE

### BY CLINT FALLOW AGAINST HERBALIFE FOR
### TORTIOUS INTERFERENCE WITH CONTRACT

115.    Plaintiff Clint Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

116.    Herbalife's "investigation" of Clint Fallow's German/ European part of the Distributorship, the severing of his ties to Herbalife, the transfer of his Distributorship to Peterson, and Peterson's subsequent meddling and mismanagement of the same, were all a knowing an intentional interference with Clint Fallow's existing valid contractual relationship and business expectancy with his German and European Distributors. These acts caused the termination of many of those relationships.

117.    As a result of these acts, Clint Fallow has been damaged by the loss of royalty payments, the damage to the German/ European part of the Distributorship, and loss of revenues, in an amount not less than $3,600,000 to be proven at trial.

EXHIBIT____A____PAGE 23

118.   Clint Fallow also suffered further and foreseeable damages as a result of Herbalife's conduct, including the loss of his house, car, credit rating, VA eligibility and possessions in an amount not less than $30,000 to be proven at trial.

### COUNT FOUR
### BY MARY FALLOW AGAINST HERBALIFE
### FOR BREACH OF CONTRACT

119.   Plaintiff Mary Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

120.   Herbalife and Mary Fallow entered into a contract in 1984 whereby Mary Fallow would act as a Distributor for Herbalife and Herbalife would compensate her as detailed above.  At all times relevant herein, Mary Fallow performed all which was required of her under her contract with Herbalife to the mutual profit and satisfaction of both parties.

121.   In that contract, Herbalife promised Mary Fallow that it would follow its own rules and delete offending Distributorship, and transfer the deleted Distributorship and its lineage to the immediate supervisor. Herbalife breached that contract when it failed to delete the Distributorship of Tonni and Jay Riley and allowed the Riley's to damage and interfere with Mary Fallow's Distributorship.

122.   As a result of that breach, Mary Fallow has been damaged in an amount no less than $12,000,000 to be determined at the time of trial.

### COUNT FIVE
### BY MARY FALLOW AGAINST HERBALIFE
### FOR BREACH OF CONTRACT AS THIRD PARTY BENEFICIARY

123.   Plaintiff Mary Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

124.   In 1994, Dan Fallow and Herbalife entered into a contract for the benefit of Mary Fallow. Dan agreed to perform certain services for Herbalife and in return, Herbalife was to delete the Riley Distributorship and assign the lineage to Mary Fallow.  Dan Fallow performed the agreed upon services.

EXHIBIT____A____PAGE__24

Rileys efforts.

133.    The Rileys breached that contract when they solicited persons to leave Mary's Distributorship and to join a rival multi-level organization and used of confidential information and/or trade secrets in order to accomplish that interference.

134.    The Rileys were contractually bound to refrain from such actions.

135.    As a result of the breach, Distributors left Mary's organization, damaging Mary in an amount to be proven at trial.

**COUNT EIGHT**
**BY DAN FALLOW AGAINST HERBALIFE**
**FOR BREACH OF CONTRACT**

136.    Plaintiff Dan Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

137.    Dan Fallow had a contract with Herbalife in which Herbalife agreed to pay Fallow a salary and reimburse expenses, delete the Riley Distributorship and "roll up" the income to Mary Fallow, and return moneys to Clint Fallow, in return for Fallow's services in investigation and shutting down a competitor.

138.    Although Fallow fully performed those services, Herbalife breached in that it did not pay, delete the Riley Distributorship or restore moneys to Clint.

139.    As a result of this conduct, Dan Fallow has been damaged in an amount to be determined at trial.

**COUNT NINE**
**BY DAN FALLOW AGAINST HERBALIFE**
**FOR QUANTUM MERUIT**

140.    Plaintiff Dan Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

141.    At the inducement of Herbalife, Dan Fallow enriched Herbalife by investigating and shutting down its competitor.

-- Page 24

142.   As a result of this effort, Herbalife has been enriched in an amount exceeding $10,000,000 to be proven at trial after discovery.

## COUNT TEN
### BY ALL PLAINTIFF AGAINST HERBALIFE
### FOR RACKETEERING UNDER AZRAC

143.   Plaintiffs reallege each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

144.   Herbalife committed racketeering as defined by A.R.S. § 13-2314.04 through the predicate acts of a scheme or artifice to defraud and a theft of services as defined by A.R.S. § 12301(D)(4)(e) and (t).

145.   Herbalife committed a theft of services as defined by A.R.S. § 13-802, on these plaintiffs and others, when it induced them to become Distributors, sell product, and induce others to become Distributors, with the representation that they would be paid, could conduct their own business, and that Herbalife would adhere by its rules and procedures.

146.   Herbalife committed a scheme or artifice to defraud these plaintiffs and others as defined by A.R.S. § 13-2310 when it knowingly obtained a benefit by means of false or fraudulent pretenses, representations promises or material omissions.  Herbalife represented Distributors would be paid, could conduct their own business, and that Herbalife would adhere by its rules and procedures.  That representation was false in that Herbalife had no intention of paying all that was owed and promised, allowing the Distributors to conduct their own business, or abide by the Herbalife rules and procedures.

147.   That representation was material in that it induced plaintiffs and others to become Distributors and expend significant moneys and effort in doing so.  Herbalife intended that plaintiffs and others rely upon these false representations.

148.   As a result of this conduct, plaintiffs were damaged as described herein in that they were not paid as promised, and they provided services to Herbalife and incurred expenses which they were not compensated and are entitled to treble damages.

EXHIBIT____A____PAGE____26

## COUNT ELEVEN

### BY ALL PLAINTIFF AGAINST HERBALIFE
### FOR PUNITIVE DAMAGES

149.    Plaintiffs reallege each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

150.    Herbalife is liable for punitive damages on Plaintiffs' First through Tenth Count in that it willfully and maliciously damaged these Plaintiffs and should be punished for such behavior in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs request a trial by jury and pray for judgment against Defendant Herbalife as follows:

1.    On his First and Second Causes of Action, Clint Fallow asks for damages against Herbalife in an amount exceeding $3,600,000, in an amount to be proven at trial;

2.    On his Third Cause of Action for damages, Clint Fallow request damages against Herbalife in an amount to be proven at trial;

3.    On her Fourth Cause of Action, Mary Fallow asks for damages against Herbalife in an amount exceeding $12,000,000 to be proven at trial;

4.    On her Fifth Cause of Action, Mary Fallow asks for damages in against Herbalife in an amount exceeding $3,200,000 plus punitive damages to be proven at trial;

5.    On her Sixth and Seventh Causes of Action, Mary Fallow asks for damages against Tonni and Jay Riley jointly and severally and against their marital community in an amount to be proven at trial;;

6.    On her Eighth and Ninth Causes of Action, Dan Fallow asks for damages against Herbalife in an amount to be proven at trial;

7.    On the Tenth cause of action, all Plaintiffs ask for racketeering treble damages against Herbalife;

-- Page 26

8.    On the Eleventh cause of action, all Plaintiffs ask for punitive damages against Herbalife in an amount large enough to deter and punish it for its conduct to be proven at trial;

9.    And on all Causes of Action:

(a) for attorneys fees, costs and expenses

(b) for costs of suit

(c) for such other and further relief as the Court may deem proper.

DATED this _29th_ day of _April_ 1997.

WARNICKE & LITTLER, P.L.C.

By_____
     Ronald E. Warnicke
     Thomas E. Littler
     Mark J. Giunta
     2020 N. Central Ave., Fifth Floor
     Phoenix, Arizona 85004
     Attorneys for Plaintiffs

ORIGINAL of the foregoing mailed
this _29th_ day of February, 1997 to:

Joel P. Hoxie, Esq.
Sarah Chilton, Esq.
SNELL & WILMER, L.L.P.
One Arizona Center
Phoenix, Arizona 85004

Matthew A. Hodel, Esq.
Sean A. O'Brien, Esq.
PAUL, HASTINGS, JANOFSKY & WALKER
695 Town Center Drive, 17th Floor
Costa Mesa, Ca  92626

Christopher Kaup, Esq.
LERCH, MCDANIEL & KAUP, P.C.
3636 North Central Ave., Ste. 990
Phoenix, Arizona 85012

Office of the Attorney General
1275 W Washington
Phoenix, AZ 85007

By _Amy M Duewe_

EXHIBIT___A___ PAGE___28

-- Page 27

# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| CLINT S. FALLOW, MARY LYNN FALLOW, and DANIEL S. FALLOW,<br><br>    Plaintiff,<br><br>    vs.<br><br>HERBALIFE INTERNATIONAL, INC., a Nevada corporation,<br><br>    Defendant<br><br>HERBALIFE INTERNATIONAL, INC., a Nevada corporation and HERBALIFE INTERNATIONAL OF AMERICA, INC., a California corporation,<br><br>            Counterclaimants,<br><br>    vs.<br><br>DANIEL S. FALLOW, CLINT S. FALLOW AND MARY LYNN FALLOW,<br><br>            Counterdefendants. | No.  CV 96-03558<br><br><br>J U D G M E N T |

The jury verdicts and most of the rulings refered to below were made in proceedings before the Honorable William Schafer. After Judge Schafer recused himself, the case was assigned to this Division of the Superior Court. This Court certifies familiarity with the record and determines that the proceedings in this case may be completed without prejudice to the parties as required by Rule 63 of the Arizona Rules of Civil Procedure.

EXHIBIT __B__   PAGE __29.__

## ON THE SUMMARY JUDGEMENT MOTIONS

Motions and cross-motions for summary judgment were filed before Judge Schafer directed towards the various claims in the complaint by plaintiffs/counterdefendants, Clint S. Fallow, Mary Lynn Fallow, and Daniel S. Fallow (hereinafter referred to as "the Fallows" or "Fallow"), and the counterclaim by defendants/counterclaimants Herbalife International, Inc., a Nevada corporation and Herbalife International of America, Inc., a California corporation (hereinafter referred to as "Herbalife"). Judge Schafer considered the materials submitted on behalf of the parties, heard the oral arguments of counsel, and was familiar with the record of proceedings in this matter. He found the parties were entitled to judgment as a matter of law on the claims as stated below.  Therefore,

IT IS ORDERED ENTERING JUDGMENT AS FOLLOWS:

1.    The Motion for Summary Judgment filed by Herbalife on Count 3 (Tortious Interference) of the Amended Complaint is granted. Defendant Herbalife is awarded judgment against plaintiff Clint Fallow on Count 3 of the Complaint.

2.    The Motions for Summary Judgment filed by the Fallows on Counts 4 (Unfair Competition), Count 5 (California Statutory Claims), Count 6 (Tortious Interference) and Count 7 (Nevada Statutory Claims) of Herbalife's Counterclaim are granted. The Fallows are awarded judgment against Herbalife on those counts of the Counterclaim.

## II.    ON THE MOTIONS FOR JUDGMENT AS A MATTER OF LAW

This matter was tried to Judge William Schafer and a jury commencing on October 26, 1998. Plaintiffs/counterdefendants Fallow and defendants/counterclaimants Herbalife presented evidence and rested. Both sides moved for judgment as a matter of law on some counts of the

EXHIBIT____B____ PAGE___30___

Amended Complaint and Counterclaim. Judge Schafer granted the motions as reflected below.

Therefore,

IT IS ORDERED ENTERING JUDGMENT AS FOLLOWS:

1.   Judgment is awarded in favor of Herbalife and against plaintiff, Clint Fallow, on Count 1 (Breach of Contract) and Count 2 (*Quantum Meruit*) of his Amended Complaint and that Clint Fallow take nothing on those counts of the Amended Complaint.

2.   Judgment is awarded in favor of Herbalife and against Mary, Daniel and Clint Fallow on Count 10 of the Amended complaint and on the Fallows' claim for punitive damages and that the Fallows take nothing on that count of the Amended Complaint.

3.   Judgment is awarded in favor of Mary, Daniel and Clint Fallow, and against counterclaimant, Herbalife, on Count 1 (Trademark Infringement), Count 2 (Trademark Infringement), Count 3 (Unfair Competition), Count 9 (Intentional Interference) and Count 10 (Intentional Interference) of the Counterclaim, and that Herbalife take nothing on those counts of the Counterclaim.

**III.   ON HERBALIFE'S REQUEST FOR PERMANENT INJUNCTION**

This Court has reviewed the record and has heard argument on Herbalife's Motion for Permanent Injunctive Relief. This Court notes that Judge Schafer granted the Fallows' motion for judgment as a matter of law against Herbalife on Count 1 (Trademark Infringement), Count 2 (Trademark Infringement), Count 3 (Unfair Competition) of the counterclaim. This ruling by Judge Schafer who saw the testimony at trial amounts to a finding that no legally sufficient evidentiary basis existed for a reasonable jury to find that any of the Fallows committed acts that would entitle Herbalife to damages on the counts that Herbalife uses as the basis for its claim for injunctive relief. Judge Schafer reserved to a later time a determination of whether injunctive relief

EXHIBIT____B____  PAGE___31____

could be granted based upon a lesser showing than would be necessary to recover damages. This Court does not find that the record supports a finding that injunctive relief is appropriate.

IT IS ORDERED ENTERING JUDGMENT denying Herbalife's Motion for Permanent Injunctive Relief.

## IV.   ON THE JURY VERDICTS

This matter was tried to Judge William Schafer and a jury commencing on October 26, 1998. The parties presented their evidence and rested. The jury was instructed by Judge Schafer, and returned its verdicts on November 23, 1998 as follows:

In favor of Mary Fallow on Count 4 (Breach of Contract) of the Amended Complaint in the sum of One Hundred Fifty Thousand Dollars ($150,000.00);

In favor of Mary Fallow on Count 5 (Breach of Contract: Third Party Beneficiary) of the Amended Complaint in the amount of Four Hundred Seventy Thousand Dollars ($470,000.00);

In favor of Daniel Fallow in the sum of Twenty Two Thousand Five Hundred Dollars ($22,500.00) on Count 8 (Breach of Contract) of the Amended Complaint;

In favor of Herbalife of Count 9 (*Quantum Meruit*) of the Amended Complaint;

In favor of Mary Fallow on Count 11 (Breach of Distributorship) of the Counterclaim;

In favor of Herbalife against Clint Fallow on Count 11 (Breach of Distributorship) of the Counterclaim in the amount of One Thousand Dollars ($1,000.00);

In favor of Herbalife and against Daniel Fallow on Count 11 (Breach of Distributorship) of the Counterclaim in the amount of Sixty Thousand Dollars ($60,000.00);

In favor of Mary Fallow and against Herbalife on Count 12 (Declaratory Relief) of the Counterclaim;

In favor of Herbalife and against Clint Fallow on Count 12 (Declaratory Relief) of the

EXHIBIT __B__ PAGE __32__

Counterclaim; and

In favor of Mary, Daniel and Clint Fallow on Herbalife's claim for punitive damages in Count 13 (Punitive Damages) of the Counterclaim. Therefore,

IT IS ORDERED ENTERING JUDGMENT AS FOLLOWS:

1.      Plaintiff, Mary Fallow, shall recover from Defendant Herbalife International, Inc. and Herbalife International of America, Inc. ("Herbalife"), and each of them, the sum of Six Hundred Twenty Thousand Dollars ($620,000.00), together with interest from November 23, 1998 at the rate of ten percent (10%) per annum, until paid in full.

2.      Counterclaimant Herbalife shall recover from Counterdefendant, Clint S. Fallow, the sum of One Thousand Dollars ($1,000.00), together with interest from November 23, 1998 at the rate of ten percent (10%) per annum until paid in full.

3.      Counterclaimant Herbalife shall recover from Counterdefendant, Daniel S. Fallow, the sum of Thirty Seven Thousand Five Hundred Dollars ($37,500.00), the amount of the excess due to Herbalife upon the above verdicts, together with interest from November 23, 1998 at the rate of ten percent (10%) per annum, until paid in full.

4.      Judgment is entered in favor of Mary Fallow and against Herbalife on Count 11 of the counterclaim.

5.      The Court finds and declares with regard to Count 12 of the Counterclaim that Mary Fallow has not breached her agreement with Herbalife and, therefore, Herbalife is obligated immediately to reinstate her to all the rights and privileges to which she is entitled as an Herbalife distributor and to pay her royalties, bonuses and other monies consistent with the terms of the distributorship agreement from and after November 23, 1998.

6.      The Court finds and declares with regard to Count 12 of the Herbalife

EXHIBIT____B____PAGE___33___

counterclaim that C. S. Fallow has breached his agreement with Herbalife, C. S. Fallow is not entitled to the rights and privileges of an Herbalife distributor and Herbalife is not obligated to pay him any additional royalties, bonuses and other monies under the distributorship agreement.

7.    Judgment  is entered in favor of Herbalife and against Dan Fallow on Count 9 (*Quantum Meruit*) of the Complaint and Count 9 is dismissed.

## V.    ON THE VOLUNTARY DISMISSALS

Counts 6 and 7 of the Complaint were voluntarily dismissed by the Fallows before the trial. Count 8 of the Counterclaim was withdrawn by Herbalife before the trial. Therefore,

IT IS ORDERED ENTERING JUDGMENT AS FOLLOWS:

1.    Counts 6 and 7 of the Complaint are dismissed.

2.    Count 8 of the Counterclaim is dismissed.

EXHIBIT___B___ PAGE___34

## VI.   REQUESTS FOR ATTORNEY'S FEES AND COSTS

Both the Fallows and Herbalife have requested attorney's fees because they claim to be the successful party in litigation arising out of contract. A.R.S. § 12-341.01A. In exercising its discretion in determining whether each litigant is a "successful" party and taking into consideration the verdicts, the rulings of Judge Schafer and the record at trial, this Court finds as follows:

1.   Mary Fallow was the successful party in her litigation with Herbalife.

2.   Herbalife was the successful party in its litigation with Dan Fallow.

3.   No party was successful in the litigation between Clint Fallow and Herbalife.

This Court will exercise its discretion further in determining the amount of reasonable attorney's fees after proper applications for attorney's fees have been made.

DATED:   _July 22, 1999_

The Honorable John Foreman
Judge of the Superior Court

# EXHIBIT C

RECEIVED

DEC 17 1999

Paul, Hastings, Janofsky & Walker LLP

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| CLINT S. FALLOW, MARY LYNN FALLOW, and DANIEL S. FALLOW, | No.  CV 96-03558 |
| Plaintiff, | SUPPLEMENTAL JUDGMENT |
| vs. | |
| HERBALIFE INTERNATIONAL, INC., a Nevada corporation, HERBALIFE INTERNATIONAL OF AMERICA, INC., a California corporation, TONNI and JAY RILEY, husband and wife, | |
| Defendants | |
| HERBALIFE INTERNATIONAL, INC., a Nevada corporation and HERBALIFE INTERNATIONAL OF AMERICA, INC., a California corporation, | |
| Counterclaimants, | |
| vs. | |
| DANIEL S. FALLOW, CLINT S. FALLOW AND MARY LYNN FALLOW, | |
| Counterdefendants. | |

This matter having come before the Court on October 29, 1999 on the following Motions and Applications:

1.    Herbalife's Motion for Judgment as a Matter of Law, or Alternatively, for New Trial;

EXHIBIT    C    PAGE    36

2.     Plaintiffs' Motion to Strike Appendices "A" through "H" of Herbalife's Motion for Judgment as a Matter of Law, or Alternatively, for New Trial;

3.     Plaintiff Mary Fallow's Statement of Costs and Herbalife's Objection to Mary Fallow's Statement of Costs;

4.     Application of Mary Fallow for Award of Attorney's Fees and Costs;

5.     Herbalife's Application for Award of Attorney's Fees and Costs against Plaintiff Daniel S. Fallow;

6.     Herbalife's Motion for Reconsideration of Court's Determination that No Party Prevailed as Between Clint Fallow and Herbalife;

7.     Herbalife's Application for Attorney's Fees Against Plaintiff Clint Fallow

8.     Herbalife's application for attorneys fees against all of the Plaintiffs under AZRAC, A.R.S. § 13-2314.04(A);

9.     Herbalife's Motion to Correct Clerical Errors in Judgment Entered on July 22, 1999;

10.    Herbalife's Motion to Partially Reimburse Contempt Fine.

Having heard the arguments of counsel and being familiar with the record of proceedings in this matter, and being fully advised,

IT IS HEREBY ORDERED:

1.     Herbalife's Motion for Judgment as a Matter of Law, or Alternatively, for New Trial is DENIED.

2.     The Plaintiff's Motion to Strike Appendices "A" through "H" of Herbalife's Motion for Judgment as a Matter of Law, or Alternatively, for New Trial is DENIED.

3.     Herbalife's Motion for Reconsideration of Court's Determination that No Party Prevailed as Between Clint Fallow and Herbalife is DENIED.

4.     Herbalife's application for fees and costs against Clint Fallow is DENIED.

5.     Herbalife's Motion to Correct Clerical Errors in Judgment Entered on July 22, 1999 is GRANTED.  The July 22, 1999 Judgment is corrected as follows:

A.     At page 3 lines 7-9, the language *"2. Judgment is awarded in favor of Herbalife and against Mary, Daniel and Clint Fallow on Count 10 of the Amended complaint and on the Fallows' claim for punitive damages and that the Fallows take nothing on that count of the Amended Complaint"* shall be replaced with the following language: "2.

-- Page 2

EXHIBIT___C___ PAGE 37

<u>Judgment is awarded in favor of Herbalife and against Mary, Daniel and Clint</u>
<u>Fallow on Count 10 of the Amended Complaint and on Count 11, the Fallows'</u>
<u>claim for punitive damages, and that the Fallows take nothing on these counts of</u>
<u>the Amended Complaint.</u>"

B.      At page 5 lines 2-3 the language "*In favor of Mary, Daniel and Clint Fallow on*
*Herbalife's claim for punitive damages in Count 13 (punitive damages) of the*
*Counterclaim, therefore*..." shall be replaced with the following language: "<u>In favor of</u>
<u>Mary, Daniel and Clint Fallow on Herbalife's claim for punitive damages.</u>
<u>Therefore, ...</u>"

C.      At page 7, after the language "3. No party was successful in its litigation between
Clint Fallow and Herbalife," the following language shall be added: "<u>4.  Herbalife was</u>
<u>the successful party in its litigation with Mary, Dan and Clint Fallow on Count 10</u>
<u>of the Amended Complaint (racketeering claims asserted under AZRAC) and is</u>
<u>entitled to make application for an award of its reasonable attorneys' fees and costs</u>
<u>pursuant to A.R.S. §13-2314(A).</u>"

6.      Herbalife's Motion to Partially Reimburse Contempt Fine is GRANTED.

7.      Herbalife's application for attorney's fees and costs against Dan Fallow is DENIED.

8.      Herbalife's application for attorney's fees and costs pursuant to A.R.S. §13-2314(A)
against Mary Fallow, Clint Fallow and Dan Fallow is DENIED.

9.      Mary Fallow's application for attorney's fees and costs is GRANTED and the Court
awards $279,000.00 in attorneys' fees and $26,347.10 in costs.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:

That Plaintiff Mary Fallow shall have and recover from Defendant Herbalife International, Inc.
and Herbalife International of America, Inc., and each of them, jointly and severally, the sum of Two
Hundred Seventy Nine Thousand Dollars ($279,000.00) in attorney's fees, and Twenty Six Thousand
Three Hundred Forty Seven Dollars and Ten Cents ($26,347.10) for her costs, together with interest

-- Page 3

EXHIBIT___C___ PAGE  38

both amounts at the rate of ten percent (10%) per annum from the date of this supplemental judgment until paid.

DONE IN OPEN COURT this 22nd day of November, 1999.

<u>JOHN FOREMAN</u>
The Honorable John Foreman
Judge of the Superior Court

APPROVED AS TO FORM:

Ronald E. Warnicke
Thomas E. Littler
WARNICKE & LITTLER, PLC
2020 North Central Avenue
Fifth Floor
Phoenix, Arizona 85004

Joel P. Hoxie
SNELL & WILMER, LLP
One Arizona Center
Phoenix, Arizona 85004-0001

AND

Matthew A. Hodel
Sean A. O'Brien
PAUL, HASTINGS, JANOFSKY &
WALKER, LLP
685 Town Center Drive
Seventeenth Floor
Costa Mesa, California 92626-1924

-- Page 4

EXHIBIT ___C___ PAGE ___39___

# EXHIBIT D

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

CLINT S. FALLOW, et al.,        )
                                )
            Plaintiff,          )
                                )
       vs.                      )     No. CV 96-03558
                                )
HERBALIFE INTERNATIONAL, et al.,)
                                )
          Defendant.            )
_____)

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

### TRIAL

BEFORE:         The Honorable William J. Schafer III
                Superior Court Judge, Presiding

APPEARANCES:    Mr. Thomas E. Littler
                Mr. Ronald E. Warnicke
                Attorneys at Law
                Representing the Plaintiff

                Mr. Matthew A. Hodel
                Mr. Joel P. Hoxie
                Mr. Sean A. O'Brien
                Attorneys at Law
                Representing the Defendant

                                    November 13, 1998
                                    Phoenix, Arizona
                                    1:30 p.m.

COPY

NCRA
MEMBER
Guardians of the Record

Kristin A. Woodall, RPR
Certified Court Reporter

**CLARK CERTIFIED COURT REPORTERS**
REGISTERED PROFESSIONAL REPORTERS
3910 S. RURAL RD. SUITE C • TEMPE, ARIZONA 85282
TELEPHONE (480) 966-3001 • (800) 352-4593
FAX (480) 966-1833 • E-MAIL CCCREPORT@JUNO.COM

Exhibit D
Page 40 of

<pre>
 1                    I N D E X

 2                                                    PAGE

 3    DEPOSITION OF BRUCE PETERS READ                   4

 4    WITNESSES

 5         GUY MECHLEM

 6              Direct Examination by Mr. Littler        5

 7              Voir Dire Examination by Mr. Hoxie      31

 8              Continued Direct Examination by Mr. Littler   43

 9              Cross-Examination by Mr. Hoxie          67

10              Redirect Examination by Mr. Littler     79

11    VIDEOTAPED DEPOSITION OF JEFFREY KICHAVEN PLAYED  89

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

Exhibit    D
Page 41   of

1                    P R O C E E D I N G S

2

3              THE COURT:  Good afternoon.  Everybody found

4    their way back.  Good.  Lawyers are here.  Everybody is here.

5    Mr. Littler?

6              MR. LITTLER:  Thank you, Your Honor.  We're going

7    to read a short portion of the deposition of Bruce Peters.

8              THE COURT:  Any objection?

9              MR. O'BRIEN:  Not if it's the part you admitted

10   and ruled on the objection.  Read page and line numbers, we'll

11   be fine.

12             THE COURT:  That will be fine.  Mr. Littler?

13             MR. O'BRIEN:  Actually, if there were objections.

14             MR. LITTLER:  There were no objections.  No

15   problem.  This is only about 12 minutes.  Mr. Blake Gunn will

16   be reading the part of Bruce Peters.

17             MR. GUNN:  Yes, Your Honor.  I'll do it.

18             MR. LITTLER:  Mr. Hoxie and I have agreed that

19   Mr. Mechlem who's the next witness, he is the accounting

20   expert right back there, we have agreed and stipulated that he

21   may remain in the courtroom during the reading of the

22   deposition of Mr. Peters, and that Mr. Weekly, their

23   accounting expert, may stay in the courtroom during

24   Mr. Mechlem's testimony.

25             THE COURT:  Is Weekly here?

Exhibit D
Page 42 of

1          MR. HOXIE:  He's not here yet.  I think it was a

2   representative from his office, but a guy who's been working

3   on the case, not him personally.

4          MR. LITTLER:  When Mr. Weekly testifies,

5   Mr. Mechlem may remain in the courtroom during his testimony

6   with the exception of Rule 615.

7          THE COURT:  Correct.  Mr. Hoxie?

8          MR. HOXIE:  Yes, Your Honor.

9          THE COURT:  Good.

10          MR. LITTLER:  Go ahead.

11          (Whereupon, the deposition of Bruce Peters was

12   read.)

13          MR. LITTLER:  Your Honor, that ends the reading

14   of the deposition of Bruce Peters.

15          MR. O'BRIEN:  Your Honor, we have two pages total

16   from Mr. Peters' deposition I could utilize, just agree,

17   unless you have an objection?

18          MR. LITTLER:  It's on their clock, Judge.

19          THE COURT:  Do you object?

20          MR. LITTLER:  I don't object.  I just don't want

21   to spend the time.

22          THE COURT:  The time is against O'Brien now.

23          (Whereupon, the deposition of Bruce Peters was

24   read.)

25          MR. O'BRIEN:  Thank you.  I'm done.

CLARK CERTIFIED COURT REPORTERS

Exhibit  D
Page 43  of

1          THE COURT:  Back to you, Mr. Littler.

2          MR. LITTLER:  Thank you, Your Honor.  Nothing

3     more, you're done.  We call Guy Mechlem.

4

5                    GUY MECHLEM,

6     called as a witness herein, having been first duly sworn, was

7     examined and testified as follows:

8

9                    DIRECT EXAMINATION

10    BY MR. LITTLER:

11         Q.   Mr. Mechlem, introduce yourself to our jury.

12         A.   Hello.  My name is Guy Mechlem.

13         Q.   Tell them what your occupation is.

14         A.   Certified public accountant.

15         Q.   How long have you been a certified public

16    accountant?

17         A.   For approximately 10 years.

18         Q.   Where did you go to school?

19         A.   California State University of Sacramento.

20         Q.   Who are you employed by?

21         A.   The firm of Semple and Cooper, CPA.

22         Q.   How long have you been employed by them?

23         A.   Twelve years.

24         Q.   What do you do in the course of your employment

25    at Semple and Cooper?

CLARK CERTIFIED COURT REPORTER

Exhibit  D
Page 44  of

1          A.    Well, I'm a partner at the firm, been a partner

2    for two years.  I have a couple of expertise.  I do damage

3    calculations for litigation business evaluations.  I also do

4    accounting for insurance agencies and construction accounting.

5          Q.    Have you ever testified as an expert witness

6    before?

7          A.    Yes.

8          Q.    And on how many occasions?

9          A.    At arbitration, couple times.  At deposition,

10   five or six times.

11         Q.    What was the nature of your prior experience as

12   an expert witness?

13         A.    Prior to becoming a partner, I worked with one of

14   the other partners in the firm who also specialized in damage

15   analysis, and I was the staff person who worked under that

16   partner.

17         Q.    Okay.  You use the phrase "damage analysis."  Is

18   that part of your regular occupation?

19         A.    Yes.

20         Q.    What does that mean, "damage analysis," in the

21   professional sense?  You do that for a living?

22         A.    Well, I would be considered a forensic accountant

23   meaning I take my expertise as a CPA, my training, my

24   background, and I apply my knowledge in order to calculate

25   damages.

Exhibit D
Page 45 of

1      Q.   Under a given set of assumptions?

2      A.   Sometimes assumptions, yes.  Sometimes they're

3  looking for answers, and I help them with the groundwork.

4      Q.   You were initially brought in by us to analyze

5  the Fallow's damage claim?

6      A.   That is correct.

7      Q.   What were you initially brought in to do?

8      A.   Your firm told me that there were certain

9  allegations against the Herbalife Company, and you asked me to

10  calculate damages for Clint Fallow and Mary Fallow.

11      Q.   What did you do as a part of your initial

12  engagement to accomplish that task?

13      A.   The first thing I did was I had a meeting with

14  Dan Fallow and another individual by the name of Dave

15  Peterman, and they introduced me to the Herbalife Market Plan

16  and spent a couple days with me to show me how the Herbalife

17  Market Plan worked.

18          Thereafter, I was given a couple of boxes of

19  production statements and royalty override statements and

20  commission statements for the distributorships of Dan and Mary

21  -- excuse me, for Mary Fallow and Clint Fallow, and I was to

22  review those and any other accounting information that were in

23  those boxes in order to calculate damages.

24      Q.   All right.  As a part of the initial engagement,

25  did you encounter some difficulties in coming up with a damage

1    model?

2           A.    The damage model was okay.  It's just that there

3    were not sufficient accounting documents in order for me to

4    make the damage calculation I wanted to do.

5           Q.    Can you describe for the jury please what the

6    problem was with getting the documents?

7           A.    Well, there were a couple of issues.  One was

8    there were not all the production bonus statements and all the

9    royalty override statements were not present, but the bigger

10   problem was -- what I was really trying to calculate was what

11   Mary Fallow and Clint Fallow may have been paid as

12   compensation.

13          Therefore, I needed additional information.  Even

14   if I had all of the monthly statements, that was not going to

15   be sufficient for me to perform a damage calculation.

16          Q.    Okay.  You were given a task to calculate damages

17   based upon what assumptions?

18          A.    Well, there were two different assumptions.  One

19   assumption was that there was a downline distributor under

20   Mary Fallow by the name of Tonni Riley, and then below her was

21   a downline distributor by the name of Jay Riley.

22          One of the assumptions was that if the Tonni

23   Riley and Jay Riley distributorships were terminated, what

24   were the amounts of moneys that would have been paid to Mary

25   Fallow for royalty override and production bonus amounts.

Exhibit D
Page 47 of

1        The second assumption was that the Clint Fallow

2   distributorship had been deemed by Herbalife to be a quote

3   dual distributorship.  And that distributorship was moved

4   under the John Peterson distributorship, and what would have

5   been the damages to Mary assuming that the distributorship had

6   been moved or had been combined with Mary Fallow instead of

7   being moved under John Peterson.

8        Q.   Okay.  With those two assumptions as part of the

9   initial engagement, what documents did you review?

10       A.   I primarily reviewed the production bonus

11  statements and the royalty override statements.

12       Q.   All right.  And did -- were you aware that

13  certain information was requested from Herbalife relating to

14  the income and to other certain information in the

15  interrogatories request to produce?

16       A.   I was aware of them, yes.

17       Q.   Was that documentation that you needed as a part

18  of your initial engagement to calculate out the damages based

19  upon those two assumptions?

20       A.   Yes, there was a list of documents I needed.

21       Q.   And could you describe what, for the jury, what

22  those documents were?

23       A.   One was I wanted a complete set of production

24  bonus and royalty override statements for the Clint and Mary

25  Fallow distributorships.

Exhibit D
Page 48 of ___

1            Probably the most important thing I wanted was
2    the John Peterson royalty override and production bonus
3    statements.  This is because what I was really calculating
4    under my assumptions or under the theory that those two
5    assumptions under those two hypotheticals --
6            MR. HOXIE:  Objection, Your Honor.  I believe the
7    question was just what information was he looking for, not why
8    it was relevant.
9            THE COURT:  Sustained.
10           Q.   (By Mr. Littler)  Okay.  Did you need anymore
11   information for what you were looking for?
12           A.   Yes.  I was looking for any information that
13   dealt with the downline production of Clint and Mary Fallow.
14   At that point, I didn't know what that would be, so it was all
15   information.
16           Q.   As part of your initial engagement, did you
17   review any of the discovery that we sent to Herbalife and
18   their responses sometime prior to late September or early
19   October of '98?
20           A.   Any discovery?
21           Q.   Yes.
22           THE COURT:  Do you know what that is?
23           THE WITNESS:  Yes, I think.  I reviewed a little
24   bit, but I remember at the end of my engagement, I formulated
25   a list of requests that ended up in the discovery document.

Exhibit D
Page 49 of

1      Q.   (By Mr. Littler)   Okay.  At the end of your

2   initial engagement, you formulated some requests you needed?

3      A.   Yes.

4      Q.   Okay.  And after that, what did you do?

5      A.   Nothing.

6      Q.   Okay.  Did there come a time when the engagement

7   -- there was a second part of the engagement?

8      A.   Yes, about a month ago.

9      Q.   And at that point, what did you review?

10      A.   At that point, there had been produced some

11   additional production bonus and royalty override statements.

12   There had been -- there was just other additional information

13   from the process, reviewing depositions, things like that,

14   answers to interrogatories.

15      Q.   In reviewing the answers to interrogatories, did

16   you find Herbalife had responded to the inquiry related to

17   those downline --

18         MR. HOXIE:  Objection, foundation.

19         THE COURT:  What foundation is that?

20         MR. HOXIE:  He's unaware of the discovery process

21   that went on from the time those interrogatories were first

22   served on Herbalife to the time he was reengaged in October of

23   '98.

24         THE COURT:  I see a missing link as far as him

25   answering that question the way you asked it.

CLARK CERTIFIED COURT REPORTER:

Exhibit  D
Page  50  Of

1                MR. LITTLER:  Let me ask a couple more, Your

2    Honor.

3         Q.    (By Mr. Littler)  Did you look at the answers to

4    interrogatories as a part of your analysis?

5         A.    In the second phase, yes.

6         Q.    And in that, did you -- why did you review those

7    answers to interrogatories?  What were you looking for?

8         A.    The accounting information that I wanted to

9    prepare my damage analysis.

10        Q.    Can you tell the jury what the damage information

11   was you were looking for in those interrogatories?  What were

12   you looking for in there?

13        A.    I was trying to find the production bonus and

14   royalty override income that Mary Fallow would have received

15   had the Tonni and Jay Riley distributorships been terminated.

16              What I was really looking for was the amounts

17   that were paid to John Peterson because he would have been the

18   person who received that money under the scenario that I was

19   calculating damages.

20        Q.    Okay.  And did you find that in the answers to

21   interrogatories that were sent to us by Herbalife, that

22   information?

23        A.    No, they objected to providing it.

24        Q.    Okay.  After looking at the additional

25   information, did you come up with a damage model in the second

1    engagement?

2           THE COURT:  You better explain what you base your

3    model upon.  Like a computer model?

4           Q.  (By Mr. Littler)  Let me ask it a little

5    differently.  Can you -- did you come up with a theory of

6    damages after looking at the interrogatories and after the

7    first part of the engagement?

8           A.  There was a theory that legal counsel gave to me.

9           Q.  Okay.

10          A.  I didn't come up with a theory.

11          Q.  Okay.  What was the theory that was given to you?

12          A.  The theory was there was a relationship between

13    the total income and the Herbalife distributor could make as

14    compared to the total volume that could be identified in a

15    downline lineage report.

16          Q.  You heard Mr. Peters' testimony?

17          A.  Yes.

18          Q.  Okay.  And Mr. Peters' testimony related to the

19    entire downline lineage of the Fallows, remember that?

20          A.  Yes.

21          Q.  So, that would be -- under my crude little

22    drawing here, that would be all of this downline lineage?

23          A.  Could you turn it a little?  I can't see it.

24          Q.  Oh, I'm sorry.  Can you see that?  Did you -- as

25    a part of your engagement, did you review what's known as an

Exhibit D
Page 52 or

1    indented lineage report?

2          A.   Yes.

3          Q.   Let me show you what's been marked as Exhibits

4    383 A, B, and C.  Is that the indented lineage report for the

5    Mary Fallow distributorship?

6          A.   Yes, that's correct.

7          Q.   And what is contained in the indented lineage

8    report for the Mary Fallow distributorship?

9          A.   Well, there's various items.  Is there a specific

10   one?

11         Q.   Just generally, what do you find in here?

12         A.   Principally, there's the personal volume, total

13   volume, and organizational volume of the Mary Fallow

14   distributorship for the annual period of 1996, for the whole

15   year of 1996.

16         Q.   Okay.  And are there names in there?

17         A.   Yes.  It's a listing of all of the distributors

18   that were downlined from Mary Fallow.

19         Q.   Now, Mr. Peters testified in his deposition that

20   we just read that there's some 59,000 distributors in there?

21         A.   Yes, I believe that's on the last page.

22         Q.   Okay.  And they're all in that book.  Is that

23   what this indented lineage is for, 1996?

24         A.   That's correct.

25         Q.   What is the total of the entire gross income for

CLARK CERTIFIED COURT REPORTERS

Exhibit D
Page 53 of

1    the Mary Fallow distributor from the indented lineage 1996

2    alone?  Do you want -- you got to find C.  It's going to be at

3    the back.

4            A.    The total volume is 37,480,662.

5            Q.    37 --

6            A.    480,662.

7            Q.    What is the total number of distributors now?

8    You got that page?

9            A.    59,045.

10           Q.    What's the total number of the supervisors and

11   retired supervisors in the entire Mary Fallow distributorship?

12           A.    4,606.

13           Q.    I think they said R and RS?

14           A.    SP and RS.

15           Q.    That's right, SP and RS.  As part of your

16   engagement, did you and your office analyze the entire

17   indented lineage report for 1996?

18           A.    Yes.

19           Q.    What -- other than seeing these numbers, did you

20   make a determination as to the number of people in that

21   distributorship at different team levels?

22           A.    Yes, the team levels are listed in the indented

23   lineage report.

24           Q.    Do you have a number for 1996, the number of

25   Presidents Teams, in the Mary Fallow downline?

Exhibit D
Page 54 of

1          A.    Yes, there were 14 presidents that we counted in

2     the downline.

3          Q.    And number of Millionaires Teams?

4          A.    I believe we counted 44.

5          Q.    Did you count the GET Team as well?

6          A.    No.

7          Q.    You were given you said from counsel a theory of

8     damages that you can calculate out from this indented lineage

9     report from 1996?

10         A.    Well, counsel told me that they had this rule of

11    thumb theory that could be used to estimate someone's total

12    income as a distributor in the Herbalife program.

13         Q.    Based upon what figure?

14         A.    Based on the 37 million dollar number on your

15    sheet.

16         Q.    The organizational volume?

17         A.    No, that's the total volume.

18         Q.    I'm sorry, total volume, okay.  And what did you

19    do to test that theory?

20         A.    I interviewed certain individuals who were

21    President Team members of the Herbalife program.

22         Q.    How many did you interview?

23         A.    Five.

24         Q.    They were all at the President Team level?

25         A.    Yes.

Exhibit D
Page 55 of

1       Q.   And did they provide you information relating to

2   their income?

3       A.   Some of them verbal, some of them actually

4   produced documents for me.

5       Q.   And did they also give you information relating

6   to their total volume?

7       A.   Some of them yes, some of them no.

8       Q.   Were you able to confirm from your investigation

9   the accuracy of a rule of thumb?

10      A.   Well, the accuracy of the rule of thumb wasn't

11  really important to me.  I needed a rule of thumb to calculate

12  the damages.

13      Q.   Okay.  Let me just make a simple -- how do you

14  calculate damages then after you were given this task?

15      A.   After interviewing these individuals and

16  receiving accounting documentation from them, I determined

17  that this rule of thumb that legal counsel professed to exist

18  did make some economic sense.  And based on my findings, I

19  formed an opinion as to what I believed a rule of thumb

20  percentage would be for Mary Fallow.

21      Q.   Okay.  And that rule of thumb percentage is what?

22              MR. HOXIE:  Objection, Your Honor.  I believe

23  we're in violation of Your Honor's order of February 26th,

24  1998, about new opinions following deposition.

25              THE COURT:  You're going to have to be more

Exhibit  P
Page 56  of

1    specific than that.  You're saying this is an opinion not

2    disclosed to you yet?

3                MR. HOXIE:  Yes.  At the time of his deposition,

4    these calculations and conclusions were not --

5            Q.   (By Mr. Littler)  Mr. Mechlem, are you going to

6    testify about anything differently than in your deposition?

7            A.   No.

8                THE COURT:  That's what I was about to ask

9    myself.  He's going to testify to the same thing he testified

10   to in his deposition.  Your argument is?

11               MR. HOXIE:  That at the time we were given the

12   opportunity to take his deposition on October 22nd, he had not

13   as yet formed any final calculations whatsoever.  Following

14   the deposition, he worked another 18 hours.  And later about

15   15 minutes before the close of business on the day before

16   trial, we were first given notice of a report for the first

17   time.

18               THE COURT:  Are you about, Mr. Mechlem, to

19   testify to totals or final figures that you didn't testify to

20   in your deposition?

21               THE WITNESS:  I gave totals and final figures in

22   my deposition.

23               THE COURT:  So, what you're about to -- you don't

24   know what the questions are yet.  What you're going to

25   anticipate is going to be exactly what you said in your

1      deposition?

2                     THE WITNESS:  Totals changed by small amounts

3      because I did some cross-checking of my numbers, but the --

4                     THE COURT:  Is that what you're referring to,

5      Mr. Hoxie?

6                     MR. HOXIE:  No.  There were material changes, and

7      I mean, I have an exhibit from the deposition.  It says

8      preliminary draft subject to change, and it materially changed

9      the next day.

10                    THE COURT:  Apparently there was a change, but

11     you say it was --

12                    THE WITNESS:  There were certain questions asked

13     of me in the deposition about what portions I needed to

14     finish, and I told him that I would need to do this -- or

15     what's on the report is what I finalized over the next eight

16     hours.

17                    THE COURT:  Is that correct, Mr. Hoxie?

18                    MR. HOXIE:  He told us that he was not done with

19     his work; that he had lots of work left.  And he then later

20     produced time records which showed after the deposition on

21     October 22nd, which ended about 3:00 p.m., he worked eight

22     hours that day, eight and a half the next day, and finally got

23     us a report at 4:45 on Friday before trial, and it has

24     material methodological changes in it.

25                    THE COURT:  Okay, but you're saying none of that

Exhibit D
Page 5B of

1  should be admitted because he did not have that in his
2  repertoire of figures at the time of his deposition.

3          MR. HOXIE:  Yes, Your Honor.

4          THE COURT:  You say I also ruled on this?

5          MR. HOXIE:  On February 26th, ordered, among
6  other things, in paragraph 7 of your order that opinions of
7  experts fairly sought and revealed in deposition and other
8  discovery shall not be supplemented at trial.

9          THE COURT:  Okay.  However, you knew that he was
10  working on some other things past his deposition, correct?

11          MR. HOXIE:  We knew and there wasn't anything we
12  could do about it because we tried to depose well before
13  trial.  He wasn't ready.  The latest we could depose him was
14  the Thursday before trial, and he still wasn't ready.

15          THE COURT:  I'm going to overrule your objection.
16  Mr. Hoxie, did you have a question?

17          MR. LITTLER:  Whatever it was, I forgot it.

18          Q.  (By Mr. Littler)  Mr. Mechlem, did you formulate
19  an opinion then on the income of Mary Fallow based upon the
20  rule of thumb that you verified and analyzed?

21          A.  Yes.

22          Q.  What is that opinion?

23          MR. HOXIE:  Objection, Your Honor, now Arizona
24  Rules of Evidence 703.

25          THE COURT:  Be more specific.

Exhibit D
Page 59 of

1          MR. HOXIE:  The facts upon which his opinion is

2    based are not reasonably relied upon by experts in the field.

3          THE COURT:  Has to be a little better than that.

4    I'll sustain it at this time.

5          Q.   (By Mr. Littler)  As part of your analysis, what

6    did you rely upon as an accountant and as a professional to

7    come up with this formula?

8          A.   Well, the premise of the formula is to figure out

9    the total income that Mary Fallow would have received had she

10   been a President Team member.  So, what I did was I reviewed

11   accounting data of the amounts of money that other President

12   Team members made in the Herbalife program.

13         Q.   Now, did you also verify with other information

14   as to whether or not there could be a calculation based -- you

15   look quizzical already.  It's already unclear to you.

16         Let me go back with a series of questions, then

17   we'll build back up to it.  You tried to get additional

18   information from Herbalife, correct?

19         A.   That's correct.

20         Q.   You couldn't get that information, correct?

21         A.   They did not supply that information.

22         Q.   All right.  So you had to come up with an

23   alternative method of calculation of these damages?

24         MR. HOXIE:  Objection, misstates prior evidence

25   as to who came up with the theory.

Exhibit D
Page 60 of

1           MR. LITTLER:  I'll withdraw the question and

2     restate it, Your Honor.

3           Q.   (By Mr. Littler)  You were presented with an idea

4     of an alternative theory, correct?

5           A.   That's correct.

6           Q.   This rule of thumb?

7           A.   This rule of thumb, yes.

8           Q.   What were you told was the rule of thumb?

9           A.   The rule of thumb was that if you reviewed

10    someone's downline lineage report and compared that to the

11    total income that he received as an Herbalife distributor,

12    that the total income would be between four and five percent

13    of the downline lineage total volume.

14          Q.   Okay.  And did you --

15          THE COURT:  Is that what you're going to go into?

16          MR. LITTLER:  Yes.

17          THE COURT:  I'm going to dismiss you for a moment

18    because there's things that I think I have to ask that you

19    can't really hear.  I don't know how long this will be, but my

20    guess is about 10 minutes.  Remember the admonition.

21          (The following proceedings were held outside the

22    presence of the jury:)

23          THE COURT:  Door is closed.  Where did he go?

24    There's Mr. Littler.  The reason I excused them was this:

25    What you're about to do is to have him come out with a damage

Exhibit D
Page 61 of

1    opinion based upon the rule of thumb, and the validation rule
2    of thumb is the five people he talked to, that figure, versus
3    the figures he ran.  Is that what you are about to do?
4              MR. LITTLER:  That's correct, Your Honor.
5              THE COURT:  I have a very large problem with
6    that, a very large problem.  You got two strikes against you
7    if that's what you're about to do.
8              MR. LITTLER:  Your Honor, here's the problem.  I
9    mean, we tried to get all the information from Herbalife
10   relating to various --
11             THE COURT:  I read your response.  That doesn't
12   make it admissible.
13             MR. LITTLER:  Well --
14             THE COURT:  What you have is -- and you can
15   correct me if I'm wrong -- it's not his rule he's going by.
16   It's a rule he was given.  There's nothing to show me that
17   that rule has any validity over and above.  It's merely a
18   statement.
19             And secondly, to validate the rule, he talked to
20   five people.  That's five out of fourteen.  I don't even know
21   if that's a representative.  And even if it's representative,
22   I don't know what the degree of fallibility would be in that.
23             MR. LITTLER:  The other -- what the witness is
24   going to testify about, Your Honor, there's two important
25   parts to this.  One is that even the Herbalife people, Peters

CLARK CERTIFIED COURT REPORTERS

Exhibit D
Page 62 of

1    and Weekly, their expert, testified that they cannot come up

2    with a calculation based upon any scenario like the one we're

3    presenting where Mary Fallow would have been a President Team

4    member, would have become a President Team member.  So,

5    there's a basis for looking for an alternative method of

6    calculation.  That is --

7              THE COURT:  I agree with that.  I can see that.

8              MR. LITTLER:  What we had discovered, there's

9    information that there was a rule of thumb, and Mr. Mechlem

10   was directed to search out and determine whether it was valid

11   or not.

12             THE COURT:  I got that.

13             MR. LITTLER:  He was able to find five people.

14   It was very difficult to find anybody who was at the President

15   Team level.  He was able to find five people that gave

16   records, and he was able to, not validate what he was given,

17   but independently determine that there is a calculation of a

18   percentage of the entire downline lineage.

19             THE COURT:  I understand.

20             MR. LITTLER:  That's what he's going to testify

21   about, Your Honor.

22             THE COURT:  All right.  I got nothing before me

23   that shows how valid that rule of thumb is.  Just its name is

24   not good enough.  It's a rule of thumb?

25             MR. LITTLER:  Right.

Exhibit D
Page 63 of

1          THE COURT:  You don't even use that in baseball.

2          MR. LITTLER:  That's what was given to him.

3    That's not an accounting term that we used.

4          THE COURT:  There's nothing to show me that has

5    any validity whatsoever, and you're familiar with what

6    normally goes to the jury.  They're not to speculate.  That's

7    close to speculation if not speculation.

8          Second thing, I would assume what you're also

9    trying to do is say:  Wait a minute.  Assume this rule is

10   valid because he went and talked to five people out of

11   fourteen.  That, to me, does not show it's valid.

12         MR. LITTLER:  Your Honor, I believe there's going

13   to be additional testimony, and maybe I could get some through

14   Mr. Mechlem as to exactly what he did to verify that.

15         THE COURT:  Go right ahead.  I only know what I

16   heard so far.

17         MR. LITTLER:  Please advise the Judge,

18   Mr. Mechlem, tell Your Honor what you did to determine the

19   percentage.

20         Q.   (By Mr. Littler)  Let me do this.  Did you come

21   up with a percentage based upon the downline lineage amounts?

22         A.   Yes.

23         Q.   What is that percentage?

24         A.   Two percent.

25         Q.   Okay.  And so, what is the two percent?  It's of

Exhibit D
Page 69 of

1       the downline lineage figure?

2               A.   Yes, two percent times the $37 million amount.

3               Q.   How did you come up with two percent as a

4       percentage, as an income number, as a percentage of total

5       downline lineage?  How did you determine that?

6               A.   Well, there was an investigation of the five

7       people.  Three gave me accounting records.  Two of them were

8       very similar in nature to Mary Fallow, but most importantly

9       was I was trying to calculate what John Peterson made.

10              So, in addition to interviewing those five

11      people, there was information provided in John Peterson's

12      deposition that told me what his percentage was and his --

13      that probably was the most important discovery for me because

14      I could determine what his percentage was.  And under my --

15      under our theory, under the assumptions by legal counsel, the

16      moneys to Mary Fallow that were not paid were paid to John

17      Peterson.

18              Therefore, it was very important that his

19      percentage was in line with the other five people that I did

20      talk to and that most importantly what she didn't receive was

21      what John Peterson received, and I was able to figure out what

22      John Peterson's percentage was.

23              THE COURT:  If you could figure out what John

24      Peterson would have received, why do you need a rule of thumb?

25              THE WITNESS:  The rule of thumb is what legal

Exhibit D
Page 65 of

1    counsel referred to as a rule of thumb.  I don't see it as a

2    rule of thumb.  I see it --

3              THE COURT:  Why do you need -- if you can figure

4    the percentage he would have received, why do you need --

5              THE WITNESS:  The amount of money he was paid was

6    based on his downline.  I was only trying to calculate a

7    percentage of Mary Fallow's which she did not receive.

8              THE COURT:  I understand that, but I still don't

9    understand if you can calculate his percentage without the use

10   of a rule, what's the rule add to it?

11             THE WITNESS:  His percentage becomes part of the

12   rule.  In other words, the rule of thumb would be his

13   percentage.  They would be synonymous.

14             THE COURT:  What you're saying is the rule of

15   thumb is the certain percentage that he would have made, and

16   you apply that percentage to her?

17             THE WITNESS:  Yes.

18             THE COURT:  What if you didn't have -- forget a

19   rule of thumb.  If you were hired to simply tell us what Mary

20   Fallow would have made, would you have gone to someone like

21   Peterson and calculated what he made and, therefore, coming

22   and testifying that that's what she would have made?

23             THE WITNESS:  I could in that case because he --

24             THE COURT:  Would you?  Would you?

25             THE WITNESS:  That's what I wanted to do, yes.  I

Exhibit  D
Page 66  Of

1   wanted to calculate what he made.  That would have been the

2   easiest thing to do.  If they gave me the records, I would

3   have done this calculation.

4                  THE COURT:  So, you can't calculate what he made?

5                  THE WITNESS:  Yes, it's on his production bonus

6   reports, but they weren't supplied.  So, I couldn't do it from

7   the information I needed.  It's there.  It just wasn't

8   produced.

9                  THE COURT:  Wait a minute.  I'm losing something

10  in the translation here.  You told us that you calculated, I

11  thought you said, what he made and then took two percent of

12  it, his production, two percent.

13                 THE WITNESS:  No.  His downline, 37 million --

14  his was about 50 million.  If you multiply that by the

15  percentage, his came out to be three and a half percent.

16  That's the total money that he made.

17                 THE COURT:  Now, when you say you can't calculate

18  how much he made, you mean you cannot determine whether the

19  two percent was valid or not?

20                 THE WITNESS:  The -- well, yeah, the two percent

21  would be valid.  His was three and a half percent I believe.

22                 THE COURT:  You better help me, counsel.  I'm

23  lost with this language.

24                 MR. HOXIE:  I assume I'll have time to be heard,

25  too.

Exhibit _D_
Page _67_ Of _____

1      Q.   (By Mr. Littler)   Where did you get the incomes

2   for the -- for the income of John Peterson?

3      A.   Of John Peterson, at his deposition.

4      Q.   Where did you get the size of his downline

5   lineage?

6           THE COURT:   Your terms of art.   You said income.

7      Q.   (By Mr. Littler)   Total income from John

8   Peterson.   You had a figure from his deposition, right?

9      A.   Correct.

10      Q.   And then you also got his downline lineage from

11   where?

12      A.   His deposition.

13      Q.   All right.   And you compared the two?

14      A.   Correct.

15      Q.   You came up with a figure, correct?

16      A.   Correct.

17      Q.   All right.   And you did the same for other

18   individuals that are at the President Team level as well,

19   correct?

20      A.   Not from their deposition, but from actual

21   accounting records.

22      Q.   You saw their accounting records and you compared

23   the two, correct?

24           THE COURT:   Is that where the two percent comes

25   from?

Exhibit___D___
Page__68 of__

1          THE WITNESS:  The two percent is my opinion.  The
2     range was somewhere between two and six percent.
3          THE COURT:  You took each of the -- each income
4     and compared it to the downline and got a percentage for each
5     and then averaged the percentage?
6          THE WITNESS:  I took the lowest one to be
7     conservative.  It was somewhere between two and six.
8          Q.   (By Mr. Littler)  And did you -- you determined
9     that was -- was there any model that you could have formulated
10    to come up with a damage analysis based upon the information
11    that was provided and the information that you got that
12    Herbalife can't run some of these scenarios?  In other words,
13    you got --
14         THE COURT:  He answered my questions unless you
15    want to show something else.
16         MR. LITTLER:  No, Your Honor.
17         THE COURT:  All right.  Let me ask a few more.
18    What you're really saying then is after meshing these five
19    together, from that -- from that mesh, you're concluding what
20    she probably would have made?
21         THE WITNESS:  Yes, probably the lowest amount she
22    could have made.
23         THE COURT:  That's what I would have liked you to
24    have done.  Better than that, you took the lowest figure
25    rather than just the average of the mesh of those five.

CLARK CERTIFIED COURT REPORTERS          Exhibit ⟋D⟍
                                         Page 69 of

1          THE WITNESS:  I took the lowest figure.

2          THE COURT:  Okay.  Have you ever done anything

3     like this before?  Have you ever worked with a multilevel --

4          THE WITNESS:  No.

5          THE COURT:  So, this is the first time you made

6     such a calculation?

7          THE WITNESS:  For a multilevel situation under

8     this type of hypothetical, right.

9          THE COURT:  Do you want to ask anything more at

10     this point?

11          MR. LITTLER:  No, Your Honor.

12          THE COURT:  Mr. Hoxie?

13          MR. HOXIE:  Yes.  My problem, Your Honor, first

14     of all, counsel asked him to assume that a relationship does

15     exist.

16          THE COURT:  Are you asking questions or argument?

17          MR. HOXIE:  I'm arguing if you want to.

18          THE COURT:  If you have questions first off.

19

20               VOIR DIRE EXAMINATION

21     BY MR. HOXIE:

22          Q.   First of all, Mr. Mechlem, when we took your

23     deposition on October 22nd, you told me you only had data from

24     two Tab Team Presidents, correct?

25          A.   I think it was -- I talked to four and had

1    accounting information from two of them.

2             Q.   Right.  And that was one of Dave Peterman?

3             A.   Correct.

4             Q.   And he was represented in the past by

5    Mr. Littler.  He was given to you by Mr. Littler, correct?

6             A.   Yes.

7             Q.   And the other was a fellow named John Bass out in

8    Texas, correct?

9             A.   Correct.

10            Q.   And you have come to understand he's been

11   represented by Mr. Littler in the past, correct?

12            A.   Based on what he said, yes.  I don't know.

13            Q.   You weren't told that I assume?

14            A.   No, I was not.

15            Q.   Then you told me there was other people, but you

16   couldn't get information from them.  That was as of Thursday,

17   October 22nd, correct?

18            A.   They were compiling the information for me.

19            Q.   But we didn't have a chance to see it because you

20   weren't completed with your work; isn't that true?

21            A.   I couldn't complete my work because I didn't have

22   the information yet.

23            Q.   The reason you told me you weren't complete on

24   October 22nd was because you had only been hired several weeks

25   before to even begin this assignment, correct?

Exhibit D
Page 31 of

1          A.   No.   I wasn't completed with my work, but I

2     didn't have all the information from the people I was

3     interviewing.

4          Q.   You don't remember telling me you were not able

5     to get me a report and you were not able to finalize any

6     calculations because there just simply hadn't been enough time

7     since you were retained, again, in October of 1998.   Do you

8     remember telling me that?

9          A.   I think I remember specifically telling you I

10    have an opinion.   I think it's page 138 of my --

11         Q.   I understand that.   Don't you also remember

12    telling me -- we can get it out of the deposition transcript

13    -- that you were not through with your calculations because

14    there simply hadn't been enough time for you to do your work

15    because you hadn't been retained early enough; isn't that

16    true?

17         A.   I think I said that it was making it a difficult

18    process for me to finish timely because of the time

19    constraints is what I believe I said.

20              THE COURT:   Mr. Hoxie, I believe -- I'm not

21    concerned with whether he was completed or not when he

22    testified in his deposition.   I think I got past that.

23              What I'm more concerned with is your latest

24    objection as to why -- what he's about to say is not what

25    another expert would use.

1          MR. HOXIE:  There -- first of all, he has not
2    come forward with any calculations to demonstrate that a
3    relationship exists between a Tab Team President's annual
4    income and total retail sales generated by that president's
5    downline lineage.
6          He was asked to assume that that's the rule of
7    thumb, just assume that.  So, what we need you to do,
8    Mr. Mechlem, is put some parameters on that.  And the people
9    they gave him were Dave Peterman, who we've heard in this case
10   wants the Fallow's to win, and Mr. Peterman was asked by
11   Mr. Mechlem:  I want to see -- I'd like to see your tax
12   returns.
13          He told me at his deposition that he was not
14   given access to Mr. Peterman's tax returns.  He also didn't
15   get full annual compensation figures for Mr. Peterman.  He
16   only got four months.
17          So from those four months, he had to annualize
18   annual income on Mr. Bass.  He spent very little time talking
19   to Mr. Bass.  Mr. Bass wrote a letter saying here are my
20   income figures for several months which he then had to analyze
21   out to twelve.  I mean, this is just --
22          THE COURT:  May well need more cross-examination.
23   I'm not saying at this point, but it may well need more cross.
24   This goes to the issue before me now.  Let me try this.  Tell
25   me where this is wrong or where it's right.

Exhibit  D
Page 73  Of

1          Take a real simple example.  You have a case of a

2     barber who is suing for loss of income.  For some reason, he

3     cannot produce the income he would have earned during that

4     year.  Wouldn't it be admissible evidence for the barber's

5     lawyer to show he charged during that year $10 and $11 for his

6     haircuts, not sure how many months he charged, but that's what

7     he charged.  His barber shop was about this size.

8          Therefore, five barber shops of that size

9     charging 10 or $11 during that period earned this much money.

10     Would that be admissible evidence?  It almost certainly would

11     be, wouldn't it?

12          MR. HOXIE:  Well, if it's a valid sampling and he

13     actually got the information that may be here now.

14          THE COURT:  Wait a minute.  That gets to my next

15     concern.  I still have a concern though.  Just do you agree

16     that would be valid evidence for the barber?

17          MR. LITTLER:  Yes, Your Honor.

18          THE COURT:  Okay.  Why go to these five and why

19     compare these five to Mary Fallow?  That hasn't been shown yet

20     what's with these five, and why should we take anything from

21     them.  That's what I was saying in the beginning.  Where's the

22     validity to that?

23          MR. LITTLER:  Well, Your Honor, first, it's

24     because they're at a President's Team level.  There's the

25     theory that we're promoting in this case that Mary Fallow

Exhibit___D___
Page___74___Of_____

1    should have been at a President Team level.

2              THE COURT:  But I -- you can still tell me even

3    people at President Team levels may have longer downlines,

4    shorter downlines, all sorts of variations.

5              MR. LITTLER:  That's correct.  This witness took

6    that into account in coming up first with the -- a range and

7    then coming up with a conservative figure.

8              THE COURT:  He only examined possibly five of a

9    possible 14.

10             MR. LITTLER:  More than five of possibly 250 I

11   think.

12             MR. HOXIE:  350 to 400, 350 to 400.

13             THE COURT:  Nationwide or --

14             MR. LITTLER:  Worldwide.  Worldwide, Your Honor.

15             THE COURT:  So that bothers me; just taking five

16   and comparing them, or at least extracting from them, a figure

17   that applies to Mary Fallow.

18             MR. LITTLER:  Your Honor, that goes to the weight

19   I believe.  It doesn't go to the admissibility.

20             THE COURT:  It does if it's low enough.  I can

21   say not to admit that.

22             MR. LITTLER:  You are -- you certainly have that

23   power, Your Honor.  It also goes to the -- we could only get

24   five because they wouldn't give us the information relating to

25   that.

Exhibit D
Page 75 of

1      THE COURT:  That doesn't help make it admissible.

2      MR. LITTLER:  No, it doesn't, Your Honor, but I

3  do believe it's admissible in this case because these

4  samplings, and he'll tell you and the jury the range of

5  samplings, the different percentages.  He used more

6  conservative figures, used the most liberal figure.

7      I don't think that would be a problem using the

8  most conservative figure.  That's the figure.  That's the

9  lowest level of range of President Team members.  That gives

10  us a calculation that justifies the opinion.

11      THE COURT:  He used the lowest figure of the five

12  sampled?

13      MR. LITTLER:  Correct.

14      THE COURT:  If he sampled 62 more, the lowest

15  figure may be totally different.

16      MR. LITTLER:  That's true.

17      THE COURT:  If we're talking about President

18  level, we may well be talking about a totally different figure

19  if we compared all of them.  I mean, that's obviously true.

20      MR. LITTLER:  We may, but it is a sampling.

21      THE COURT:  Yeah.  The question would be if it's

22  a big enough sample.

23      MR. HOXIE:  That's the key.  It's not a sample

24  under accounting guidelines which is -- he's here as a CPA, as

25  a forensic accountant.  It's not a valid statistical sampling

1     and not a valid judgmental sampling.

2                    THE COURT:  He just put it under accounting

3     guidelines.  Can you translate such a thing?  If I were to ask

4     you is this a valid sampling under accounting guidelines,

5     could you give me an answer?

6                    THE WITNESS:  I would say that taking the five

7     would be a lower percentage.  However, the facts that I had

8     information on, the individual who I was saying received the

9     money, I should have just been able to sample just him.  That

10    would have given me enough of an opinion.

11                   THE COURT:  You don't have that?

12                   THE WITNESS:  I do have that in -- it's in the

13    deposition.  The money was paid to John Peterson.  He stated

14    information in his deposition.  I could have just used that

15    information.

16                   THE COURT:  That would be a valid sampling to you

17    as opposed to 350 presidents?

18                   THE WITNESS:  It could have, yes, but he was paid

19    all the money.  Mary's money that -- I say Mary's money --

20    that should have been paid to her was paid to John Peterson.

21    Therefore, he was the best sample I could come up with.

22                   THE COURT:  How do you know that?

23                   THE WITNESS:  How do I --

24                   THE COURT:  Best sample.

25                   THE WITNESS:  Because he was the one that

Exhibit ___
Page _77_ Of ___

1    received the money.

2              THE COURT:  How do you know if out of 350 --

3    assume we both agree 350.

4              MR. HOXIE:  350 to 400.

5              THE COURT:  Out of the whole world, he would be

6    the one best to compare her to?

7              THE WITNESS:  Because of the amount of money he

8    was paid that she would have been paid.  So, if I can figure

9    out what he was paid, that's what she would have been paid.

10             MR. LITTLER:  In other words, that has to do with

11   the four percent or six percent.

12             MR. HOXIE:  The record --

13             THE COURT:  Wait a minute.

14             MR. LITTLER:  Did you have a Tabulator Team bonus

15   guide?

16             THE WITNESS:  I was calculating the amount of

17   money that Mary Fallow would have been paid.  I show that

18   amount of money was paid to John Peterson.  Therefore, he is

19   the best sample I could possibly come up with.

20             THE COURT:  Okay.  Then what if you didn't know

21   how much money he was paid, do you consider, as an accounting

22   professional, five out of 350 a good enough sample?

23             THE WITNESS:  In this case, I could have anyways

24   for different reasons.

25             THE COURT:  Answer my question.  Do you consider

Exhibit
Page ___ Of ___

1    that a sufficient sample?

2              THE WITNESS:  I think that's like one percent, so

3    you have to have some extraordinary circumstances to say that

4    one percent sampling was sufficient.

5              THE COURT:  He gets into the last question I was

6    going to ask which goes back to my first question, just

7    repeats it.  I think what he's saying is he knows what she

8    would have gotten paid because he's under the assumption she

9    would have gotten paid what he got paid; is that right?

10             MR. LITTLER:  Isn't that right, Guy?

11             THE WITNESS:  That's the whole theory, the damage

12   analysis, yes.

13             MR. LITTLER:  With other -- he verified that with

14   other President Team members.

15             MR. HOXIE:  That's not what he did under the rule

16   of thumb.

17             THE COURT:  Wait a minute.  Is that what you did

18   under the rule of thumb?

19             THE WITNESS:  The rule of thumb was given to me

20   by legal counsel, and I went and came up with my own

21   conclusion of two percent.

22             In other words, when they gave me -- when they

23   gave me a rule of thumb, I told Mr. Littler that this isn't

24   rocket science.  It's somewhere between zero and eleven

25   percent because that's what the Herbalife distributors get

Exhibit D
Page 79 Of

1    paid.

2              So, I know I'm between zero and eleven percent at

3    a minimum.  I had to figure out a percentage I was comfortable

4    with based on my procedures performed.  I feel comfortable

5    with two percent.

6              THE COURT:  Under the evidence so far, would Mary

7    have been paid what Peterson was paid?  No, not him.

8              MR. LITTLER:  Yes, Your Honor.  Mary would have

9    been paid what Peterson was paid.  Yes, Your Honor, under the

10   Tabulator Team production bonus.

11             THE COURT:  Mr. Hoxie?

12             MR. HOXIE:  I have his final report here.  There

13   is absolutely nothing in it about John Peterson.  There was

14   nothing in the deposition about John Peterson on October 22nd.

15             It was about Peterman and it was about Bass and

16   the partial information he took from them in the sample math

17   he did, and he established a parameter on the basis of two

18   people that said two to four percent and then left that and

19   went to one year of downline lineage reported from Mary Fallow

20   and said two percent of that is a lot of money, and that's my

21   conclusion.

22             THE COURT:  We're down to Peterson now.  The fact

23   he's not on the report doesn't concern me.

24             MR. HOXIE:  Right, and each Tab Team President is

25   different.  We've already heard testimony in this trial that

Exhibit ___D___
Page _80_ Of_____

1    Peterson was, you know, had a huge downline, and he can't be

2    suggesting to you that Mary gets what John Peterson gets.

3             She ends up in a better position if you take the

4    assumption that the Tonni Riley distributorship and Jay Riley

5    distributorship is deleted and if the two Fallow

6    distributorships are merged because if you don't do that, then

7    she's not even a President Team member, but that's not the

8    same as saying she gets what John Peterson gets which gets

9    back to the fundamental theory he's already said.

10            His theory is based on this assumed relationship

11   based on a sample.  That's not a sample at all.  It's not

12   random.  It's not statistical.  It's not even judgmental under

13   the AICPA guidelines.

14            THE COURT:  I don't have anymore questions I

15   wanted to ask of him, but you still got two strikes against

16   you.  Do you want to show anything else?

17            MR. LITTLER:  I can't think of anything else,

18   Your Honor.

19            THE COURT:  All right.  I won't ask you to read

20   that back.  I think at this point you were getting into his

21   opinions, and we had an objection; is that right?

22            MR. LITTLER:  Yes, Your Honor.

23            THE COURT:  I would sustain the objection.

24   Anything more you want to do or say before we bring the jury

25   in?

Exhibit D
Page 81 of

```
 1                    MR. LITTLER:  Could I have maybe five minutes,
 2      Your Honor, to --
 3                    THE COURT:  You may.  We'll recess for five
 4      minutes.
 5                    MR. HOXIE:  Thank you, Your Honor.
 6                    (Recess taken.)
 7                    THE COURT:  We're going to bring the jury in.
 8                    (The following proceedings were held within the
 9      presence of the jury:)
10                    THE COURT:  We're all here.  You may be seated.
11      Mr. Littler?
12                    MR. LITTLER:  Thank you, Your Honor.
13
14                    CONTINUED DIRECT EXAMINATION
15      BY MR. LITTLER:
16            Q.   Mr. Mechlem, did you make a determination as to
17      what Tabulator Team level Mr. Peterson was at?
18            A.   Yes.
19            Q.   Which level is that?
20            A.   He's a president.
21            Q.   And at what level were the Fallows at different
22      times?
23            A.   Well, Mary Fallow was a millionaire.
24            Q.   Okay.  And what is the difference between the
25      percentages that a distributor gets between a president and
```

1    millionaire?

2         A.   Well, a president gets six percent for a

3    production bonus, and a millionaire gets four percent.  So,

4    two percent difference.

5         Q.   And that is of the entire downline?

6         A.   Yes.

7         Q.   And are you familiar with the concept of

8    blocking?

9         A.   Yes.

10        Q.   What is that?

11        A.   Blocking is when someone in your downline

12   prohibits you from receiving additional production bonus

13   income because they are at a level equal to or higher than

14   you.

15        Q.   And does Mary Fallow block the Petersons?

16        A.   Not for two percent.

17        Q.   So, the Petersons are making what then of the

18   entire Mary Fallow downline?

19        A.   The Petersons are making six percent up to the

20   Mary Fallow line and then --

21        Q.   Let me just stop you there.  So, John and Susan

22   Peterson get six percent of Mary Fallow?

23        A.   That's correct.

24        Q.   And then what do they get?

25        A.   Then they get two percent of everything below

1    Mary Fallow assuming that they're not further blocked by some

2    other president down below Mary Fallow.

3              Q.    Okay.  And you looked at the President Team

4    members down below Mary Fallow?

5              A.    Yes, there were 14 of them.

6              Q.    Have you calculated out what that two percent

7    difference is between the four percent that the Fallows

8    obtained and the six percent the Petersons obtained?

9              A.    I'm not sure I understand that question.

10             THE COURT:  I was going to ask the same thing.

11             Q.    (By Mr. Littler)  Let me ask you this.  Have you

12   made a determination or you do have information relating to

13   John and Susan Peterson's entire downline lineage; is that

14   correct?

15             A.    Well, Mary Fallow is in John Peterson's downline.

16   So, I know what 37 million of it is.  Then I have further

17   testimony from John Peterson in his deposition that says that

18   his downline might be between 50 to 60 million.

19             Q.    Do you have information relating to what John and

20   Susan Peterson's income is?

21             A.    From his deposition, he stated an amount, yes.

22             Q.    What was that amount?

23             A.    Maybe a couple hundred thousand, less than two

24   and a half million.

25             Q.    Now, did you also discover what level the

1   indented lineage report reveals Tonni Riley is at?

2        A.   On the indented lineage report, I believe she was

3   listed as a president at 1996.  I know she was a millionaire

4   before that.

5        Q.   So in 1996, that indented lineage report shows

6   her at a President Team level?

7        A.   That's correct.  If I could double-check that,

8   I'm pretty sure.  That's correct.

9        Q.   Sure.  It's in the first one.

10       A.   That's correct.  She's a president.

11       Q.   All right.  Are you aware of whether Tonni Riley

12   has ever applied for the Tabulator Team?

13       A.   From reading her deposition, she said she never

14   has.

15       Q.   But yet, she's shown on the indented lineage

16   report as being at that President Team level?

17       A.   Yes.

18       Q.   Have you determined in other years whether Tonni

19   Riley shows up as a President Team member?

20       A.   Well, I have some production bonus statements for

21   Mary Riley that I reviewed.

22       Q.   Mary Riley?

23       A.   Mary Fallow and, you know, she has -- Tonni Riley

24   shows up on her production bonus statements sometimes as a

25   president, sometimes as a millionaire.

CLARK CERTIFIED COURT REPORTERS

Exhibit _D_

Page _89_ of ___

1        Q.   So, let's refresh the jury's recollection as to

2   what those production bonus statements are.

3        A.   The production bonus statement is an additional

4   source of income compensation program where they earn either

5   two percent, four percent, or six percent depending on what

6   level they are at.   The program is known as the Tabulator

7   Team.

8        Q.   And those reveal what level people are at in that

9   Tab Team or Tabulator Team?

10       A.   I'd have to look at one, but, yes, it does on the

11   production bonus statements.   There is a detail of everyone

12   that you are getting paid on for that month.   And then on the

13   last page or two, there's a summary of -- I think it's done by

14   type of country and the percentage you receive.   Because when

15   you become a president, you can get six percent, four percent,

16   or two percent depending on blocking.   So, it lists that on

17   the last page.   It's also a recap if you got six percent, four

18   percent, or two percent.

19       Q.   Okay.   What does it show as Tonni Riley getting

20   six percent or do you know?

21       A.   If she's a president, it would -- could you

22   repeat that?

23       Q.   Let me withdraw the question.   Have you made a

24   determination as to whether if Tonni Riley were terminated and

25   the royalties rolled up to Mary Fallow, would Mary Fallow have

1    been at a President Team level?

2         A.   Yes.

3         Q.   And would she have been at a President Team level

4    if Tonni Riley was terminated?

5         A.   Yes.

6         Q.   What would that have done to Mary Fallow's income

7    if Tonni Riley were terminated and the royalties rolled up?

8         A.   It would have increased it.

9         Q.   What ways would this have increased Mary Fallow's

10   income?

11        A.   A couple of ways.

12        Q.   Tell the jury what those are, please.

13        A.   Well, one is if the Tonni Riley distributorship

14   was terminated, all of the downline underneath Tonni Riley

15   would have been moved up to Mary Fallow.

16             So, in relation to royalties and override

17   payments, the five percent -- you get five percent on the

18   three levels below you.  So, on the fourth level, which would

19   have been Mary Fallow's fourth level, that would -- if Tonni

20   Riley was taken out, that would have moved those people up to

21   Mary Fallow's third level.

22        Q.   And did you -- so, Mary Fallow would have gotten

23   paid on this level, this level, and this level, correct?

24        A.   The three levels for the royalty override,

25   correct.

1          Q.   And if Tonni Riley were terminated, then this
2     level -- she would, Mary Fallow, would -- let me slow down
3     here.  If Tonni Riley were terminated, then this level, this
4     level, and now this level would roll up to Mary; is that
5     correct?

6          A.   Yes, she would have gained five percent on that
7     bottom level.

8          Q.   She would have gained five percent plus five
9     percent of this level?

10          A.   Correct, that's one item.  The second item is if
11     she had become a president, if the Tonni Riley distributorship
12     had been terminated, the volume would have been moved up to
13     Mary.  That volume was large enough combined with Mary to make
14     Mary a president, and the situation changes dramatically if
15     Mary Fallow becomes a president.

16          Q.   How does it change dramatically if Mary Fallow
17     becomes a President Team member?

18          A.   Because of blocking.  Currently, if Mary Fallow
19     is a millionaire, she's getting -- she has the capability of
20     getting four percent of her entire downline.  If she becomes a
21     president, she has the capability of receiving six percent of
22     her downline.

23          Q.   Okay.  And what impact does blocking have on that
24     -- the difference between that four and six percent on Mary
25     Fallow's income?

1      A.   I did not understand that question.

2      Q.   Okay.  If Mary Fallow was at four percent and now

3    because Tonni Riley is terminated, she's already at a

4    President Team level, she rolls up, and Mary is now at the six

5    percent.  She gets the additional two percent of the entire

6    downline.  Is that a bad question?

7      A.   She has the capability of getting that entire two

8    percent of that entire downline.

9      Q.   I understand.  This is complex for me, probably

10   simpler for her.  But Mary Fallow would be blocked at various

11   levels down here because of the 14 President Team members,

12   correct?

13     A.   Making her a president would not stop the

14   blocking for the President Team.  However, because she's a

15   millionaire, she would still pick up additional income.  If I

16   could explain this?

17     Q.   Yes, please do.

18     A.   When you're a millionaire, you receive four

19   percent of your entire downline until you reach either another

20   millionaire or a president.

21          When you reach another millionaire, you still get

22   your four percent, but you're blocked thereafter.  But if you

23   were to become a president, you would still be blocked for

24   four percent, but your two percent would go all the way down.

25          So Mary, as she was -- as she was receiving four

Exhibit  D
Page  87  of

1    percent as a millionaire, every time she hit another

2    millionaire or president, she stopped.  But if she was a

3    president, even when she hit 44 other millionaires that were

4    in her line, she still had the capability of going for an

5    extra two percent of the 44 other millionaires.

6              In addition, as a millionaire, she -- when she

7    reaches a president, she doesn't get four percent on that

8    because the president, which was lower than her, stops her

9    from getting anything on that president.  But as a president,

10   even though that president will block her, she will still get

11   six percent one time.

12             So, there's a magnitude of additional money that

13   comes to play when you're a president versus a millionaire.

14   She pierces the 44 lines of other millionaires plus she gets

15   six percent on the president that she could have never even

16   got, the four percent, as a millionaire.

17             Q.   That's the difference she would obtain on the

18   Tabulator Team production bonus?

19             A.   That's the effect, yes.

20             Q.   Were you able to calculate that with the records

21   that were provided to us by Herbalife?

22             A.   Not with those records, no.

23             Q.   Were you able to calculate it based upon any

24   other records?

25             A.   Well, I calculated -- I calculated what I could.

1    There's a few things that --

2             MR. HOXIE:  Objection, calls for a yes or no

3    answer I believe.

4             THE COURT:  Sustained.

5        Q.   (By Mr. Littler)  What were you able to

6    calculate, Mr. Mechlem?

7        A.   I believe I was able to calculate two specific

8    items.

9        Q.   What were those two items?

10       A.   In relation to the royalty override, the five

11   percent, I was able to calculate what the additional five

12   percent royalty override money would be for that additional

13   level that she received.

14       Q.   What -- we'll get to that in a second.  What else

15   were you able to calculate?

16       A.   There was a millionaire Tab Team member for

17   certain downline distributors underneath her.  So, she got

18   four percent on a certain pot of money.  It was easy then to

19   convert the four percent to six percent.  It was just a simple

20   mathematical calculation.

21            So, on what she did get paid, I just converted

22   the four percent to six percent, and I was able to calculate

23   that.

24       Q.   What did you calculate as the amount?

25       A.   I'd have to look at my report because I don't

1    remember.

2            Q.    Do you have it with you?

3            A.    No, I do not.

4            Q.    Okay.

5            A.    Could you repeat the question?

6            Q.    What did you calculate as to that difference, as

7    to the four percent or six percent?

8                  MR. LITTLER:  Your Honor, are you going to be

9    alternating our normal schedule?

10                 THE COURT:  Mainly because of the 12 minutes.

11                 MR. LITTLER:  We'll go till about 3:12.

12                 THE WITNESS:  Excluding interest, I calculated

13   the additional two percent to be $126,313.

14           Q.    126,313?

15           A.    Yes.

16           Q.    For what time period?

17           A.    May 1992 through December 1997.

18           Q.    May '92 to December of '97?

19           A.    Yes.

20           Q.    Why did you choose that time period?

21           A.    1997 I used because that's the last date I had

22   information available from Herbalife in relation to the Fallow

23   downline.  May 1992 because that's the starting point that I

24   chose based on an assumption that I made.

25           Q.    So, that is with the limited information that you

CLARK CERTIFIED COURT REPORTERS   Exhibit  D

                                   Page  92  Of

1    had in your control and review?

2            A.   That part I was able to calculate, yes, without

3    any additional information from Herbalife.

4            Q.   Now, let's talk about the additional royalties.

5    That's the Tabulator Team bonus, correct?

6            A.   Yes.

7            Q.   Let's talk about additional royalties that would

8    have been earned if Tonni Riley was terminated and there was a

9    roll-up.

10           A.   That amount excluding interest was $347,385.

11           Q.   For what time period?

12           A.   The same time period, May '92 through December

13   '97.

14           Q.   Okay.  If there had been a termination for that

15   time period, Mary Fallow would have earned an additional two

16   percent which to calculate that at 126,313 plus an additional

17   five percent at this level which is $347,385?

18           A.   Correct.

19           Q.   Are you also familiar with the President Team

20   bonus?

21           A.   Yes.

22           Q.   As a member of the President Team bonus, would

23   Mary Fallow also have obtained a President Team bonus?  As a

24   member of the President Team, would Mary Fallow also have

25   earned a President Team bonus?

CLARK CERTIFIED COURT REPORTERS

Exhibit P
Page 93 Of

1          A.    Perhaps.

2          Q.    Okay.  Why do you say perhaps?

3          A.    Well, there's some -- just because you're a

4     President Team doesn't mean that you'll get any of the

5     President Team bonuses.

6          Q.    You understand that to be discretionary?

7          A.    There's a -- yes, fairly discretionary.

8          Q.    Have you -- strike that.  Now, how long -- if

9     Mary had not been suspended in October of 1996, do you have a

10    professional opinion as to how long she would have been able

11    to earn additional moneys?

12         A.    What do you mean by additional moneys?

13         Q.    We've calculated out a time period here of May

14    '92 to December '97, correct?

15         A.    Yes.

16         Q.    Now, she would have continued to earn after

17    December of 1997, correct?

18         A.    Yes.

19         Q.    And would you have a professional opinion as to

20    how long she would have been able to continue to earn these

21    kinds of royalties, additional royalties, and additional

22    production bonuses?

23              MR. HOXIE:  Could we have a yes or no answer,

24    Your Honor?

25              THE COURT:  Yes, please.

1    Q.   (By Mr. Littler)   Yes or no, do you have a

2    professional opinion as to the continued length of time?

3    A.   Yes.

4    Q.   And what is that professional opinion based on?

5         MR. HOXIE:   Objection, foundation.

6         MR. LITTLER:   What the foundation is -- that's

7    the foundation question, Your Honor.   What is that

8    professional opinion based on?   That's the question asking for

9    foundation.

10        MR. HOXIE:   I'll withdraw the objection.

11   Q.   (By Mr. Littler)   Maybe I wasn't clear.   What is

12   your professional opinion based on?

13   A.   I used the Work Life Expectancy Table published

14   by the Bureau of Labor.

15   Q.   Is this a table that within your profession you

16   customarily use to determine future income for someone who's

17   claiming lost income or lost wages?

18   A.   Yes, that's the table accountants and economists

19   use.

20   Q.   How long would Mary Fallow continued to have earn

21   revenue?

22        MR. HOXIE:   Objection, foundation.

23        THE COURT:   Foundation?   He's probably using the

24   same table that's in the statutes.

25        MR. HOXIE:   For salaried employees, but these are

1    small business owners and --

2            THE COURT:   And your objection then is what?

3    He's got the wrong scale in mind?

4            MR. HOXIE:   Foundation that he's looked at some

5    labor statistics for salaried employees, but not for small

6    business employees.

7            THE COURT:   I'll overrule the objection.

8        Q.   (By Mr. Littler)   Mr. Mechlem, how long would she

9    have continued to earn?

10       A.   Fifteen years.

11       Q.   Fifteen years from when?

12       A.   Starting the year 1998.

13           THE COURT:   There's probably a clean sheet up

14   there.

15           MR. LITTLER:   They're not up there I must tell

16   you.   It's falling apart.   I don't think there's any left.

17   It's Friday the 13th, Your Honor.

18           THE COURT:   You shouldn't have said that.

19       Q.   (By Mr. Littler)   Now, Mr. Mechlem -- it's Friday

20   the 13th, I'm sorry.   This additional income on the additional

21   production bonus and the additional royalties -- I said

22   additional.   Is that money that Mary Fallow would have earned

23   in addition to what she did earn?

24       A.   Yes.

25       Q.   Okay.   Did you review in preparing your analysis

1    and your report the actual income of the Fallows, of Mary

2    Fallow?

3            A.    Define income.

4            Q.    I'm sorry, the actual revenue that she was paid

5    by Herbalife over a period of years.

6            A.    I have certain years in my report, yes.

7            Q.    What years do you have in your report?

8            A.    Parts of 1992 through 1997.

9            Q.    What is the source of those income figures?

10           A.    I believe they were answers to interrogatories by

11   Herbalife.

12           Q.    Do you have those figures in the report?  Can we

13   just go over those?

14           A.    Yes.

15           Q.    I'll use part of this.  What was the Mary Fallow

16   income revenue?  I'll call it --

17                 MR. HOXIE:  Your Honor, could we get Mr. Mechlem

18   to refer to specific exhibits.  His report has specific

19   exhibits.

20                 THE COURT:  Do you have it in front of you?

21                 THE WITNESS:  Yeah, 2A.

22                 MR. HOXIE:  Thank you.

23           Q.    (By Mr. Littler)  Okay.  What was the Mary Fallow

24   revenue then as reported by Herbalife in the interrogatories?

25           A.    For 1992:  71,291.  1993:  107,580.  1994:

Exhibit____D____
Page__97__Of_____

1      106,031.  1995:  69,293.  1996:  36,165.  1997:  28,862.

2           Q.   Now, are you aware that in 1996 that the

3      Herbalife distributorship was suspended?

4           A.   Yes.

5           Q.   Are you aware of whether that has an impact on

6      the earning capacity of the distributorship?

7           A.   Well, if it was suspended, it has a dramatic

8      impact on earning capability.

9           Q.   All right.  Now, just to close up this one point,

10     the figures you gave me earlier, which I'll try to bring them

11     together later, are in addition to these figures for the Mary

12     Fallow distributorship, correct?

13          A.   Right, the 475,000 is in addition to those

14     amounts.

15          Q.   These?

16          A.   No.  The other amounts, which is about $475,000,

17     is in addition to those amounts listed right there.

18          Q.   Okay.  Would that be in addition to any President

19     Team bonus that she would earn?

20          A.   That does not include any President Team bonus or

21     any of the additional two percent she would have received had

22     she been a president.

23          Q.   Okay.  All right.  Now, as an accountant

24     analyzing damages, how do you take the information that you

25     have got on current income adding the income that you've

1    projected she would have earned under the scenario and project

2    that into the future?  Just generally, how do you do that?

3           A.   Well, when you project income into the future,

4    there's a couple of factors that you have to take into effect.

5    One is the time value of money.  A dollar today will have a

6    higher dollar value in the future.

7           Q.   Okay.  And so what do you do?  What do you first

8    do to get to that figure?

9           THE COURT:  Wait a minute.  I was a tax judge for

10   about five years.  I think I know what he's going to go into.

11   We better break now, 15 minutes.  Remember the admonition.

12           (Recess taken.)

13           THE COURT:  We're all here again.  Mr. Littler?

14           MR. LITTLER:  Thank you, Your Honor.

15           Q.   (By Mr. Littler)  Mr. Mechlem, let's jump back a

16   little bit.  The 475 is additional production bonus and

17   additional royalty that you were able to calculate?

18           A.   Correct.

19           Q.   Over the six-year period calculates out to about

20   what?

21           MR. HOXIE:  I'm sorry, what period?

22           Q.   (By Mr. Littler)  Six-year period.

23           A.   That would be about 80,000 a year.

24           Q.   So, is it your opinion that in addition to the --

25   some other things we're going to talk about -- that the Mary

1     Fallow distributorship would have earned an additional 80,000

2     a year?

3              A.    Yes.

4              Q.    Now, let's talk about this additional two

5     percent.  You were able to calculate some of the additional

6     moneys under the Tabulator Team production bonus that Mary

7     Fallow was able to earn, correct?  That's part of this figure

8     here?

9              A.    That's correct.

10             Q.    You were unable to determine an additional two

11    percent.  Can you explain to the jury what that two percent is

12    and why you were unable to calculate that?

13             A.    The two percent is a factor of three items.  One

14    is it's just taking an additional two percent.  If Mary was a

15    president, she would have been at six instead of four.  So,

16    that's an extra two percent.  That's the number I did

17    calculate.

18                   But in addition to that, if she was a president,

19    for all presidents below her, she would have gotten six

20    percent on that president's volume.  So, including that two

21    percent would be the six percent on that president.

22                   In addition, because she was a millionaire, she

23    didn't get any money on any millionaires below her.  So, now

24    as a president, she'll get six percent to every millionaire

25    plus two percent below every millionaire.

Exhibit D
Page 100 Of

1          Q.   Okay.  And based upon your review of one year,

2    the only year we get the 1996 indented lineage?

3          A.   Yes.

4          Q.   Is that a substantial figure or could it be a

5    substantial figure?

6               MR. HOXIE:  Object, foundation, speculation.

7               MR. LITTLER:  Let me ask some additional

8    questions.

9          Q.   (By Mr. Litter)  Do you --

10              THE COURT:  Sustained.

11         Q.   (By Mr. Littler)  You looked at the 1996 indented

12   lineage report?

13         A.   Yes.

14         Q.   Were you able to calculate the impact of this

15   additional two percent just from that document?

16         A.   No.

17         Q.   Do you believe that the two percent -- you can't

18   put a number on the two percent, correct?

19         A.   Not from the information that I had.

20         Q.   What information would you need to have in order

21   to calculate this two percent?

22         A.   Well, easiest thing would to have production

23   bonus statements of John Peterson because the amounts are

24   listed right on his production bonus statement.

25         Q.   And are you aware as to whether certain

Exhibit  D
Page 101  Of

1    information -- that information was requested from Herbalife

2    and refused?

3              A.   It was requested.

4              Q.   Did they produce it?

5              A.   They did not.

6              Q.   Okay.  Now, to come up with a damage figure

7    because of the suspension in 1996, what numbers would you take

8    and how would we calculate it?

9              A.   In order to calculate what?

10             Q.   Just a projected future damage figure.

11             A.   There's really generally four components.

12   There's the amount of money that could have been made from

13   retail sales.

14             Q.   So, that would be an addition here, correct?

15             A.   Yes.

16             Q.   Okay.

17             A.   And the other items that are listed, the

18   President Team bonus, the two percent, and additional

19   royalties override, which is your $80,000 number.

20             Q.   Would you add that to the income that was already

21   earned?

22             A.   In the future, yes.  All those would be

23   components of the future.

24             Q.   What would you -- that would come up with a

25   number, correct?

Exhibit D
Page 102 of

1          A.   Correct.

2          Q.   Now, would it be fair to say you would simply

3     take the actual income at the 80,000, add the President Team

4     bonus, add the additional two percent that you mentioned, and

5     add the retail sales?

6          A.   Yes, that's correct.

7          Q.   Would that come up with an annual figure?

8          A.   Yes.

9          Q.   What would you do with that annual figure then?

10         A.   That would be their total income from all

11    sources.  So, you would have to substract the costs.  One

12    would be the cost of the product and the other would be the

13    cost to run the distributorship.

14         Q.   Okay.  And then you would come up with an annual

15    figure?

16         A.   That would give you a net income figure.

17         Q.   And then what would you do with what income

18    figure?

19         A.   You would project it into the future taking into

20    account time value of money.

21         Q.   Okay.

22         A.   In other words, the revenue would probably

23    increase due to price increases.  The expenses would increase

24    due to price increases.

25         Q.   Okay.  And so you would take that annual figure

1    and add a percentage to it over the next 15 years?

2           A.    Yes.

3           Q.    What is your professional opinion about the

4    correct percentage?

5           A.    When I prepared damage calculations for just

6    price increases, I used the Consumer Price Index which is the

7    measurement of the inflation for rising prices.

8           Q.    And what is the CPI, Consumer Price Index?

9           A.    In a percentage amount?

10          Q.    Yes.

11          A.    Every year, there's a new percentage.   It's

12   varied anywhere from one percent to as high as eight percent.

13          Q.    Well, when you take the annual figure that you

14   come up with based upon all these numbers, you would multiply

15   it by 15 which is the 15 years?

16          A.    Correct.

17          Q.    You would take the CPI, which is a number, and do

18   what with it?

19          A.    Well, instead of multiplying the total times 15

20   years, you would take that total and grow it by the CPI every

21   year.   If you believe the CPI was three percent at 100,000 in

22   1998, you would be at 103,000 for 1999, a little over 106,000

23   for 19 -- for the year 2000, et cetera, for 15 years.

24          Q.    And as you sit here today, what CPI would you

25   use?  What number would you use to grow it?

Exhibit D
Page 109 of

1          A.    In my opinion, three percent is a reasonable rate

2     of CPI.

3          Q.    That's three percent per year?

4          A.    Yes.

5          Q.    Once you took that out for 15 years adding three

6     percent per year, how would you make the maximum 15 years with

7     the annual figures relevant from money paid to date?

8          A.    That would be a discount factor to determine what

9     the present value of the future amount is.

10         Q.    Okay.  And to get a discount factor, is there a

11    professional opinion that you have as to an appropriate

12    discount factor to apply?

13         A.    Yes.

14         Q.    What is that discount factor?

15         A.    That's the risk-free rate.

16         Q.    What is that?

17         A.    That's approximately six percent.

18         Q.    So, explain to the jury.  After you come up with

19    an annual figure, you add the three percent per year for the

20    next 15 years.  You've come up with 15 years worth of annual

21    figures, correct?

22         A.    Correct.

23         Q.    And then what do you do with those 15 years of

24    annual figures?

25         A.    You discount them back to a present value.

1          Q.   Do you add them up?  First, well, I'm sorry, Your

2     Honor.  How do you discount them back to a present value?

3          A.   Your first year, you would discount back for one

4     year.  Your second future year, you would discount back for

5     two years.  Your third year, you would discount back three

6     years all the way up to the fifteenth year, and discount that

7     back 15 years.

8          Q.   Applying a six percent factor?

9          A.   Yes, applying the six percent factor.

10         Q.   Is that how you come up with a damage figure?

11         A.   Yes.

12         Q.   Relevant to what Mary Fallow or what Clint Fallow

13    would have earned in the next 15 years?

14         A.   That's -- yes, that's what I would do.

15              MR. LITTLER:  Your Honor, we pass the witness.

16              THE COURT:  Mr. Hoxie?

17              MR. HOXIE:  Thank you, Your Honor.

18

19                          CROSS-EXAMINATION

20    BY MR. HOXIE:

21         Q.   Good afternoon, Mr. Mechlem.

22         A.   Good afternoon.

23         Q.   I believe you told Mr. Littler that you have

24    testified as an expert in some arbitrations and in a few

25    depositions.  Did I hear you correctly?

Exhibit  D
Page 106  of

1          A.   That's correct.

2          Q.   You have before today not testified in a Maricopa

3     County Superior Court, have you?

4          A.   That's correct.

5          Q.   Nor have you testified in any other court

6     anywhere; isn't that true?

7          A.   That's correct.

8          Q.   Until testifying here today, you've never

9     testified as an expert in a case involving a multilevel

10    marketing company; isn't that true?

11         A.   That's correct.

12         Q.   Because you used a -- what you termed a risk-free

13    rate of six percent to look at future earnings, does that mean

14    you have the opinion that Mary Fallow's Herbalife

15    distributorship is in a risk-free industry?

16         A.   Yes.

17         Q.   And how much time have you spent interviewing

18    Mary Fallow about how she works her distributorship and what

19    industry challenges she may currently face or face in the

20    future?

21         A.   Between half an hour and an hour.

22         Q.   When was this done, sir?

23         A.   It was done through a telephone conversation

24    couple weeks ago, and I met with Mary last week.

25         Q.   So, you obtained additional information from Mary

Exhibit D
Page 107 of

1   Fallow during the trial and subsequent to your deposition on

2   October 22nd; is that correct?

3       A.   When you say additional information, I asked her

4   some questions and she gave me some answers.

5       Q.   And were those questions pertinent to your

6   opinions on an appropriate discount rate for future earnings?

7       A.   No.

8       Q.   So, any information you obtained from her

9   pertinent to trying to determine what an appropriate discount

10   rate would be for future earnings was the result of the

11   telephone call I believe you talked about earlier in October?

12       A.   That was part of my conclusion, yes.

13       Q.   And we've seen some notes that you took of that

14   telephone conversation.  One of the things you asked Mary

15   Fallow was her birth date, correct?

16       A.   Yes.

17       Q.   And then I believe she told you that she intended

18   to work a distributorship until retirement age.  Isn't that a

19   fair statement?

20       A.   That's correct.

21       Q.   Did you get any other information from Mary

22   Fallow for use in coming up with your conclusion that her

23   distributorship is carried on in a risk-free environment?

24       A.   Well, the risk-free rate is a rate that I use for

25   all of my damage calculations.  So, whatever she had told me

1    would not have changed my opinion.

2         Q.   Do you not apply different discount rates for

3    different industries depending on the risk in a given

4    industry?

5         A.   Not in a case of loss of income.  We do for

6    business evaluations, but this isn't a business evaluation.

7         Q.   But Mary Fallow is referred to in this court as

8    running a small business as an independent Herbalife

9    distributor.  You understand that, correct?

10        A.   That's correct.

11        Q.   And wouldn't her future capacity to profit from

12   her business depend in part on her health?

13        A.   Yes.

14        Q.   Have you secured any information from Mary Fallow

15   about her prior or current health?

16        A.   I may have read something in a deposition, but I

17   didn't specifically ask her.

18        Q.   Now, when we took your deposition on October

19   22nd, I believe you told me you hadn't read Mary Fallow's

20   deposition; isn't that true?

21        A.   That's correct.

22        Q.   So, is that something else you did once I had an

23   opportunity to depose you Thursday before this trial started?

24        A.   Yes, I since have read it.

25        Q.   Did you do any study about competition in the

1    multilevel market industry?

2          A.   No.

3          Q.   Did you do any study about competition in the

4    health care and nutritional products industry?

5          A.   I did not.

6          Q.   Tell me what study you did about the attrition

7    rate in the downline.  You were telling counsel about these

8    58,000 distributors.  How many of those distributors based on

9    your study leave the business at a given time period?

10         A.   I did not do that study.

11         Q.   You didn't do any study, correct?

12         A.   In regard to attrition?

13         Q.   Yes.

14         A.   Not a specific study, no.

15         Q.   Well, you didn't do any specific study, did you?

16         A.   Well, her downline was growing for a period of

17   time, so I didn't do an attrition study.

18         Q.   You looked at a lineage report for one year,

19   1996, correct?

20         A.   That's correct.

21         Q.   And on that basis, that's where you came up with

22   this $58,000 figure as to how many Herbalife distributors in

23   the Mary Fallow downline?

24         A.   Yes.

25         Q.   You didn't look at a lineage report for 1994, did

Exhibit  D
Page  116  Of

1     you?

2          A.   If one had been prepared.

3          Q.   Just answer my question, sir.  You did not look

4     at a lineage report for 1994, correct?

5          A.   That's correct.

6          Q.   So, you took static information and for the

7     purposes of the calculations, you went through with

8     Mr. Littler assuming that everyone in that downline would

9     remain the same going 15 years into the future.  Isn't that a

10    fair statement?

11         A.   That's correct.

12         Q.   You told the jury and us about this Consumer

13    Price Index percentage of three percent and how this

14    distributorship would grow at the rate of three percent just

15    based on inflation, correct?

16         A.   That's correct.

17         Q.   But I noticed, and correct me if I'm wrong, in

18    the figures you came up with, this $475,000 figure for the

19    time period May 1992 through December 1997, you didn't

20    substract three percent going the other way for the period

21    from 1997 back to 1992, did you?

22         A.   No, I wouldn't.

23         Q.   Why not?  Wouldn't you assume a growth rate

24    starting back in 1992 and going forward?

25         A.   No.

1      Q.   Now, the $475,000 figure that you came up with

2    and you talked about, that was based in part upon actual

3    earnings by the Mary Fallow distributorship, correct?

4      A.   Yes.

5      Q.   And those were all gross revenue figures,

6    correct?

7      A.   Yes.

8      Q.   So, those figures that you were telling the jury

9    about do not take into consideration the overhead expenses

10   that one would expect to have in running a distributorship,

11   correct?

12     A.   I'm not sure I understood that question.

13     Q.   If you were using gross earnings, you did not

14   take into consideration the overhead expenses Mary Fallow

15   would have in running her distributorship on a day in, day out

16   basis, correct?

17     A.   It was not gross earnings.  It was additional

18   earnings.

19     Q.   But whether there were additional earnings or

20   not, they were gross figures and did not take into

21   consideration any overhead expenses, correct?

22     A.   There would not be overhead expenses relating to

23   that, correct.

24     Q.   You understand the President Team bonus is a

25   discretionary payment to Tab Team presidents?

CLARK CERTIFIED COURT REPORT

Exhibit__D____
Page_112_Of_____

1          A.    Fairly discretionary.

2          Q.    And what are the criteria for that payment of

3     that bonus?

4          A.    One, you need to be a President Team.  Other than

5     that, I'm not -- I don't know what the criteria is.

6          Q.    Because that was not part of the work you did in

7     this case, correct?

8          A.    That is correct.

9          Q.    Would you expect Herbalife to pay a President

10    Team bonus to someone like Mary Fallow if they thought that

11    Mary Fallow was in violation of certain Herbalife rules?

12         A.    That may be a legal opinion.  I don't know if I

13    can answer that.

14         Q.    As I understood your testimony, there are two

15    fundamental assumptions underlying your opinions that we've

16    heard today.  The first assumption is that the Tonni Riley and

17    Jay Riley distributorships are deleted, correct?

18         A.    That's correct.

19         Q.    And the second fundamental assumption underlying

20    your opinions is that there has to be a merger between the

21    C.S. Fallow distributorship and the Mary Fallow

22    distributorship, correct?

23         A.    They don't both have to happen, but those are two

24    assumptions that I assumed.

25         Q.    You don't personally have an opinion as to

1     whether there should have been a merger of the Mary Fallow and

2     the C.S. Fallow distributorships, correct?

3          A.   Correct.

4          Q.   In fact, if, as of the late spring, early summer

5     of 1994, Dan Fallow and Mary Fallow had been divorced based on

6     your understanding of the Herbalife marketing plan, it would

7     not have been appropriate to merge two divorced people into

8     one distributorship, would it?

9          A.   Could you give me those facts again?

10         Q.   Yeah.  If you assume -- I believe you told me at

11    your deposition that you understood there had been a dual

12    distributorship investigation and a sanction imposed some time

13    in the late spring, early summer of 1994.  Are you with me?

14         A.   Yes.

15         Q.   Okay.  Now, if, in fact, you were to assume that

16    at that time, Dan Fallow and Mary Fallow were divorced and

17    based on your understanding of the -- what you say your

18    understanding is of the Herbalife marketing plan, you wouldn't

19    deem it appropriate to merge the C.S. Fallow distributorship,

20    if it was found it was being run by Dan, in with the Mary

21    Fallow distributorship if these are two divorced individuals,

22    would you?

23          MR. LITTLER:  Your Honor, object to this question

24    because he's asking for a legal opinion based upon the

25    marketing plan, and this witness isn't competent to testify as

Exhibit D
Page 119 Of

1    to a legal opinion.

2              THE COURT:  I don't know if it's legal, but I'm

3    going to sustain an objection to it.

4              MR. LITTLER:  Thank you.

5         Q.   (By Mr. Hoxie)  Can you also assume, sir, that

6    you don't personally know whether or not the Tonni Riley or

7    Jay Riley distributorships should have been deleted from the

8    Herbalife organization, correct?

9         A.   That's correct.

10        Q.   Okay.  You would agree, would you not, that if it

11   is ultimately determined that the Riley distributorships

12   should not have been deleted, it is your opinion in this case

13   that the damages sustained by the Mary Fallow distributorship

14   are zero, correct?

15        A.   That's correct.

16        Q.   It's also your opinion, is it not, that the

17   damages to the C.S. Fallow distributorship are zero based on

18   your latest report that was provided shortly before trial?

19        A.   That's incorrect.

20        Q.   Is there something in the report you provided to

21   me late in the day on October 23rd, 1998, that sets forth

22   damages to the C.S. Fallow distributorship?

23        A.   That's combined in the Mary Fallow --

24        Q.   But on a stand-alone basis, did you undertake to

25   compute any damages to the C.S. Fallow distributorship?

CLARK CERTIFIED COURT REPORTERS   Exhibit  _D_
                                   Page _115_ of ____

1    A.   Not on the stand-alone basis.

2    Q.   In fact, you were advised at one point that there

3    might be some damage because of a dual distributorship

4    investigation conducted by Herbalife where they went out and

5    talked to some distributors, and it was suggested to you that

6    that might have caused distributors in the C.S. Fallow

7    downline to leave the business.  Do you remember that?

8    A.   Yes.

9    Q.   Concluding those -- that there was no correlation

10   to that dual distributorship investigation and loss of

11   distributors in the C.S. Fallow downline, correct?

12   A.   Correct.

13   Q.   And did I hear you correctly that your

14   understanding of the Herbalife marketing plan stems in

15   material part from information provided to you by two people,

16   Dan Fallow and Dave Peterman?

17   A.   And me reading it myself, yes.

18   Q.   Didn't I understand you to say that early in your

19   engagement you met for a couple of days, I believe my notes

20   say, with Dan Fallow and Dave Peterman so they could bring you

21   up to speed with respect to the Herbalife marketing plan?

22   A.   Correct.  I hadn't read it yet.  They met with me

23   before I had a chance to read it.

24   Q.   Just a minute, Your Honor.  You're not an

25   attorney, sir; is that correct?

CLARK CERTIFIED COURT REPORTE:

Exhibit  D
Page  116  Of

1          A.   That's correct.

2          Q.   And when you mentioned in response to a question

3    on your direct examination to the extent that certain

4    information wasn't made available to you by Herbalife, you

5    didn't mean to suggest that, within the context of this case,

6    Herbalife had done anything improper with respect to the

7    Arizona Rules of Civil Procedure, did you?

8          A.   No, just reading their responses --

9               THE COURT:  Next question, Mr. Hoxie.

10              MR. HOXIE:  Thank you, Your Honor.  I may be just

11   about done if I could just check my notes.

12         Q.   (By Mr. Hoxie)  Did you undertake any study of

13   the overhead expenses that the Mary Fallow distributorship was

14   incurring from its start in mid 1980s up until the future

15   time?

16         A.   I reviewed the tax returns of their company and

17   saw the expenses that were listed on their tax returns.

18         Q.   When did you undertake that review?  Was that

19   after your deposition?

20         A.   Yes, it was.

21         Q.   Was that after the trial had started?

22         A.   I don't recall.  Yes, the trial started I believe

23   on Monday.

24              MR. HOXIE:  No further questions.  We would still

25   object to any opinions that he's had since his deposition on

Exhibit D
Page 117 Of

1    October 22nd.

2                    THE COURT:  Noted for the record.  Mr. Littler?

3                    MR. LITTLER:  Thank you, Your Honor.

4

5                           REDIRECT EXAMINATION

6    BY MR. LITTLER:

7           Q.   Mr. Mechlem, you were asked a question about if

8    the Rileys were not terminated that the damage of Mary Fallow

9    would be zero.  Do you remember that?

10          A.   I remember the question.

11          Q.   As a part of your engagement, were you asked to

12   render an analysis or an opinion or a thought at all as to the

13   impact of her suspension in 1996?

14          A.   No, that's not something I looked into.

15          Q.   Your analysis involved what would have happened

16   based upon her revenue and these other factors that we went

17   over, but did not take into account that suspension, correct?

18          A.   That's correct.

19          Q.   Do you have an opinion as to the damages caused

20   by Mary Fallow -- withdrawn, Your Honor.  You were asked some

21   questions by Mr. Hoxie about the use of the risk-free rate.

22   Do you remember that?

23          A.   Yes.

24          Q.   What analysis did you do -- did you perform to

25   determine that the risk-free rate was appropriate?

Exhibit  D
Page 118 of

1          A.   Well, the discount factors, only to take future

2     dollars and discount them back to the present dollars.  And

3     the underlying assumption there is that a person would invest

4     a dollar today at a risk-free rate, so that in my instance, 15

5     years from now, they would have that money in the bank.

6               If you used anything greater than the risk-free

7     rate, if you took the dollar today and invested and discounted

8     it at a higher rate, you would not have the money 15 years

9     from now.  So, the risk-free rate is the only thing you can

10    use.

11         Q.   Okay.  Mr. Mechlem, you were asked some

12    questions, maybe just one question, by Mr. Hoxie relating to

13    the use of the indented lineage.

14         A.   Okay.

15         Q.   Questions gets worse as Friday afternoon goes on.

16    Let me try to say it again.  I think Mr. Hoxie asked you --

17    you only looked at the 1996 indented lineage; isn't that

18    correct?  Do you remember that question?

19         A.   For?

20         Q.   Mary Fallow.

21         A.   Mary Fallow, that's correct.

22         Q.   You have looked, as a part of your engagement, at

23    the discovery responses of Herbalife, correct?

24         A.   Yes, I have.

25         Q.   Let me show you what we've marked for

CLARK CERTIFIED COURT REPORTERS

Exhibit D
Page 119 of

1    identification as Exhibit 415.  Can you identify what 415 is,

2    please?

3         A.   It's Herbalife's response to the plaintiff's

4    second request for production of documents.

5         Q.   And those are -- what is the date of Herbalife's

6    response?

7         A.   August 21st, 1998.

8         Q.   All right.  Look at request number 11 on page 12.

9    Got page 12?

10        A.   Yes, I have it.

11        Q.   All right.  And on page 12 at question number 11,

12   the Fallows requested a number of additional indented

13   lineages, didn't they?

14        A.   Yes.

15        Q.   All right.  And as an expert performing this

16   damage calculation, would you have liked to have seen

17   additional indented lineage reports?

18        A.   Yes.

19        Q.   What would you have done with those if you had

20   seen them?

21        A.   One of the things that the indented lineage

22   report tells me is what the production volume is of all their

23   downline supervisors.  So, to help me determine how the Mary

24   Fallow line was changing over the years, it would have also

25   enabled me to use specific years instead of using one year and

Exhibit  P
Page 126 of

1    stating this was representative of the last five years.

2         Q.   That one year you used in those three books of

3    the year 1996 when she was suspended, correct?

4         A.   That's correct.

5         Q.   Now, we had asked, had we not, for the indented

6    lineages for the years 1992 to 1997 for Mary Fallow, C.S.

7    Fallow, Tonni Riley, Jay Riley, John and Susan Peterson, Dave

8    and Sharon Peterman, and Madda Hillguard (phonetic), didn't

9    we?

10             MR. HOXIE:  Objection, Your Honor, beyond the

11   scope, also waiver and estoppel.

12             THE COURT:  Overruled.

13        Q.   (By Mr. Littler)  Didn't we, Mr. Mechlem?

14        A.   Specifically for the years 1992 through 1997 for

15   those individuals you just stated.

16        Q.   And you would have liked to have seen those to

17   perform your calculation, correct?

18        A.   That's correct.

19             MR. LITTLER:  All right.  Your Honor, we offer

20   415.

21             MR. HOXIE:  We object.  He's requested for

22   abandonment, no longer material.

23             THE COURT:  I'm not familiar with the abandonment

24   part.

25             MR. HOXIE:  Requests were made.  Appropriate

CLARK CERTIFIED COURT REPORTER:

Exhibit _D_
Page _121_ Of _____

1    objections were made, and then they never -- they failed to

2    follow up, so now they're trying to suggest that --

3             THE COURT:  Is this a true objection?

4             MR. LITTLER:  Well, Your Honor, all I wanted to

5    read is the part that talks about their inabilities to

6    produce.

7             THE COURT:  But you offered 415.

8             MR. LITTLER:  I'll just offer the number 11 and

9    the response.

10            MR. HOXIE:  Same objection.  There's no uniform

11   Rule 4(G) conference and no motion to compel, and they just

12   abandoned the request.

13            THE COURT:  I'll sustain the objection.

14       Q.   (By Mr. Littler)  Mr. Mechlem, after we accepted

15   that response -- or excuse me, after they sent that response,

16   did we ever see the indented lineage reports?

17            MR. HOXIE:  Same objection, now relevancy also.

18            THE COURT:  Well, I think you're simply asking

19   over and above the response that did he ever see them.  I'll

20   overrule that objection.

21       Q.   (By Mr. Littler)  Did you ever see them,

22   Mr. Mechlem?

23       A.   No.

24       Q.   Did you develop an understanding -- from your

25   understanding -- you read Mr. Peters' deposition, Bruce

1    Peters?

2           A.   Yes.

3           Q.   You read Bruce Peters' deposition?

4           A.   Yes.

5           Q.   And you've looked at the answers to

6    interrogatories including the answer that we were just talking

7    about to the indented lineage reports?

8           A.   Yes.

9           Q.   Did you develop an understanding as to whether

10   Herbalife could produce those indented lineage reports?

11          MR. HOXIE:   Objection, now scope.  I don't think

12   we heard anything about this on direct.

13          THE COURT:   Sustained.

14          MR. LITTLER:   No further questions, Your Honor.

15          THE COURT:   You may step down, and you -- may he

16   be excused?

17          MR. HOXIE:   Fine with me, Your Honor.

18          THE COURT:   Go home.  No, go back to work.

19          MR. LITTLER:   This is Friday afternoon, Your

20   Honor.  Was that an order?

21          THE COURT:   Well, if we have to work, so does he.

22          MR. LITTLER:   Your Honor, we were going to show

23   the videotaped deposition.

24          THE COURT:   Just make sure he doesn't take those

25   deposition exhibits with him.

1        MR. LITTLER:  Thank you.  We're going to show the

2   videotaped deposition of Mr. John Peterson or portions of it.

3        MR. O'BRIEN:  Your Honor, I object to showing the

4   video deposition.  They never told us they were going to show

5   them today.  They were going to rest their case after

6   Mr. Mechlem, and they also -- we also have three pages of

7   objections that haven't been ruled on, and that's -- as far as

8   I know, they never submitted the deposition transcripts for

9   you to rule on our objections.

10        THE COURT:  I got a deposition over the noon

11   hour.

12        MR. O'BRIEN:  Yes, that's from Michelle Peters.

13   We'll use her next week, but I wanted a ruling on the

14   objections.  I have no idea what passages are going to be

15   offered.

16        THE COURT:  The objections referred to, are they

17   in the pretrial?

18        MR. O'BRIEN:  Yes, but they haven't told you what

19   passages.  We have objections to all passages.

20        THE COURT:  Unless you've taken those out, I'm

21   going to sustain his objection at this point.

22        MR. LITTLER:  We may very well have, Your Honor.

23   I have to go back and check.  Quite frankly, Your Honor, we

24   believed Mr. Mechlem would take the bulk of the afternoon, and

25   we were going to show this Monday morning.  We were kind of

1    trying to throw in a witness here to spend the last 40 minutes

2    of Friday afternoon.

3                    I don't see any reason why, if Mr. O'Brien

4    follows along with me, that we can't deal with this as we are

5    going through the videotape.  It is a slow process as you

6    know.  I think we can fill this time wisely.

7                    THE COURT:  I wouldn't do that over his

8    objection.  He still objects.

9                    MR. O'BRIEN:  We do object.  We're ready to start

10   our case in chief.  I have a video that has been admitted.

11   It's the deposition of Mr. Jeffrey Kichaven.

12                   MR. LITTLER:  Your Honor --

13                   MR. O'BRIEN:  He can save it for rebuttal if

14   there's time.

15                   MR. LITTLER:  I would not object if we take that

16   out of order then until we deal with these other objections.

17                   THE COURT:  Mr. Hodel?

18                   MR. HODEL:  I'm sorry, Your Honor?

19                   THE COURT:  What you save for rebuttal, of

20   course, there's a technical objection as to whether it's

21   rebuttal or not.  Are you waiving that?

22                   MR. O'BRIEN:  No, I'm not.

23                   THE COURT:  What he's saying, the only way he

24   would permit you to do it is if it's proper rebuttal.

25                   MR. LITTLER:  Well, Your Honor, I don't believe

Exhibit___D___
Page_125_of_____

1    that's appropriate.  As Mr. O'Brien knows, if we rest and if

2    there's good cause shown, we can reopen.  I don't think it's

3    fair, in light of the fact we thought Mr. Mechlem would take

4    the entire afternoon, to force us to rest simply because he

5    hasn't submitted his objections to you for consideration.

6              THE COURT:  Let me say this.  I will sustain his

7    objection at this point.  I will not express any opinion,

8    however, as to whether I would allow you to reopen your case

9    for that one thing in view of what you said.  The third thing

10   I should say is if it is what I think it is, I doubt very much

11   if it could be proper rebuttal.  Now, I'll leave you with

12   that.

13             MR. LITTLER:  That's what concerns me, Your

14   Honor.  We're ready to play it.  I don't want to be --

15             THE COURT:  I'm going to sustain the objection.

16   The objections haven't been ruled on, and they are properly in

17   front of me because they're in the pretrial.

18             MR. LITTLER:  One last point, Your Honor.  I

19   believe it's his burden to make sure there are rulings on the

20   objections, not mine.  But that being the case --

21             THE COURT:  Even if he hadn't raised it, however,

22   I would have done it myself.

23             MR. LITTLER:  I've started to quibble with you.

24   I don't want to do this.  We'll probably ask you to reopen on

25   Monday.  We're going to have to rest then.

1          THE COURT:  Very well.

2          MR. HOXIE:  At this time, the defense would make

3    a motion pursuant to Arizona Rule 50.  Without arguing in

4    front of the jury, may we simply hand our motion to the clerk

5    for Your Honor's consideration?

6          THE COURT:  You may unless you raise some

7    objections to that.

8          MR. LITTLER:  I have no idea what he's handing to

9    the clerk, Your Honor.

10         THE COURT:  I don't know either, but you will

11   shortly.  Do you have a copy for him?

12         MR. HOXIE:  We do, Your Honor.

13         THE COURT:  You may do that.

14         MR. HOXIE:  Thank you, Your Honor.

15         THE COURT:  That means, of course, Mr. Littler, I

16   will read this obviously which I have not done at this point.

17   I'll probably read it --

18         MR. LITTLER:  And we will deal with this when

19   Your Honor does so.

20         THE COURT:  Well, if I see something to be dealt

21   with, I will do it on Monday.

22         MR. LITTLER:  Okay.

23         THE COURT:  If I don't, however, I'll simply

24   rule.

25         MR. LITTLER:  Okay, Your Honor.  Thank you.

Exhibit___D___
Page__127_of_____

1          MR. HOXIE:  Thank you, Your Honor.

2          MR. O'BRIEN:  May we proceed with the video, Your

3    Honor?  Could you give me five minutes to set up?

4          THE COURT:  I don't know about five.  They have

5    rested their case.  We're now on the defense case.  We're

6    going to stop, gentlemen, at quarter to.

7          MR. O'BRIEN:  The individual you're about to see

8    on this video is an individual whose name is Jeffrey Kichaven.

9    He's a California lawyer.  He was a lawyer that was involved

10   representing Herbalife in the ANC lawsuit.  The jury is

11   familiar with the nature of the lawsuit, Your Honor.

12         MR. LITTLER:  Your Honor, he moved the TV screen.

13   I couldn't -- may I be permitted to go over?

14         MR. HODEL:  I won't hurt him.

15         (Whereupon, the videotaped deposition of Jeffrey

16   Kichaven was played.)

17

18         (The proceedings were adjourned.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, KRISTIN A. WOODALL, certify that I made a

4   shorthand record of the matter contained herein, and that the

5   foregoing 89 typewritten pages contain a full, true, and

6   accurate transcript of said shorthand record, done to the best

7   of my skill and ability.

8           DATED, at Mesa, this 1st day of January, 1999.

9

10

11                              *Kristin A. Woodall*
                    KRISTIN A. WOODALL, RPR

12
                         Certified Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

1         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3

4   CLINT S. FALLOW, MARY LYNN        )
    FALLOW, and DANIEL S. FALLOW,     )
5                                     )
              Plaintiffs,             )
6                                     )
         vs.                          )   CV96-03558
7                                     )
    HERBALIFE INTERNATIONAL, INC., a )
8   Nevada corporation, TONNI and JAY)
    RILEY, husband and wife,          )
9                                     )
              Defendants.            )
10  _____)

11
                    Phoenix, Arizona
12            Wednesday, November 18, 1998

13
        BEFORE:   THE HONORABLE WILLIAM J. SCHAFER III
14                 Superior Court Judge

15

16
            REPORTER'S TRANSCRIPT OF EXCERPTS OF
17          DAY NO. 14 OF JURY TRIAL PROCEEDINGS

18          TESTIMONY OF CAROL HANNAH (Cont'd.), GUY
        MECHLEM (Rebuttal) AND DAN FALLOW (Rebuttal)
19
               (Volume 11, Pages 2435-2631)
20

21

22
                              COPY
23
                         BEVERLEE CAPERTON, CSR, RPR
24                       Official Court Reporter

25  PREPARED FOR:
    MATTHEW A. HODEL, ESQ.

Exhibit ___D___
Page __130.01__

1   APPEARANCES:

2        For the Plaintiffs:

3            Ronald E. Warnicke, Esq.
             Thomas E. Littler, Esq.
4            Ellen Davis, Esq.
             WARNICKE & LITTLER, P.L.C.
5            2020 North Central, Fifth Floor
             Phoenix, Arizona 85004-4506

6        For the Defendant Herbalife:

7
             Joel P. Hoxie, Esq.
8            Craig Marquiz, Esq.
             SNELL & WILMER, L.L.P.
9            One Arizona Center
             Phoenix, Arizona 85004-0001

10
             Matthew A. Hodel, Esq.
11           Sean A. O'Brien, Esq.
             PAUL, HASTINGS, JANOFSKY & WALKER, L.L.P.
12           695 Town Center Drive, 17th Floor
             Costa Mesa, California 92626

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit        D

Page 131   Of

# I N D E X

| | PAGE |
|---|---|
| **DEFENDANTS' WITNESSES:** | |
| CAROL HANNAH | |
| Direct examination (Cont'd.) by Mr. Hodel | 2438 |
| Cross-examination by Mr. Littler | 2556 |
| Redirect examination by Mr. Hodel | 2604 |
| | |
| **PLAINTIFFS' REBUTTAL WITNESSES:** | |
| GUY MECHLEM | |
| Further redirect examination by Mr. Littler | 2609 |
| Further recross-examination by Mr. Hoxie | 2617 |
| DAN FALLOW | |
| Further redirect examination by Mr. Littler | 2621 |
| Further recross-examination by Mr. Hodel | 2625 |
| Further redirect examination by Mr. Littler | 2629 |

## EXHIBITS

| | | | ID'd | Rec'd |
|---|---|---|---|---|
| 202 | Handwritten Letter 3-12-90 | | 2450 | 2450 |
| 204 | Handwritten Note (Approx. 1990) | | 2458 | 2459 |
| 989 | Flow Chart (John Peterson) | | 2544 | 2545 |

Exhibit  D
Page 132 of

1      A.  Yes.

2      Q.  Dave Peterman is still unhappy?

3      A.  Yes.

4      Q.  He came back to court.  And John Peterson and

5  Susan Peterson are unhappy with how it was resolved?

6      A.  Yes.

7          MR. HODEL:  All right.  Herbalife rests, your

8  Honor.

9          THE COURT:  Rebuttal, Mr. Littler.

10          MR. LITTLER:  Thank you, your Honor.  We call

11  Mr. Mechlem.

12          THE COURT:  Oh.  Yeah, you may step down.

13          THE WITNESS:  Thank you.

14          THE COURT:  I don't recall whether I dismissed

15  you or not, Mr. Mechlem.  Does it show, Terri?

16          (Discussion off the record between the Court

17          and Clerk.)

18          THE COURT:  Be sworn again.

19

20              GUY MECHLEM,

21  called on rebuttal by the Plaintiffs at 2:23 p.m.,

22  resworn by the Clerk, testified further as follows:

23

24

25

Exhibit D
Page 133 of

FURTHER REDIRECT EXAMINATION

BY MR. LITTLER:

    Q.  Are you still Guy Mechlem since we last talked?

    A.  Yes.

    Q.  Were you present for Mr. Weekly's testimony?

    A.  Yes, I was.

    Q.  You heard him criticize your testimony because of some mathematical errors?

    A.  That's correct.

    Q.  Was he right about that?

    A.  No, he was not.

    Q.  How was he incorrect?

    A.  Well, he testified about two mathematical incorrect calculations.  One dealt with $2500 of royalty overrides.  I went back and checked my computations and there was no mathematical mistake there.

    He stated that there was an annualization of nine months that it was done improperly.

    Q.  Okay.  Was it done improperly?

    A.  No, it was done correctly.

    Q.  Okay.  You went back and checked?

    A.  Yes.

    Q.  And the second mathematical error?

    A.  The second mathematical error he did on the flip chart.  I could probably show you where he was

1    incorrect if you were to able to find his flip chart.

2         Q.   Right here, I believe.  (Indicating.)

3         THE WITNESS:  Could I --

4         THE COURT:  He wants the pointer.

5         THE WITNESS:  Could I?

6         THE COURT:  Yes, you may.

7         (Witness leaves witness stand and goes by

8         easel.)

9         THE COURT:  Would this help?

10        THE WITNESS:  I was just going to get --

11        MR. LITTLER:  Here's one.

12        THE WITNESS:  Red one?

13        MR. LITTLER:  So we can tell yours from his.

14        THE WITNESS:  Okay.

15        THE COURT:  Mr. Hoxie, you can come over here.

16        MR. HOXIE:  Thank you, your Honor.

17        THE COURT:  You better try to stand to one side

18   so the jury can see what you are doing.

19       A.   Okay.  Mr. Weekly was stating that the amount

20   of actual production bonus that was paid was this $84,000

21   number.  And what I was trying to calculate was moving --

22   making an assumption that Mary Fallow would have been a

23   President.  She was a Millionaire.  There's some two

24   percent difference.

25        So if $84,000 is four percent -- and I'm only

Exhibit  D
Page  135  of

1    trying to calculate two percent -- the most you could --

2    then the two percent being the difference between the six

3    and the four, it's pretty easily mathematically computed

4    that this two percent is half of the four percent.

5    Therefore, 84,000, the damages should be half of that,

6    which would be 42,000.

7            And so you took 84,000 times 50 percent, which

8    would be the two percent difference, and that would be

9    $42,000 of damages.  And my report says $127,000,

10   therefore $85,000 overstated.

11           I'm not sure he understood what he was talking

12   about, but let me explain.  The four percent that was

13   paid, you can get four percent and you can also get two

14   percent because of blocking.  For Mary, it just so

15   happened that 90 percent of what she was paid was at the

16   two percent level and about 10 percent of what she was

17   paid was at the four percent level.

18           So it is true that for 10 percent of the time

19   you would multiply times 50 percent.  However, if you are

20   being -- even though you are a Millionaire but you get

21   substantial sums of money at the two percent, in order to

22   calculate damages here, now we have a difference of other

23   than wanting to be paid at six but only being paid at two.

24   So there's a four percent difference.

25           So to calculate four percent, as he stated

Exhibit  D
Page  136  of

1    somewhere -- I don't know where it was -- but in order to

2    get the -- the two percent, you would double the number

3    that the -- the amount would be twice that.

4            So to calculate damages between the two -- the

5    six and the two percent, it wouldn't be a multiplication

6    times 50 percent.  It would be a multiplication times 200

7    percent.  And you may remember him at some point -- I

8    don't know which chart it is -- saying that it was 200

9    percent off, which is correct.  Based on his testimony,

10   which was incorrect, I would be 200 percent off because he

11   doesn't understand the calculation.  But there are --

12   there are two different calculations, and that is why I'm

13   not overstating by anything.  My -- my calculation is

14   correct.  There are the $127,000 of damages.

15           THE COURT:  Do you want him to stay there,

16   Mr. Littler?

17           MR. LITTLER:  No, I think that we're done with

18   that chart.  Thank you.

19           (Witness returns to witness stand.)

20       Q.  BY MR. LITTLER:  Did you also hear Mr. Weekly

21   testify about the discount rate.

22       A.  Yes, I did.

23       Q.  Okay.  And you heard him say that he believed

24   the 40 percent discount rate would be appropriate?

25       A.  Yes, I did.

Exhibit___D___
Page__137.00___

1          Q.   And do you disagree with that?

2          A.   Yes, I do.

3          Q.   Why do you disagree with that?

4          A.   It's probably easier if I go back to a flip

5     chart to show it --

6          Q.   All right.

7          A.   -- if I could.

8               THE COURT:  Do you need a clean sheet?

9               THE WITNESS:  Yes.

10              MR. LITTLER:  I'll have to give you this then.

11    Come over here and I'll hold it up.  The pen's right

12    there.

13              (Witness leaves witness stand and goes by

14              easel.)

15              THE COURT:  Try to clip that, Shawne.  She's

16    got a clip.

17              MR. LITTLER:  Oh.  Thank you, Shawne.

18              There you go.

19              THE WITNESS:  Thank you.  And I'll refer to a

20    -- a screen that -- that he put on that you may recollect.

21    But one of his exhibits said that I believe it was in --

22    in five years, if you use a discount rate -- which I used

23    to six percent under my scenario -- a damage award would

24    be somewhere around $3700.  And what -- let explain what

25    this means because we're talking about the future.

Exhibit___D___
Page_138_of_____

1          MR. HOXIE:  Objection, your Honor.  I think we

2  are now beyond the scope under 39.  This isn't attacking

3  four percent.  He's now doing a calculation he should have

4  done in his case in chief.

5          THE COURT:  Overruled.

6          THE WITNESS:  What the 50,000 is, that's a

7  number in the future.  What six percent is, it's a

8  discount to -- to today's date.  So what we're -- what I'm

9  trying to say here is, you may have $10,000 of future

10  damages for five years, which is $50,000, but that's five

11  years from now.  So what I'm saying is, bringing that back

12  to net present value, it's 37,000 there.  It's not the

13  3,700.  Bringing that to present value to discount rate

14  would be 37,000, which that means if you put $37,000 in

15  the bank today and it earns interest at six percent, in

16  five years it would be worth $50,000.  What he's saying

17  is, 50,000 at 40 percent, and I think his number was like

18  a hundred and thirty-seven, so that would be 1,370.

19          The problem with what he's doing is, now to get

20  this 50,000 of future cash flows, he's saying that if I

21  have an award of $1370, it is now up to the recipient of

22  the reward to invest that money, make a 40 percent return

23  so they receive $50,000.

24          So the problem -- the problem is, theoretically

25  the difference between what I'm saying and he's saying,

1   I'm saying you need 37,000 today so you can put the money

2   in the bank, be safe, and have 50,000 in the future.  He's

3   saying 1370, go take as much risk as you possibly can --

4   you got the award today, go find some investments that

5   earn 40 percent -- because that's like an Herbalife -- and

6   then you'll have 50,000.  And that's why he is incorrect

7   and I believe I am correct.

8          Q.   BY MR. LITTLER:   Thanks.  Did you also take

9   into account the -- this particular company, Herbalife --

10  yeah, you need to go back.  Why don't you go back.

11         A.   Thank you.

12              (Witness returns to witness stand.)

13         Q.   BY MR. LITTLER:   Well, you are not going to

14  need to write anymore, are you?

15         A.   I hope not.

16         Q.   My question was, did you take into account this

17  coming up with a six percent factor instead of a 40

18  percent factor the stability of Herbalife as a company?

19              MR. HODEL:   Objection.  Goes beyond the scope.

20  We went over this in his last testimony.  They are getting

21  a second bite of the apple.

22              THE COURT:   His what testimony?

23              MR. HOXIE:   The last time he was on the stand

24  when he came in here.  He's now going over the testimony,

25  he's now getting a second bite in the apple.

1          THE COURT:  Overruled.  Do you remember the

2    question?

3          THE WITNESS:  Can you repeat it?

4      Q.  BY MR. LITTLER:  The question was, coming up

5    with a lower discount rate, six percent versus 40 percent,

6    did you take into account the size of Herbalife?

7      A.  Yes.

8      Q.  Did you take into account stability?

9      A.  Yes.

10     Q.  Now Herbalife, I think has been said, is a

11   billion dollar company; right?

12     A.  Billion and a half from sales, if I remember,

13   yes.

14     Q.  Did you look at their -- the reports that they

15   give to the Securities and Exchange Commission?

16     A.  Yes, I have.

17     Q.  And did you determine their financial stability

18   in taking that into account?

19         MR. HOXIE:  Same objection.

20         THE COURT:  Well, I think this is just an

21   extenuation of the other question, so I'll overrule.

22     A.  Yes.

23     Q.  BY MR. LITTLER:  Okay.  Did you also take into

24   account Mary Fallow's particular downline and its history?

25     A.  Yes.

Exhibit___D
Page_191_Of_____

1  Q.  What did you find with that.

2  A.  Well, the downline -- Mary Fallow had been in

3  business for about 14 years.  The downline had remained

4  fairly constant for a couple years.  It did -- it did

5  start to decrease in the later years.

6  Q.  After the '96 suspension?

7  A.  Yes.

8  Q.  Okay.  Did you take into account Tonni's line,

9  which is one of the legs of Mary's downline?

10  A.  Yes.  Yes, that was part of the calculation.

11  Yes.

12  Q.  So do you stand by your six percent discount

13  rate?

14  A.  Yes.  But you are -- you are comparing apples

15  and oranges without understanding what Mr. Weekly is

16  trying to state versus what I'm trying to state.

17  Q.  Okay.  You are saying they are very different,

18  but you still stand by your six percent calculation?

19  A.  That's correct.

20  MR. LITTLER:  All right.  We pass the witness.

21  THE COURT:  Mr. Hoxie.

22  MR. HOXIE:  Thank you, your Honor.

23  FURTHER RECROSS-EXAMINATION

24  BY MR. HOXIE:

25  Q.  You would agree, would you not, Mr. Mechlem,

Exhibit    D
Page 142 Of

1    that the higher the appropriate discount rate, the lower

2    the award today if you are talking about a calculation of

3    future damages?

4         A.   Yes.

5         Q.   And the mathematical calculation that you went

6    through for the jury's benefit, just where this one -- the

7    one -- the page before on this $85,000 mathematical

8    error -- that mathematical calculation was not included in

9    your report of October 23, 1998 -- isn't that correct? --

10   the actual math.

11        A.   What do you mean by "math."  You mean the

12   numbers there?  I'm not sure I understand your question.

13        Q.   My question is, in your report of October 23,

14   1998, you had a final calculated number for allegedly lost

15   production bonus for the years 1992 to 1997; but the math

16   supporting that calculation was not set forth in the

17   report itself so that someone like Weekly could follow

18   your calculation.  Isn't that correct?

19        A.   It was a compounded question.  Somebody like

20   Mr. Weekly could have followed the calculation.

21        Q.   But the calculation --

22        A.   But my -- the math was not a separate exhibit

23   in my report.

24        Q.   Thank you.  As you heard counsel say, this is

25   their rebuttal case, so you are here today to rebut

Exhibit    D

Page  143 of  _____

1    Mr. Weekly.  I take it you do not rebut his conclusion

2    that there were misleading tax returns filed by the

3    Plaintiffs with respect to their Herbalife financial

4    affairs?

5            A.   Misleading tax returns?

6            Q.   Right.

7            A.   I don't know if I'd say they were misleading.

8            Q.   You are here today to say that they filed

9    accurate tax returns with respect to their Herbalife

10   financial affairs?

11           A.   Under -- in my opinion, they -- they probably

12   need to be amended.  Under what they believe they did, I

13   can understand why they didn't report the income.

14           Q.   You don't disagree, do you, that the -- that

15   Dan Fallow and Mary Fallow had a financial interest in

16   both the Mary Fallow and the C.S. Fallow distributorships.

17   You don't disagree with that proposition, do you?

18           A.   Under what definition of "financial interest."

19           Q.   That they shared a financial interest in both

20   distributorships.  They enjoyed the benefit of the income

21   generated from both distributorships.  You don't disagree

22   with that proposition, do you?

23           A.   Under that definition, no.

24           Q.   You don't disagree with Mr. Weekly's conclusion

25   that there was a precipitous drop in the income in the



Exhibit_____D_____
Page__144_of_____

1    C.S. Fallow distributorship starting in April of 1993, with

2    the most dramatic decline in October of '93 through the

3    end of that year.  You don't disagree with that

4    proposition, do you?

5         A.   I disagree with a few things that he said, but

6    I'd have to see the chart in front of me to tell you what

7    my opinion would be.

8         Q.   Okay.  And with respect to longevity, did you

9    do any analysis as to the longevity of an habitual rules

10   violator, a distributor who habitually violates rules, how

11   long a distributor could last like that in the future.

12   Did you do any such analysis?

13        A.   No.

14             MR. HOXIE:  That's all the questions I have.

15   Thank you, sir.

16             THE COURT:  Mr. Littler.

17             MR. LITTLER:  No questions, your Honor.

18             THE COURT:  You may step -- you may step down,

19   Mr. Mechlem.

20             MR. LITTLER:  We call Dan Fallow to the stand.

21             THE COURT:  You don't have to swear him.  He's

22   been sworn.

23             You are already sworn.

24

25

Exhibit ___D___
Page __148__ of ____