**ORIGINAL**

U S DISTRICT &
BANKRUPTCY COURTS

01 MAY 18  PM 5: 46

FILED DEPOSITORY IDAHO
Cameron S. Burke, Clerk

James L. Martin, ISB No. 4226
MOFFATT THOMAS BARRETT ROCK & FIELDS, CHTD.
101 South Capitol Boulevard
10th Floor, P.O. Box 829
Boise, Idaho 83701-0829
Telephone: (208) 345-2000

Mark R. McDonald
Asako Sakai
MORRISON & FOERSTER LLP
555 West Fifth Street
Suite 3500
Los Angeles, California  90013-1024
Telephone: (213) 892-5200

Attorneys for Defendants
HERBALIFE INTERNATIONAL, INC.
and HERBALIFE OF AMERICA, INC.

## UNITED STATES FEDERAL DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| MARY LYNN FALLOW, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.  CIV 01-0073-N-EJL |
| | ) | |
| vs. | ) | **DEFENDANTS' REQUEST FOR** |
| | ) | **JUDICIAL NOTICE IN SUPPORT** |
| HERBALIFE INTERNATIONAL, INC., | ) | **OF THE MOTION TO DISMISS** |
| a Nevada Corporation; HERBALIFE | ) | |
| OF AMERICA, INC., a California | ) | |
| Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pursuant to Federal Rules of Evidence 201(d), Defendants Herbalife International,

Inc. and Herbalife of America, Inc. (collectively, "Herbalife") respectfully request that this Court

take judicial notice of the following documents in support of their Motion to Dismiss Complaint:

**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**
**IN SUPPORT OF THE MOTION TO DISMISS - 1**

BOI_MT1:346248.1

1.     Amended Complaint For: Breach of Contract, Quantum Meruit,

Intentional Interference With Contract, Fraud, Conversion, Racketeering, Punitive Damages,

filed in the Superior Court of the State of Arizona, in *Fallow v. Herbalife International, Inc.,*

Case Number CV 96-03558, a true and correct copy of which is attached hereto as Exhibit A.

2.     Plaintiff's Initial Disclosure Statement, filed in the Superior Court of the

State of Arizona, in *Fallow v. Herbalife International, Inc.,* Case Number CV 96-03558, a true

and correct copy of which is attached hereto as Exhibit B.

**3.     Joint Pretrial Statement, filed in the Superior Court of the State of**

**Arizona, in *Fallow v. Herbalife International, Inc.,* Case Number CV 96-03558, a true and**

**correct copy of which is attached hereto as Exhibit C.  [NO FILE-STAMPED COPY; NO**

**SIGNATURES]**

4.     Reporter's Transcript of the trial proceeding, November 19, 1998, in the

Superior Court of the State of Arizona, in *Fallow v. Herbalife International, Inc.,* Case Number

CV 96-03558, a true and correct copy of which is attached hereto as Exhibit D.

Dated this 18th day of May, 2001.

MARK R. MCDONALD
ASAKO SAKAI
MORRISON & FOERSTER LLP

MOFFATT, THOMAS, BARRETT, ROCK &
FIELDS, CHARTERED


By  *Kelly M. Hamily  fo*

James L. Martin - Of the Firm
Attorneys for Defendant

**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**
**IN SUPPORT OF THE MOTION TO DISMISS - 2**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of May, 2001, I caused to be served a true copy of the foregoing **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE MOTION TO DISMISS** by the method indicated below, and addressed to the following:

| | |
|---|---|
| Ford Elsaesser | (✓) U.S. Mail, Postage Prepaid |
| Joseph Jarzabek | ( ) Hand Delivered |
| ELSAESSER JARZABEK ANDERSON | ( ) Overnight Mail |
|   MARKS & ELLIOTT, CHTD. | ( ) Facsimile |
| Third & Lake Streets | |
| PO Box 1049 | |
| Sandpoint, ID  83864 | |


James L. Martin

**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF THE MOTION TO DISMISS - 3**

BOI_MT1:346248.1

# EXHIBIT A

**WARNICKE & LITTLER, P.L.C.**
2020 North Central Avenue
Fifth Floor
Phoenix, Arizona 85004-4506
(602) 256-0400
FAX (602) 256-0345

Ronald E. Warnicke/SBN 001791
Thomas E. Littler/SBN 006917
Mark J. Giunta/SBN 015079

Attorneys for the Plaintiffs

**RECEIVED**

**APR 30 1997**

Paul, Hastings, Janofsky & Walker LLP

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| CLINT S. FALLOW, MARY LYNN FALLOW, and DANIEL S. FALLOW,<br><br>    Plaintiffs,<br><br>vs.<br><br>HERBALIFE INTERNATIONAL, INC., a Nevada Corporation, TONNI and JAY RILEY, Husband and Wife,<br><br>    Defendants. | No.  CV 96-03558<br><br>**AMENDED COMPLAINT FOR: BREACH OF CONTRACT QUANTUM MERUIT INTENTIONAL INTERFERENCE WITH CONTRACT FRAUD, CONVERSION RACKETEERING PUNITIVE DAMAGES**<br><br>**(Jury Trial Demanded)**<br><br>**(Assigned to the Honorable Colin F. Campbell)** |

Plaintiffs Clint S. Fallow, Mary Lynn Fallow, and Daniel S. Fallow for their amended complaint against Defendants Herbalife International Inc., and Herbalife of America, Inc. (together "Herbalife") and Tonni and Jay Riley by and through counsel undersigned, hereby allege as follows:

### I.     PARTIES

1.     Plaintiff Clint S. Fallow is a resident and citizen of Maricopa County, Arizona.

2.     Plaintiff Mary Lynn Fallow is a resident and citizen of Sandpoint, Idaho.  At relevant times, Mary Lynn Fallow was married to and then divorced from Dan S. Fallow, Clint Fallow's father.  At relevant times herein, she was a resident of Maricopa County, Arizona.

3

3.      Plaintiff Daniel S. Fallow is a resident and citizen of Sandpoint, Idaho.  At relevant times herein, he was a resident of Maricopa County, Arizona.

4.      Defendant Herbalife International Inc. has, and at all relevant times had, its principal place of business in Southern California.  Nonetheless, it is a Nevada corporation.  Herbalife is the holding company for Herbalife of America Inc.

5.      Defendant Herbalife of America Inc. has, and at all relevant times had, its principal place of business in Southern, California.

6.      Upon information and belief, at all times relevant herein Herbalife of America and Herbalife International Inc. acted in concert and as agents of each other.

7.      Defendants Tonni and Jay Riley, husband and wife, are believed to be residents of Prescott, Arizona, doing business in Maricopa County.  At relevant times herein, they were residents of Maricopa County.

8.      Herbalife does, and at all relevant times has been doing, business in Maricopa County Arizona, and collects sales tax for the State of Arizona (which may or may not be paid over to the State, and which may form the basis for a later class action claim).  Herbalife has solicited consumer sales in Arizona, shipped large amounts of products to Arizona, and has solicited thousands of Arizona residents to become sales agents for Herbalife.

9.      At all relevant times, Mark Reynolds Hughes, has been and is the Founder and President of Herbalife International.

10.     Mary Fallow began her Distributorship for Herbalife while a resident of Maricopa County, Arizona.  Mary operated the Distributorship in Maricopa County from April of 1984 to mid 1987.

11.     Clint Fallow began his Distributorship for Herbalife while a resident of Maricopa County, Arizona.  Clint operated the Distributorship in Maricopa County, Arizona, at all relevant times herein.

12.     Dan Fallow began a Distributorship with Mary in Maricopa County, Arizona, and operated

-- Page 2

4

that Distributorship with Mary in Maricopa County until 1987.

## II. GENERAL ALLEGATIONS

A.   <u>Facts Relating To the Business of Herbalife</u>

1.   <u>The Herbalife Promises: Income Limited Only By Individual Effort.</u>

13.   Herbalife sells the idea of success, the ability to get rich quick, and to enjoy a lavish lifestyle and unlimited income.  Herbalife recruits Distributors through a series of video tapes, offering the promise of new homes, dream vacations and quick cash  designed to lure more and more people into filling out the bottom of the Herbalife pyramid, necessary to support the avarice of the those at the top.

14.   The contrivance for Herbalife's pyramidal get rich quick scheme is the sales and distribution of overpriced herbal weight loss, nutritional and personal care products.  The products cannot be purchased through retail outlets.  Rather, they are sold exclusively through a network of persons employed as independent "Distributors."

15.   Plaintiff Dan Fallow has recently gained information which makes him believe that Herbalife is able to offer its Distributors the promise of large returns because the mark-up on its products is over seven times the cost of manufacturing.  For example, its "Protein Power" weight loss drink is believed to cost approximately $2.50 a can to manufacture.  Herbalife sells it for $20.00 a can -- all of which is profit.  Herbalife recoups its costs by tacking on other charges, marking up UPS or other freight charges over actual cost, and adding a superfluous 6% packaging and handling charge on every order.  Upon information and belief, Herbalife funds its recently announced "infinite bonus" payments to the highest level of Distributors by the packaging and handling charge.  Prior to implementing this bonus system, Herbalife had never charged packaging and handling.

16.   In its promotional materials, Herbalife offers the example of Founder and President, Mark Hughes as someone who became rich selling Herbalife, and drives a Rolls Royce and lives in a $20 million dollar Beverly Hills mansion.  However, upon information and belief, a large portion of Hughes' current income is not earned through sales of Herbalife products through Distributorship, but is earned from sales

-- Page 3

made to Herbalife by supplier companies in which Hughes has an equity interest.  According to recent 10-Q report filed with the SEC in May of 1995, Hughes earned almost $5,000,000 in 1994 from these companies, one of which has a requirements contract, obligating Herbalife to purchase all of its products from it.

17.    An applicant for a Herbalife Distributorship becomes a Distributor when the person purchases a "Distributor Kit" and "when [his] completed application has been accepted and processed by Herbalife World Headquarters."  Once the application has been accepted, the "contract with Herbalife becomes effective immediately, giving [the Distributor] all the rights and responsibilities of a Distributor."

18.    Herbalife induces persons to become Distributors by promising opportunity and income limited only by the Distributor's individual effort.  Herbalife promises its Distributors that its "sales and marketing plan has been designed" to "maximize his success" if "he applies dedication, hard work and perseverance."  Herbalife promises that "the rewards you receive as a Distributor operating your own business will be directly proportionate to the time and effort you put into your business."  By sponsoring others, the Distributor had "the opportunity to grow as fast as [he] want[s] to" and "may sponsor people anywhere" and "earn a profit on their sales activities."

19.    Herbalife Distributors are also promised the ability to operate his or her Distributorship as their "own business".  Herbalife promises "a freedom of choice in [his] earning potential . . . It is our belief that each person should have the inherent right to choose the manner in which they live, the work they perform and the amount of money they want to earn."

20.    Pursuant to this philosophy that each Distributor operates his or her own business, each Herbalife Distributor is required to bear all the expenses of running the operation, including advertising, travel, entertainment, office or home space, hotel meeting room rentals, etc.  Herbalife bears no part of these expenses, regardless of the profit to Herbalife.

21.    Additionally, Herbalife Distributors make sales of "Distributor Kits" and literature for Herbalife for which they receive no compensation.  As royalties are paid only on certain items, sales of non-

-- Page 4

royalty items are profit to the company, but earn no profit to the Distributor.

22.     Distributors, Herbalife proclaims, earn money by making retail sales to "all those persons with whom they come into contact."  Additionally, Distributors "who sponsor others into their specific Distributor network can earn royalty override bonuses based on the individual sales of the persons that they have sponsored."

23.     In addition to income from personal retail sales, and royalties from sales of others sponsored by the Distributor, Distributors also receive "bonus" payments tied to a complex system of tiered production levels.

### 2.     The Reality: Herbalife Arbitrarily and In Violation Of Its Own Rules Takes Away Earned Income.

24.     Despite these representations, after a Distributor has attained some success, quit other employment and has received some large royalty and bonus checks, Herbalife has a pattern and practice of arbitrarily and capriciously taking away income from its Distributors and withholding it, or redistributing that income to other persons more favored within the organization.

25.     Herbalife also has a pattern and practice of arbitrarily reducing checks without explanation and then refusing to account for the deficiencies.  Herbalife's accounting is so confusing and unexplained that a Distributor never has all the information needed to determine whether he or she has been paid as promised. This purposeful lack of access to information give Herbalife the ability to arbitrarily withhold income.

### 3.     Herbalife's Stated Organizational Structure.

26.     Herbalife also promises that "[e]ach and every Distributor begins in the same position with an equal opportunity for success and advancement.

### 4.     Herbalife's Actual Organizational Structure.

27.     Despite this outward protestation of a meritocracy, the truth is that not all Herbalife Distributors are created equal.  In reality, Herbalife is a dictatorship run by its founder and a small group of favored sycophants.  As demonstrated by what happened to these Plaintiffs, and as they have observed

-- Page 5

happen to others, Plaintiffs now know that the chosen few are allowed to violate the stated rules and are given favored treatment.

       5.    The Herbalife Rules.

       a.    Rules Regarding Married Couples.

28.    Married couples who wish to be Distributors must work under the same Sponsor, and cannot sponsor each other.  If Distributors marry each other, one must relinquish his or her distributorship, unless either Spouse has achieved "Supervisor" status, in which case, each may maintain their separate distributorship in the original line of Sponsorship.

29.    Any Herbalife Distributor may resign at any time by submitting his or her notarized resignation letter to Herbalife headquarters.  At relevant times herein, Distributors were told that he or she must wait six months before re-applying for another Herbalife Distributorship under any Sponsor other than the original Sponsor.  Herbalife later increased the six month requirement to twelve months.

       b.    The Reality: The Rules Are Bent or Broken To Favor Certain Sponsors.

30.    Despite these written rules, and even if Distributors follow these rules, as demonstrated by what happened to these Plaintiffs, the rules are broken in order to benefit certain favorite sponsors at the expense of Distributors who suffer the misfortune of being targeted by the favorite few.

       c.    The Rules Barring Unfair Sales Practices.

31.    Rule 8 of the Rules of Conduct for Herbalife Distributors provides that:

> No Distributor shall attempt to induce any other Herbalife Distributor, whom he does not personally sponsor, to sell Herbalife products.  The purpose of the rule is to ensure that the rights of other Sponsors are honored at all times.

       d.    The Reality: These Rules Are Ignored When It Benefits The Favored Few.

32.    Despite these written rules, demonstrated by what happened to violating Distributors under one of these Plaintiffs, if certain Distributors break these rules, the violations are ignored if enforcing the rules would result in less income for favorite sponsors -- even though the failure to enforce the rules resulted in a

-- Page 6

1   huge income loss to Plaintiff.

2            e.     <u>Herbalife Promises Due Process Prior To Cutting A Distributor's Income</u>.

3        33.    Rule 13 of the Rules of Conduct for Herbalife Distributors provides that:

4            Every Distributor has the duty and responsibility to investigate and
5            properly report any and all violations of the Distributor Rules of
         Conduct.

6        34.    The Herbalife Enforcement Procedures provide a "step-by step summary of the methods by

7   which Herbalife Distributors may deal with violations of the Rules of Conduct.

8            Step 1.  Upon learning of a violation, a Distributor should inform the
9            violator of the appropriate section in the Rules of Conduct and discuss
         the matter with him.  Point out the purpose behind the particular rule.
10           Be sure that the alleged violator knows how his conduct broke the rule
         and what the proper conduct should have been.  Most violations are
11           due to a lack of understanding; a discussion usually settles the matter.
         If the violator understands the rule and agrees to comply, then is not
12           necessary to inform the Company of the violation.  However, a
         Distributor should always ensure that his Supervisor is aware of the
13           problem.

14           Step 2.  If the alleged violator shows by word or conduct that he is
         unwilling or refuses to cooperate, then the Distributor should send a
15           letter to the company stating the nature of the complaint; names,
         addresses, and telephone numbers of all persons involved; dates; times;
16           places; etc.  The letter must be signed by the Distributor(s) reporting
         the violation.  Anonymous complaints cannot be made the basis for
17           disciplinary action.
         After the letter has been mailed, the Distributor should maintain
18           contact with the violator and report any changes in the situation.  The
         utmost care must be taken to ensure that the complaint is accurate and
19           truthful -- knowingly making a false complaint is a violation of the
         Rules of Conduct.  The Company considers all complaint information
20           to be strictly confidential.

21           Step 3.  When the complaint is received by the Company, it will be
         handled accordingly to set Company procedures.  All parties will be
22           afforded the opportunity to present evidence and argument in writing
         to the Company.  No decision will be rendered until all parties have
23           been notified and an opportunity to appeal the fairness of the decisions
         has been made available.  Although the Company bears the primary
24           responsibility for enforcement of the Rules of Conduct, Supervisors
         and occasionally Sponsor may be called upon to implement and enforce
25           these decisions.

26

27           f.     <u>The Reality: Herbalife Denies Due Process When It Suits It</u>.

28

Despite this outwardly fair facade, as demonstrated by what happened to these Plaintiffs, Herbalife does not offer due process when it targets disfavored Distributors to advantage favored Distributors. In fact, on at least one occasion, Herbalife conducted a secret, damaging and rumor filled investigation, then withheld income and forced a Distributor out of business, without so much as a chance to explain, much less the process described above.

6.    The Real Rules: Whatever Herbalife Wants At The Moment.

35.    Despite these Rules, as demonstrated by what happened to these Plaintiffs and others, Herbalife, has a pattern of either ignoring them, or making up new ones, in order to withhold income, and/or redistribute income to other persons more favored within the organization. As demonstrated by testimony given by Founder Mark Hughes in a recent deposition taken on November 29, 1995, in Los Angeles, California, Herbalife also has unwritten rules it enforces at will without notice.

36.    Herbalife is no doubt aware that giving large rewards and fast dollars generates loyalty. Apparently, however, even that promise is not enough to generate the kind of control over its Distributors Herbalife insists upon. Plaintiffs have information that makes them believe that, on many occasions, Herbalife has exercised its power to turn off a Distributors' income stream, and/or significantly reduce it, to force successful Distributors to bend to its will, whether or not Herbalife's demand is within Herbalife's stated rules or policies. Herbalife uses this coercion tactic to gain a level of control over its Distributors not afforded by its contractual rights.

37.    In one example of this coercive control, a Southern California Distributor's income was terminated when she began to generate income from selling direct mail literature to her down line Distributors. There is no Herbalife Rule preventing the sale of literature which does not use the Herbalife name or trademarks.

38.    Favoritism also results in broken rules. Herbalife represents that it will now allow Distributors to sell into foreign countries which are not yet "open" by Herbalife. The truth is that, on at least

one occasion, it has allowed a favored Distributorship, John and Susan Peterson, to sell and establish Distributorship in an unopened country, Mexico, prior to allowing competition by any other Distributors. This favoritism allowed the Petersons to gain an immense advantage and a much greater income than the normal Distributor who was bound by the no-selling limitation.

39.    While the favored prosper, the disfavored suffer.  In one instance, one Texas million dollar distributor was terminated when he began to sell competing products.    Another Southern California distributor was terminated when her husband began to sell competing products.  Yet, as described herein, Herbalife has also chosen to turn a blind eye to identical behavior when it benefited the favored.  Plaintiffs are currently investigating other such examples of disparate treatment among Distributors.

C.    The Fallows Join Herbalife.

1.    Mary And Dan Become a Distributorship.

40.    On or about April 13, 1984, Dan Fallow, Clint's Father, and Mary Fallow, while residents of Mesa, Arizona, signed an  "Application for Distributorship", No. 545212,  with Herbalife under the Sponsorship of favored John O. Peterson of Harris County, Texas.

41.    In 1984, the Fallows lived Herbalife, working seven days a week and 12 hour days.  Their activities included: paying all their own expenses, advertising for Distributors by distributing flyers on car and telephone poles, posting notices in grocery stores, laundries, placing advertisements in the newspaper, handling calls from people interested in the product or becoming Distributors, setting up to twenty appointments a day with potential Distributors in their home, selling the product retail, holding sales training and motivational meetings three times a week with people who had become Distributors, holding meetings in rented hotel rooms at which as many as 500 people would attend on the weekends, following up on referrals, and having their house constantly filled with people.

42.    That first year, the Fallows earned as much as $30,000 a month and more than $300,000 for the year.

-- Page 9                                              **11**

43. However, the second year Herbalife experienced problems with the FDA which Herbalife represented as the FDA's insistence that Herbalife change its labeling. Herbalife refused and instead instituted suit against the FDA. The negative publicity surrounding the fight made it extremely difficult for the Fallows, despite constant effort. Hotel meetings which had previously been attended by as many as 500 people now dwindled. The Fallows paid for and held a few meetings where no one came. Their income plummeted from $30,000 a months to $30,000 for the entire second year. The Fallows lost their home, their credit rating and their security.

44. Rather than leave the organization as others began to do, the Fallows remained committed. They agreed to move to Colorado for six months and then to Mexico for six months to follow better markets. Sales and Distributorship were much more difficult, but the Fallows persisted and began to rebuild.

45. It was in Mexico that the Fallows first noticed how favoritism ran Herbalife. Although the Mexican market was not officially "open" to Herbalife Distributors, Herbalife allowed the favored John and Susan Peterson to sell and establish Distributorship in advance of allowing competition from other Distributors. Before any other Distributor could make sales, the Petersons were sending product by the plane full to Mexico.

2.   Dan and Mary Divorce, Dan Resigns, His Distributorship Ends, and the Distributorship Becomes Mary's Alone.

46. As a result of suffering injuries in an automobile accident, on or about March 21, 1988, Dan Fallow sent Herbalife headquarters a notarized letter and resigned his distributorship with Herbalife.

47. On or about January 16, 1989, Dan and Mary Fallow received a decree of divorce. The Fallows and Herbalife agreed that the Distributorship was to belong to Mary Fallow alone.

48. Herbalife confirmed that the Distributorship had been reassigned to Mary Fallow alone.

49. Dan then met the stated Herbalife requirements for inactive Distributorship, severing himself from his former sponsor, the favored John and Susan Peterson. For at least the next twelve months after this resignation, Dan Fallow was inactive in the Herbalife business. He did not become a Distributor. He did not

-- Page 10

**12**

participate in any way in the operation, training, selling or recruiting of Mary Fallow's or any other Herbalife Distributorship.

      **D.**    <u>Dan's Son, Clint S. Fallow Joins Herbalife</u>.

      50.    Dan's son, Clint had recently gotten out of the Armed Forces.  Impressed by the success in Herbalife of Dan and Mary, on or about April 25, 1992, while living in Tempe, Arizona, Clint Fallow applied for and became an Herbalife Distributor.  Warned away from Sponsorship of John and Susan Peterson by Dan joined under the sponsorship of David J. Peterman of Spokane Washington.

      51.    There is no Herbalife rule which requires the son of a former Distributor to sign with any particular sponsor.  Clint, on Dan's advice, chose the sponsorship of David Peterman.

      52.    At the time Clint Fallow applied for Distributorship, his father, Dan Fallow was not an Herbalife Distributor.

      53.    Clint Fallow followed the Rules to become a Distributor.  He paid for and received his Distributor kit.  On April 28, 1992, Herbalife sent Clint Fallow an Herbalife Distributor Processor Notice welcoming him to Distributorship.

      54.    In paragraph 6 of that Application, Herbalife represented that if a Distributor fails to comply with the terms of this agreement, Herbalife may revoke this Distributorship.  There is no provision allowing Herbalife to revoke or terminate a Distributorship for any other reason.

      55.    Clint Fallow's sponsor, Dave Peterman, trained and assisted Clint Fallow in establishing and developing his Herbalife Distributorship.  Clint Fallow threw himself into the business and sold Herbalife product in Arizona and signed up new Distributors under his sponsorship.  Clint Fallow achieved the advanced level of Herbalife "Supervisor."

      56.    Thereafter, Peterman discussed opportunities in Germany with Clint Fallow.  Another Distributor had recently relocated there and was very successful.  Clint had been in the service there and believed he could build Distributors.  However, Clint also wanted to return to college and finish his education.

57.     When Clint was unable to travel to Germany, Peterman invited Dan Fallow on the trip.  Dan Fallow agreed to go to assist Clint.  Thereafter, Dan Fallow began to assist his son in the German and later European part of Clint's Distributorship.  Dan did not then re-apply to be a Distributor.  Instead, he worked solely as an agent of his son.

58.     Upon information and belief, Herbalife was then aware of Dan Fallow's assistance to his son. Dan and Clint were open about the arrangement and explained it to every Distributor they signed up.  It was also made public knowledge at the Barcelona Extravaganza Herbalife convention in early 1993.

59.     Despite this awareness, during the time Clint was building his Distributorship with Dan's assistance, in 1992, 1993 and the first half of 1994, Herbalife never objected.  Herbalife never suggested that Dan's assistance to Clint would or could affect Clint's right to payment.

60.     The German/European part of Distributorship was extremely successful, resulting in income of $7,000 to $8,000 to Clint per month throughout 1993.  Perhaps the Distributorship was too successful, as it then caught the eye of the favored John and Susan Peterson.

61.     In 1994, favored Distributors John or Susan Peterson, the Sponsors of Mary Fallow and former sponsor of Dan Fallow, sent in certified letters to Herbalife and complained to Herbalife that Clint Fallow's Distributorship should somehow be credited to them, and not to Clint's sponsor, David J. Peterman.

62.     In the spring of 1994, Herbalife then conducted an unprecedented "investigation" of Clint Fallow's Distributorship -- ignoring its own rules of due process.  During that investigation, Herbalife contacted several of Clint Fallow's down line Distributors and Supervisors, spreading rumors and implying that Clint was guilty of wrongdoing.  The campaign damaged the relationship between Clint Fallow and those persons, upset Clint's Distributors, and resulted in a significant decline of business and loss of income.

63.     As a result of this campaign of misinformation, royalties to Clint Fallow from the German/European part of the Distributorship declined to approximately $1,000 a month.

64.     On or about July 6, 1994, Herbalife wrote to Clint Fallow and informed him that his

-- Page 12

14

distributorship "was in fact a distributorship of Dan Fallow, former husband of Mary Fallow" and required to be under the sponsor, John Peterson."  As a result of this determination, Herbalife transferred the Distributorship of Clint Fallow and the lineage developed under that Distributorship to John Peterson. Herbalife further determined that approximately $79,371.97 would be deducted from the earnings of the Clint Fallow Distributorship to repay John Peterson for adjusted "Royalty Override and Production Bonus Adjustments."  By the time Herbalife transferred part of Clint's income to the Petersons, Clint's income was down to approximately $1,000 a month.  The Petersons are believed to have been making as much as $175,000 a month.

65.    Prior to this determination, and contrary to the Step 1 of the Herbalife Enforcement Procedures, neither Herbalife or John Peterson made any attempt to contact or discuss the matter with Clint or Dan Fallow, or inform them that anyone believed a Rule was being broken.

66.    Prior to this determination, and contrary to Step 3 of the Herbalife Enforcement Procedures, Clint Fallow was not "afforded the opportunity to present evidence and argument in writing to the Company" or an "opportunity to appeal the fairness of the decision" prior to the time this decision was rendered.

67.    This summary "termination" of Clint Fallow's Distributorship was totally unjustified by Herbalife's Rules or policy.  It was in direct contravention of Clint's Fallows rights as a Distributor and Herbalife's representations which induced Clint Fallow to begin and build his Distributorship.

68.    Nothing in Herbalife's Rules, literature or memoranda provided to Clint Fallow prohibited him from using agents to assist him.  To the contrary, Herbalife went to great lengths to inform its Distributors that they are "independent contractors" and not employees, with freedom to run "their own business."

69.    At the time Herbalife made this determination, it had no rule or policy which required the son of a former Distributor (who had previously resigned his Distributorship) to become a Distributor under the original sponsor of his father or under the sponsorship of his father's wife who was no blood relation to him.

70.    Just as there was no reason to bind Clint Fallow to sponsorship under the Petersons, there

-- Page 13

was no reason to bind even Dan Fallow to sponsorship under the Petersons.  Under the then operative Herbalife Rules, once Dan Fallow resigned from Herbalife in 1988, divorced, and then waited more than two years becoming active again in Herbalife, Dan Fallow had the right to re-apply as a Distributor under a new sponsor, different from Peterson.  Dan Fallow's past relationship with Herbalife was not grounds for "taking" Clint Fallow's Distributorship.

71.    At the time Herbalife made this determination, Herbalife also had no rule or policy which prevented a Herbalife Distributor from using a former Distributor to assist him in his business, or which would cause the Distributor to lose his Distributorship as a result of that assistance.

72.    Herbalife's arbitrary and sudden taking of Clint Fallow's Distributorship was so without precedent and unprincipled that it apparently confused even Herbalife.

73.    Herbalife first informed Clint that it would take only half of his check to send to the Petersons.  However, it withheld entire checks or sent checks for a lesser amount without explanation.

74.    In 1994 and 1995, after Herbalife officially determined that Clint had no Distributorship because it belonged to Dan, Clint Fallow continued to operate the Arizona portion of his Distributorship.  Herbalife sent Clint letters recognizing his right to operate his Distributorship -- at the same time they withheld moneys to send to the Petersons.

75.    Dan and Clint also continued work on the German/European part of Clint's Distributorship.  In early 1995, through persistent effort, Dan Fallow and a Danish Distributor were able to revive a portion of the German/European part of the Distributorship and increase the royalties and bonuses back up to $15,000 a month (which were sent to the Petersons).  But for Herbalife's actions, the value of the German/European part of the Distributorship would have continued to increase.

76.    In 1995, the Fallows hired an attorney to investigate and restore their rights.  In response to this inquiry, Herbalife began to manufacture reasons to cut the Fallow's income.  Inconsistent with its determination that Clint Fallow's Distributorship had been reassigned to Peterson, and was no longer held by

-- Page 14

Clint (or Dan, who was not recognized as having any Distributorship), Herbalife sent a notice to Dan Fallow, at his address, that the Distributorship had not generated enough sales volume to qualify for "Supervisor Status", preferred treatment and greater payments.   Mary Fallow received a similar letter regarding her Distributorship.  If Herbalife had treated the two entities as one Distributorship, as it claimed it was required to do, both would have been entitled to preferred treatment and greater payments.

77.     Throughout 1995, Herbalife continued their schizophrenic treatment of Clint, deducting payments while recognizing his Distributorship --at both his and Dan's address.  Although Herbalife claimed that Clint's Distributorship was in fact Dan's, Clint's name and Distributor ID number were never deleted from the Herbalife Distributor list.  Clint's Distributorship was never transferred to Dan's social security number, but remained under Clint's number.  On or about February 26, 1995, Mark Hughes, Founder and President of Herbalife sent Clint Fallow, a letter recognizing that he had "re-qualified as an Herbalife Supervisor."  In October of 1995, Herbalife sent another letter to "C.S. Fallow" at Dan's address, informing him that the Distributorship needed to re-qualify to be considered a supervisor and was in danger of losing all of his down-line organization.  To avoid this loss, the Distributorship was forced to buy a large amount of product to again re-qualify.

78.     Events continued to turn for the worse.  In the spring of 1995, Herbalife stopped purporting to offset the royalty checks against the moneys purportedly owed to Peterson, and upon information and belief, the distributorship was transferred to Peterson directly.  This transfer is in direct contravention of Herbalife rules which provide that any deleted Distributorship is to be merged with the old line, (in this case that of Mary Fallow) rather than given directly to Fallow's sponsor, the favored John Peterson.  Upon information and belief, this departure from Herbalife rules was done to benefit John Peterson at the expense of the Fallows.

79.     Simultaneously, Peterson and his wife had contacted some of Clint Fallow's European Distributors and have continued to harm the growth of the German/ European part of the Distributorship.

-- Page 15

Through a conference call arranged by Herbalife in July of 1994 (at which neither Clint or Dan Fallow were allowed to participate), and through other contacts, the Petersons informed the Distributors that Clint Fallow was no longer their Sponsor, but that they would report to the Petersons. The Petersons stated or implied that Dan or Clint Fallow, or Clint's sponsor, Dave Peterman were guilty of wrongdoing which had necessitated the change in sponsorship. This announcement caused Distributors, who did not wish to be associated with the taint of wrongdoing, to quit Herbalife.

80.    The Petersons further damaged the business when they began implementing a new authoritarian and condescending management style which was not well received. The Petersons humiliated and alienated Distributors, who then left Herbalife.

81.    Despite all efforts to rebuild, Herbalife's diversion of Clint's income proved disastrous. Clint Fallow was unable to maintain the cash flow necessary to purchase the volume of product necessary to keep the Distributorship producing at its prior levels. A drop in production meant an exponential drop in income. As a result, Clint Fallow lost considerable production and income.

82.    Eventually the problems became too much for Clint to overcome. He lost his town home, his credit rating, and his VA loan eligibility. His possessions were put into storage. He later lost them too when he could no longer pay to store them.

83.    To date, Clint Fallow's damages, not including the present value of his future royalty income stream and the damage to the growth of that future royalty income stream, are in an amount exceeding $356,000. His lifetime earnings would have exceeded $3,600,000.

B.    Facts Relating To the Claims of Mary Fallow

84.    As discussed above, Mary and Dan Fallow began their Distributorship in 1984, operating in Maricopa County Arizona for the first three years.   As discussed above, Mary and Dan parted, and the Distributorship became hers alone.

85.    Mary's "sponsor" for her Distributorship was John O. Peterson then residing in Houston,

-- Page 16                                     18

Texas and now residing in Denver, Colorado.

86.    While an Herbalife Distributor, Mary sponsored the Distributorship of a couple, Tonni and Jay Riley, then residents of Maricopa County, Arizona.   Tonni Riley, then Tonni Lukavics, signed a Distributorship contract with Herbalife which named the Fallows as her "sponsors" and "supervisors" or third party beneficiaries of that contract.   Tonni Riley later married Jay Riley and her joined her in the Distributorship.  At all times relevant herein, the Rileys were acting on behalf of, and as agents for each other and for their marital community.

87.    On or about 1990, Tonni and Jay Riley began violating Herbalife Rule in two ways: (1) by "cross-sponsoring" persons in Herbalife in violation of Rule 8 of the Rules of Conduct; and (2) by trying to recruit other Distributors in Mary Fallow's Distributorship to another competitive organization selling diet and nutrition products called "Genesis 2000."  Upon information and belief, the Rileys developed, marketed and distributed the Genesis 2000 products.

88.    Herbalife's long-standing and continuing practice had been to sanction such behavior by deleting the violator's interest in their Distributorship and transferring the interest to the violator's immediate sponsor.

89.    However, when Herbalife learned of the Riley's actions in cross sponsoring, Herbalife merely withheld the Riley's royalty checks until the Riley's promised to stop their violations.  Herbalife then resumed payment to the Rileys.  This departure from policy cannot be understood, except for the fact that the Riley's presence was extremely profitable to the Petersons.

90.    Almost immediately after promising to behave, the Riley's started a rival enterprise called Genesis 2000 Company and recruited persons in Mary Fallow's Distributorship.

91.    On our about March 24, 1992, Mary Fallow caused a letter to be sent to Herbalife, detailing the complaints about the Rileys, (and attaching inconvertible evidence of the Riley's defection, a flyer with a photograph and testimonial by the Rileys promoting Genesis 2000) and asking that the Riley's distributorship

-- Page 17

be canceled and reassigned to Mary Fallow as was then Herbalife's established policy.

92.     Despite the complaint and evidence, in contravention of Herbalife policy, Herbalife took no action other than to harass Mary in subtle ways.

93.     Herbalife began to take strange and unexplained deductions from Mary's check.  When she attempted to get relief, no one at Herbalife would return her telephone calls.

94.     Mary's financial losses were horrendous.  From 1992 through January of 1995, Herbalife's failure to delete the Riley's interest in their distributorship caused Mary Fallow to lose approximately $3,240,000 in monthly royalties and bonuses to date (which was diverted to the favored Petersons), and lifetime earning exceeding $12,000,000.

95.     From June of 1991 to January of 1992, Mary lost monthly royalties of approximately $17,000 a month for a total of $119,000.  From January of 1992 to September of 1995, Mary lost monthly royalties of $18,000 a month for those 44 months for a total of $710,000.  But for the Rileys, her "Infinite Level Bonuses" for 1992 would have been $284,000; $800,000 for 1993 and 1994, and $185,000 for 1995. But for the Rileys, her year end bonuses would have been $200,000 for 1993 and $100,000 for 1994.

C.     Facts Relating To the Claims of Dan Fallow

96.     At about this time, Dan Fallow discovered that Herbalife had an unwanted competitor in Europe who claimed to own the right to use the Herbalife name in certain countries.  Fallow informed Herbalife that this competitor proposed to produce a knock-off product and label it identically or almost identically to Herbalife.  At the time, Herbalife estimated that the competitor could cost it tens of millions of dollars.

97.     Herbalife was understandably looking for a way to shut this operation down and was willing to use unethical means to accomplish this. Herbalife, through its "safety and security department", which was in reality a dirty tricks department designed to solve business problems outside of legal channels, resolved to stop the competitor.

-- Page 18

98.    Herbalife proposed to set up a phony manufacturer of products, approach the competitor and induce it to make a large order.  Herbalife would then simply keep the money and never deliver product, driving the competitor out of business.

99.    In 1994, Herbalife began to pressure Dan Fallow to assist it in shutting down the competitor. In early September, faced with huge losses to Clint and Mary, and coerced with the threat that these losses would continue unless he cooperated, Dan Fallow agreed to pose as the phony manufacturer and gather intelligence about the competitor.

100.    At the direction of David Addis, Herbalife's head counsel, and Bill Gillespie, its Director of Security, and with Herbalife funding, Dan Fallow traveled to Europe and began the operation.

101.    As conditions of Dan Fallow's coerced cooperation, Herbalife promised to pay him time and expenses, to enforce its policy regarding Distributors Tonni and Jay Riley, rolling up their royalties to Mary Fallow, and to reinstate Clint's Distributorship, and/or restore the lost moneys in the form of a bonus.

102.    During its investigation of the competitor, Herbalife learned that the Herbalife product in Russia was controlled by the Russian Mafia, and that organization could prevent any legitimate Herbalife operations in Russia without payment to the Mafia.  Herbalife pressured Dan Fallow to contact the Russian Mafia and gain its permission for product distribution, paying the Mafia if necessary, and/or using the Mafia to put the competitor out of business "quietly."  Although Dan Fallow feared for his life and asked Herbalife to provide protection for him, it refused to do so.

103.    Herbalife also asked Dan Fallow to work with a U.S. products manufacturer believed to be supplying knock off product.  Fallow was able to catch the manufacturer in damaging admissions which formed the basis for a lawsuit which neutralized the manufacturer's threat.  In that lawsuit, Herbalife's counsel drafted an affidavit for Dan Fallow to sign, without allowing Fallow an opportunity to add clarification to the statements.  Herbalife then used the affidavit to its advantage in the suit.

104.    After Dan Fallow traveled all over Europe for Herbalife, risked his life, and posed as its front

-- Page 19                                    **21**

man in this distasteful scheme, and signed Herbalife's affidavit, Herbalife broke its promises.  Herbalife paid Dan Fallow for his time and expenses only until it no longer needed him.  After Fallow ceased to be useful, Herbalife refused to pay time or expenses.  It did not enforce its policy with regard to the Rileys Distributorship, or "roll up" those and the attached down-line royalties to Mary Fallow, or restore the lost moneys to Clint, in contravention of their agreement with Dan Fallow.

### III. CAUSES OF ACTION

### COUNT ONE
### BY CLINT FALLOW AGAINST HERBALIFE FOR
### BREACH OF CONTRACT

105.    Plaintiff Clint Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

106.    Herbalife and Clint Fallow entered into a contract in 1992 whereby Clint Fallow would act as a Distributor for Herbalife and Herbalife would compensate him as detailed above.  At all times relevant herein, Clint Fallow performed all which was required of him under his contract with Herbalife to the mutual profit and satisfaction of both parties.

107.    Herbalife additionally promised that if Clint Fallow followed the Herbalife Rules, his Distributorship would not be revoked and that he would be able to maximize his income, limited only by his own individual effort.

108.    Herbalife additionally promised that prior to taking action against any Distributorship, it would follow the due process procedure set forth above.

109.    Herbalife additionally promised that Clint Fallow would be allowed to run his own business, and that all Distributors would be treated equally.

110.    Herbalife breached its contract with Clint Fallow in that it did not pay him as promised, did not allow him to maximize his income, withheld income arbitrarily, revoked his Distributorship even though he had followed all applicable Rules, conducted an "investigation" in violation of its own rules which

damaged Clint, revoked his Distributorship without the promised due process, interfered with his ability to run his own business, and failed to treat him equally with other Distributors.

111.    As a result of these breaches, Clint Fallow has been damaged in an amount not less than $356,000 in damages accruing to date, and lifetime damages exceeding $3.6 million to be proven at trial.

## COUNT TWO
## BY CLINT FALLOW AGAINST HERBALIFE FOR
## QUANTUM MERUIT

112.    Plaintiff Clint Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

113.    At the inducement of Herbalife, Clint Fallow enriched Herbalife by acting as an Herbalife Distributor and by selling product, signing up Distributors and paying expenses relative to that effort.

114.    As a result of this effort, Herbalife has been enriched in an amount not less than $3,600,000 to be proven at trial after discovery.

## COUNT THREE

## BY CLINT FALLOW AGAINST HERBALIFE FOR
## TORTIOUS INTERFERENCE WITH CONTRACT

115.    Plaintiff Clint Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

116.    Herbalife's "investigation" of Clint Fallow's German/ European part of the Distributorship, the severing of his ties to Herbalife, the transfer of his Distributorship to Peterson, and Peterson's subsequent meddling and mismanagement of the same, were all a knowing an intentional interference with Clint Fallow's existing valid contractual relationship and business expectancy with his German and European Distributors. These acts caused the termination of many of those relationships.

117.    As a result of these acts, Clint Fallow has been damaged by the loss of royalty payments, the damage to the German/ European part of the Distributorship, and loss of revenues, in an amount not less than $3,600,000 to be proven at trial.

-- Page 21

118.   Clint Fallow also suffered further and foreseeable damages as a result of Herbalife's conduct, including the loss of his house, car, credit rating, VA eligibility and possessions in an amount not less than $30,000 to be proven at trial.

## COUNT FOUR
## BY MARY FALLOW AGAINST HERBALIFE
## FOR BREACH OF CONTRACT

119.   Plaintiff Mary Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

120.   Herbalife and Mary Fallow entered into a contract in 1984 whereby Mary Fallow would act as a Distributor for Herbalife and Herbalife would compensate her as detailed above.  At all times relevant herein, Mary Fallow performed all which was required of her under her contract with Herbalife to the mutual profit and satisfaction of both parties.

121.   In that contract, Herbalife promised Mary Fallow that it would follow its own rules and delete offending Distributorship, and transfer the deleted Distributorship and its lineage to the immediate supervisor. Herbalife breached that contract when it failed to delete the Distributorship of Tonni and Jay Riley and allowed the Riley's to damage and interfere with Mary Fallow's Distributorship.

122.   As a result of that breach, Mary Fallow has been damaged in an amount no less than $12,000,000 to be determined at the time of trial.

## COUNT FIVE
## BY MARY FALLOW AGAINST HERBALIFE
## FOR BREACH OF CONTRACT AS THIRD PARTY BENEFICIARY

123.   Plaintiff Mary Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

124.   In 1994, Dan Fallow and Herbalife entered into a contract for the benefit of Mary Fallow. Dan agreed to perform certain services for Herbalife and in return, Herbalife was to delete the Riley Distributorship and assign the lineage to Mary Fallow.  Dan Fallow performed the agreed upon services.

125.   Herbalife breached that contract when it failed to delete the Riley Distributorship and transfer the lineage to Mary Fallow.  As a result of that breach, Mary Fallow has been damaged in an amount not less than $3,200,000 to be proved at trial.

## COUNT SIX
## BY MARY FALLOW AGAINST THE RILEYS
## FOR TORTIOUS INTERFERENCE WITH CONTRACT

126.   Plaintiff Mary Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

127.   Mary Fallow had a valid contract with Herbalife and her "down line" Distributors (in which she was named as a third party beneficiary "Sponsor") which entitled Mary to royalties from the sales of those Distributors.

128.   The Rileys were aware of those contracts and intentionally and tortiously interfered with those contracts when they solicited persons to leave Mary's Distributorship and to join a rival multi-level organization.

129.   The Rileys were not privileged to interfere, rather they were contractually bound to refrain from such interference, and tortiously employed the use of confidential information and/or trade secrets in order to accomplish that interference.

130.   As a result of that interference, Distributors left Mary's organization, damaging Mary in an amount to be proven at trial.

## COUNT SEVEN
## BY MARY FALLOW AGAINST THE RILEYS
## FOR BREACH OF CONTRACT BY THIRD PARTY BENEFICIARY

131.   Plaintiff Mary Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

132.   The Rileys have a written Distributorship Agreement with Herbalife which explicitly names Dan and Mary Fallow as "supervisors" or "third-party" beneficiaries of that contract.  The contract was especially for the benefit of Mary Fallow in that she was to collect royalties and bonus income based upon the

-- Page 23

Rileys efforts.

133. The Rileys breached that contract when they solicited persons to leave Mary's Distributorship and to join a rival multi-level organization and used of confidential information and/or trade secrets in order to accomplish that interference.

134. The Rileys were contractually bound to refrain from such actions.

135. As a result of the breach, Distributors left Mary's organization, damaging Mary in an amount to be proven at trial.

## COUNT EIGHT
## BY DAN FALLOW AGAINST HERBALIFE
## FOR BREACH OF CONTRACT

136. Plaintiff Dan Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

137. Dan Fallow had a contract with Herbalife in which Herbalife agreed to pay Fallow a salary and reimburse expenses, delete the Riley Distributorship and "roll up" the income to Mary Fallow, and return moneys to Clint Fallow, in return for Fallow's services in investigation and shutting down a competitor.

138. Although Fallow fully performed those services, Herbalife breached in that it did not pay, delete the Riley Distributorship or restore moneys to Clint.

139. As a result of this conduct, Dan Fallow has been damaged in an amount to be determined at trial.

## COUNT NINE
## BY DAN FALLOW AGAINST HERBALIFE
## FOR QUANTUM MERUIT

140. Plaintiff Dan Fallow realleges each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

141. At the inducement of Herbalife, Dan Fallow enriched Herbalife by investigating and shutting down its competitor.

-- Page 24

142.    As a result of this effort, Herbalife has been enriched in an amount exceeding $10,000,000 to be proven at trial after discovery.

<div align="center">

**COUNT TEN**
**BY ALL PLAINTIFF AGAINST HERBALIFE**
**FOR RACKETEERING UNDER AZRAC**

</div>

143.    Plaintiffs reallege each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

144.    Herbalife committed racketeering as defined by A.R.S. § 13-2314.04 through the predicate acts of a scheme or artifice to defraud and a theft of services as defined by A.R.S. § 12301(D)(4)(e) and (t).

145.    Herbalife committed a theft of services as defined by A.R.S. § 13-802, on these plaintiffs and others, when it induced them to become Distributors, sell product, and induce others to become Distributors, with the representation that they would be paid, could conduct their own business, and that Herbalife would adhere by its rules and procedures.

146.    Herbalife committed a scheme or artifice to defraud these plaintiffs and others as defined by A.R.S. § 13-2310 when it knowingly obtained a benefit by means of false or fraudulent pretenses, representations promises or material omissions.  Herbalife represented Distributors would be paid, could conduct their own business, and that Herbalife would adhere by its rules and procedures.  That representation was false in that Herbalife had no intention of paying all that was owed and promised, allowing the Distributors to conduct their own business, or abide by the Herbalife rules and procedures.

147.    That representation was material in that it induced plaintiffs and others to become Distributors and expend significant moneys and effort in doing so.  Herbalife intended that plaintiffs and others rely upon these false representations.

148.    As a result of this conduct, plaintiffs were damaged as described herein in that they were not paid as promised, and they provided services to Herbalife and incurred expenses which they were not compensated and are entitled to treble damages.

## COUNT ELEVEN

### BY ALL PLAINTIFF AGAINST HERBALIFE
### FOR PUNITIVE DAMAGES

149.    Plaintiffs reallege each and every one of the allegations contained in the preceding paragraphs as though fully set forth herein.

150.    Herbalife is liable for punitive damages on Plaintiffs' First through Tenth Count in that it willfully and maliciously damaged these Plaintiffs and should be punished for such behavior in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs request a trial by jury and pray for judgment against Defendant Herbalife as follows:

1.    On his First and Second Causes of Action, Clint Fallow asks for damages against Herbalife in an amount exceeding $3,600,000, in an amount to be proven at trial;

2.    On his Third Cause of Action for damages, Clint Fallow request damages against Herbalife in an amount to be proven at trial;

3.    On her Fourth Cause of Action, Mary Fallow asks for damages against Herbalife in an amount exceeding $12,000,000 to be proven at trial;

4.    On her Fifth Cause of Action, Mary Fallow asks for damages in against Herbalife in an amount exceeding $3,200,000 plus punitive damages to be proven at trial;

5.    On her Sixth and Seventh Causes of Action, Mary Fallow asks for damages against Tonni and Jay Riley jointly and severally and against their marital community in an amount to be proven at trial;;

6.    On her Eighth and Ninth Causes of Action, Dan Fallow asks for damages against Herbalife in an amount to be proven at trial;

7.    On the Tenth cause of action, all Plaintiffs ask for racketeering treble damages against Herbalife;

# EXHIBIT B

*WARNICKE & LITTLER, P.L.C.*
2020 North Central Avenue
Fifth Floor
Phoenix, Arizona 85004-4506
(602) 256-0400
FAX (602) 256-0345

Ronald E. Warnicke/SBN 001791
Thomas E. Littler/SBN 06917
Ellen B. Davis/SBN 013806
Attorneys for Plaintiffs

**RECEIVED**

**OCT 09 1996**

Paul, Hastings, Janofsky & Walker LLP

**SUPERIOR COURT OF ARIZONA**

**COUNTY OF MARICOPA**

| | |
|---|---|
| CLINT S. FALLOW, MARY LYNN FALLOW, and DANIEL S. FALLOW )<br><br>Plaintiffs, )<br><br>-vs- )<br><br>HERBALIFE INTERNATIONAL INC., a Nevada Corporation, HERBALIFE OF AMERICA INC., TONNI and JAY RILEY, Husband and Wife, )<br><br>Defendants. ) | No. CV 96-03558<br><br>PLAINTIFFS INITIAL DISCLOSURE STATEMENT PURSUANT TO RULE 26.1 |

Plaintiffs Clint S. Fallow, Mary Lynn Fallow, and Daniel S. Fallow, by and through the undersigned counsel, hereby submit the following initial disclosure statement pursuant to Rule 26.1 of the Arizona Rules of Civil Procedure. The information given is accurate as of the date provided, and plaintiffs will supplement if and when additional information is gained.

**I.   FACTUAL AND LEGAL BASIS FOR PLAINTIFFS' CLAIMS**

   **A.   Factual and Legal Basis for Clint Fallow's Claims Against Herbalife.**

In March of 1992, Clint Fallow had recently been discharged from the Air Force and called his father, Dan Fallow, to gain his assistance in becoming an Herbalife Distributor. At Clint's

1   request, Dan Fallow then contacted David Peterman and spoke to him
2   about Clint Fallow joining Herbalife.  Clint Fallow, Dan Fallow and
3   David Peterman will testify that Clint's intention in forming the
4   Clint  Fallow  Distributorship  was  to  be  a  Distributor.    The
5   Distributorship was not a pretext for Dan's Fallow's return to
6   Herbalifenor would it need to be.  As evidenced by Dave and Sharon
7   Peterman's May 25, 1995 sworn statement, Dan Fallow was not
8   interested in rejoining Herbalife at that time.

9              1.    Breach of Contract

10       A contract requires offer, acceptance and consideration.  All
11   of these elements were present in Clint Fallow's Distributorship
12   agreement with Herbalife.

13       Herbalife  solicited  Distributors  though  its  authorized
14   representative David Peterman.  On or about April 25, 1992, while
15   living  in  Tempe,  Arizona,  Clint  Fallow  responded  to  that
16   solicitation and accepted Herbalife's offer to become a Distributor
17   when  he  purchased  a  Distributor  Kit  and  sent  his  completed
18   application to Herbalife.  On April 28, 1992, Herbalife accepted
19   that offer when it sent Clint Fallow an Herbalife Distributor
20   Processor Notice welcoming him to Distributorship.  According to
21   Herbalife representation and policy, the application became effect
22   immediately, giving Clint all of the rights and responsibilities of
23   a Distributor.  At that time the contract which gives rise to this
24   claim was formed.

25       The contract between Herbalife and Clint Fallow was supported
26   by consideration.  Clint Fallow performed all which was required of
27   him under his contract with Herbalife.  As required, Clint Fallow

28                       **31**        2

1  devoted time and effort to Herbalife and paid all of the expenses

2  of running the operation, including advertising, travel,

3  entertainment, office or home space, hotel meeting room rentals,

4  etc.  Clint Fallow's sponsor, Dave Peterman, trained and assisted

5  Clint Fallow in establishing and developing his Herbalife

6  Distributorship.  Clint Fallow threw himself into the business and

7  sold Herbalife product in Arizona and signed up new Distributors

8  under his sponsorship.  Clint Fallow achieved the advanced level of

9  Herbalife "Supervisor."   Clint Fallow, Dan Fallow and David

10  Peterman will testify about Clint's efforts selling Herbalife and

11  recruiting Distributors.

12       Under the terms of Herbalife's contract with Clint, Herbalife

13  promised that: (a) if Clint Fallow followed the Herbalife Rules,

14  his Distributorship would not be revoked; (b) that he could run his

15  own business; (c) that prior to taking action against any

16  Distributorship, it would follow certain due process procedures;

17  (d) that "[e]ach and every Distributor begins in the same position

18  with an equal opportunity for success and advancement"; (e) that by

19  sponsoring others, the Distributor had "the opportunity to grow as

20  fast as [he] want[s] to" and "may sponsor people anywhere" and

21  "earn a profit on their sales activities", earning royalties,

22  commissions and bonuses based upon his own sales and based upon the

23  sales and distributorships of those people he sponsored to become

24  Herbalife distributors according to a predetermined and set formula

25  for calculating royalties, commissions and bonuses; (f) that

26  opportunity and income was limited only his own individual effort;

27  (g) that Herbalife's "sales and marketing plan has been designed"

28                      **32**        3

1   to "maximize [a Distributor's] success" if "he applies dedication,

2   hard work and perseverance"; and (h) that "the rewards you receive

3   as a Distributor operating your own business will be directly

4   proportionate to the time and effort you put into your business",

5   among others.    These representations were made to Clint Fallow

6   through the Herbalife Career Book, brochures, literature, video

7   tapes, presentations made by Herbalife's agents, and orally.    In

8   Paragraph 6 of the Distributor Application, Herbalife represented

9   that if a Distributor fails to comply with the terms of this

10   agreement, Herbalife may revoke this Distributorship.    There is no

11   provision    allowing    Herbalife    to    revoke    or    terminate    a

12   Distributorship for any other reason.    Clint Fallow, Dan Fallow

13   and David Peterman will testify as to the representation made to

14   Clint Fallow by Herbalife.

15      Herbalife breached its contract with Clint Fallow in that it

16   did not pay him as promised, did not allow him to maximize his

17   income, withheld income arbitrarily, revoked his Distributorship

18   even though he had followed all applicable Rules, conducted an

19   "investigation" in violation of its own rules which damaged Clint,

20   revoked his Distributorship without the promised due process,

21   interfered with his ability to run his own business, failed to

22   treat him equally with other Distributors, and favored other

23   Distributors at his expense.

24      Herbalife agreed to due process at a term of its Distributor

25   contract prior to it being allowed to withhold Distributor income.

26   Rule 13 of the Rules of Conduct for Herbalife Distributors provides

27   that:

28           **33**     4

> Every Distributor has the duty and responsibility to investigate and properly report any and all violations of the Distributor Rules of Conduct.

The Herbalife Enforcement Procedures provide a "step-by step summary of the methods" by which Herbalife Distributors may deal with violations of the Rules of Conduct.

> Step 1.    Upon learning of a violation, a Distributor should inform the violator of the appropriate section in the Rules of Conduct and discuss the matter with him.  Point out the purpose behind the particular rule.   Be sure that the alleged violator knows how his conduct broke the rule and what the proper conduct should have been. Most violations are due to a lack of understanding; a discussion usually settles the matter.
>
> If the violator understands the rule and agrees to comply, then is not necessary to inform the Company of the violation.  However, a Distributor should always ensure that his Supervisor is aware of the problem.
>
> Step 2.   If the alleged violator shows by word or conduct that he is unwilling or refuses to cooperate, then the Distributor should send a letter to the company stating the nature of the complaint; names, addresses, and telephone numbers of all persons involved; dates; times; places; etc. The letter must be signed by the Distributor(s) reporting the violation.    Anonymous complaints cannot be made the basis for disciplinary action.
>
> After the letter has been mailed, the Distributor should maintain contact with the violator and report any changes in the situation.   The utmost care must be taken to ensure that the complaint is accurate and truthful -- knowingly making a false complaint is a violation of the Rules of Conduct. The Company considers all complaint information to be strictly confidential.
>
> Step 3.   When the complaint is received by the Company, it will be handled accordingly to set Company procedures.   All parties will be afforded the opportunity to present evidence and argument in writing to the Company.    No decision will be rendered until all parties have been notified and an opportunity to appeal the fairness of the decisions has been made available.   Although the Company bears the primary responsibility for enforcement of the Rules of Conduct, Supervisors

5

and occasionally Sponsor may be called upon to implement and enforce these decisions.

The German/European part of Clint Fallow's Distributorship was extremely successful, resulting in income of $7,000 to $8,000 per month to Clint throughout 1993. Perhaps the Distributorship was too successful, as it then caught the eye of the favored John and Susan Peterson. In 1994, favored Distributors John or Susan Peterson, the Sponsors of Mary Fallow and former sponsor of Dan Fallow, sent in certified letters to Herbalife and complained to Herbalife that Clint Fallow's Distributorship should somehow be credited to them, and not to Clint's sponsor, David J. Peterman. Dan and Clint Fallow and Dave Peterman will testify that Herbalife's actions were unprecedented and a breach of contract.

Herbalife did not follow this due process prior to withholding Clint Fallow's income and diverting it to the Petersons. Rather, in the Spring of 1994, Herbalife, through John and Susan Peterman and others not yet identified, conducted an unprecedented, secret, rumor-filled and damaging "investigation" without the due process contractually required. During that investigation, Herbalife, through John and Susan Peterson and others contacted several of Clint Fallow's down line Distributors and Supervisors, spreading rumors and implying that Clint was guilty of wrongdoing. The campaign damaged the relationship between Clint Fallow and those persons, upset Clint's Distributors, and resulted in a significant decline of business and loss of income.

Reinholdt Schmidt will testify as to his being a Distributor under the Clint Fallow Distributorship, how Herbalife contacted him

1    during its investigation of the Clint Fallow Distributorship, how
2    he withdrew from the Herbalife business as a result of Herbalife's
3    telephone call.  Heiner Koberich, will testify as to being signed
4    up as a Distributor under Clint Fallow, and how he quit after
5    Herbalife's investigation of the Distributorship.  Mette Hyldgaard
6    will testify as to her conversations with John and Susan Peterson
7    regarding the investigation and taking over Clint Fallow's
8    Distributorship.  Clint Fallow will testify that as a result of
9    this campaign of disinformation, royalties to Clint Fallow from the
10   German/European part of the Distributorship declined to
11   approximately $1,000 a month.

12       Without following its contractual obligation to follow its due
13   process procedures, on or about July 30, 1994, and on July 6, 1994,
14   as evidenced by its letters, Herbalife wrote to Dan and Clint
15   Fallow and informed them that Clint Fallow's distributorship "was
16   in fact a distributorship of Dan Fallow, former husband of Mary
17   Fallow" and required to be under the sponsor, John Peterson."  As
18   a result of this determination, Herbalife transferred the
19   Distributorship of Clint Fallow and the lineage developed under
20   that Distributorship to John Peterson.  Herbalife further
21   determined that approximately $79,371.97 would be deducted from the
22   earnings of the Clint Fallow Distributorship to repay John Peterson
23   for adjusted "Royalty Override and Production Bonus Adjustments."

24       Further, Herbalife did not even live up to terms set forth in
25   the improper termination letters.  For example, after termination
26   a down line Distributors in Clint's line, Reinholdt Schmidt,
27   requalified as a supervisor, in August of 1996 placing a $4,000

28                        **36**          7

order.    This generated a royalty which should have been paid to Clint according to the terms of the termination letter (as it was after the 28 month period).    However, rather than credit this royalty to Clint, Herbalife backdated the volume into May so that it would fall within the 28 month period, and paid the royalty to the Petersons.

Soon after this letter, Herbalife conducted a conference telephone call between Carol Hanna, John and/or Susan Peterson, and others at Herbalife not yet identified, with Distributors down line from Clint and informed them neither Clint Fallow or Dave Peterman had ceased being their upline sponsor.    In that call, upon information and belief, the Petersons stated or implied that Dan or Clint Fallow, or Clint's sponsor, Dave Peterman were guilty of wrongdoing which had necessitated the change in sponsorship.    This announcement caused Distributors, who did not wish to be associated with the taint of wrongdoing, to quit Herbalife.    Plaintiffs do not know what else was said, and cannot identify all of the participants in the call, but believe that the telephone call was recorded by Herbalife.    Clint Fallow was not permitted by Herbalife to participate in the call.

After the conference call, Peterson telephoned Dan Fallow and asked for his assistance in convincing the Distributors in Clint Fallow's Distributorship to work for Peterson, and offered to assist Clint Fallow in qualifying for royalty every month in return.

Prior to this determination, and contrary to the Step 1 of the Herbalife Enforcement Procedures, neither Herbalife or John

37

8

1  Peterson made any attempt to contact or discuss the matter with
2  Clint or Dan Fallow, or inform them that anyone believed a Rule was
3  being broken.   Prior to this determination, and contrary to Step
4  3 of the Herbalife Enforcement Procedures, Clint Fallow was not
5  "afforded the opportunity to present evidence and argument in
6  writing to the Company" or an "opportunity to appeal the fairness
7  of the decision" prior to the time this decision was rendered.
8  This summary "termination" of Clint Fallow's Distributorship was
9  totally unjustified by Herbalife's Rules or policy.   It was in
10 direct contravention of Clint's Fallows rights as a Distributor and
11 Herbalife's representations which induced Clint Fallow to begin and
12 build his Distributorship.

13     Nothing in Herbalife's Rules, literature or memoranda provided
14 to Clint Fallow prohibited him from using agents to assist him.  To
15 the contrary, Herbalife went to great lengths to inform its
16 Distributors that they are "independent contractors" and not
17 employees, with freedom to run "their own business."

18     On or about July 28, 1994, attorney Jim Bartlett, counsel for
19 Petermans in Montana, sent a letter to Herbalife complaining that
20 it has not followed its rules.  In response, Addis told Peterman
21 that if Bartlett sued that Herbalife would retaliate, including
22 cutting off his Distributorship income.

23     After supposedly deleting Clint Fallow's Distributorship,
24 Herbalife then wrote to Clint Fallow noting its diversion of income
25 and inconsistently accounting for the monies taken and the status
26 of the Clint Fallow Distributorship.   Herbalife's arbitrary and
27 sudden taking of Clint Fallow's Distributorship was so without

28                          **38**              9

1   precedent and unprincipled that Herbalife confused itself.
2   Herbalife first informed Clint that it would take only half of his
3   check to send to the Petersons. However, it withheld entire checks
4   or sent checks for a lesser amount without explanation.  In the
5   spring of 1995, Herbalife again changed its mind, and stopped
6   sending royalty checks to Clint Fallow, and transferred the
7   European Distributorship to Peterson directly.

8       In 1994 and 1995, after Herbalife unilaterally determined that
9   Clint had no Distributorship because it belonged to Dan, Clint
10  Fallow continued to operate the Arizona portion of his
11  Distributorship.  Herbalife sent Clint letters recognizing his
12  right to operate his Distributorship -- at the same time they
13  withheld monies to send to the Petersons.

14      In 1995, Dan Fallows hired an attorney to investigate and
15  restore their rights.  In response to this inquiry, Herbalife began
16  to manufacture reasons to cut the Fallow's income.  Inconsistent
17  with its determination that Clint Fallow's Distributorship had been
18  reassigned to Peterson, and was no longer held by Clint, and
19  ignoring the fact that Dan did not have any Distributorship,
20  Herbalife sent a notice to Dan Fallow, at his address, that the
21  Distributorship had not generated enough sales volume to qualify
22  for "Supervisor Status", preferred treatment and greater payments.
23  Mary Fallow received a similar letter regarding her
24  Distributorship.  If Herbalife had treated the two entities as one
25  Distributorship, as it claimed it was required to do, both would
26  have been entitled to preferred treatment and greater payments.

27

28                          39          10

1        Throughout 1995, Herbalife continued their schizophrenic

2    treatment of Clint, deducting payments while recognizing his

3    Distributorship --at both his and Dan's address.    Although

4    Herbalife claimed that Clint's Distributorship was in fact Dan's,

5    Clint's name and Distributor ID number were never deleted from the

6    Herbalife Distributor list.    Clint's Distributorship was never

7    transferred to Dan's social security number, but remained under

8    Clint's number.    On or about February 26, 1995, Mark Hughes,

9    Founder and President of Herbalife sent Clint Fallow a form letter

10   recognizing that he had "re-qualified as an Herbalife Supervisor."

11   In October of 1995, Herbalife sent another letter to "C.S. Fallow"

12   at Dan's address, informing him that the Distributorship needed to

13   re-qualify to be considered a supervisor and was in danger of

14   losing all of his down-line organization.    To avoid this loss, the

15   Distributorship was forced to buy a large amount of product to

16   again re-qualify.

17       After the Distributorship line was transferred to the

18   Petersons, the Petersons further damaged the line when they began

19   implementing a new authoritarian and condescending management style

20   which damaged the line by discouraging sales and Distributors.    The

21   Petersons humiliated and alienated Distributors, who then wanted to

22   leave Herbalife.

23       The Petersons also began a campaign to discourage Distributors

24   in Mary Fallow's downline.    Peterson contacted Rex Allen, a

25   Distributor in Mary Fallow's downline, in 1993 or 1994 (as well as

26   eight to ten other Distributors in Clint Fallow's downline) to

27   inform the Distributors that they were not getting the type of

28

**40**

11

support from their sponsor that they deserved, that their downline would not generate as much income due to Fallow's sponsorship, that Fallow was not experienced, and generally that association with the Fallows would hurt any Distributor's ability to earn income.

Dan and Clint worked to mitigate their damages. In early 1995, through persistent effort, Dan Fallow and a Danish Distributor were able to revive a portion of the German/European part of the Distributorship and increase the royalties and bonuses back up to $15,000 a month (which were sent to the Petersons).    But for Herbalife's actions, the value of the German/European part of the Distributorship would have continued to increase.

Herbalife's mistreatment of Clint Fallow and its withholding and diverting income is documented by its many letters to Clint Fallow regarding the termination of his Distributorship, the status of his Distributorship.    Clint Fallow, David Peterman, Jackie Hartman, and other yet unidentified employees of Herbalife will testify as to Herbalife's withholding income from Clint Fallow and diverting that income to John and Susan Peterman.

Herbalife transferred the income from the Clint Fallow Distributorship to John and Susan Peterson because it sought to benefit the Peterson's at Fallow's expense.    Herbalife's stated reason for deleting Clint Fallow's Distributorship, that it was in reality the Distributorship of Dan Fallow, is simply a pretext. Herbalife's stated policy (in its Career Book and distributed in periodic policy statements) is that married couples who wish to be Distributors must work under the same Sponsor, and cannot sponsor each other.    If Distributors marry each other, one must relinquish

**41**              12

1    his or her distributorship, unless either Spouse has achieved

2    "Supervisor" status, in which case, each may maintain their

3    separate distributorship in the original line of Sponsorship. Any

4    Herbalife Distributor may resign at any time by submitting his or

5    her notarized resignation letter to Herbalife headquarters. At

6    relevant times herein, Distributors were told that he or she must

7    wait six (later twelve) months before re-applying for another

8    Herbalife Distributorship under any Sponsor other than the original

9    Sponsor.

10        Herbalife's spouse Distributorship policy should not have

11    resulted in the deletion of the Clint Fallow Distributorship. Dan

12    Fallow, and a yet unidentified member of Herbalife's Compliance

13    Department, will testify that he resigned from Herbalife

14    Distributorship status and sent a notarized letter of resignation

15    to Herbalife's Compliance Department on March 21, 1988, as required

16    by Herbalife's rules.  Dan Fallow, Mary Fallow, and a yet

17    unidentified member of Herbalife's Record Administration will

18    testify that on April 14, 1988, Herbalife's Records Administration

19    Department wrote to both Mary and Dan Fallow, confirming that the

20    joint Distributorship had been "re-assigned" in Mary Fallow's name

21    as of March 29, 1988. After his divorce, Dan Fallow met the stated

22    Herbalife requirements for inactive Distributorship, severing

23    himself from his former sponsor, the favored John and Susan

24    Peterson.  For at least the next twelve months after this

25    resignation, Dan Fallow was inactive in the Herbalife business. He

26    did not become a Distributor. He did not participate in any way in

27    the operation, training, selling or recruiting of Mary Fallow's or

28

1   any other Herbalife Distributorship, even after Dan and Mary's
2   remarriage in 1991.  Dan and Mary Fallow will testify that under
3   Herbalife's then stated rules (as stated in Herbalife's Career book
4   and other policy statements), Dan Fallow was then free to work for
5   Clint Fallow in his Distributorship.  There is no Herbalife Rule
6   preventing Clint from employing Dan as an agent, or which required
7   Clint Fallow to sign up the original sponsor of his father who had
8   since resigned from Herbalife.

9       Dan Fallow only became involved in Clint's Distributorship
10  when Dave Peterman asked him to travel to Germany, because Peterman
11  had a free ticket, and to assist Clint while he pursued an
12  education.  Thereafter, Dan Fallow began to assist his son in the
13  German and later European part of Clint's Distributorship.  Dan did
14  not then re-apply to be a Distributor.  Instead, he worked solely
15  as an agent of his son.

16      If Dan's agency for Clint violated any Herbalife rules,
17  Herbalife waived that violation.  During the time Clint was
18  building his Distributorship with Dan's assistance, in 1992, 1993
19  and the first half of 1994, Herbalife never objected or suggested
20  that Dan's assistance to Clint would or could affect Clint's right
21  to payment.  Dan and Clint were open about the arrangement and
22  explained it to every Distributor they signed up.  It was also made
23  public knowledge at the Barcelona Extravaganza Herbalife convention
24  in early 1993.

25      Even if the husband and wife Distributor policy was
26  applicable, Herbalife has waived the policy because it was
27  selectively enforced.  Although Herbalife has claimed that any

28                          **43**         14

1    Distributorship efforts by Dan Fallow must be combined with those
2    of Mary Fallow, Herbalife has allowed at least one former husband,
3    Randy Treadwell, to sign up a new Distributorship under his former
4    wife (as opposed to combining the two Distributorships) after
5    divorcing under his former wife.  Randy Tredwell will be called to
6    testify as to his signing up under his ex-wife.  Herbalife allowed
7    Distributor Ron Touchard, Dan Stammen and Ed Lukavics to change
8    sponsors for his Herbalife Distributorship without resigning.  Ed
9    Likavics, a Distributor in Mary Fallow's downline was allowed to
10   resign under any sponsor he chose after his divorce from Tonni
11   Riley, without Mary Fallow's permission.  After Jim Fobair was
12   terminated for competing multi-level activity, Judy Fobair was
13   allowed to resign up as a Distributor under Tich Rosin, rather than
14   her original sponsor, Pat Boyd.

15       Even if Clint Fallow's Distributorship had been Dan Fallow's
16   Distributorship, Herbalife did not follow its own stated policy (in
17   its Career Book and other policy statements) regarding the penalty
18   for husband and wives operating two separate Distributorships (that
19   "all lineage sponsored under that Distributorship will be moved to
20   the lineage of the original sponsorship").  Under that policy,
21   Herbalife should have transferred the lineage, volume and income of
22   Clint  Fallow's  Distributorship  to  Mary  Fallow,  rather  than
23   transferring the "lineage and volume" past Mary to John and Susan
24   Peterson -- as Herbalife had done in other cases.  For example,
25   after Distributors John and Lynn Landwalker Zitting married,
26   Herbalife transferred all of the "lineage and volume" back to Lynn
27   Zitting.   John and/or Lynn Landwalker Zitting may be called to

28                        44              15

testify as to Herbalife's treatment of their Distributorships.  On or about October 12, 1994, Jackie Hartman of Herbalife wrote to the Zittings offering the Zittings three options: (1) to operate one distributorship; (2) to allow Joel to operate a Distributorship under his original sponsor Mark Jones; or (3) in the event of divorce, Joel would have to be inactive for twelve months before he could begin another Distributorship.  As another example or Herbalife's course of dealings in transferring Distributorships back to the original sponsor rather than moving the income upline, when Herbalife determined that Karina Anderson was "working a distributorship in the name of Lars Olsen" it did not delete her Distributorship and move the income upline, rather on July 12, 1996, Bo Sorenson of Herbalife's "Administration Herbalife Europe North" wrote to Anderson and notified her that her "lineage, volume and statute will be moved to your original contract."  Although this move should have resulted in income to Clint Fallow, he had never seen the money.

Despite all efforts to rebuild, Herbalife's diversion of Clint's income proved disastrous.  Clint Fallow was unable to maintain the cash flow necessary to purchase the volume of product necessary to keep the Distributorship producing at its prior levels.  A drop in production meant an exponential drop in income. As a result, Clint Fallow lost considerable production and income. Eventually the problems became too much for Clint to overcome.

To date, Clint Fallow's contract damages, not including the present value of his future royalty income stream and the damage to the growth of that future royalty income stream, are in an amount

**45**        16

exceeding $356,000.  His lifetime earnings would have exceeded $3,600,000, as computed below.

2.    Facts and Legal Theories Unique to the Quantum Meruit Claim.

Alternatively, if Herbalife had no contract with Clint Fallow, Clint Fallow would still be entitled to recover in quantum meruit. At the inducement of Herbalife, Clint Fallow enriched Herbalife by acting as an Herbalife Distributor and by selling product, signing up Distributors and paying expenses relative to that effort.  As a result of this effort, Herbalife has been enriched in an amount not less than $3,600,000, as computed below.

3.    Facts and Legal Theories Unique to Clint Fallow's Conversion Claim.

As described herein, Herbalife wrongfully and intentionally exercised dominion and control over the Distributorship belonging to Clint Fallow with the intent of and the effect of permanently depriving him of his property, dealing with his Distributorship and downline organization in ways inconsistent with his rights in that property.

As a result of this conduct, Clint Fallow has been damaged in an amount not less than $3,600,000, as computed below.  In addition to those contract damages, Clint Fallow suffered further and foreseeable damages approximating $30,000 as a result of Herbalife's conduct. He lost his town home, his credit rating, and his VA loan eligibility.  His possessions were put into storage. He later lost them too when he could no longer pay to store them.

4.    Facts and Legal Theories Unique to Clint Fallow's Tortious Interference With Contract Claim.

**46**          17

1   Herbalife's "investigation" of Clint Fallow's German/ European
2   part of the Distributorship, the severing of his ties to Herbalife,
3   the transfer of his Distributorship to Peterson, and Peterson's
4   subsequent meddling and mismanagement of the same, were all a
5   knowing and intentional interference with Clint Fallow's existing
6   valid contractual relationship and business expectancy with his
7   German and European Distributors.   These acts caused the
8   termination of many of those relationships.

9   As a result of these acts, Clint Fallow has been damaged by
10  the loss of royalty payments, the damage to the German/ European
11  part of the Distributorship, and loss of revenues, in an amount not
12  less than $3,630,000 as computed below.

13      B.    **Factual and Legal Basis for Mary Fallow's Claims.**

14      1.    **Facts and Legal Theories Relevant To All of Mary
              Fallow's Claims and To Her Breach of Contract**
15            **Claims**.

16  On or about April 13, 1984, Herbalife entered into a contract
17  with Dan Fallow and Mary Fallow, while residents of Mesa, Arizona,
18  when they signed and Herbalife accepted an  "Application for
19  Distributorship", No. 545212, with Herbalife under the Sponsorship
20  of favored John O. Peterson of Harris County, Texas.   At all times
21  relevant herein, Mary Fallow performed all which was required of
22  her under her contract with Herbalife to the mutual profit and
23  satisfaction of both parties.

24  As with Clint, prior to the time Mary Fallow became a
25  Distributor with Herbalife, Herbalife promised that it would follow
26  its rules and regulations (as set forth above), which included but
27  is not limited to treating Distributors equally, deleting

28                          **47**         18

1   Distributors engaged in competing organizations and cross
2   sponsoring, paying her royalties, commissions and bonuses as
3   earned, and following due process before cutting or withholding her
4   income.

5       In 1984, the Fallows lived Herbalife, working seven days a
6   week and 12 hour days. Their activities included: paying all their
7   own expenses, advertising for Distributors by distributing flyers
8   on car and telephone poles, posting notices in grocery stores,
9   laundries, placing advertisements in the newspaper, handling calls
10  from people interested in the product or becoming Distributors,
11  setting up to twenty appointments a day with potential Distributors
12  in their home, selling the product retail, holding sales training
13  and motivational meetings three times a week with people who had
14  become Distributors, holding meetings in rented hotel rooms at
15  which as many as 500 people would attend on the weekends, following
16  up on referrals, and having their house constantly filled with
17  people.

18      That first year, the Fallows earned as much as $30,000 a month
19  and more than $300,000 for the year.

20      However, the second year Herbalife experienced problems with
21  the FDA which Herbalife represented as the FDA's insistence that
22  Herbalife change its labeling.  Herbalife refused and instead
23  instituted suit against the FDA.  The negative publicity
24  surrounding the fight made it extremely difficult for the Fallows,
25  despite constant effort.  Hotel meetings which had previously been
26  attended by as many as 500 people now dwindled to just Mary and
27  Dan.  The Fallows paid for and held a few meetings where no one

28          **48**          19

1  came.   Their income plummeted from $30,000 a month to $30,000 for
2  the entire second year.  The Fallows lost their home, their credit
3  rating and their security.

4      Rather than leave the organization as others began to do, the
5  Fallows remained committed.  They agreed to move to Colorado for
6  six months and then to Mexico for six months to follow better
7  markets.  Sales and Distributorship were much more difficult, but
8  the Fallows persisted and began to rebuild.

9      On or about March 21, 1988, Dan Fallow sent Herbalife
10 headquarters a notarized letter and resigned his distributorship
11 with Herbalife.  On or about January 16, 1989, Dan and Mary Fallow
12 received a decree of divorce.  The Fallows and Herbalife agreed
13 that the Distributorship belonged to Mary Fallow alone, as
14 evidenced by Herbalife's letters to Mary and Dan Fallow.

15     While an Herbalife Distributor, Mary sponsored the
16 Distributorship of a couple, Tonni and Jay Riley, then residents of
17 Maricopa County, Arizona.  Tonni Riley, then Tonni Lukavics, signed
18 a Distributorship contract with Herbalife which named the Fallows
19 as her "sponsors" and "supervisors" or third party beneficiaries of
20 that contract.  Tonni Riley later married Jay Riley and he joined
21 her in the Distributorship.

22     As stated in the Herbalife Career Book, Rule 8 of the Rules of
23 Conduct for Herbalife Distributors provides that:

24          No Distributor shall attempt to induce any other
             Herbalife Distributor, whom he does not personally
25          sponsor, to sell Herbalife products.  The purpose
             of the rule is to ensure that the rights of other
26          Sponsors are honored at all times.

27

28                    49          20

In its counterclaim, Herbalife has also admitted that it "has promulgated written rules, regulations, policies and procedures concerning the ability of its distributors to solicit other Herbalife distributors into competing multi-level marketing or direct sales companies."

On or about 1990, Tonni and Jay Riley began violating Herbalife Rule in two ways: (1) by "cross-sponsoring" persons in Herbalife in violation of Rule 8 of the Rules of Conduct; and (2) by trying to recruit other Distributors in Mary Fallow's Distributorship to other competitive organizations (Joanne Woodard, competing diet and nutrition products called "Genesis 2000", and then an organization run by former Herbalife Distributor Jim Fobair).   Upon information and belief, the Rileys developed, marketed and distributed the Genesis 2000 products.   Upon information and belief, the Rileys continued their activity in Genesis 2000 until at least the fall of 1995.   At that time, the Rileys closed the office of Genesis 2000 and moved the operation to their home in Prescott.   The Rileys are believed to be involved in the new Fobair competing organization.  Many Herbalife Distributors complained to Herbalife about the Riley's damaging actions, but Herbalife failed to take action.   Both David Addis and Carol Hanna told Dan Fallow that Herbalife had collected a large file of complaints on the Rileys.  Mary Fallow, Dan Fallow, Ed Lukavics and other yet unidentified Herbalife Distributors will testify to the foregoing.  The Rileys's participation in Genesis 2000 is evidenced by their literature bearing their picture, a tape recording of

**50**                    21

1    their sales pitch, recordings of radio ads by Tonni Riley, and
2    files of complaints kept by Herbalife.

3        Herbalife's longstanding and continuing practice had been to
4    sanction such behavior by deleting the violator's interest in their
5    Distributorship and transferring the interest to the violator's
6    immediate sponsor.  For example, when Jim Fobair began a competing
7    multi-level organization, Herbalife deleted his Distributorship and
8    rolled his royalties upline to his sponsor Pat Boyd, who then
9    received the fund formerly paid to Fobair.

10       However, when Herbalife learned of the Riley's actions in
11   cross sponsoring, Herbalife merely withheld the Riley's royalty
12   checks until the Riley's promised to stop their violations.
13   Herbalife then resumed payment to the Rileys.  Certain Herbalife
14   high level employees may have protected Tonni Riley because she
15   threatened to tell their wives of her affairs with them.

16       This departure from policy constituted a breach of Herbalife'
17   contract with Mary Fallow,  This breach cannot be understood,
18   except for the fact that the Riley's presence was extremely
19   profitable to the Petersons due to royality structure.

20       Almost immediately after promising to behave, the Riley's
21   started a rival enterprise called Genesis 2000 Company and
22   recruited persons in Mary Fallow's Distributorship.

23       On our about March 24, 1992, again on March 29, 1993, and
24   again on Marcy 22, 1994, Mary Fallow sent letters to Herbalife,
25   detailing the complaints about the Rileys, (and attaching
26   inconvertible evidence of the Riley's defection, a flyer with a
27   photograph and testimonial by the Rileys promoting Genesis 2000)

28

**51**

22

and asking that the Riley's distributorship be canceled and reassigned to Mary Fallow as was then Herbalife's established policy.   On or about March 10, 1994, Dan Fallow met with David Addis at the Peabody Hotel and again complained about the Rileys. In that conversation, Addis agreed that Herbalife had "dropped the ball" in not taking action against the Rileys, offered to represent Mary Fallow in her efforts to have the Riley Distributorship deleted, and agreed to delete the distributorship. Dan Fallow took notes during that conversation and followed up that conversation with confirming telephone calls.  Mary Fallow wrote a confirming letter to Addis at Herbalife on or about March 22, 1994.

Despite the complaint and evidence, in contravention of Herbalife policy, Herbalife took no action other than to harass Mary in subtle ways.  Herbalife's failure to enforce the rules resulted in a huge income loss to Plaintiff and a gain for the Petersons.  Herbalife's treatment of the Fallows is believed to be the result of intentional malice. William Gillespie, Mark Hughes' brother in law and Director of Security, told Dan Fallow that Herbalife wanted "the Fallow family to suffer."

Herbalife's only response to Mary Fallow's complaints was to take strange and unexplained deductions from Mary's check.   When she attempted to get relief, no one at Herbalife would return her telephone calls.

Mary's relationship with Herbalife caused damage to her health and well being.   Mary Fallow, her friends, and her treating physicians, will testify that because of her problems with Herbalife, she began to suffer from stress related illnesses, TMJ

**52**          23

syndrome, fibromyolgia, an immune deficiency causing chronic fatigue, acid reflex (in which a small valve between the esophagus fails to close releasing acid into the throat), sleeplessness and depression. The stress also worsened her adenomyosis, a form of endometriosis. As a result of the adenomyosis, Mary developed problems with a pregnancy and began to hemorrhage. She was confined to strict bed rest for six months at a time when she had to care for an eight month old and a three year old child. Although Mary had hired and needed domestic help during this period, she lost it when Herbalife suddenly reduced her income. Surgery has not cured the adenomyosis. Mary continues to suffer chronic pain and faces a total hysterectomy.

Mary's financial losses were equally horrendous. From 1992 through January of 1995, Herbalife's failure to delete the Riley's interest in their distributorship caused Mary Fallow to lose approximately $3,240,000 in monthly royalties and bonuses to date (which was diverted to the favored Petersons), and lifetime earning exceeding $12,000,000. In the telephone call Peterson made to Dan Fallow after making the conference call in which Peterson took over Clint's line, Peterson also bragged to Dan Fallow that Peterson had made over $800,000 that year from Mary Fallow's line as a result of Herbalife's failure to delete the Riley Distributorship.

    1.    <u>Facts And Legal Theories Unique to Mary Fallow's Tortious Interference Claim Against the Rileys</u>.

Mary Fallow had a valid contract with Herbalife and her "down line" Distributors (in which she was named as a third party

53

24

1  beneficiary "Sponsor") which entitled Mary to royalties from the
2  sales of those Distributors.

3      The Rileys were aware of those contracts and intentionally and
4  tortiously interfered with those contracts when they solicited
5  persons to leave Mary's Distributorship and to join a rival multi-
6  level organization.

7      The Rileys were not privileged to interfere, rather they were
8  contractually bound to refrain from such interference, and
9  tortiously employed the use of confidential information and/or
10  trade secrets in order to accomplish that interference.

11      As a result of that interference, Distributors left Mary's
12  organization, damaging Mary in an amount to be proven by further
13  discovery.

14      C.   <u>Factual and Legal Basis for Dan Fallow's Claims for
   Breach of Contract and Quantum Meruit</u>.

15      In late 1993, Dan Fallow and Carol Hannah will testify that it
16  was Dan Fallow who informed Herbalife of "certain unexplained
17  thefts of products from its newly-opened Frankfurt, Germany
18  warehouse facility." Dan Fallow learned that Herbalife product was
19  being sold in a German flea market at prices below those prices at
20  which Distributors were able to buy the product from Herbalife.
21  Dan Fallow telephoned Carol Hanna at Herbalife who informed him
22  that she did not believe that product was being stolen from the
23  German warehouse, but asked Dan to "keep his eyes open" for the
24  source of the products.

25      Dan and Clint Fallow will testify that Craig Frick, Paul
26  Goodwin, Mogens Garbenfeldt and Kent Kristensen were then downline
27

28              **54**      25

(in that order) Herbalife Distributors under Clint Fallow's Distributorship (who were then producing a large part of the income in that Distributorship) began dropping out of Clint Fallow's line, and having "secret" meetings. As Clint's agent in Europe, Dan Fallow investigated. Craig Frick invited Dan Fallow to a meeting. Dan Fallow learned that Kristensen had told Frick, Goodwin and Garbenfeldt that he had thousands of people who were waiting to become Herbalife Distributors in unopened countries. Kristensen proposed that Frick, Goodwin and Garbenfeldt pool their resources (selling genuine Herbalife product) and split expenses in these new countries. If Frick, Goodwin and Garbenfeldt would agree with Kristensen and eachother to sign up new Distributors under Kristensen, instead of under Clint Fallow, Kristensen would also sign up thousands of new people, and the group would share expenses and split the Kristensen Herbalife check. The group also would work to open new markets (selling genuine Herbalife product) and gain advantage over other Herbalife Distributors. Herbalife had previously allowed other Herbalife Distributors to sell into "unopened" countries (as evidenced by the efforts of John and Susan Peterson in Mexico, and by Metta Hyldgaard's May 3, 1993 letter to Jim Rohn of Denmark regarding her efforts to sell into Denmark before it was opened.) Although Herbalife had represented that it was working to open new countries, Craig Frick reported that Herbalife had not yet begun the approval process. Kristensen proposed that group of Distributors call themselves "Herbalife, Inc" or "Herbalife European Distributors." Kristensen's proposal would have resulted in a great loss of income to Clint Fallow

1   because Herbalife would only pay royalties to the supervisors up
2   three levels, leaving Clint out.

3       Dan Fallow and Craig Frick will testify as to the original
4   nature and purpose of the HEG organization: to sell genuine
5   Herbalife products.   Kent Kristensen, Paul Goodwin, and Mogens
6   Garbenfeldt have disappeared and are not available to testify.

7       Dan Fallow, Kristensen, Frick and Mogens Gargenfeldt conducted
8   an Herbalife meeting in a hotel in Oslo (prior to the time
9   Herbalife had opened the Norway market) for Herbalife to promote
10  Herbalife product.   The legitimate nature of these meetings is
11  demonstrated by the fact that a representative of the Herbalife
12  compliance Department attended and monitored the meeting without
13  complaint.

14      The document, the "Herbalife European Distributors" of "HEG"
15  agreement   attached   to   Herbalife's   counterclaim,   represents
16  Kristensen's proposal to cooperate to open new markets for genuine
17  Herbalife products.   Kristensen invited Fallow to participate in
18  the plan.  Dan Fallow had no choice but to monitor and/or join this
19  group in order to protect Clint's line.  Although Dan Fallow placed
20  his signature on the document, that document was simply a draft and
21  the proposal was never implemented.   Rather, the Distributors
22  involved continued to follow their normal distribution line.  Both
23  Dan Fallow and Craig Frick will testify as to the meaning of the
24  HEG agreement.

25      Dan Fallow and Craig Frick will testify that at no time did
26  Dan Fallow contact other Herbalife Distributors in Europe in an
27  attempt to induce them to breach their Distributorship agreement

28                      **56**          27

1   with Herbalife and join HEG.    At no time did Dan Fallow
2   participate in any effort to "sell" Herbalife back its trademark
3   rights or otherwise extort monies from Herbalife.

4       Rather, as Dan Fallow and Craig Frick will testify, Dan Fallow
5   agreed to listen to and investigate the HEG proposal and to
6   determine whether new markets for genuine Herbalife product could
7   be opened.   Kristensen told Fallow that in order to open new
8   countries, the governments of those countries would need to approve
9   the sale of the Herbalife product.   The approval process required
10  giving the government authorities an analysis of the Herbalife
11  products.  Dan Fallow contacted laboratories in order to determine
12  whether that analysis could be performed.  During that search, Dan
13  Fallow contacted ANC Manufacturing in Las Vegas, Nevada and spoke
14  to a secretary, and then President Adam Dieter.   Dieter informed
15  Fallow that he could analyze the Herbalife product, that the
16  formula was not patented, that he had previously manufactured
17  product for Herbalife (prior to the time Herbalife began ordering
18  all of its products from D&F Industries, of which Mark Hughes owns
19  an interest) and that he could manufacture a similar product for
20  less than Herbalife sold it product to its Distributors.  Both Dan
21  Fallow and Adam Dieter will testify as to the purpose of and
22  substance of Fallow's contacts with ANC.    On November 2, 1993,
23  Dorothy Harvilik of ANC sent Fallow a two page report containing an
24  analysis of Herbalife product.

25      Dan Fallow and Craig Frick will testify that after Fallow told
26  Kristensen what Dieter had said, Kristensen proposed that HEG hire
27  ANC to manufacture product rather than purchase product from

28                        **57**        28

Herbalife.  Sometime later, before Thanksgiving of 1993, Fallow met with Kristensen in a hotel in Stockholm, Sweden.  At that meeting Kristensen presented Fallow the HEG draft agreement whose purpose was to distribute legitimate Herbalife product.  At a second later meeting in Stockholm, Kristensen also informed Fallow that he intended to hire ANC to manufacture counterfeit product.  Dan Fallow told Kristensen that he would not participate in such a venture if Kristensen persisted.

In December of 1993, Fallow went to Las Vegas to meet with Adam Dieter (and ANC's CPA and Chief Financial Officer Kirk Scherer) to tour the ANC manufacturing facility.  During those meetings, both Fallow and Adam Dieter of ANC made it clear to each other and to Kristensen that they would not participate in manufacturing product under the name "Herbalife, Inc."  Kristensen began pressuring Fallow to convince Dieter to notify Polish authorities that Kristensen was the President of Herbalife, Inc.  Fallow advised Dieter not to comply.

Kristen then insisted that the products be mis-labeled.  On or about December 17, 1993, Fallow refused to mis-label the products to be manufactured by ANC.  Kristensen began to contact ANC directly, and Dan Fallow was no longer involved.  Both Dan Fallow and Adam Dieter will testify as to the timing and substance of these meetings.

Dan Fallow will testify that he never received a "brokerage" fee from ANC, and that at least one member of HEG, Craig Frick, knew that ANC had suggested that Fallow would be entitled to compensation.  As Herbalife suggestion (as made by David Addis and

1    later William Gillespie) Fallow persisted in his role a "broker"
2    only as a way to monitor the situation and/or in order to gain
3    information to report to Herbalife.

4    In December 1993, Dan Fallow will testify that he periodically
5    called Herbalife in order to inform it about HEG's operation.  No
6    one at Herbalife would take the calls.

7    On December 28, 1993, Dan Fallow formally resigned in writing
8    from HEG, then calling itself Herbalife of Russia (as evidenced by
9    Fallow's letter to HEG, and by Craig Frick's later August 13, 1995
10   faxed letter to John Bolsover of Herbalife).  Dan Fallow and Craig
11   Frick will testify that Fallow had previously resigned verbally.

12   In January of 1994, Dan Fallow will testify that he began to
13   concertedly telephone Carol Hanna, Mark Hughes and Chris Perr's
14   office (VP in charge of opening new foreign markets), at Herbalife
15   in order to inform it about Kristensen's counterfeiting.  Neither
16   Hanna, Perr or Hughes returned the calls.  Upon information and
17   belief, Hughes was then absent from Herbalife while attending a
18   drug treatment program.

19   Dan Fallow will testify that finally on or about February 1,
20   1993, he again called Herbalife in order to reach Hanna, Perr or
21   Hughes.  Frustrated that no one had returned his calls, Fallow
22   spoke with Jackie Hartman, another Herbalife employee.  After
23   Fallow told Hartman of Kristensen's counterfeit manufacturing
24   scheme, Hartman contacted David Addis, in-house counsel for
25   Herbalife.  Hartman then called Fallow back and requested that
26   Fallow fly to Herbalife's headquarters at Herbalife's expense in
27   order to assist Herbalife in its efforts to stop HEG.

28                        **59**          30

On or about February 13, 1994, Fallow flew to Los Angeles to met with Addis. A yet unidentified attorney working for Herbalife drafted an affidavit to be used by it in its lawsuit against ANC in Nevada. Dan Fallow will testify that he was not represented by counsel in drafting the affidavit, was not informed that Herbalife's counsel was not represented him, was not informed of the need to protect his rights, or any conflict which may exist between his rights and those of Herbalife's. Herbalife's counsel also refused to put all the relevant facts into the affidavit. For instance, Dan Fallow was not allowed to discuss his unreturned telephone calls to Herbalife to inform it of HEG's efforts, among other facts which might have been considered damaging to Herbalife.

During Fallow's meeting with Herbalife and while drafting Fallow's affidavit which Herbalife intended to use in its lawsuit against ANC, Herbalife (David Addis and/or other unidentified counsel) realized that Herbalife needed additional information from ANC in the affidavit. Addis requested that Fallow telephone Adam Dieter at ANC and probe him for information about HEG's efforts. Addis dialed the telephone while in his office. After Herbalife's employee dialed the telephone, Addis, Gillespie and an attorney who was actually writing the affidavit, secretly eavesdropped upon the telephone call between Dieter and Dan Fallow via an extension.

On or about February 23, 1994, as admitted by Herbalife in its counterclaim, Herbalife sued ANC and requested an injunction largely based upon information provided by and the declaration signed by Dan Fallow.

**60**            31

1    Dan Fallow will testify that in a subsequent meeting, Addis
2    informed Fallow that Herbalife was not salified with simply
3    enjoining ANC, but that Herbalife would need to put HEG out of
4    business because it could simply find a new manufacture and resume
5    its counterfeiting and/or competing organization.  Addis suggested
6    that the only way to end the threat to its market was to fool HEG
7    into believing that someone representing Herbalife could supply HEG
8    with product, convince HEG to place a large order, and then keep
9    the money without delivering product.  Addis asked Fallow to act as
10   the "broker" for the phony manufacturer and to assist Herbalife in
11   putting HEG out of business in return for Herbalife's agreement to
12   delete the Riley Distributorship.   Herbalife began to pressure
13   Fallow to participate in its "sting operation" against HEG.

14   Fallow will testify that he began his spying operations for
15   Herbalife under the direction of David Addis.  Sometime after the
16   operations began, Addis directed Fallow to report to William
17   ("Bill") Gillespie, head of Herbalife's security department.

18   As evidenced by the letter, on or about March 8, 1994, Jackie
19   Hartman of Herbalife sent a letter to Craig Frick terminating him
20   as an Herbalife Distributor, "for reasons that are well known" to
21   him.   As evidence by the certified mail receipts, although
22   Herbalife claims that it has previously terminated Frick, Frick did
23   not receive the prior letter or letters.

24   Dan Fallow and/or David Addis will testify that on or about
25   March 10, 1994, Dan Fallow met with Addis at the Peabody Hotel in
26   Orlando, Florida, as evidenced by the notes Fallow took at the
27   meeting, and by Mary Fallow's March 22, 1994 letter to David Addis.

28

32

1   Fallow complained to Addis that Herbalife had ignored Mary Fallow's
2   complaint about the Rileys.   Fallow asked whether Mary needed to
3   hire counsel.   Addis convinced Fallow that Mary did not need to
4   hire counsel because Addis would act as counsel for Mary and ensure
5   Herbalife would delete the Rileys and rollup the royalty payments
6   to Mary Fallow.   Faced with these huge losses to Mary, and coerced
7   with  the  threat  that  these  losses  would  continue  unless  he
8   cooperated, Dan Fallow agreed to pose as the phony manufacturer and
9   gather  intelligence  about  the  competitor.   Addis  agreed  that
10  Herbalife would pay Dan Fallow salary and $15,000 for expenses in
11  this effort.

12       On  or  about  March  15, 1994, as evidenced  by the checks,
13  Herbalife paid Dan Fallow $8,000 for expenses to be incurred in
14  Herbalife's operation against HEG.  Shortly thereafter, on or about
15  April 7, 1994, Herbalife paid Dan Fallow, $7,000 the remainder of
16  the promised $15,000 payment.

17       Dan  Fallow  will  testify  that  on  or  about  May  7,  1994,
18  Herbalife, posing as Manhatten Drug, produced a product price sheet
19  to give to HEG (as evidenced by the price sheet).  Dan Fallow and
20  a yet unidentified representative of the telephone company will
21  testify that Manhatten Drug's telephone number, (310) 258-7084, was
22  physically located and rang into Herbalife's offices.  As evidenced
23  by the testimony of Dan Fallow, William Gillespie, and/or Jennifer
24  Mulcahy, Gillespie of Herbalife instructed his secretary, Jennifer
25  Mulcahy, to answer that telephone line as "Manhatten Drug."

26       A  series  of  communications  were  then  made  between  Fallow,
27  Herbalife  and  HEG,  as  evidenced  by  the  faxed  communications

28                              33
                    **62**

1     produced with this Disclosure statement. On or about July 7, 1994,

2     Mogens Garbenfeldt faxed a message to Dan Fallow indicating that

3     HEG had just received the "samples" from Manhatten Drug

4     (Herbalife), and discussing terms of future purchases.

5         On or about July 28, 1994, James C. Bartless of Hash, O'Brien

6     & Bartles of Kalispell, as evidenced by the letter, Montana wrote

7     to Herbalife on behalf of Dave and Sharon Peterman complaining that

8     Herbalife had wrongfully deleted Clint Fallow's Distributorship and

9     transferred the income from Clint and the Petermans to the

10     Petersons.  Dan Fallow will testify that in reaction to this

11     letter, Herbalife stopped funding to Dan Fallow in Herbalife's

12     operation against HEG.  This caused Dan Fallow to miss an August

13     10th meeting with HEG in Denmark.

14         On or about August 9, 1994, Kent Kristensen sent David Addis,

15     counsel for Herbalife a copy of a label for Herbalife Inc., which

16     Kristensen intended to distribute in Europe, offering to settle its

17     trademark dispute with Herbalife.  This letter was supplied to Dan

18     Fallow by Herbalife.

19         On or about August 10, 1994, Dan Fallow wrote to Mark Hughes

20     at Herbalife to discuss HEG, noting (as Hughes was already aware)

21     that Fallow "ha[s] been the point man on [the] sting operation",

22     and acknowledging the Herbalife supplied the labels which Fallow

23     sent to HEG, and that Herbalife had cut off the funding for the

24     operation.  Herbalife resumed funding.

25         On or about August 16, 1994, Mogens Garbenfeldt of HEG sent a

26     faxed message to Dan Fallow complaining that he had not appeared on

27     August 10th and that expressing interest in placing an order.

28

1    On or about August 17th, as evidenced by the itinerary, Dan
2  Fallow's testimony, and canceled checks, Herbalife arranged and
3  paid for Dan Fallow's trip to Europe to meet with HEG through
4  SanDance Travel.  On or about August 28, 1994, and August 29, 1994
5  (as evidenced by the faxed messages), while in Europe with HEG, Dan
6  Fallow sent a faxed messages to Bill Mulcahy (Gillespie) at
7  Manhatten Drug (Herbalife) regarding future orders.

8    On or about August 30, 1994, Bill Mulcahy (Gillespie) from
9  Manhatten Drug (Herbalife) sent a faxed reply.

10   On or about September 1, 1994, Craig B. Frick of HEG sent a
11 faxed response to Bill Mulcahy (Gillespie) to Manhatten Drug
12 (Herbalife).

13   On or about September 7, 1994, Bill Mulcahy (Gillespie) sent
14 a fax to Dan Fallow at HEG from Manhatten Drug (Herbalife)
15 instructing HEG to wire funds, asking HEG to place an order for a
16 larger shipment which "makes me some money", and asking when he
17 could deal directly with HEG.

18   On or about September 9, 1994, Mulcahy (Gillespie) of
19 Manhatten Drug (Herbalife) sent HEG another price quote with
20 instructions to wire $5,582.24 through AEI.  Those funds were
21 wired, received and retained by Herbalife, as evidenced by the
22 faxed communications and copies of the wire transfer requests.  HEG
23 paid an additional amount, approximately $1,900 to Dan Fallow as a
24 commission to compensate him in his assumed role as agent for
25 Manhatten Drug, and to make his participation believable.
26 Herbalife was aware of and sanctioned the payment.

27

28                    **64**       35

1     On or about September 9, 1994, Dan Fallow wrote to Gillespie
2  at Herbalife and requested that his agreement with Herbalife be
3  memorialized in writing.  Gillespie agreed to Fallow's terms.

4     On or about September 20, 1994, Dan Fallow sent a faxed
5  message to Bill Mulcahy (Gillespie) with wire transfer instructions
6  for HEG's funds to AEI, attention Terry Biagi.  As evidence by the
7  wire transfer instructions, the funds were transferred on or about
8  September 27, 1994.

9     On or about September 30, 1994, Bill Mulcahy (Gillespie) by JM
10  (Jennifer Mulcahy) faxed a message to Dan Fallow indicating that he
11  would be available for a telephone conference with Kristensen that
12  Wednesday morning.

13     On or about October 10, 1994, Kent Kristensen sent a fax
14  message to Mr. Bill Mulcahy (William Gillespie's assumed name) at
15  Gillespie's home telephone number, of Manhatten Drug (the name used
16  by Herbalife in posing as a manufacturer) informing Gillespie that
17  HEG had transferred funds to Air Express International ("AEI") as
18  directed by Herbalife (posing as Manhatten Drug) in order to
19  purchase a test order, and anticipating purchasing product from
20  Manhatten Drug.

21     On or about November 3, 1994, Bill Mulcahy (Gillespie) sent a
22  faxed message to Kent Kristensen (with whom he was now dealing
23  directly) regarding HEG orders and asking HEG to wire $45,000 to
24  Manhatten Drug (Herbalife) through AEI.

25     On or about November 14, 1994, Dan Fallow sent a faxed message
26  to Bill Gillespie at Herbalife informing him that Fallow has
27  learned that HEG is looking at other manufacturers.

28

1   During its investigation of the competitor, Herbalife learned
2   that the Herbalife product in Russia was controlled by the Russian
3   Mafia, and that organization could prevent any legitimate Herbalife
4   operations in Russia without payment to the Mafia.   Herbalife
5   pressured Dan Fallow to contact the Russian Mafia and gain its
6   permission for product distribution, paying the Mafia if necessary,
7   and/or using the Mafia to put the competitor out of business
8   "quietly."  Dan Fallow feared for his life and asked Herbalife to
9   provide protection for him.  Although Herbalife first agreed to do
10  so, at the last minute, Herbalife reneged on that promise.

11  On or about December 2, 1994, Dan Fallow sent a faxed message
12  to Bill Gillespie at Herbalife from the Holiday Inn in Frankfurt
13  informing Gillespie that Fallow would meet with the representative
14  of the Russian Mafia the next day to start negotiations for
15  Herbalife.

16  On or about December 12, 1994, Dan Fallow sent Gillespie an
17  expense accounting and request for payment for his efforts in
18  Herbalife's operations against HEG.

19  On or about December 16, 1994, Gillespie sent a faxed message
20  to Dan Fallow (on Herbalife letterhead) requesting a meeting with
21  a member of the Russian Mafia "your friend", setting an agenda, and
22  requesting that Fallow not attend the meeting.  Gillespie requested
23  that Fallow not attend because he intended to request that the
24  Russian Mafia eliminate HEG personnel and Herbalife did not want
25  Fallow to witness the conversation.  The Mafia had requested that
26  Herbalife stop HEG's sales of product as that would compete with
27  its distribution of product supplied by Herbalife.   In a taped

28

1   telephone conversation with Dan Fallow, William Gillespie stated
2   that he was ready to pay for the Russian Mafia to put Kent
3   Kristensen "out of business quietly."

4       On or about December 31, 1994, a representative of the Russian
5   Mafia faxed a message to Dan Fallow indicating that the
6   representative would meet with Gillespie only if Dan Fallow were
7   also present.

8       In the early part of 1995, Herbalife sent Dan Fallow a 1099
9   form indicating that it had paid him $38,370.49 in "nonemployee
10  compensation" for his efforts in assisting Herbalife's operations
11  against HEG. As evidenced by the 1099 and check stubs, Herbalife's
12  made at least five payments to Fallow for the "special project" in
13  1994.

14      On or about January 4, 1995, Gillespie faxed a message to Dan
15  Fallow on Herbalife letterhead advising Fallow that he would not
16  meet with the Russian Mafia with Dan Fallow present for
17  "discussions" but that Gillespie understood that Fallow had to be
18  present for "introductions." Gillespie also asked Fallow whether
19  the Russian Mafia would "put [Kristensen] out of business as a
20  gesture of good will" if Herbalife would not "ship any additional
21  product to Kent Kristensen's group." Then, Herbalife would be
22  willing to "develop a dialogue" with the Russian Mafia.

23      On or about January 4, 1995, Mull Mulcahy (Gillespie) faxed a
24  message to Ken Kristensen of HEG stating that Manhatten Drug
25  Company (Herbalife) "will no longer provide you with requested
26  products." This fax was sent to Dan Fallow on or about January 6,
27  1995.

28          **67**        38

1    Dan Fallow will testify that the operation against HEG ended
2    in February 1995.  Once the operation against HEG ended, after Dan
3    Fallow travelled all over Europe for Herbalife, risked his life,
4    and posed as its front man in this distasteful scheme, and signed
5    Herbalife's affidavit, Herbalife broke its promises.  Now that
6    Fallow was no longer needed, Herbalife then refused to compensate
7    Dan Fallow for his promised time and expenses.  In a telephone
8    conversation with Gillespie, Gillespie informed Fallow that "the
9    Company was comfortable with not paying him" as promised.
10   Herbalife also refused to delete the Rileys Distributorship, and
11   "roll up" those and the attached down-line royalties to Mary
12   Fallow, or restore the lost monies to Clint, in contravention of
13   their agreement with Dan Fallow.  Fallow contacted counsel, John
14   White, in order to enforce his rights.

15       On or about March 10, 1995, Dan Fallow wrote to Herbalife
16   informing him that Fallow in an attempt to get it to fulfill its
17   agreements, and announcing that he might work with a competing
18   multi-level organization.

19       On or about August 13, 1995, Craig Frick wrote to John
20   Bolsover of Herbalife and explained his participation in HEG.  In
21   that letter, Frick confirmed that the original purpose of HEG and
22   the draft agreement (attached by Herbalife to its counterclaim) was
23   not to counterfeit product, but for Distributors to combine their
24   effort in marketing legitimate Herbalife product.  Frick also
25   confirmed that Dan Fallow was not involved in counterfeiting
26   product and had no involvement after early December 1993.

27

28                     **68**        39

On or about August 25, 1995, after receiving Frick's letter, John Bolsover of Herbalife wrote to Frick stating that Herbalife was willing to accept him back as a Distributor, in violation of its own stated rules. However, without precedent or explanation, Herbalife would not agree agreed to reinstate Frick's downline. On or about August 25, 1995, Frick wrote to David Addis requesting reinstatement of his downline. Frick will testify that his downline was not reinstated.

B. Facts Relating to Plaintiffs' Claim Against Herbalife For Racketeering and Punitive Damages.

As evidenced by the testimony of Plaintiffs, Herbalife Distributors named herein, other yet unidentified Herbalife Distributors, and as analyzed by a yet unidentified multi-level marketing expert, Herbalife has a pattern and practice of inducing people to become Herbalife Distributors based upon false promises of unlimited income, the ability to operate their own businesses, the continued right to future income as long as the Distributor obeys Herbalife's written rules, due process, and equal treatment. Yet, despite its stated rules, Herbalife has a pattern and practice of either ignoring its rules, or making up new ones, in order to withhold income, and/or redistribute income to other persons more favored within the organization. As demonstrated by testimony given by Founder Mark Hughes in a recent deposition taken on November 29, 1995, in Los Angeles, California, Herbalife also has unwritten rules it enforces at will without notice. After a Distributor has attained some success, quit other employment and has received some large royalty and bonus checks, Herbalife has a

pattern and practice of arbitrarily and capriciously taking away income from its Distributors without notice or due process, and withholding or redistributing that income to other persons more favored within the organization.

On many occasions, Herbalife has exercised its power to turn off a Distributors' income stream, and/or significantly reduce it, to force successful Distributors to bend to its will, whether or not Herbalife's demand is within Herbalife's stated rules or policies. Herbalife uses this coercion tactic to favor some Distributors over others, and/or gain a level of control over its Distributors not afforded by its contractual rights.

Among other examples, as evidenced by letters to Herbalife, Chris Carley Stapp, a Southern California Distributor, had her income and her "President's Team check" taken without notice or due process of any kind (eleven days before Christmas and one day before the checks were due) when she began to generate income by setting up a computer program for direct mail and from selling direct mail literature to her down line Distributors. Carley had invested "thousands of dollars" in the system which had been previously sent to and approved by David Addis. There is no Herbalife Rule preventing the sales by direct mail or preventing the sale of literature which does not use the Herbalife name or trademarks. Herbalife had also promised to allow, Carley, like all of its Distributors, to conduct her own business. Herbalife reneged on the promise. In its efforts to curb Carley's efforts, Herbalife subjected her to "discrimination, blackmail extortion illegal business trade demands, defamation of character to other

**70**      41

distributors, verbal abuse, harassment, duress and malice." After withholding income, Addis demanded that Carley stop the direct mail campaign, even though other Distributors were allowed to continue with similar marketing (including Joe Flagherty whose checks were withheld for nine months). When Carley wrote to Herbalife to cure her losses, Herbalife characteristically ignored her telephone calls and faxes. On December 26, 1995, and again on April 16, 1996, Carley wrote to Herbalife and complained of its arbitrary and unjustified actions. After withholding Carley's checks, and after Carley and her downline had invested time, money and effort into developing the direct mail program, Herbalife issued a new policy forbidding the type of marketing program instituted by Carley, convincing Distributors to drop out of Carley's downline costing her over $20,000 per month.

In another example, as evidence in pleadings filed in a lawsuit against Herbalife, upon information and belief, Herbalife withheld the income of Distributor Marilyn McCormick when her husband began a competing multi-level organization, even though there is no Herbalife Rule prohibiting a Distributor from being married to a competitor.

In another example, Herbalife represents that it will now allow Distributors to sell into foreign countries which are not yet "open" by Herbalife. As Mary and Dan Fallow witnessed, the truth is that, on at least one occasion, it has allowed a favored Distributorship, John and Susan Peterson, to sell and establish Distributorship in an unopened country, Mexico, prior to allowing competition by any other Distributors. This favoritism allowed the

71

42

1   Petersons to gain an immense advantage and a much greater income

2   than the normal Distributor who was bound by the no-selling

3   limitation.

4       As evidenced by the testimony of Plaintiffs, Herbalife

5   Distributors named herein, yet unidentified Herbalife Distributors,

6   and as analyzed by the multi-level marketing expert, Herbalife also

7   has a pattern and practice of arbitrarily reducing checks without

8   explanation and then refusing to account for the deficiencies.

9   Herbalife's accounting is intentionally so confusing and

10  unexplained that a Distributor never has all the information needed

11  to determine whether he or she has been paid as promised.   This

12  purposeful lack of access to information give Herbalife the ability

13  to arbitrarily withhold income.

14      As analyzed by the yet unidentified multi-level marketing

15  expert, Herbalife's promises of riches and financial independence

16  are and are known by Herbalife to be false and illusory.   The

17  organization which is designed to enrich the favored few cannot

18  sustain a consistent income for the many.

19      Herbalife committed racketeering as defined by A.R.S. § 13-

20  2314.04 through the predicate acts of a scheme or artifice to

21  defraud and a theft of services as defined by A.R.S. §

22  12301(D)(4)(e) and (t), in that Herbalife: (1) induced Plaintiffs

23  and others to become Distributors, sell product, and induce others

24  to become Distributors, with the representation that they would be

25  paid, could conduct their own business, and that Herbalife would

26  adhere by its rules and procedures; (2) intentionally, knowingly,

27  wrongfully and repeatedly withheld income from its Distributors

28                          **72**        43

1   and/or transferred the funds to those more favored within the
2   organization; (3) and knowingly obtained benefits from its
3   Distributors by means of false or fraudulent pretenses,
4   representations promises or material omissions. Herbalife
5   represented Distributors would be paid, could conduct their own
6   business, and that Herbalife would adhere by its rules and
7   procedures. That representation was false in that Herbalife had no
8   intention of paying all that was owed and promised, allowing the
9   Distributors to conduct their own business, or abide by the
10  Herbalife rules and procedures. That representation was material
11  in that it induced plaintiffs and others to become Distributors and
12  expend significant monies and effort in doing so. Herbalife
13  intended that plaintiffs and others rely upon these false
14  representations.

15      As a result of this conduct, Plaintiffs and other Distributors
16  have been damaged as described herein in that they were not paid as
17  promised, and they provided services to Herbalife and incurred
18  expenses which they were not compensated and are entitled to treble
19  damages.

20  III. FACTUAL BASIS, LEGAL THEORIES AND WITNESSES, FOR PLAINTIFFS'
       DEFENSES TO COUNTERCLAIMS.
21
       A. Defenses For Dan Fallow.
22
       1.   Federal Trademark infringement, false designation of
23          origin, common law unfair competition and trademark
            infringement, California statutory unfair competition
24          violation, California statutory trademark dilution and
            injury to business reputation.
25
       The legal and basis for Dan's defense is (1) that California
26
    and Nevada law do not apply to him; (2) he did not do the wrongful
27

28
                        44

acts alleged; and (3) there was no agency, partnership, joint venture, association or other relationship between Dan and HEG from which liability can be imputed from HEG to Dan Fallow; and (4) Herbalife consented to Dan Fallow use of its intellectual property.

The factual basis for this defense is that Dan was an Idaho residents, who did not have sufficient connection with either California or Nevada with respect to the wrongful acts alleged. He did not distribute goods in California as prohibited by § 14320 of the California Business and Professions Code.

The additional facts relevant to Dan Fallow's contract with Herbalife to assist Herbalife in shutting down the operations of HEG are set forth above. Those facts make it clear that Dan Fallow never joined with HEG in its venture to counterfeit or otherwise mis-use Herbalife's intellectual property. The only uses Dan Fallow made of Herbalife's intellectual property were done with its consent. There are no facts which would support an agency, partnership, and/or conspiratorial relationship between and among those responsible for the acts which form the basis for these counterclaims and Dan Fallow. Dan Fallow withdrew from HEG when Kristensen insisted that it infringe on Herbalife's trademarks. Dan did not have a common purpose with HEG, direct or control its or any of its participants actions, and/or conspire with HEG or any of its beneficial owners to do any of the acts which form the basis for Herbalife's counterclaim.

2.   Violation of the California Privacy Act:

The legal and factual basis for Dan Fallow's defense is that (1) there is no basis for applying this California law to Dan

Fallow who was not in California at the time of the action and had no reason to be aware of the law; (2) the law is preempted by Federal regulation; and (3) it would violate due process to apply the California Penal Code to an Idaho resident who had not reason to know of the law; (4) many of the communications were not confidential; (5) Herbalife waived the confidentiality of its communications and had made similar recordings; (6)

     3.  <u>Conversion</u>

The factual and legal basis for Dan Fallow's defense to Herbalife's counterclaim for conversion is that Dan Fallow did not steal any Herbalife property. Any property used was done with Herbalife's consent.

     4.  <u>Intentional Interference With Contractual Relations and Economic Advantage</u>.

The factual and legal basis for Dan Fallow's defense to Herbalife's counterclaim for intentional interference with contractual relations is that Dan never contacted or induced Herbalife Distributors to breach any contract or agreement with Herbalife or otherwise interfere with Herbalife's economic advantage. To the contrary, Dan Fallow and Herbalife representatives will testify that Dan Fallow protected Herbalife's interests.

     5.  <u>Breach of Distributorship Agreement and Injunctive Relief</u>.

As stated above, Dan Fallow's legal and factual defense to Herbalife's Eleventh and Twelfth cause of action is that Dan Fallow did not violate Herbalife rules, make unauthorized use of Herbalife's intellectual property, recruit Herbalife Distributors

into competing multi-level organizations, or engage in a dual distributorship.

B. Defenses for Mary and Clint Fallow.

1. Federal Trademark infringement, false designation of origin, common law unfair competition and trademark infringement, California statutory unfair competition violation, California statutory trademark dilution and injury to business reputation.

The legal and basis for Mary and Clint's defense is (1) that California and Nevada law do not apply to them; (2) neither Mary or Clint did the wrongful acts alleged; and (3) there was no agency, partnership, joint venture, association or other relationship between Mary and Clint Fallow and HEG from which liability can be imputed from HEG to Mary and Clint Fallow.

The factual basis for this defense is that Mary and Clint Fallow were Idaho and Arizona residents, respectively, who had no connections with either California or Nevada with respect to the wrongful acts alleged. Neither Mary or Clint distributed goods in California as prohibited by § 14320 of the California Business and Professions Code. Further, neither Mary or Clint Fallow wrongfully "use" Herbalife's protected intellectual property, utilized a false designation of origin, attached false labels, marketed, sold or were otherwise involved with counterfeit products.

There are no facts which would support an agency, partnership, and/or conspiratorial relationship between and among those responsible for the acts which form the basis for these counterclaims and Mary and Clint Fallow. Mary and Clint Fallow did not have a common purpose with HEG, direct or control its or any of

its participants actions, and/or conspire with HEG or any of its beneficial owners to do any of the acts which form the basis for Herbalife's counterclaim.

2. <u>Violation of the California Privacy Act</u>:

The legal basis for Mary and Clint Fallow defense is that (1) there is no basis for applying this California law to non-California residents who were not present in the state; (2) Section 637 of the California Penal Code creates a civil cause of action only for violations of § 632 only against the person who allegedly did the wiretapping, eavesdropping or recording of the confidential communications, and this California law does not apply to Arizona and Idaho residents; and (3) the law is preempted by Federal regulation.

The factual and legal basis for Mary and Clint Fallow's defense is that they were not in California and that they did not wiretap, eavesdrop, or record confidential conversations with Herbalife employees or representatives.

3. <u>Conversion</u>

The factual and legal basis for Mary and Clint Fallow defense to Herbalife's counterclaim for conversion is that neither Mary or Clint Fallow were affiliated with HEG and/or stole anything belonging to Herbalife.

4. <u>Intentional Interference With Contractual Relations and Economic Advantage</u>.

The factual and legal basis for Mary and Clint Fallow's defense to Herbalife's counterclaim for intentional interference with contractual relations is that neither Mary or Clint Fallow

were affiliated with HEG and/or contacted or induced Herbalife Distributors to do anything associated with HEG.

      5.   <u>Breach of Distributorship Agreement and Injunctive Relief</u>.

Mary Fallow's legal and factual defense to Herbalife's Eleventh and Twelfth cause of action is that she did not violate Herbalife rules, make unauthorized use of Herbalife's intellectual property, recruit Herbalife Distributors into competing multi-level organizations, or engage in a dual distributorship.

III. WITNESSES

    A.   <u>The Plaintiffs</u>

      1.   CLINT S. FALLOW, will testify to on many subjects as discussed above.

      2.   MARY LYNN FALLOW will testify on many subjects as discussed above.

      3.   DANIEL S. FALLOW will testify on many subjects as discussed above.

    B.   <u>The Defendants and Herbalife Representatives</u>

      1.   TONNI AND JAY RILEY, husband and wife, will testify regarding their competing and cross sponsoring activities, as discussed above.

      2.   MARK REYNOLDS HUGHES will testify to the many subjects discussed above as well as his personal wealth, his income received from other companies which supply product to Herbalife, his conversations with Dan Fallow regarding the string operation of HEG, his admissions that Herbalife's legal department was arbitrarily withholding income from Distributors.

**78**      49

1    3.    WILLIAM GILLESPIE, Director of Herbalife Security, will

2 testify   regarding   Herbalife's   operation   against   HEG,   his

3 conversations with HEG and Fallow, as discussed above.

4    6.    DAVID ADDIS, counsel for Herbalife, will testify on many

5 subjects as discussed above.

6    7.    MICHAEL   HUFFMAN,   V.P.   of   Herbalife,   will   testify

7 regarding: his planned attendance at a meeting with a member of the

8 Russian Mafia and William Gillespie.

9    8.    JACKIE HARTMAN: an employee of Herbalife, will testify

10 regarding the subjects discussed above as well as Herbalife's

11 policy and practice regarding withholding Distributor income and

12 terminating Herbalife Distributorships.

13    9.    ROXANE ROMANS: an employee of Herbalife, will testify

14 regarding Herbalife's policy and practice regarding withholding

15 Distributor income and terminating Herbalife Distributorships.

16    10.    LARRY THOMPSON, former Vice President of Herbalife, will

17 testify regarding favored treatment by Herbalife for the Rileys and

18 certain Distributors who catered to the wishes of Mark Hughes, his

19 relationship with Tonni Riley, and his summary firing by Hughes

20 after 14 years with Herbalife.

21    11.    A representative or representatives of Herbalife from the

22 Distributor Compliance Department will testify regarding: letter

23 sent to Clint, Dan and Mary Fallow regarding the status of the Mary

24 Fallow and Clint Fallow's Distributorships.

25    D.    Unequal Treatment of Herbalife Distributors

26    12.    DAVE AND/OR SHARON PETERMAN will testify regarding the

27 subjects discussed above.

28                          79          50

13. JOHN AND/OR SUSAN PETERSON will testify regarding the subjects discussed above.

14. METTE HYLDGAARD will testify regarding the subjects discussed above, including but not limited to: being signed up as a Distributor under Clint Fallow by her cousin Craig Frick, Susan Peterson's unprofessional conduct, her success as a Distributor, her sales in Denmark and Brazil, her statements to other Herbalife Distributors in March of 1996, that she was selling large amounts of product in Brazil and had signed up more than 200 Distributors per day and was selling at the "Presidents' Team" level, and Herbalife's touting her as an example of an extremely successful Distributor. Upon information and belief, Hyldgaard may testify as to Herbalife's allowing her to set up a second Distributorship without recognizing Clint Fallow as her sponsor in order to allow Herbalife to bypass royalties and commissions to Clint Fallow.

15. JIM AND JUDY FOBAIR will testify as to the Herbalife's treatment of their Distributorship, deleting it as a penalty for competing, as well as Herbalife's allowing Judy Fobair to sign another Distributorship agreement under Tisch Roshin.

16. RANDY TREDWELL, will testify as to being allowed to sign up as a Distributor under his ex-wife as discussed above.

17. DANIEL and/or MARILYN MCCORMICK will testify as to the termination of his (or his wife's) Herbalife Distributorship because of his involvement in a competing multi-level organization, Herbalife's arbitrarily and wrongfully terminating his wife's Distributorship commissions, royalties and bonuses, and his lawsuit against Herbalife.

18.  CHRIS STAPP KARLEY, an Herbalife Distributor in Southern California, will testify to Herbalife' wrongful taking of her income as discussed above.

19.  JOSEPH FLAGHERTY, an Herbalife Distributor in Southern California, will testify that his checks were held by Herbalife for nine months and not turned on until he hired counsel and threatened to file a class action lawsuit.

20.  HARRY NOUHAN, an Herbalife Distributor in Michigan, will testify that he sued Herbalife on December 13, 1991 in California for terminating his income without cause.

22.  MARY ETTA MOORE, a former Herbalife Distributor in Maricopa County will testify as to the promises made to her by Herbalife to induce her to become a Distributor and her subsequent suit against Herbalife International on October 14, 1983.

23.  PATTY BERMAN, in-house counsel for Herbalife, will testify as to her conversations with Dan Fallow regarding his complaints against the Rileys.

24.  REX ALLEN, a Distributor in Mary Fallow's downline, will testify regarding conversations with the Petersons, as discussed above.

25.  JIM BARTLETT, will testify regarding his representation of the Petermans.

26.  RON TOUCHARD will testify that Herbalife allowed him to change sponsors for his Herbalife Distributorship without resigning.

27.  ED STAMMEN will testify that Herbalife allowed him to change sponsors.

28.   ED LUKAVICS will testify as to the Rileys Distributorship and that Herbalife allowed him to change sponsors.

29.   JOEL and LYNN LANDWALKER ZITTING will testify as to Herbalife's treatment of husband and wife Distributorships as discussed above.

30.   Yet unnamed Distributors who resigned and then were allowed to become Herbalife Distributors under someone other than their original sponsor within the applicable six or twelve month prohibition period may testify.

31.   An employee of Herbalife, not yet identified, will testify as to procedure, regularity and contents of Herbalife royalty, commission, bonuses and override statements.

E.   The Damage Done To Clint's Distributorship

32.   REINHOLDT SCHMIDT will testify as to his being a Distributor under the Clint Fallow Distributorship and withdrawing as a result of Herbalife's investigation, as discussed above.

33.   HEINER KOBERICH, will testify as to being signed up as a Distributor under Clint Fallow, but quit after Herbalife's investigation of the Distributorship, as discussed above.

F.   Mary Fallow's Emotional Distress

34.   SHENE NAURETAS, may be called to testify as to Mary Fallow's pain and distress.

35.   JULIE HESS, former nanny, may be called to testify as to Mary Fallow's pain and distress.

36.   JOYCE FONTAINE, may be called to testify as to Mary Fallow's pain and distress.

37.  DR. STEVEN PUFFER, treating physical, may be called to testify as to the source and severity of Mary Fallow's pain and distress.

38.  DONNA FORD, P.A. may be called to testify as to her treatment of Mary Fallow.

39.  DR. STEVEN BRISBOIS of Spokane Washington, treating physical, may be called to testify as to the source and severity of Mary Fallow's pain and distress.

40.  CAROL NEER, friend, may be called to testify as to Mary's Fallow's pain and distress.

41.  CAROL TUPIS, may be called to testify as to Mary Fallow's pain and distress.

F.  The Riley's Interference With Mary Fallow's Distributorship.

42.  MIKE, FRAN and/or ED RICKS will testify about the Riley's competing efforts.

43.  MARY HABIB, will testify that the Rileys induced her to leave Herbalife and work for competing organizations.

44.  ELANA LOSTANA, former nanny, will testify to Tonni Riley's competitive efforts.

45.  SHERRY MEJAH, Tonni's secretary, will testify to Tonni Riley's competetive efforts.

46.  JOANNE BAKER, KRUGLER DENUE, ANDREA NEGAE and/or HARRY NUHAN will also testify as to the Riley's competing organizations.

G.  Herbalife's Operation Against HEG

47.  DICK MARCONI, of D&F Industries (Herbalife's product manufacturer), will testify regarding: Herbalife's instructions

**83**        54

1  that he furnished samples of Herbalife product, made to look like
2  counterfeit product, to be used by Dan Fallow in Herbalife's
3  operation against HEG, and upon information and belief Herbalife's
4  false use of the Ph.D. designation.

5      48.  Female assistants, Debbie Nocita, Cynthia Simons and
6  Rose, employed by D&F, whose name is current unknown, who helped
7  make the samples Herbalife supplied to HEG will testify regarding:
8  making those samples and Bill Addis and William's Gillespie's
9  directions.

10      49.  DOROTHY HAVELICK formulator at ANC will testify regarding
11  analysis of the Herbalife product for HEG and of her conversations
12  with Dan Fallow, as discussed above.

13      50.  TERRY BAGGI, an employee of AEI shipping company will
14  testify regarding: conversations with Bill Gillespie; his role in
15  setting up false shipping designations and account numbers given to
16  HEG by Herbalife in order to convince HEG to wire monies to AEI to
17  ship product HEG believed to be counterfeit -- but which Herbalife
18  never intended to ship, as discussed above.

19      51.  KENT  KRISTENSEN  is  believed  to  be  unavailable  for
20  testimony.

21      52.  CRAIG FRICK will testify as to his role in HEG as
22  discussed above.

23      53.  MOGENS GARBENFELDT, Kent Kristensen's confidant and
24  second in command is believed to be unavailable to testify.

25      54.  PAUL GOODMAN will testify as to his role in HEG as
26  discussed above.

27

28

**84**

55.   ADAM DIETER, formerly of ANC, will testify as to employment by Herbalife as a manufacture of genuine Herbalife powder from 1980 to 1984, Herbalife's move to D&F Industries, and his dealings with HEG, as discussed above.

56.   DOROTHY HAVALIK, an employee of D&F Industries, will testify as to her formulation of the look alike Herbalife powder as discussed above.

57.   JENNIFER MULCAHY, a secretary in William Gillespie's office, will testify regarding: answering the telephone at Herbalife as "Manhatten Drug Company" when receiving calls from persons associated with HEG and William Gillespie's use of the alias Bill Mulcahy.

58.   PATTI BERMAN, in house counsel for Herbalife, will testify regarding conversations with Dan Fallow discussing complaints about the Riley's cross-sponsoring and rule violations;

59.   CAROL HANNAH will testify regarding a telephone call she received from Dan Fallow as discussed above, complaints received about the Rileys, and the subjects discussed above.

60.   All witnesses listed by other parties.

61.   All witnesses disclosed by further discovery in this matter.

62.   All witnesses necessary to lay foundation or authenticate documents or exhibits.

**IV.  PERSONS WITH PERTINENT KNOWLEDGE**

1.   All persons listed above.

2.   Former Distributors who have sued Herbalife, including but not limited to Mary Etta Moore, Nell A. Woffard, Harry Netti and Francine Cavanagh.

3.   Other Herbalife Distributors whose names and addresses are currently unknown.

4.   Members of Herbalife's accounting Department whose names and addresses are currently unknown.

5.   Members of Herbalife Management whose names and addresses are currently unknown.

V. EXPERT WITNESSES

1.   An expert not yet identified will testify as to the value of earnings lost by Mary and Clint Fallow.

2.   An accountant, not yet identified, specializing in multilevel marketing operations will testify as to the accounting of monies owed and paid to Plaintiffs.

3.   A marketing expert, not yet identified, will testify as to the income potential and distribution in multi level organizations and how that potential and distribution differs from the promises made to induce people to become Herbalife Distributors.

VI. WITNESS STATEMENTS

Defendants are not aware of any witness statements other than those recorded in the tape recordings listed and produced with this Disclosure statement.

VII. COMPUTATION AND MEASURE OF DAMAGES

A.   Damage Calculation for Clint Fallow

**86**          57

For his breach of contract claim against Herbalife, Clint Fallow has been damaged in an amount not less than $356,000 in damages accruing to date, and lifetime damages exceeding $3.6 million to be proven at trial. By the fall of 1992, the European Distributorship was generating monthly income of $8,000 U.S. Without Herbalife's interference, and diversion of income to John Peterson, the income would have remained at high levels. Clint Fallow has also been damaged in an unknown amount to Clint Fallow but known to Herbalife representing income wrongfully diverted from Clint Fallow to John and Susan Peterson.

B.    Damage Calculation for Mary Fallow

From June of 1991 to January of 1992, Mary lost monthly royalties of approximately $17,000 a month for a total of $119,000. From January of 1992 to September of 1995, Mary lost monthly royalties of $18,000 a month for those 44 months for a total of $710,000. But for the Rileys, her "Infinite Level Bonuses" for 1992 would have been $284,000; $800,000 for 1993 and 1994, and $185,000 for 1995. But for the Rileys, her year end bonuses would have been $200,000 for 1993 and $100,000 for 1994. Mary Fallow's projected lifetime earning loss approximates $12,000,000 (inclusive of damages to date).

Mary Fallow seeks emotional Distress damages in an amount not less than $100,000 as a result of injuries and health problems described above suffered as part of Herbalife's racketeering.

C.    Damage Calculation for Dan Fallow

For his contract claim, Dan Fallow seeks to recover expenses unpaid salary of $15,000 ($1,500 per week until February of 1995)

and specific performance of Herbalife's agreement to delete the Riley Distributorship, roll the royalties up to Mary Fallow, and reinstate Clint Fallow's Distributorship.

For his quantum meruit claims, Dan Fallow seeks to recover benefits conferred on Herbalife in shutting down HEG in an amount not less than $10,000,000.

For his racketeering claim, Dan Fallow seeks emotional Distress damages to recover for stress attacks (so severe as to make Dan Fallow fear he was having a heart attack), sleeplessness (so severe to require treatment in a sleep clinic and valium) in an amount not less than $100,000 as a result of injuries suffered as part of Herbalife's racketeering.

**VIII. EXHIBITS.**

1. Documents produced with and identified in this Disclosure Statement.

2.  Exhibits offered by other parties

3.  Exhibits identified in future discovery.

**IX. TANGIBLE EVIDENCE OR RELEVANT DOCUMENTS**

1.  All documents and evidence discussed above and produced with this Disclosure statement.

2.  Issues of the Herbalife Career Book.

3.  Herbalife brochures, handbooks, and statements of policy. Herbalife product literature

4.  Distributor order forms.

5.  Video Tape, the next ten minutes can make a world of difference.

6.    The Herbalife Supervisor Goal Sheet for Herbalife Distributors for 1995 and 1996.

7.    An issue of Success Magazine June 1996

8.    An issue of Working At Home magazine featuring Mark Hughes.

9.    An article from Money Magazine of November 18, 1995 reporting the 25 fasting growing private U.S. firms.

10.    An issue of the Sand Point Newsline, Summer of 1996.

12.    Letters from Herbalife to Mary and Clint Fallow regarding and accounting for product sales, personal volume, group volume, organization volume, commission, royalties, and bonuses, and Distributorship status.

13.    Herbalife sales and marketing plan.

14.    Herbalife filings with the Securities and Exchange commission.

15.    Button which  says Lose Weight Now Ask Me How

16.    A collar pin which says Herbalife.

17.    Herbalife proxy filings.

18.    Herbalife annual reports.

19.    Newspaper and magazine articles concerning Herbalife.

20.    Labeled and unlabeled sample counterfeit products supplied by D&F to Herbalife to be given to HEG., and facsimile copies of Herbalife labels faxed by Herbalife Security ("HRB") to Dan Fallow to be given to HEG.

21.    Copies of pleading filed in lawsuits against Herbalife.

22.    Herbalife Distributor kit with literature, product, and audio tape.

**89**                60

23.  Issues of the Herbalife Journal.

24.  Plane tickets and/or travel itineraries of trips taken by Dan Fallow at Herbalife's expense.

25.  Video tapes of Herbalife Satellite network broadcasts.

26.  Video tapes of CNN presentations regarding Herbalife.

27.  Video Tapes of C-SPAN broadcasts of Senate Hearing on Herbalife.

28.  Partial and possibly inaccurate transcripts of taped conversations between Dan Fallow and others.

29.  Brochure of Genesis 2000.

30.  Newsletter by Herbalife Distributors showing the profitability of Distributorship organizations.

31.  Written, audio or video transcripts of speeches and presentations given by Herbalife Distributors showing the profitability of their Distributorship line.

32.  Magazine article by Joseph M. Beasy (former Deputy U.S. Marshall) explaining how multi-level marketing which promises benefits for the many actually only benefits the favored few, does not result in real or consistent income for anyone working on a part time basis, involves a compensation plan is intentionally confusing, is based upon false promises of financial independence, requires a purchase of a large amount of product by the new distributor in order to achieve "bonuses" (which work out to be smaller than the amount spent on product purchased) and who is then forced to drop out of the organization when he runs out of money (which has been transferred to the favored distributors up-line).

1      33.   Telephone list kept by Dan Fallow containing David Addis

2   unlisted and guarded home telephone number given to Dan Fallow

3   during his employment by Herbalife in Herbalife's operations

4   against HEG.

5      34.   Entry in home health handbook on TMJ Syndrome and its

6   causes.

7      35.   Articles on chronic fatigue syndrome.

8      36.   Articles on Fibromyalgia

9      37.   Articles on stress.

10     DATED this 7th day of October, 1996

11                          WARNICKE & LITTLER, P.L.C.

12

13                     By _____
                          Ronald E. Warnicke
14                        Thomas E. Littler
                          Ellen B. Davis
15                        2020 N. Central Ave, Fifth Floor
                          Phoenix, AZ  85004
16                        Attorneys for **Plaintiffs**

17   COPY OF THE FOREGOING
     HAND DELIVERED THIS 9TH DAY OF OCTOBER
18
     Sarah Chilton, Esq.
19   Joel Hoxie, Esq.
     SNELL & WILMER
20   One Arizona Center
     400 E. Van Buren
21   Phoenix, Arizona 85004-0001
          Attorneys for Herbalife Defendants
22
     By _____
23
     MAILED THIS 9TH DAY OF OCTOBER
24   Dean W. O'Conner, Esq.
     LEARCH, MCDANIEL & KAUP, P.L.C.
25   2700 North Central Ave
     Suite 1500
26   Phoenix, Arizona 85014
          Attorneys for Defendants Rileys
27   By _____

28                    **91**              62

State of Idaho        )
                      )   s s
County of Bonner      )

   Daniel S. Fallow, being sworn upon oath, deposes and says that he is one of the plaintiffs in this action, that he has read the foregoing Disclosure Statement dated October 7, 1996, knows the contents thereof, and that the same are true to the best of his knowledge.

_____
Daniel S. Fallow

Subscribed and sworn to before me this ___22___ day of ___October___, 1996.

_____
Notary Public

My commission expires:
   8-26-02

**92**

State of Idaho )
) s s)
County of _Bonner_ )

Mary Lynn Fallow, being sworn upon oath, deposes and says that she is one of the plaintiffs in this action, that she has read the foregoing Disclosure Statement dated October 7, 1996, knows the contents thereof, and that the same are true to the best of her knowledge.

_Mary Lynn Fallow_
Mary Lynn Fallow

Subscribed and sworn to before me this __22__ day of __October__, 1996.

_Lucinda J. Carter_
Notary Public

My commission expires:
__8-26-02__

93

## VERIFICATION

I, Clint S. Fallow am a plaintiff in this action. I have reviewed the Disclosure Statement filed by me and Mary and Dan Fallow in this action. Certain factual matters contained therein are not within my personal knowledge. I hereby verify those matters which are within my personal knowledge.

_____
Clint S. Fallow


SUBSCRIBED AND SWORN to before me this _31st_ day of _October_ _____

_____
Notary Public

My commission expires:

_Oct. 31 - 98_


OFFICIAL SEAL
**MARILYN P. WEBSTER**
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 31, 1998

**94**

# EXHIBIT C

**WARNICKE & LITTLER, P.L.C.**
2020 North Central Avenue, Fifth Floor
Phoenix, Arizona 85004-4506
(602) 256-0400
FAX (602) 256-0345
Ronald E. Warnicke/SBN 001791
Thomas E. Littler/SBN 006917
Ellen B. Davis/SBN 013806

Attorneys for Plaintiffs and Counterdefendants

**SNELL & WILMER, L.L.P.**
One Arizona Center
Phoenix, Arizona 85004-0001
(602) 382-6000
Joel P. Hoxie/SBN 005448
Craig Marquiz/SBN 015896

**PAUL, HASTINGS, JANOFSKY & WALKER L.L.P**
695 Town Center Drive, 17th Floor
Costa Mesa, CA 92626
(714) 668-6200
Matthew A. Hodel (Pro Hac Vice)
Sean A. O'Brien (Pro Hac Vice)

Attorneys for the Defendants and Counterclaimants

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| CLINT S. FALLOW, MARY LYNN FALLOW, and DANIEL S. FALLOW, | No. CV 96-03558 |
| **Plaintiff,** | |
| vs. | **JOINT PRETRIAL STATEMENT** |
| HERBALIFE INTERNATIONAL, INC., a Nevada corporation, TONNI and JAY RILEY, husband and wife, | |
| **Defendants** | **(Assigned to William J. Schafer, III)** |
| HERBALIFE INTERNATIONAL, INC., a Nevada corporation and HERBALIFE INTERNATIONAL OF AMERICA, INC., a California corporation, | |
| **Counterclaimants,** | |

235A

vs.

DANIEL S. FALLOW, CLINT S.
FALLOW AND MARY LYNN FALLOW,

Counterdefendants.

Pursuant to the Uniform Rules of Practice of the Superior Court of Arizona, Rule VI, the parties

hereto submit the following Joint Pretrial Statement.

I.

## THE UNCONTESTED FACTS DEEMED MATERIAL

### About Herbalife

1.      Herbalife International Inc. is a Nevada corporation with offices in Southern California.

2.      Herbalife International of America, Inc. is a California corporation that shares offices

with Herbalife International, Inc. in Southern California.

3.      Herbalife is a multi-level marketing organization that sells weight loss, nutritional and

personal care products through a world-wide network of independent distributors.

4.      Herbalife sells a nutritional drink mix in a power form called "Formula 1." Formula 1 is

most often used as a meal replacement drink in connection with a weight loss program. Herbalife

Formula 1 comes in three different flavors.

### The Herbalife Distributorship Agreements

5.      According to the Distributorship Agreement, Herbalife distributors are "independent

contractors" and are not employees of Herbalife.

6.      On or about April 22, 1984, plaintiff Clint Fallow executed an Herbalife "Agreement of

Distributorship" under the sponsorship of Dan and Mary Fallow.

7.      On or about November 15, 1986, plaintiff Clint Fallow executed and Herbalife

"Agreement of Distributorship" under the sponsorship of Dan and Mary Fallow.

8.      On or about April 25, 1992, plaintiff Clint Fallow executed an Herbalife "Agreement of

--Page 2                                96

Distributorship" under the name of C. S. Fallow.

9.     On or about January 22, 1993, Clint Fallow executed a Tabulator Team Production Bonus Agreement for the C. S. Fallow distributorship.

### The Rules In The Herbalife Career Book

10.     A person becomes a distributor by "purchasing a distributor kit, filling out and executing an application, and having that Application accepted by Herbalife."

### Facts Regarding Dan and Mary Fallow

11.     On or about April 13, 1984, Dan and Mary Fallow entered into an Herbalife "Agreement of Distributorship" together, under the sponsorship of John and Susan Peterson.

12.     As all other distributors, the Fallows paid and incurred expenses of conducting the Herbalife distributorship, including advertising, printing, postage, airfare, other travel, entertainment, office or home space, hotel meeting rooms, rentals, etc.  Herbalife bears no part of these expenses, regardless of profit or other benefit to Herbalife.

13.     In 1985 Dan and Mary Fallow set up an Arizona corporation called Nuvo Riche, Inc.. Earnings from the Dan and Mary Fallow Distributorship, and later the Mary Fallow distributorship were reported as earnings of Nuvo Riche.

14.     Dan and Mary Fallow are (and have been) the only officers, directors and shareholders of this company.

15.     On March 21, 1988, Dan Fallow wrote to Herbalife and requested that his distributorship with Mary be transferred into Mary's name because due to a car accident he was unable to keep up with the Herbalife business.

16.     On April 14, 1998, Herbalife notified Dan and Mary Fallow by letter that their distributorship had been reassigned into Mary Fallow's name.

17.     Mary Fallow filed a petition for divorce from Dan Fallow on December 14, 1988.

--Page 3                                97

18.     A default decree of divorce was entered on January 16, 1989.

19.     In May of 1991, Dan Fallow traveled alone to Denver to work Mary Fallow's Herbalife distributorship.

20.     Dan and Mary Fallow subsequently remarried each other in December 1991 in Hawaii. Mary Fallow has never resigned from or relinquished her original Herbalife distributorship that she signed up with Dan Fallow.

21.     In the spring of 1989, Dan Fallow traveled alone down to Mexico to work in Mary Fallow's Herbalife distributorship.

### Facts Regarding the C.S. Fallow Distributorship

24.     Clint Fallow is Dan's son from a prior marriage and is unrelated to Mary Fallow.

25.     In 1984, and again in 1986, Clint Fallow previously signed up to be an Herbalife distributor under Dan and Mary Fallow.  Those distributorships ceased to exist when they were not renewed.

26.     On December 1, 1987 Clint Fallow joined the Air Force.  During that time, he was assigned to Germany.

27.     In January of 1991, Clint Fallow completed his service in the Air Force.

28.     During the summer of 1991, Clint Fallow registered and began attending college at Arizona State University.

29.     On or about April 25, 1992, Clint Fallow executed an Herbalife "Agreement of Distributorship" under the name of C.S. Fallow."

30.     On or about April 30, 1992, C. S. Fallow qualified for and applied to be an Herbalife Supervisor by making retail sales of the Herbalife products.

31.     At the time Dan Fallow worked in the C. S. Fallow Distributorship, Dan Fallow acted as the agent for the C.S. Fallow distributorship with the knowledge and consent of his son Clint Fallow.

--Page 4

33.   From July 1992 to 1994, Dan Fallow traveled several times to Europe to work the C.S. Fallow distributorship. Every new distributor signed up directly underneath the C.S. Fallow distributorship in Europe was personally sponsored by Dan Fallow.

34. Clint Fallow never went with Dan Fallow to Europe to work the C.S. Fallow distributorship.

36.   The C.S. Fallow Distributorship generated retail income as well as profits, royalties, and bonuses.

38.   On or about November 22, 1991, a change of address form was submitted to Herbalife for the C.S. Fallow distributorship. The new address was listed as a post office box located in Spokane, Washington, close to where Dan and Mary Fallow resided across the border in Sandpoint, Idaho.

39.   Clint Fallow has always lived in Arizona and did not receive any of the checks from Herbalife for the C.S. Fallow distributorship after the change of address form was submitted to Herbalife.

40.   Clint Fallow has never been an officer, director, shareholder or employee of Nuvo Riche, Inc., nor has he ever had a financial interest in that corporation.

41.   Clint Fallow authorized Dan Fallow to deal directly with Herbalife during the 1994 dual distributorship investigation. Dan Fallow told his son Clint to stay out of the investigation, and that he would handle everything. Clint Fallow agreed to do so.

42.   Herbalife notified the Fallows and Dave Peterman of its dual distributorship finding and penalty by letter late June/early July.

43.   Herbalife did not merge the C. S. Fallow distributorship with that of Mary Fallow. Herbalife moved the C. S. Fallow distributorship underneath distributor John Peterson next to the Mary Fallow Distributorship.

44.   After Herbalife imposed its dual distributorship penalty against the Fallows in July 1994,

--Page 5                                         99

neither Dan nor Clint Fallow actively worked the C.S. Fallow distributorship.

## The Fallows Damage Claims

45.     According to Herbalife, the C. S. Fallow line earned a gross income of at least $116,618 between 1992 and 1995.

## Facts Re HEG in Europe

46.     Herbalife is the registered owner of the name "HERBALIFE." This trademark is registered with the U.S. Patent and Trademark Office, Trademark No. 1,254,211.

47.     Herbalife is the registered owner of the Herbalife design which consists of the name "HERBALIFE" with the depiction of three leaves in a circle (the three-leaf logo) for various products and promotional materials. The Herbalife design is registered with U.S. Patent and Trademark Office, Trademark No. 1,811,780.

48.     Herbalife began receiving reports of activities of HEG in the fall of 1993 from distributors and from its European Compliance division.

49.     Dan Fallow telephoned Jackie Hartman in early 1994. During that conversation, Dan Fallow told her that he had been one of the partners in HEG, but had previously resigned.

50.     At Herbalife's expense, Dan Fallow flew to Herbalife's corporate headquarters in Inglewood, California on or about February 14, 1994 to meet with Herbalife representatives and its attorneys.

51.     During that meeting with Herbalife's attorneys, Dan voluntarily gave Herbalife a written sworn declaration dated February 15, 1994, outlining the plans of HEG, ANC, his involvement. 52.

On or about February 14, 1994, HEG contacted Herbalife, and demanded, among other things, that Herbalife pay $17 million to acquire the rights to HEG's registered trademarks in certain Eastern

--Page 6

European and former Soviet Block countries.

53.    On February 23, 1994, Herbalife filed an action against ANC in the U. S. District Court for the District of Nevada.  As part of this lawsuit, Herbalife first sought, and obtained, a TRO without notice (and later preliminary injunction), as well as a seizure order against ANC.

54.    The seizure order was executed by the U. S. Marshal's office on February 24, 1994.  A Consent Judgment was subsequently entered by the U. S. District Court wherein ANC agreed to a permanent injunction prohibiting it from manufacturing or selling any products bearing Herbalife's registered trademarks in order to settle with Herbalife.

### Dan Fallows' Involvement In Herbalife's Efforts To Shut Down HEG

55.    In March 1994, Dan Fallow contacted Herbalife and informed it that HEG was still involved in the distribution and sale of Herbalife product.

56.    Dan Fallow told Herbalife that HEG was stealing legitimate Herbalife products from Herbalife's European warehouses, and was also continuing in its efforts to have either ANC or another entity manufacture duplicate product to be labeled with Herbalife's registered trademarks.

57.    In March and April 1994, Herbalife paid Dan Fallow a total of $15,000 (in two separate checks for $7,000 and $8,000) to reimburse him for his costs and expenses to gather information from HEG.

58.    Thereafter, Herbalife paid Dan Fallow additional money to make two trips over to Europe to investigate the activities of HEG.

58(a).  Beginning in October 1994, Herbalife agreed to pay Dan Fallow a "special consultant's fee" of $1,500 per week to continue on as a paid informant concerning the activities of HEG.

59.    In February 1995 Herbalife notified Dan Fallow that his services as a paid informant would no longer be needed.

## Facts Re Mary Fallow's Dispute with Tonni and Jay Riley.

60.     On or about November 21, 1984, defendant Tonni (Lukavics) Riley executed and Herbalife "Agreement of Distributorship" with her then husband, Ed Lukavics. The Lukavics were personally sponsored into Herbalife by Dan and Mary Fallow.

61.     In or about June 1987, defendant Jay Riley executed an Herbalife "Agreement of Distributorship." Jay Riley was personally sponsored into Herbalife by Tonni Riley before Tonni and Jay were married.

62.     In 1986, Tonni and Ed Lukavics were divorced.  As part of that divorce, Ed Lukavics relinquished all rights to their Herbalife Distributorship, and it was given solely to Tonni Lukavics.

63.     Thereafter, Tonni Lukavics married Jay Riley in December of 1987.  Both Tonni and Jay Riley were Herbalife distributors at the time of their marriage and each has previously qualified for "Supervisor" status.   The Rileys remained downline distributors to Dan and Mary Fallow.

64.     After 1989 the Rileys became less active in their Herbalife business and began to explore other business pursuits.

65.     In 1991, the Rileys formed their own multi-level marketing organization called "Genesis 2000."

66.     The Rileys operated Genesis 2000 from at least January of 1991 to June of 1995, at which time the business shut down.

67.     The Fallows first complained to Herbalife about the Rileys in a letter dated March 24, 1992 that was received by Herbalife.

68.     After receiving this complaint letter, Herbalife spoke directly with Dan Fallow on or about April 7, 1992, to get more information.

69.     Prior to sending in this written complain, the Fallows never first spoke with the Rileys pursuant to Step 1 in the Herbalife Career Handbook.

70.    A year later, on or about March 29, 1993, Many Fallow wrote another letter to Herbalife addressed: "To Whom It May Concern."   In this letter she again complains about the Rileys being involved in Genesis 2000.  This letter enclosed a brochure for Genesis 2000 which the Fallows admitted they obtained from someone other than the Rileys.

71.    The Fallows contend that several active Herbalife distributors were recruited by the Rileys into Genesis 2000 in violation of Herbalife rules.  These individuals names are Mary Habeeb, Michael Ricks, Ed Ricks, and James Kugeler.

72.    Mary Habeeb began her Herbalife distributorship in 1989 and has continuously been an Herbalife distributor to the present.

## II.

## CONTESTED ISSUES OF FACT AND LAW COUNSEL AGREES ARE MATERIAL OR APPLICABLE

### The Complaint

**Count 1: Breach Of Contract By Clint Fallow Against Herbalife**

1.  Did Herbalife breach the terms of its agreement with Clint Fallow by any of the following:

(1)    Herbalife's method of investigation of the distributorship in 1994;
(2)    penalizing his distributorship in July of 1994;
(3)    moving the distributorship in 1994; or
(4)    imposing a monetary penalty;

2.    Was Clint Fallow damaged by Herbalife's breach and if so, entitled to recover actual damages, lost profits and consequential damages?

3.    Did Herbalife waive any breach of the terms of its agreement by Clint Fallow when it knew of Dan Fallow's involvement in the C.S. Fallow distributorship but did not act, allowing Dan and Clint Fallow to continue building the distributorship, or by allowing other distributors to conduct their business in similar ways, by any other such knowing waiver?

4.    Is Herbalife estopped to assert any breach of the terms of its agreement by Clint Fallow due to its conduct when it knew of Dan Fallow's involvement in the C.S. Fallow distributorship but did

--Page 9

not act, allowing Dan and Clint Fallow to continue building the distributorship, or by any other such conduct?

    5.    Is Clint Fallow barred from enforcing his distributor agreement against Herbalife because of prior material breaches?

**Count 2:**    **Clint Fallow's Claim For Quantum Meruit Against Herbalife**

    6.    If Clint Fallow is entitled to recover in quantum meruit in the instance of a breach by Clint Fallow, is Clint Fallow entitled to recover from Herbalife because under all the circumstances it was unfair for Herbalife to receive the benefit of his services and his distributorship without paying for them?

    7.    Is Clint Fallow barred from recovering in quantum meruit because of unclean hands?

**Count 4:**    **Mary Fallow's Claim For Breach Of Contract Against Herbalife**

    8.  Did Herbalife breach the terms of its distributorship agreement with Mary Fallow because it:

(1) did not investigate claims against the Rileys;
(2) did not terminate the Rileys:
(3) suspended her buying privileges,
(4) withheld income; or
(5) withheld reports or information from her?

    9.    Was Mary Fallow damaged by Herbalife's breach and if so, entitled to recover actual damages, lost profits and consequential damages?

    10.    Did Herbalife waive any breach the terms of its distributorship agreement by Mary Fallow?

    11.    Is Herbalife estopped to assert any breach of the terms of its distributorship agreement by Mary Fallow due to its conduct?

    12.    Is Mary Fallow barred from enforcing his distributor agreement against Herbalife because of prior material breaches?

**Count 5:**    **Mary Fallows' Claim For Breach Of Contract Against Herbalife As Third Party Beneficiary**

13.     Did Herbalife enter into an agreement or agreements with Dan Fallow to delete the Riley distributorship to benefit Mary Fallow?

14.     If so, did Herbalife breach the terms of its agreement with the Dan Fallow when it failed to terminate the Rileys distributorship?

15.     If so, is Mary Fallow entitled to recover actual damages, lost profits and consequential damages?

**Count 8:     Dan Fallow's Claim For Breach Of Contract Against Herbalife**

16.     Did Herbalife enter into an agreement or agreements with Dan Fallow to pay him a salary, reimburse expenses, delete the Riley distributorship to benefit Mary Fallow or return monies to the C.S. Fallow distributorship in return for Fallow's services in 1994 in investigating and shutting down a competitor ?

17.     Did Herbalife breach the terms of its agreement with Dan Fallow?

18.     If so, is Dan Fallow entitled to recover actual damages, lost profits for Mary Fallow and Clint Fallow, and consequential damages?

19.     Is Dan Fallow barred from enforcing the contract(s) because of prior material breaches?

**Count 9:     Dan Fallow's Claim For Quantum Meruit Against Herbalife**

20.     If Dan Fallow is entitled to recover in quantum meruit, is Dan Fallow entitled to recover from Herbalife because under all the circumstances it was unfair for Herbalife to receive the benefit of his services without paying for them?

21.     Is Dan Fallow barred from recovery under quantum meruit because of unclean hands?

**Count 10:    Clint, Mary And Dan Fallows' Claims Against Herbalife For Racketeering.**

22.     Did Herbalife commit a theft of services or scheme to artifice to defraud Clint, Mary or Dan Fallow because it knowingly obtained a benefit by means of false or fraudulent pretenses, representations promises or material omissions, and induced them to render services to Herbalife under

--Page 11

false pretenses and then did not pay for them, damaging the Fallows?

23.    If so, are Clint Fallow, Mary Fallow and Dan Fallow entitled to recover treble damages?

**Count 11:**    **Clint, Mary And Dan Fallow's Motion Against Herbalife For Punitive Damages**

24.    Are Clint, Mary and Dan Fallow entitled to punitive damages from Herbalife because Herbalife willfully and maliciously damaged these Plaintiffs and should be punished for such behavior in an amount necessary to punish Herbalife.

## The Counterclaims

**Count 1:**    **Herbalife's Federal Trademark Infringement Claim Against Clint, Mary And Dan Fallow.**

25.    Did Dan Fallow reproduce, counterfeit, copy or colorably imitate Herbalife's trademarks, the word "Herbalife" and/or the three leaf logo design incorporated with the word "Herbalife," without Herbalife's consent, and then use either mark in connection with the sale, offering for sale, distribution or advertising of any goods, or such uses, so that it was likely purchasers of the goods were likely to be deceived or confused as to the source of the goods by the similarity of the marks?

26.    Are Clint Fallow and Mary Fallow jointly and severally liable for any wrongful and unlawful acts committed by Dan Fallow under any agency, joint venture or partnership theory applicable to trademark infringement law?

27.    Was Herbalife damaged as a result of conduct by Dan Fallow, Clint Fallow or Mary Fallow, and if so, is Herbalife entitled to recover lost profits, actual, treble and/or punitive damages?

**Count 2:**    **Herbalife's False Designation Federal Trademark Claim Against Clint, Mary And Dan Fallow**

28.    Did Dan Fallow affix, apply, or annex, or use in connection with goods or services, or any container or containers for goods, a false designation of origin, or any false description or representations, including words or other symbols tending falsely to describe or represent the same, and then cause such goods or services to enter into commerce?

29.     Did Dan Fallow cause or procure goods with a false designation of origin to be transported or used in commerce or delivered to any carrier to be transported or used in?

30.     Did Clint Fallow affix, apply, or annex, or use in connection with goods or services, or any container or containers for goods, a false designation of origin, or any false description or representations, including words or other symbols tending falsely to describe or represent the same, and then cause such goods or services to enter into commerce?

31.     Are Clint Fallow and Mary Fallow jointly and severally liable for any wrongful and unlawful acts committed by Dan Fallow under any agency, joint venture or partnership theory applicable to trademark infringement law?

32.     Was Herbalife damaged as a result of conduct by Dan Fallow, Clint Fallow or Mary Fallow, and if so, is Herbalife entitled to recover lost profits, actual, treble and/or punitive damages?

**Count 3:     Herbalife's Common Law Trademark Infringement Claim Against Clint, Mary And Dan Fallow.**

33.     Did Dan Fallow commit trademark infringement and unfair competition in violation of Arizona law by advertising for sale, offering for sale, selling or distributing product in Arizona bearing a mark so similar to Herbalife's that it is likely to cause confusion or mistake or to deceive persons as to the source of origin of the goods?

34.     Are Clint Fallow and Mary Fallow jointly and severally liable for any wrongful and unlawful acts committed by Dan Fallow under any agency, joint venture or partnership theory applicable to trademark infringement law?

35.     Was Herbalife damaged as a result of conduct by Dan Fallow, Clint Fallow or Mary Fallow, and if so, is Herbalife entitled to recover lost profits, actual, treble and/or punitive damages?

**Count 8:     Herbalife's Conversion Claim Against Clint, Mary, And Dan Fallow**

[claim withdrawn by stipulation of Herbalife]

--Page 13

**Count 9:**     **Herbalife's Intentional Interference With Contractual Relations Claim Against Clint, Mary, And Dan Fallow**

36.     Did Dan Fallow intentionally interfere with Herbalife contractual relations with its distributors by inducing Herbalife distributors to terminate and/or breach their Herbalife distributorship contracts and to join HEG's competing business?

37.     Are Clint Fallow and Mary Fallow jointly and severally liable for tortious interference with contractual relations because of any wrongful and unlawful acts committed by Dan Fallow under any applicable agency, joint venture or partnership theory?

38.     Was Herbalife damaged as a result of conduct by Dan Fallow, Clint Fallow or Mary Fallow, and if so, is Herbalife entitled to recover lost profits, actual, and/or punitive damages?

**Count 10:**     **Herbalife's Intentional Interference With Prospective Economic Advance Or Relations**

39.     Did Dan Fallow intentionally interfere with Herbalife's valid contractual relationship or business expectancy with Herbalife distributors, with knowledge of that relationship, inducing a breach of that contract, without privilege or justification, which resulted in damage to Herbalife?

40.     Are Clint Fallow and Mary Fallow jointly and severably liable for any interference with prospective economic advantage or relations because of act committed by Dan Fallow under any applicable agency, joint venture or partnership theory?

41.     Was Herbalife damaged as a result of conduct by Dan Fallow, Clint Fallow or Mary Fallow, and if so, is Herbalife entitled to recover lost profits, actual, and/or punitive damages?

**Count 11:**     **Herbalife's Claim For Breach Of Contract Against Clint, Mary, And Dan Fallow**

42.     Did Clint Fallow and Mary Fallow breach their respective distributorship agreements by violating Herbalife rules as a result of the following acts by them or Dan Fallow?

    (1)        conducting a dual distributorship;
    (2)        recruiting Herbalife distributors into HEG; or
    (3)        engaging in unauthorized use of Herbalife's registered trademarks or violating federal trademark or common law unfair competition laws?

--Page 14

43.     Were Clint Fallow, Mary Fallow and/or Dan Fallow the agents and/or joint venture partners of each other with respect to the C.S. Fallow Distributorship for any time period since April 1992, and if so, did conduct by the other amount to a breach of contract of the C.S. Clint Fallow distributorship?

44.     Were Dan Fallow and Mary Fallow the agents and/or joint venture partners of each other with respect to the Mary Fallow distributorship for any time period since April 1988, an if so, did conduct by Dan Fallow amount to breach of contract of the Mary Fallow distributorship?

45.     Has Herbalife waived any breach of its distributor agreements with Mary Fallow or Clint Fallow?

46.     Is Herbalife estopped by its conduct to assert any breach of its distributor agreements with Mary Fallow or Clint Fallow?

**Count 12:     Herbalife's Claim For Declaratory Relief Against Clint, Mary, And Dan Fallow**

47.     Did any action or conduct by Dan, Mary or Clint Fallow amount to a prior breach of contract with Herbalife so that Herbalife is excused from future performance under those contracts?

**III.**

**SEPARATE STATEMENT OF FALLOWS' ISSUES OF FACT OR LAW FALLOWS BELIEVE TO BE MATERIAL**

1.     Built through the efforts of distributors, Herbalife had worldwide retail sales with a value of $923,644,000 in the fiscal year ending 1995.

2.     Herbalife does not divulge all its rules to its distributors.

3.     On or about January 14, 1991, plaintiff Mary Fallow executed a Tabulator Team Bonus Production Bonus Agreement.

4.     At the time Mary Fallow signed this agreement, she was not married to Dan Fallow.

6.     Mary Fallow signed the Tabulator Team bonus application, but did not understand that termination was a penalty authorized under the agreement.

7.     At the time Herbalife adopted the Tabulator Team bonus application, it did not intend to enforce its term against participation in other multi-level organizations against Herbalife distributors.

8.     This bonus is Herbalife's attempt to compensate the distributor for the loss of the 6% bonus for that leg of the distributor's lineage.   The Presidents Team Bonus can be estimated at approximately $100,000.00 per qualified Presidents Team member in the distributors first line.

9.     The calculation of royalties and bonus by Herbalife is a complex procedure that depends completely on the information in Herbalife's computer and a complicated computer program.   A computer department of 75 people perform the calculations.  A computer running a program internally generated by Herbalife employees calculates payments to distributors.

10.     Moreover, the annual Presidents Team Bonus has a discretionary element that makes it even more difficult to calculate the royalties and bonus that Mary and Clint Fallow would have earned had Herbalife not acted in an improper manner.

11.     Herbalife maintains that its computer programs cannot run calculations of theoretical royalties and bonus scenarios, and it would be impossible to hand calculate them without the computer program.

12.     Mary and Dan Fallow earned numerous Herbalife awards and were often top distributors for Herbalife for monthly sales and income.

12(a).   Mary Fallow's distributorship qualified for the Millionaire team status.

13.     According to a 1996 Herbalife "indented lineage report" the Mary Fallow distributorship (formerly the Dan and Mary Fallow downline) generated over $37 million in retail sales of Herbalife products for that year alone.

14.     At the time Dan and Mary Fallow signed up as Herbalife distributors, on or about April 13, 1984, Dan and Mary Fallow were not legally married.

15.     In November of 1987, Dan and Mary Fallow were recognized by Herbalife as being the

--Page 16                                   **110**

number 1 distributors in the world.

16.     Rule 6 of the 1988 Career Book set forth the applicable Rule for resignation at that time.

17.     Dan Fallow subsequently appealed from his ex-wife's fraud judgment against him to the Arizona Court of Appeals.  On or about May 24, 1988, the Arizona Court of Appeals affirmed the judgment of the trial in favor of Dan Fallow's ex-wife, Melinda (Fallow) Westfall, including the trial court's fraud finding.

18.     Dan Fallow was inactive in Herbalife for the next six months after he resigned, from March 22, 1988 to September 21, 1988.

19.     A default decree of divorce was entered on January 16, 1989.

19(a).  The reason Dan and Mary Fallow divorced on or about January 16, 1989 was due to personal problems in their relationship.  Herbalife played no part in that decision.

20.     At times after their divorce, Dan and Mary Fallow lived together.  Two of their three children were born August 4, 1990 and September 26, 1991.

20(a).  John Peterson also traveled to Mexico at the same time and signed up Herbalife distributors.

20(b).  Dan and Mary Fallow's decision to remarry in December 1991 had nothing to do with Herbalife.

21.     Dan Fallow did not work for the Mary Fallow distributorship during July 1992 to June 1994.

22.     If the Rileys distributorship had been terminated, Mary Fallow's distributorship would have qualified for the President's Team Status under Herbalife's marketing plan.

23.     The C. S. Fallow distributorship was sponsored by Dave Peterman, (who then began to assist him in developing retail business.)

24.     Clint Fallow actively sold Herbalife products retail, held training sessions, and sponsored

a few individuals as distributors into Herbalife.

25.   In the summer of 1992, Dave Peterman invited Clint Fallow to travel with him to Germany to Germany and sell Herbalife there.  Clint Fallow declined to go to Germany.

26.   Dave Peterman then offered the trip to Dan Fallow who decided to go.

27.   Dan Fallow did not then reapply to be an Herbalife distributor.

28.   Dan and Clint Fallow had an agreement whereby Dan would build the business for Clint and Clint would receive living expenses on occasion from Dan.

28(a).  Dan Fallow operated the distributorship and gave his son reports by telephone.

29.   During the time Dan Fallow worked in Germany, he contributed to Clint Fallow's living expenses.

29(a).  Clint Fallow did receive income from his father during 1992 to 1994.

30.   Clint Fallow understood that he did not have to report income from the German European distributorship on his income tax return because the income was earned outside of the U.S.

31.   Dan Fallow did not hide his involvement in the C.S. Fallow distributorship.  Dan Fallow attended the Barcelona Extravaganza in early 1993 and publicly acknowledged his role.

32.   Clint and Dan Fallow discovered that it was easier to deposit foreign checks into Idaho accounts because local banks were placing a hold on the funds.

33.   Earnings from the C.S. Fallow distributorship were deposited into Idaho bank accounts held by Mary and Clint Fallow, and by Mary Fallow alone, or by Dan Fallow.  Checks to the C.S. Fallow distributorship were endorsed by Dan and/or Mary Fallow.

34.   After Mary Fallow deposited earnings from the C.S. Fallow checks, she withdrew that amount of cash and gave it to Dan Fallow to keep track of those earnings.

35.   Clint Fallow approved Dan and Mary's Fallow's check cashing and depositing methods

36.   John and Susan Peterson were and are top producers at Herbalife.

37.     Mark Hughes considers the Petersons to be friends.

38.     When Peterson learned of Dan Fallow's role in his son's line in Europe, Peterson complained repeatedly to Mark Hughes that he was deprived of royalty and bonus income.  Peterson demanded that Herbalife investigate an alleged "dual distributorship."

39.     John Peterson never spoke to Dan Fallow or Clint Fallow to first point out the violation and explain the rule prior to or during the time of Herbalife's investigation.

40.     Herbalife never spoke to Clint Fallow during its investigation.

41.     Herbalife's action benefited John Peterson, but deprived the Fallows of the benefit of a larger combined organization..

42.     Herbalife also penalized Dave Peterman by taking away money from his distributorship to repay John Peterson.

43.     Herbalife began deducting the monies it claimed were owed to John Peterson from the check issued to Clint Fallow's distributorship.

44.     Herbalife only sells its product to distributors in case lots.

45.     Without the royalty revenue from the distributorship, Clint could not afford to purchase the volume of product required by Herbalife to receive sell product to others and receive the monthly royalty checks.

46.     On or about July 28, 1994, counsel for Dave Peterman sent a letter to Herbalife asking for documentation and rules supporting Herbalife' decision to "penalize" David Peterman.

47.     Herbalife refused to comply and threatened Peterman.

48.     Herbalife never lost a dollar, but made money as a result of Dan Fallow's efforts in the Mary Fallow distributorship.  Moreover, Herbalife cannot quantify or substantiate any damage tot he integrity of its marketing system due to any conduct by the Fallows.

49.     After the filing of this lawsuit on October 24, 1996, Herbalife suspended the buying

privileges of both the Fallow distributorships.  Because the earnings of the royalties and bonus require the purchase of certain minimum amounts of product and the sale of product to at least 10 customers a month, the Fallows income during the suspension has been at a minimum level inconsistent with the earnings they should have received absent the suspension.

50.    Herbalife annual bonuses are very large.  John Peterson, Mary Fallow's first upline, received a one million-dollar bonus in 1998 for the 1997 year.

51.    That bonus was based in large part on Mary Fallows lineage, which is one of the largest in Herbalife.

53.    As an alternative way to calculate income due a distributor under the Herbalife marketing plan, there is a "rule of thumb" for determining an estimate of the total income that a Presidents Team member would earn based on the total volume of the Distributorship as shown in the indented lineage reports.

54.    An indented lineage report is a list of all the downline in a distributor's lineage.  It lists the name of the distributor, the level of that distributor, the sales of all the distributors in the lineage, and adds it all up in a summary page.

55.    The report shows the total personal volume of the distributor and the total volume of the entire distributorship downline.  The Total Volume as shown on the report is the total of the sales of product at a retail price of Herbalife product by the downline of that distributor

56.    The total income of a Presidents Team member ranges from two to five percent of the total volume of the lineage.

### Mary Fallow's Damage Claim

57.    Herbalife has produced only one Indented Lineage Report for the Mary and Clint Fallow lineage and has failed and/or refused to produce any additional ones.  That report shows that for the year 1996 the Total Volume of the Mary Fallow lineage was $37,480.662.00.

58.    This amount represents the retail value in US dollars of all product sold by Mary Fallow

**114**

and the distributors in her lineage.

59.     According to Bruce Peters, Herbalife received approximately one-half of that amount in net sales in 1996 from Mary Fallow's line.

60.     Using the rule of thumb as described above, Mary Fallow should have earned somewhere between $749,613.24 and $1,874,033.00 for 1996 alone.

61.     Such incomes are not unusual in Herbalife. John Peterson has earned in excess of three million dollars for the year 1997 and is and will earn that amount or more substantially from the Mary and Clint Fallow lineage.

62.     Dave Peterman and John Bass, other Presidents Team distributors with large downlines (with neither as large as Mary's however) each have earned in the range of one-half to one million dollars a year.

63.     Mary Fallow would have also been paid approximately one million dollars a year had Herbalife performed its contractual duties.

64.     The Rileys' checks (from Mary's downline) are approximately $8,000 per month. These checks would have gone to Mary if Tonni had been terminated as she should have if Herbalife had performed its duties. This alone is approximately an extra $100,000 annually to Mary spread out over an infinite number of years.

65.     Moreover, assuming that the C. S. Fallow distributorship was a dual distributorship, under the rules that existed at the time, and the only fair remedy fitting the offense, is the merger of the new distributorship with the first one. The Fallows obtained information that Mette Hyldegaard's check is in the $8,000 per month range. That would have meant an additional substantial amount added to Mary's already existing revenue of at least another $100,000.00 per year.

66.     Mary Fallow would have earned approximately one million dollars a year for a period in excess of twenty years.

--Page 21

### Facts Regarding Clint Fallow's Damage Claim

67.    Clint Fallow has been damaged in an amount not less than $356,000 in damages accruing to date, and lifetime damages exceeding $3,600,000.00.

68.    By the fall of 1992, the European Distributorship was generating monthly income of $8,000.00. Part of the proof of the value of this distributorship comes from the exhibits that Herbalife used to calculate the "sanction" for the dual distributorship. This distributorship generated substantial cash flow and would have been even better if left unmolested by Herbalife.

### Facts Regarding Dan Fallow's Damage Claim

69.    For his contract claim, Dan Fallow seeks to recover unpaid salary of $15,000 ($1,500 per week until February of 1995) and specific performance of Herbalife's agreement to delete the Riley Distributorship, roll the royalties up to Mary Fallow, and put Clint Fallow's Distributorship where it belongs.

70.    Herbalife does not hold a patent on its powered drink meal replacement formula.

71.    Herbalife does not hold a registered trademark on the three leaf logo design alone when not in combination with the name Herbalife.

72.    In fall of 1993, Herbalife had not yet opened certain European and Eastern European markets.

73.    Sometime in 1993, Herbalife distributor Kent Kristensen obtained or claimed to have obtained the right to use the corporate name Herbalife in certain European countries where Herbalife was not currently doing business.

74.    Kristensen also claimed to have obtained the legal right to use the tradename "Herbalife" in certain Eastern European countries.

75.    Kristensen was joined by other Herbalife distributors in the C.S. Fallow downline Kent Kristensen, Craig Frick, Mogens Garbenfeldt, Paul Goodwin.

76.    The group became known as "HEG," but considered a variety of names.

--Page 22                                116

77.     In October of 1993, Dan Fallow met with Kristensen, Frick, Garbenfeldt and Goodwin. At that meeting Dan signed an agreement to participate in HEG.

78.     Dan Fallow was involved in HEG from approximately late October 1993 to mid-December 1993.

79.     .Dan Fallow communicated with ANC using the home address in Sandpoint Idaho, the same address used in the Mary Fallow and C.S. Fallow distributorship.

80.     That agreement did not involve the manufacture of product.   It was a standard confidentiality agreement ANC required visitors to sign before being allowed to tour its facilities.   That document and listed the same address that was being used for the Mary Fallow distributorship.

81.     By mid December 1993, it became clear that Kent Kristensen, the leader of the group, wanted to hire ANC to produce a meal replacement weight loss powder with labels bearing the tradename  "Herbalife."

82.     Dan Fallow tried to dissuade Kristensen, and encourage him to compete legally, then resigned when he could not do so.

83.     ANC then began dealing with Kristensen for HEG, not Dan Fallow.

84.     Dan Fallow was not involved in the printing of the labels.

85.     Kirk Scherer at ANC received the actual "blueline" of the counterfeit label.

86.     Dan Fallow never placed any advertisements for HEG.

87.     Dan Fallow never shipped any product bearing counterfeit labels.

88.     ANC first received labels bearing the Herbalife mark after Christmas 1993.

89.     ANC received labels bearing the "Herbalife" mark after Dan Fallow had ceased to do business for HEG.

90.     ANC did not ship any product bearing labels until after Christmas 1993.

91.     ANC shipped product in January 1994, after Dan Fallow ceased to do business with

HEG.

92.     Kent Kristensen and Morgens Garbenfeldt made the final decision as to what label to apply to the ANC product.

93.     After resigning from HEG, Dan Fallow made numerous attempts to telephone Herbalife in Inglewood, California in January 1994.

94.     According to a January 17, 1997 report, Herbalife investigators in Herbalife's European Distributor Compliance division, Al DeCambra, Chris Weaver and Hernrik Jagd, interviewed Herbalife Distributor Mette Hyldegaard and took down her statements verbatim.  In those statements, Ms. Hyldegaard attributed all the actions of HEG to Craig Frick or Kent Kristensen.  The only mention of Dan Fallow was that she thought he was "involved" but that there was "no evidence" of that involvement.

95.     Those same long distance carrier telephone records, show that Dan Fallow also telephoned Herbalife on several occasions during January 1994.

96.     Dan Fallow never received any money or compensation from HEG, other than the purchase of the airplane ticket to Las Vegas.

97.     Dan Fallow never received any money or compensation from ANC.

98.     Dan Fallow never recruited Mette Hyldegaard into HEG.

99.     After investigation, Herbalife sent letters to the Herbalife distributors that it determined has violated Herbalife's rules by involvement in HEG.  Dan Fallow's name was not on the list.

100.    None of the reports supplied to Herbalife by members of its European Distributor Compliance Division mention Dan Fallow's involvement in any counterfeit Herbalife labels.

101.    Dan Fallow was not involved in that demand.  Rather, at that time, he was in Herbalife's offices listening to the call.

102.    Herbalife did not name Dan Fallow, Mary Fallow, or Clint Fallow as defendants in that

action.

103.   Dan Fallow never recruited Herbalife distributor Mette Hyldegaard into HEG.

104.   Employees and representatives of ANC never did any business with Mary or Clint Fallow.

105.   At the time of its investigation, Herbalife never uncovered evidence that Mary or Clint Fallow had any involvement with HEG.

106.   Mary and Clint Fallow did not recruit any Herbalife distributors to join HEG.

107.   In 1993, Herbalife estimated that HEG could cost it tens of millions of dollars.

109.   To shut down the operation, Herbalife decided to pose as a manufacturer of products (called Manhattan Drug), approach HEG, induce it to make a large order, and then keep the money.   Herbalife believed that course of action would drive the competitor out of business.

110.   Herbalife recruited Dan Fallow to pose as the middle man to cause HEG to enter the order in return for reimbursement of expenses, a salary, and Herbalife's promise to enforce its policy against "cross-sponsoring" by deleting the Tonni Riley distributorship and "rolling up" the royalties to Mary.

111.   In a memo to Herbalife's outside counsel, David Addis (Herbalife's in house counsel), confirmed having a conversation with Dan regarding the proposal.

112.   On September 9, 1994, Dan Fallow wrote a letter to Herbalife and demanded a "written agreement" and $1,500 per week as fees for his time.

113.   On or about December 31, 1994, Dan Fallow set up a meeting between William Gillespie and representative of the Russian mafia.

114.   Herbalife partially paid Dan Fallow for his time and expenses and part of his salary until it no longer needed him and did not perform its promise to delete the Tonni Riley distributorship even though Dan, at times, put his life in jeopardy as a part of the investigation.

## Facts Regarding The Rileys

115.   Tonni Lukavics testified that Mary Fallow helped her to learn the Herbalife marketing system and products and set up her business.  Thereafter, Ed and Tonni Lukavics became remarkably successful Herbalife distributors.

116.   Tonni (then Lukavics) Riley sponsored Jay Riley into Herbalife.  Tonni was downline to Dan and Mary Fallow.  Jay Riley was downline to Tonni, and two levels down to Dan and Mary Fallow.

117.   Jay Riley subsequently resigned from Herbalife.

118.   Although Tonni Rileys now holds the only Herbalife Distributorship, Tonni Riley testified at her deposition that Jay Riley "handles the family bus

119.   Herbalife has never terminated or fined the Tonni Riley's Herbalife distributorship.

120.   In 1990, Susan Peterson wrote to Herbalife and complained that the Rileys were cross sponsoring distributors they had not personally sponsored.

121.   On or about 1990, Herbalife distributor Keith Lombardo wrote to Herbalife and complained that Jay and Tonni Riley had contacted more than 25 distributor in his Herbalife organization and solicited them to join another multi-level organization.

122.   Also in 1990, Herbalife could not verify that Tonni Riley complied with the "ten customer rule."

123.   An investigation was opened, and the Riley's earnings checks were held by Herbalife for a short time, but later reinstated.

124.   Vice President of Herbalife, Larry Thompson, interceded on behalf of the Rileys.

125.   The Fallows did not complain to Herbalife about the Rileys in 1990, and in fact, Dan Fallow interceded on Tonni Riley's behalf in 1990 to get Herbalife to reinstate her earnings because Tonni Riley pleaded with Dan Fallow to assist her, and promised not to repeat the violation.

126.   Steve Bigelow, Tonni Riley's brother, acted as Genesis 2000's recruiting agent.

127.   James Kugeler, an Herbalife distributor, was sponsored into Herbalife by Frank Mills.

128.   Mr. Kugeler joined Genesis 2000.

129.   Mr. Kugeler resigned from Herbalife on February 8, 1991.

130.   A few days after his resignation, Mr. Kugeler sent a letter to his former downline Herbalife distributors describing all his and Tonni Riley's work in Genesis 2000.

131.   The Fallows contend that the Rileys solicited other Herbalife distributors, who may not have been actually recruited into Genesis 2000.

### Facts Re Racketeering and Punitive Damages

132.   Herbalife schemed to defraud and steal services when it induced the Fallows and others to become Distributors, to sell products, and to induce others to become Distributors based upon the representation that they would be paid, that they could conduct their own business, and that Herbalife would adhere by its rules and procedures.

133.   That representation was false because Herbalife had no intention of paying all that was owed and all that it promised, namely allowing the Distributors to conduct their own business and abiding by the Herbalife rules and procedures.

134.   That representation was material because it induced plaintiffs and others to become Distributors and expend significant moneys and effort in becoming distributors and in building the Herbalife business. Herbalife intended that the Fallows and others rely upon these false representations.

135.   Herbalife's "intention" to defraud was revealed when Jackie Hartman Fisher testified in deposition that Herbalife has "secret" rules, which it does not divulge until it chooses to enforce them.

136.   Herbalife admitted that it enforced rules on a "case by case" basis, depending on whether "high level" distributors were involved.

137.   Herbalife has enforced the same rule against different distributors with opposite results.

138.   Herbalife misrepresents the availability of Bonuses.   In the Career Book, Herbalife

dangles the promise of a Tab Team Production Bonus (and additional 2%, 4% or 6% of "organizational volume") as an incentive to sign up, to sell Herbalife and to work hard.

139.    However, Herbalife conceals the eligibility requirements for the bonus.    The bonus application requires distributors (and their spouses--who may not even be distributors) to agree not to participate in any other multi-level organizations.

140.    That requirement is not disclosed until after the distributor has otherwise qualified for the bonus has become entitled to receive a check, conditioned upon his acceptance of the previously undisclosed terms.

141.    This can be potentially devastating to a distributor who has worked hard to earn the bonus, only to learn he cannot collect it without abandoning other money making endeavors.

142.    Herbalife's ill will is demonstrated by its history of threatening any distributor that challenges it by searching the distributors downline, hiring an investigator to look into a distributors background, and then aggressively defending a lawsuit including the assertion therein of unsupported accusations about the distributors' personal life. Herbalife does that in the hopes that the distributor will give up.

### Herbalife Rules

144.    Herbalife has no rules other than those "published" or "issued" to Herbalife in the Career book or in other Herbalife "publications."

145.    Statements by Herbalife Corporate Officers are not Herbalife Rules included in the Herbalife Distributor Agreement.

146.    In actual practice, Herbalife has three sets of rules: one set if gives out to distributors, another set it does not divulge until the rule is enforced against the distributor, and a third set consisting of a "case by case" review performed by Mark Hughes.

147.    Although Herbalife claims to have a stated a policy against distributors from conducting

business in foreign countries in which Herbalife has not yet obtained government approval to sell and distribute its product, in the past, Herbalife has allowed distributors to do so, including John Peterson and Mette Hyldegaard, people who are currently Herbalife distributors.

148.   Herbalife has no rule providing for  "potential" "automatic termination of a person's Herbalife distributorship."

### Rules Regarding Dan and Mary Fallows' Marital Status ⬦

150.   At this time, Herbalife had no rule preventing former, or even ex-spouses, from assisting distributors in their distributorships.

152.   Herbalife rules did not require distributor Mary Fallow tell Herbalife about her remarriage to Dan Fallow.

153.   Under Herbalife's then rules, Dan Fallow resigned on March 21, 1988.

154.   Herbalife had no rule which required both spouses to resign before the resignation of either one was effective.

155.   Herbalife had not rule which bound Dan Fallow to John Peterson, his original sponsor for life.

156.   Herbalife has no rule which says that the spouse of a distributor must work only in that distributors' line.

157.   Herbalife does not always consider a husband and wife to be part of the same distributorship.

158.   Herbalife has no rule defining a "dual distributorship" as when a non-distributor spouse works in another distributor's organization.

159.   Orders from Mark Hughes are not part of the Herbalife Distributor Agreement and distributors are not bound by them.

160.   Herbalife does not enforce its rules uniformly or consistently.

161.   Herbalife adopts rules without the intention of enforcing them.

162.   Herbalife distributors commonly and routinely work with, sign up people under, share expenses, and pool resources with, other distributors.

163.   The Fallows did not damage the integrity of the Herbalife marketing system.

164.   Although Herbalife claims to have a stated policy in its Career Book providing that a "distributor may not make any verbal or written medical, therapeutic or curative claims about Herbalife products or any medical results", Herbalife has an actual policy encouraging distributors to repeat "testimonials" to prospective customers.  These "testimonials" are stories of health or weight loss benefits experienced by people who use the Herbalife product.

165.   Herbalife Journals include many such testimonials.

166.   Herbalife gives its distributors a handout entitled "Cellular Nutrition" by Dr. Stanley Katzin which described how the Herbalife products affect the "villi" of the intestine.  Dan Fallow's presentation was simply a restatement of Herbalife's handout.

### Herbalife's Investigation of The Rileys

167.   Although Herbalife claims that it conducted an investigation and found no wrongdoing, testimony from the Herbalife employees responsible for that investigation reveals that no investigation occurred.

168.   Tonni Riley's dilemma was resolved when Herbalife vice-president, Larry Thompson, intervened and authorized the release of her check.

169.   Tonni Riley's personal assistant, Sherrie Mejia, testified that Tonni Riley had boasted to her that she had an affair with Larry Thompson.

170.   From June of 1991 to January of 1992, Mary lost monthly royalties of approximately $17,000 a month for a total of $119,000.  From January of 1995, Mary lost royalties of $18,000 a month for those 44 months for a total of $710,000.

171.   But for the Rileys, Mary's "infinite Level Bonuses" for 1992 would have been $284,000; $800,000 for 1993 and 1994, and $185,000 for 1995.

172.   But for the Rileys, her year end bonus would have been $200,000 for 1993 and $100,000 for 1994.

### Clint Fallow

173.   In early 1992, Clint Fallow was unemployed, say an Herbalife flyer, and became interested in Herbalife as a way to money.

174.   Clint, on Dan's advice, chose the sponsorship of Dave Peterman.

175.   There is no Herbalife rule which requires the son of a former Herbalife distributor to sign with any particular sponsor

176.   At the time Clint Fallow applied for Herbalife distributorship, Dan Fallow was not an Herbalife distributor because he had resigned March 21, 1988.

177.   When Clint Fallow asked Dan to work with him in his Herbalife business, Dan Fallow initially declined because he was not interested in working for Herbalife.

178.   Clint Fallow was free to work with Dan Fallow.  Herbalife promised Clint Fallow the freedom to operate an 'independent" distributorship, which included the power to  "hire as many people" as he could, including Dan Fallow, sell product, sign up distributors, and make money.

### HEG

179.   Herbalife Distributors Craig Frick, Paul Goodwin, Mogens Garbenfeldt and Kent Kristensen originally formed HEG.

180.   In October of 1993, Dan Fallow was later invited to and attended a meeting with these people.

181.   That agreement listed a company name including the word  "Herbalife" Dan had agreed that the name of the group would be European Success Group.  Dan did not read that agreement before

he signed it.

182.    At the time of formation, HEG was intended to help open new markets and sell genuine Herbalife product in European countries in which Herbalife has not yet "opened."

183.    Dan Fallow made no effort to hide the effort.  Dan Fallow called Herbalife's product manufacturer, D&F Industries and told the manufacturer of the effort.

184.    Later, the focus of the group turned to possibly manufacturing a competing similar product.

185.    On or about December 28, 1993 Dan sent a handwritten resignation letter to the group. However, the letter was returned with a request for it to be notarized. Dan notarized the letter and returned it on January 31, 1994. Craig Frick later faxed Dan a formal resignation letter to sign, which he did on February 9, 1994.

186.    Dan Fallow could not have given "counterfeit" labels to Hyldegaard in November or at any time because they were not produced until after her contact with Dan Fallow ceased.

187.    At Herbalife's expense, Dan Fallow flew to Herbalife's corporate headquarters in Inglewood, California on or about February 14, 1994 to meet with Herbalife representatives and attorneys.

188.    During that meeting with Herbalife's attorneys, Dan Fallow voluntarily gave Herbalife a written sworn declaration dated February 15, 1994, outlining his involvement in *and resignation from* HEG.

189.    Dan Fallow testified that he had agreed to use the name "Herbalife Success Group" in the initial venture, designed to market legitimate Herbalife product into unopened countries.

190.    Dan Fallow did not read the Agreement drafted by Kent Kristen before signing it.  The agreement stated the company name as Herbalife Inc.

191.    In that declaration, Dan Fallow said only that he was part of HEG's initial efforts to open

--Page 32

126

new markets for Herbalife or to manufacture a competing legitimate product.

192.    In that declaration, Dan Fallow made it clear that he told the members of HEG not to use the Herbalife name on its products and resigned when it would not compete legally.

193.    Neither Mary nor Clint Fallow ever dealt with or even heard of HEG.

194.    There was no agreement, partnership, or joint venture, between Mary or Clint Fallow and Dan Fallow, or between Clint and Mary Fallow, regarding manufacture of a competing Herbalife product or a counterfeit Herbalife product, or any use of the Herbalife trademarks.

195.    Clint and Mary Fallow did not participate financially in HEG, and received no compensation from any of its activities.

196.    Clint and Mary Fallow were not aware of and had no control over Dan Fallow's involvement in HEG.

197.    Mary and Clint Fallow never misappropriated or exerted any control over Herbalife product in any German warehouse.

198.    Dan, Clint and Mary Fallow agreed to abide only by Herbalife's rules in the Career Book and Herbalife "publications" or rules which were "issued" to them.

199.    The purpose of the Herbalife Rules of Conduct set forth in the Career Book are to "develop relationships which are more conducive to good business practices while at the same time maintaining the right of each Distributor to engage in a free and independent business."

200.    In its Career Book, Herbalife states that its marketing plan is an "outstanding example of a way in which any individual can participate and succeed in the free enterprise system."

201.    In its Career Book, Herbalife states:

The Herbalife sales and marketing plan has been designed to provide information and sales tools so that an independent distributor can maximize his success if he applies dedication, hard work and perseverance . . . The rewards you receive as a Distributor operating your own business will be directly proportionate to the time and effort you put into your business.

202.    The Herbalife Career Book states:

If you stop and think about it, almost without exceptions, most successful people have one thing in common... they usually have people working for them. * * * How large do you want your business organization to be? You have the opportunity to grow as fast as you want to, without geographic limits to where your group functions.

203.   The Herbalife Career Book promised that distributors could run "their own business." Herbalife promised

a freedom of choice in a distributor's earning potential . . . It is our belief that each person should have the inherent right to choose the manner in which they live, the work they perform, and the amount of money they want to earn.

204.   The Herbalife Career Book states Herbalife will enforce these Rules of Conduct.  When "a complaint is received by the Company, it will be handled according to set company procedures".

205.   Rule 2 of the Rules for Becoming a Distributor states:

A husband and wife who wish to become distributors together must sign the same application for Distributorship form; their Distributorship will be issued under one Sponsor.  Married couples cannot be under separate Sponsors not can they sponsor each other.  If one spouse is already a Distributor and the other wishes to become a Distributor, they must add the name of the second spouse to the first spouse's Distributorship.  Distributors who marry each other must relinquish one Distributorship and become partners in the other.  However, if both are Supervisors or above, then each may maintain a separate Distributorship.  In addition, each shall remain in his original line of sponsorship.

206.   Rule 4 of the Rules for Becoming a Distributor in the Career Book states:

A corporation may not be a distributor, but individuals who are Herbalife distributors may conduct their business through a corporation.  In such a case, the Distributorship must be in the individual's name.  There is no need for the corporation name or titles of officers to appear on the application for Distributorship.  Individual Distributors must send a written request to Herbalife if they wish their checks to be made payable to their Corporation.

207.   Rule 5 of the Rules for Becoming a Distributor in the Career Book states:

A partnership may not be a Distributor, but individuals who are Herbalife Distributors may conduct their business as a partnership.  In such a case, the Distributorship must be in an individual's name.  The partnership's name or parties involved need not appear on the Application for Distributorship.  Individual Distributors must send a written request to Herbalife if they wish their checks to be made payable to their partnership.

208.   Rule 6 of the Rules for Becoming a Distributor in the 1988 Career Book set forth the Rule for resignation:

Any Herbalife Distributor wishing to resign should submit his resignation letter to Herbalife Headquarters after he had had the letter notarized. The Distributor or spouse must wait six months before re-applying for another Herbalife Distributorship. (emphasis added)

209.    Rule 7 of the Rules of Conduct for Herbalife Distributors in the Career Book requires

that all Herbalife distributors must purchase products and supplies from and through their own

sponsors, or from Herbalife directly.

210.    Rule 8 of the Rules of Conduct for Herbalife Distributors in the Career Book provides:

No Distributor shall attempt to induce any other Herbalife Distributor, whom he does not personally sponsor, to sell other than Herbalife products.

211.    Rule 11 of the Rules of Conduct for Herbalife Distributors in the Career Book provides:

No Distributor shall make any medical claims for any Herbalife product.

### Enforcement Procedures

212.    This is a step by step summary of the methods by which Herbalife Distributors may deal

with violations of the Rules of Conduct

Step 1

Upon learning of a violation, a Distributor should inform the violator of the appropriate sections of the Rules of Conduct and discuss the matter with him. Point out the purpose behind the particular rule. Be sure the alleged violator knows his conduct broke the rule and what his proper conduct should have been. Most violations are due to a lack of understanding; a discussion usually settles the matter.

If the violator understands the rule and agrees to apply, then it is not necessary to inform the Company of the violation. However, a Distributor should always assure that his supervisor is aware of the problem.

Step 2

If the alleged violator shows by word or conduct that he is unwilling or refuses to cooperate, then the Distributor should send a letter to the company stating the nature of the complaint: names, addresses, phone numbers of all persons involved; dates ; times places; etc. The letter must be signed by the Distributor(s) reporting the violation. Anonymous complaints cannot be made the basis for disciplinary action.

After the letter has been mailed, the Distributor should maintain contact with the violator and report any changes in the situation. The utmost care must be taken to assure that the complaint is accurate and truthful- knowingly making a false complaint is a violation of the Rules of Conduct. The Company considers all complaint information to be strictly confidential.

**129**

--Page 35

Step 3

When the complaint is received by the Company, it will be handled by set Company procedures. All parties will be afforded the opportunity to present evidence and argument in writing to the Company. No decision will be rendered until all parties have been notified and an opportunity to appeal the fairness of the decision has been made available. Although the Company bears the primary responsibility for the enforcement of the Rules of Conduct, Supervisors and occasionally Sponsors may be called upon to implement and enforce these decisions.

214.    Herbalife's Career Book does not list a sanction for dual distributorship violations.

However, if Herbalife has any rules other than those in the Career Book, according to Herbalife "set

policy" in effect in June 1994:

(a) The second distributorship will be terminated. (b) All lineages sponsored under that distributorship will be moved to the lineage of the original distributorship. (c) The volume purchased and earnings paid may be mored to the original distributorship.

215.    Rule 4 Change of Sponsorship in the Rules for Becoming a Sponsor in the Herbalife

Career Book discourages, but permits, changes in sponsorship.

216.    There is no Herbalife rule which binds a person to a particular sponsor for life.

### The Tabulator Team Bonus

217.    Dan Fallow never signed a Tabulator Team bonus agreement.

### Description of the Herbalife Marketing Plan

218.    Distributors in Herbalife make money in four different ways pursuant to the marketing

plan as outlined in the Herbalife Career Manual:  (1) the distributor makes money from commissions

made from the sale of product by the distributor and downline distributors that do not qualify as

supervisors; (2) the distributor earns five percent on the purchases of product on three downline levels if

they qualify at the supervisor level (qualification requires certain minimum purchases); (3) if a

distributor qualifies by earning certain level of royalty points (from the sales of the three downline

distributors as discussed in (2) above) the distributor can qualify to earn a Tabulator Team Bonus of

two, four, or six percent of the distributor's entire downline; provided, however, that if some one in the

--Page 36                                130

downline qualifies for this bonus they cut the upline distributor out of that percentage of the bonus (if the downline reaches the 6% level the distributor is cut out of the entire 6% of that leg of the downline (see the chart in the appendix); and (4) if the distributor reaches the Presidents level of the Tabulator Team and has a qualified Presidents Team member qualify in the first line of their lineage, the distributor is also entitled to an annual bonus called the Presidents Team Bonus.

219.  Dan and Mary Fallow first got married on or about September 26, 1987.

220.  In 1989, Herbalife did not have a rule absolutely  limiting spouses to one distributorship

221.  On or about July 6, 1994, Herbalife wrote to Clint Fallow and stated: :

This is to advise all concerned of the result of Herbalife's investigation of the Distributorship of C.S. Fallow, I.D. number 10004768.  It has been determined that this distributorship was in fact a Distributorship of Dan Fallow, former husband of Mary Fallow, I.D. number 379746447. According to the established Rules of the Company, Dan Fallow was required to develop his own Distributorship under his original sponsor, John Peterson.

At this time, we will transfer the Distributorship of C.S. Fallow to the original sponsor, John and Susan Peterson.  According to standard company policy, the lineage developed under the C.S. Fallow Distributorship will be transferred as well.

One-half of the monthly earnings from the C.S. Fallow Distributorship [will be deducted] until the entire amount, approximately $79,000 U.S. dollars is paid, within a 26 month period . . .

222.  In the letter, Herbalife did not cite any Herbalife rules giving Herbalife the authority to find that Clint Fallow's distributorship was actually Dan Fallow's, to deduct monies from the distributorship and pay them over to another distributor, or move the Clint Fallow distributor under John Peterson.'

### The Quantum Meruit Claims

223.  Dan and Clint Fallow have contributed a substantial benefit to Herbalife by creating a lineage that generates over thirty-seven million dollars of retail sales a year, provides over 59,000 distributors that may purchase product and/or sign up other distributors, and helped put a major threat to the European Herbalife operations out of business saving Herbalife millions by their own calculations.

224.  Mark Hughes, Herbalife's President, testified that an Herbalife distributor violated

--Page 37

131

Herbalife Rules if the person uses an agent to solicit or recruit people to join a different multi-level marketing company.

A.   **Contested Issues Of Fact And Law Which Plaintiffs Believe Are Material And Applicable**

**Count 1:**      **Breach Of Contract By Clint Fallow Against Herbalife**

1.    Did Herbalife breach the terms of its agreement with Clint Fallow by any of the following:

(1)      suspending his buying privileges or
(2)      withholding income.

2.    Did Herbalife breach the covenant of good faith and fair dealing implied into every contract by:

(1)   by the way in which it arrived at a decision to penalize the C.S. Fallow distributorship;
(2)   penalized the C.S. Fallow distributorship,
(3)   "moved" the distributorship,
(4)   suspended buying privileges;
(5)   withheld income or information;

**Count 4:**      **Mary Fallow's Claim For Breach Of Contract Against Herbalife**

3.    Did Herbalife breach the covenant of good faith and fair dealing implied into the contract with Mary Fallow because it:

(1)   failed to investigate the Rileys;
(2)   failed to terminate the Rileys;
(3)   suspended her buying privileges;
(4)   withheld income
(5)   withheld information;
(6)   refused to apply rules
(7)   failed to apply rules uniformly;
(8)   enforced rules other than those published or issued; or
(9)   otherwise failed to live up to the representations contained in its distributorship agreement or Career Book?

**IV.**

**SEPARATE STATEMENT OF HERBALIFE'S ISSUES OF FACT OR LAW WHICH HERBALIFE BELIEVES TO BE MATERIAL**

1.    At the time Dan and Mary Fallow signed up as Herbalife distributors in 1984, Dan

132

--Page 38

Fallow was married to another woman named "Melinda" Fallow, with whom he had two minor children.

2.     At the time Dan and Mary Fallow signed up as Herbalife distributors, on or about April 13, 1984, Dan and Mary Fallow were not legally married.

3.     On or about April 22, 1987, Dan Fallow was involved in an automobile accident in Phoenix.

4.     On or about July 10, 1987, the Superior Court of the State of Arizona for the County of Maricopa entered a decree of dissolution of marriage, and judgment against Dan Fallow in the amount of $124,500 in favor of Dan Fallow's ex-wife, Melinda Fallow.  In addition, the court awarded Melinda Fallow custody of the Fallows' minor children, and also ordered Dan Fallow to pay monthly alimony and child support.

4(a).   Dan Fallow told other Herbalife distributors that he needed to get his Herbalife distributorship out of the name because of his ex-wife's judgment.

5.     On or about December 30, 1987, Dan Fallow, as plaintiff, filed a complaint in the Superior Court of the State of Arizona for the County of Maricopa against several defendants arising out of that car accident.

6.     As part of the car accident lawsuit, Dan Fallow sought damages for future loss of income, loss of business opportunity, and loss of earning capacity in connection with his Herbalife business.

7.     After the judgment was affirmed by the Arizona Court of Appeals, Dan Fallow did not pay off the judgment, nor did he pay his monthly support obligations from 1987 through August 1990.

8.     At the time Dan and Mary Fallow signed up as Herbalife distributors in 1984, Dan Fallow was married to another woman named "Melinda" Fallow, with whom he had two minor children.

9.     Dan Fallow and Mary Fallow purchased their current residence in Sandpoint Idaho in late November 1988.

—Page 39

10.    Dan Fallow never appeared to contest the divorce, and a default judgment was entered in favor of Mary Fallow on January 19, 1989.

11.    Dan Fallow admits that one of the reasons he subsequently divorced Mary Fallow was that he felt financial pressure because eof the unpaid adverse judgment and support obligations he had to his first ex-wife, Melinda Fallow.

12.    As part of that divorce, Dan was awarded 25% of the net income from their original Herbalife distributorship, but Mary Fallow was awarded their newly purchased residence.

13.    After the divorce, since February 1989, Dan Fallow continued to live with Mary Fallow at their residence in Idaho.  They also conceived two children together in the first 2 years after their divorce.

13(a).    After their purported divorce, Dan and Mary Fallow continued to file joint tax returns claiming that they were still married.

14.    The trial of Dan Fallow's automobile accident case commenced in September 1989. Both Dan Fallow and Mary Fallow testified at trial on Dan Fallow's behalf.

15.    On or about January 23, 1990, Dan Fallow filed a petition with the Idaho court to modify his divorce decree with Melinda Fallow in order to reduce his child support and maintenance obligations.

16.    As of March 1990, Dan Fallow was delinquent in his support obligation to his ex-wife Melinda in the amount of $39,500.

17.    On April 16, 1990, Dan Fallow executed a "Bill of Sale' transferring his remaining 25% interest in the original Dan/Mary Fallow distributorship to Mary Fallow for $1,000.

18.    On or about August 28, 1990, Dan Fallow entered into a settlement agreement with his ex-wife Melinda to fully and finally settle the fraud judgment that Melinda had previously obtained

against him, as well as past and future child support obligations.  In this regard, Dan Fallow paid his ex-wife Melinda a lump sum amount constituting 70% of the net proceeds that Dan Fallow had received in a personal injury car accident settlement in 1990.

19.     On or about October 5, 1990, a Satisfaction of Judgment was entered with the Arizona Superior Court in the County of Maricopa on Melinda (Fallow) Westfall 1987 Adverse Judgment against Dan Fallow.

20.     Dan Fallow has not paid any further child support obligation with respect to his two minor children whom he had with this ex-wife Melinda (Fallow) Westfall since his 1990 settlement.

21.     In May 1991, Dan Fallow traveled alone to Denver to work the Herbalife business with his original sponsors, John and Susan Peterson.  During this time, Dan Fallow recruited and signed up distributors underneath the original Dan/Mary Fallow distributorship.

22.     The Fallows admit that they never informed Herbalife about their 1991 remarriage until after they filed this lawsuit.

23.     Dan Fallow continued to sign up Herbalife distributors under the original Dan/Mary Fallow distributorship in 1988 after the reassignment of the distributorship by Herbalife into Mary Fallow's name.

24.     From 1988 through 1995, Dan and Mary Fallow claimed they were Herbalife distributors on loan applications, their personal income tax returns, and their corporate tax returns filed for Nuvo Riche, Inc.

25.     In spring of 1989, Dan Fallow traveled alone down to Mexico to work the Herbalife business.  While in Mexico, Dan recruited and signed up new Herbalife distributors in the original Dan/Mary Fallow downline Mary Fallow distributorship through the summer of 1989 in Mexico.

26.     In numerous conversations and written communications with Herbalife representatives

--Page 41                                   **135**

during 1994, Dan Fallow repeatedly referred to Mary Fallow as his "ex-wife," even though he had been remarried to her since 1991.

27.     After their remarriage in 1991, Dan Fallow remained personally involved in the original Dan/Mary Fallow distributorship--continuing to recruit and sign up distributors.   Indeed, Dan was present at the signing up of every distributor underneath the original Dan/Mary Fallow Herbalife distributorship after 1988.

28.     After their purported divorce in 1989, and after their remarriage in 1991, Dan and Mary Fallow continued to share the income and expenses associated with the original Dan/Mary Fallow Herbalife distributorship.

29.     In early 1992, Dan Fallow spoke with Dave Peterman about signing up a second Herbalife distributorship in the name of "C.S. Fallow."   Dan Fallow represented to Dave Peterman that he was divorced from Mary, and no longer has any interest in his original distributorship with her.

30.     Dan Fallow never told Dave Peterman until after this lawsuit was filed that Dan Fallow had remarried Mary Fallow in 1991, that he continued to work their original distributorship after the divorce, or that he had been claiming the majority of income from their original distributorship all this time.

31.     The vast majority of the C.S. Fallow distributorship income checks went into two separate Idaho bank accounts controlled by Dan and Mary Fallow.   Many of these checks were endorsed by Mary Fallow or Dan Fallow, or had Clint Fallow's forged signature on them.

32.     In early 1993, Mary Fallow and Clint Fallow opened up an Idaho bank account with First Interstate Bank, Account No. 14095711.

33.     Mary Fallow also had a separate Idaho bank account with Panhandle State, Account No. 1042986.   The Fallows further admitted that they also deposited income and earnings from the C.S. Fallow distributorship into this separate account, on which Clint was not a signatory.

--Page 42                                          **136**

34.     Mary Fallow also admits that she deposited income and earnings checks from the original Dan/Mary Fallow distributorship, and that the funds were commingled with the C.S. Fallow distributorship income in those accounts and that funds from the C.S. Fallow distributorship were also deposited in those accounts.

35.     Clint Fallow testified that if his father, Dan Fallow, had authorized Mary Fallow to deposit the C.S. Fallow distributorship income and earnings checks into these two bank accounts, then it was his approval and/or subsequent ratification.

36.     The Fallows admits that throughout the time they operated both the original Dan/Mary Fallow distributorship and the C.S. Fallow distributorship, that the income and expenses for both distributorships were shared among them.

37.     Checks from the C.S. Fallow distributorship went into two separate Idaho bank accounts controlled by Dan and Mary Fallow.  With Clint Fallow's permission, many of these checks were endorsed by Mary or Dan Fallow.

38.     The Fallows admit that Some of the C.S. Fallow distributorship income and earnings checks were deposited into this First Interstate Bank account.

39.     In April 1994, Dan Fallow sent Jackie (Hartman) Fisher only the first page of his 1989 divorce decree with Mary Fallow.

40.     Herbalife subsequently ordered a certified copy of Dan and Mary's entire 1989 divorce decree from the Idaho court.

41.     Herbalife fully performed its obligations and duties to make payments under the C.S. Fallow distributorship agreement until at least the point in time Herbalife imposed its dual distributorship penalty.

42.     In fall 1993 Herbalife began receiving reports from several of its European distributors that a new multi-level marketing company calling itself "Herbalife European Group"("HEG") was in

operation.  These Herbalife distributors claimed that HEG was attempting to recruit genuine Herbalife distributors and was advertising and distributing products using Herbalife's registered trademarks. These products bore the registered trademark "Herbalife" as well as Herbalife's registered three-leaf logo design.

43.    Herbalife commenced an investigation into the activities of HEG.  The investigation was conducted by members of Herbalife's European Distributor Compliance division.

44.    In November 1993, Dan Fallow executed a written agreement with four other Herbalife distributors in the C.S. Fallow downline to form a company called "Herbalife Inc." which also was known as Herbalife European Group ("HEG").  The four  other Herbalife distributors who signed this written contract were Craig Frick, Mogens Garbenfeldt, Paul Goodwin and Kent Kristensen.

45.    The investigation conducted by Herbalife was overseen by its internal legal department, and an Herbalife employee named Jackie (Hartman) Fisher was charged with gathering information about HEG from reports which she received from Herbalife's European Distributor Compliance investigators.

46.    In January 1994, Herbalife learned that Dan Fallow and several existing Herbalife distributors in the "C.S. Fallow" distributorship downline were involved.

47.    Dan Fallow first contacted ANC on behalf of HEG in late October 1993 to have ANC *analyze or* duplicate Herbalife's "Formula 1" product that was being sold in Germany.

48.    While meeting with ANC in Las Vegas, Dan Fallow discussed pricing, and other ordering information for the products ANC was to manufacture for ANC.  Dan Fallow also discussed with ANC about setting up a separate "brokerage fee" arrangement whereby Dan Fallow would act as the middlemen for the products that ANC would sell to HEG.

49.    Dan Fallow also personally entered into a written "Confidentiality Agreement" with ANC, dated December 14, 1993.

--Page 44

50.     Also, as part of its investigation, and before it spoke with Dan Fallow, *On or about January 17, 1994*, Herbalife learned that HEG's counterfeit product was being manufactured by a U. S. company based in Las Vegas, Nevada called American Nutritional Corporation, Inc. ("ANC"), based on the counterfeit labels it had obtained.

51.     As a result of the seizure order, Herbalife obtained additional documents in Dan Fallow's own handwriting.

52.     Clint Fallow admitted that if his father Dan Fallow was involved in recruiting other Herbalife distributors to join a competing company like HEG, or was involved in the use of Herbalife's trade names and trademarks without the permission of Herbalife, then these actions and rule violations would be directly attributable to him and the C.S. Fallow distributorship.

53.     The Rileys never elected to participate in Herbalife's Tabulator Production Team Bonus Program, and consequently never signed the Tabulator Team Production Bonus Agreement

54.     The Herbalife distributorship agreement signed by Mary and Dan Fallow expressly provided that the distributor "abide by all Herbalife policies and rules, as issued from time to time, including policies set forth in the Herbalife Career Book and other Herbalife Publications."

55.     The Herbalife distributorship agreement signed by Clint Fallow expressly provided that the distributor agrees to "abide by all of Herbalife's rules and policies, as amended from time to time, including those set forth in the Herbalife Career Book and other Herbalife Publications."

56.     In addition, each of the distributorship agreements signed by the Fallows expressly state: If Distributor fails to comply with the terms of this Agreement, Herbalife may revoke this distributorship.

57.     Mary Fallow's distributorship has never qualified for the President's Team Status under Herbalife's marketing plan.

58.     Clint Fallow never personally withdrew any monies from these Idaho bank accounts.

--Page 45

59.    Dan Fallow wrote and faxed a letter to Kent Kristensen of HEG, dated December 11, 1993, requesting that HEG wire transfer funds *to* pay for Dan Fallow's airplane ticket to Las Vegas to visit ANC.  Fallow requested that the funds be wired to the same Idaho bank account in which C.S. Fallow distributor checks were being deposited.

60.    Dan Fallow traveled to Las Vegas, Nevada, on or about December 14, 1998 to meet with ANC representatives on behalf of HEG.

61.    In the same letter dated December 11, 1993, Dan Fallow wrote to Kent Kristensen of HEG and suggested that HEG "fight [Mark Hughes] direct on the name Herbalife Inc., which HEG has registered in various European Countries, and tell him if he wants it back it will cost him x amount of money," and discusses HEG's plans to take away various distributors from Herbalife "by the thousands" like HEG is set up to do in various European Countries.

62.    In one letter in Dan Fallow's own handwriting, which was faxed from Dan and Mary Fallows' Idaho residence on or about December 22, 1993, Dan Fallow writes to his colleagues in HEG about his "productive trip" to ANC.  He also talks about his meeting with *a* printer, and the fact that HEG needs to wire transfer over $29,000 to ANC so that they begin the initial manufacture of over 10,000 cans of product  In that same letter, Dan Fallow also suggests that HEG use the name **"HERBS & LIFE"** on their product labels.

63.    The telephone number for ANC in Las Vegas, Nevada is (702) 452-5200.

64.    Long distance carrier telephone records (Sprint) for Dan and Mary Fallow show that the Fallows called ANC on at least four separate occasions during January 1994.

65.    In that conversation, Dan Fallow did not tell Jackie Fisher that he was involved in "counterfeiting" Herbalife trademarks.

66.    This conversation is memorialized in a telephone log prepared by Herbalife employee, Jackie Hartman-Fisher.

--Page 46                                **140**

67.     Herbalife told Dan Fallow that it needed "much more written documentation" to open an investigation file.  Dan Fallow agreed to obtain additional documentation, such as written statements from other distributors, to support the Fallows' charges.

68.     A joint venture is a combination of two or more persons where a profit is jointly sought. See Ellingson v. Sloan, 22 Ariz.App. 383, 527 P.2d 1100, 1104 (1974) (a joint venture agreement may be represented by a contribution of money, services or property).

69.     The elements of a joint venture generally include: (1) an agreement, (2) a common purpose, (3) a community of interest, (4) some of element of control or participation in the venture, and (5) participation in profits and losses. See Estate of Hernandes v. Flavio, 187 Ariz. 506, 930 P.2d 1309, 1313-13 (1997); Tanner Cos. v. Superior Court, 144 Ariz. 141, 143, 696 P.2d 693, 695 (1985); Ellingson v. Sloan, supra, 527 P.2d at 1103 (1975).

70.     Where there is a question as to the existence or nature of a joint venture, the issue of one of fact to be decided by the jury.  Schenks v. Earnhardt Ford Sales Co., 9 Ariz.App. 555, 454 P.2d 873, 875 (1969) (summary judgment reversed on issue of agency; held question of fact for jury).

71.     The existence of a joint venture or joint enterprise arrangement can be either expressed or implied, and is normally proved by the acts and conduct of the parties, not their self-serving declarations to the contrary. Mercer v. Vinson, 85 Ariz. 280, 336 P.2d 854, 858-59 (1959); Helfenbein v. Barae Investment Co., Inc., 19 Ariz.App. 436, 508 P.2d 101, 104 (1973).

72.     An agency relationship can be proved by circumstantial evidence, such as the relation of the parties to each other and to the subject matter. O.S. Stapley Co. v. Logan, 6 Ariz.App. 269, 431 P.2d 910, 914 (1967).

73.     When a joint venture exists, each of the parties is the agent of the other, and each is likewise a principal so that the act of one is the act of all. West v. Soto, 85 Ariz. 255, 336 P.2d 153, 157 (1959); Sparks v. Republic National Life Ins. Co., 132 Ariz. 529, 647 P.2d 1127, 1138 (1982);

Muccilli v. Huff's Boys' Store, Inc., 12 Ariz.App. 584, 473 P.2d 786, 791 (1970); Tanner Cos., supra, 696 P.2d at 695 ("joint ventures share full liability in agency and in tort.").

74.     Acceptance of the benefits of an unauthorized act of one purporting to act as an agent amounts to ratification of that act. Corral v. Fidelity Bankers Life Insurance Co., 129 Ariz. 323, 630 P.2d 1055, 1058 (1981); Phoenix Western Holding Corp. v. Gleeson, 18 Ariz.App. 60, 500 P.2d 320 (1972).

75.     An apparent or ostensible agent is one where the principal has intentionally or inadvertently induced third persons to believe that such a person was his agent although no actual or express authority was conferred as agent. Reed v. Gershweir, 160 Ariz. 203, 772 P.2d 26, 28 (App. 1989). Under such circumstance the principal is estopped from denying its existence. Koven v. Saberdyne Systems, Inc., 128 Ariz. 318, 625 P.2d 907, 911 (App. 1980); Muccilli, supra at 12 Ariz.App. 584, 473 P.2d at 790.

76.     A claim of infringement of a federally registered trademark under the Lanham Act occurs when a person uses:  (1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; and (4) in connection with the sale, offering for sale, distribution or advertising of any goods, or such uses likely to cause confusion, or to cause mistake or to deceive. See 15 U.S.C. § 1114(1)(a).

77.     For a trademark owner to prove infringement, the test is "whether the public is likely to be deceived or confused by the similarity of the marks." Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988).

78.     In evaluating where there is a likelihood of confusion, the following 8 factors are to be considered: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8)

likelihood of expansion of the product lines. <u>AMF, Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348-49 (9th Cir. 1979); <u>Kelley Blue Book v. Car-Smarts, Inc.</u>, 802 F.Supp. 278, 286-88 (C.D. Cal. 1992).

79.    Exact copying of a registered trademark is not required. It is sufficient if the infringer decides to use a mark that is <u>phonetically</u> similar. <u>See</u> <u>e.g.</u>, J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, Vol. 3, § § 23:22-23:23 (4th Ed. 1998) (collecting numerous cases involving infringement by use of phonetically similar marks).

80.    The Lanham Act also creates a separate federal claim for "the deceptive use of false description and/or designation of origin." 15 U.S.C. § 1125(a). <u>New West Corp. v. NYM Co. of California, Inc.</u>, 595 F.2d 1194, 1198 (9th Cir. 1979). The ultimate test, again, is whether the public is likely to be deceived or confused by the similarity of the trademarks. <u>Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.</u>, 944 F.2d 1446, 1454 (9th Cir. 1991).

81.    Where competing products having similar trade dress or design <u>e.g.</u>, an overall visual impression created by the package as a whole, including such features as size, shape, color or color combinations, texture and graphics -- a violation of the Lanham Act occurs. <u>Vision Sports, Inc. v. Melville Corp.</u>, 888 F.2d 609, 613-14 (9th Cir. 1989).

82.    Trademark infringement and unfair competition claims under state common law and statutory law are established under substantially the same standards as under federal law, <u>i.e.</u>, infringement is established if the alleged infringer used an identical or substantially indistinguishable mark for the same goods. <u>See</u> <u>Century 21</u>, <u>supra</u>, 846 F.2d at 1180.

83.    The Lanham Act extends to extraterritorial activities, such as where counterfeit goods are shipped through the United States for sale abroad, or where the primary defendants were U.S. citizens and some of the alleged illegal activities, such as negotiations and arrangement for shipment, occurred in the United States. <u>See</u> <u>Levi Strauss & Co. v. Sunrise International Trading, Inc.</u>, 51 F.3d 982, 984-85 (11th Cir. 1995); <u>Ocean Garden, Inc. v. Marktrade Co., Inc.</u>, 953 F.2d 500, 503 (9th Cir.

1991).

84.     For federal trademark and trade dress infringement, and unfair competition under the Lanham Act there are two types of monetary recovery which you the jury can provide to Herbalife. They are:

1.      An award to Herbalife of the Fallows' profits; and

2.      An award to Herbalife measured by its actual business damages and losses caused by the Fallows' wrongful conduct, including Herbalife's own lost profits.

In addition, such as legal feeds incurred by Herbalife to protect is trademarks against infringement by other third parties – such as bringing a lawsuit – are recoverable as damages. <u>Gucci America, Inc. v. Rebecca Gold Enterprises</u>, 798 F. Supp. 177, 183 (S.D.N.Y. 1992); <u>Merriam-Webster, Inc. v. Random House, Inc.</u> 26 U.S.P.Q.2d 1161 (S.D.N.Y. 1993).

85.     To recover damages in this trademark infringement action, it is not necessary for Herbalife to prove it has actually lost sales. 15 U.S.C. § 1117, <u>Brooks Bros. V. Brooks Clothing of California, Ltd.</u>, 60 F.Supp. 442 (S.D. Cal 1945), aff'd 1548 F.2d 798 (9th Cir. 1947); <u>Maier Brewing Co. v. Fleischmann Distilling Corp.</u>, 390 F.2d 117 (9th Cir. 1968); <u>Foremost-McKesson, Inc. v. Trojan Distrib. Co., Inc.</u>, CA No. C-71-1153 RHS (N.D. Calif. 1973).

86.     Uncertainty as to the amount of damage, if any, does not deprive Herbalife of its recovery.  If damage has been caused to Herbalife by the Fallows' wrongful conduct, an award of those damages which are definitely attributable to the wrong, even though uncertain in respect of their amount, should be made. <u>Bethom Corp. v. Meredith Corp.</u>, 203 U.S.P.Q. 819 (N.D. Cal. 1978).

87.     In addition, if you find Herbalife is entitled to compensatory damages because of injuries caused by the Fallows, the Lanham Act provides that you may, but are not required to, award Herbalife any sum above the amount found as actual damages, not exceeding three times such amount.  You also may, but are not required to, award Herbalife the costs it incurred in bringing this lawsuit. <u>Raybestos Products Co. v. Younger</u>, 54 F.3d 1234, 34 U.S.P.Q. 2d 1516 (7th Cir. 1995).

88.     Deliberate an willful infringement of Herbalife's registered trademark rights provides a basis for punitive and exemplary relief, including treble damages. 15 U.S.C. § 1117, <u>Maier Brewing Co. v. Fleischmann Distilling Corp.</u>, 390 F.2d 117 (9th Cir. 1968), cert denied, 391 U.S. 966 (1968); <u>Foremost-McKesson, Inc. v. Trojan Distrib. Co., Inc.</u>, CA NO. C-71-1153 RHS (N.D. Calif. 1973).

89.     An agency and/or joint venture relationship between the Fallows makes them all jointly and severally liable for trademark infringement and unfair competition against Herbalife.  <u>See David Berg & Co. v. Gaddo International Trading Co.</u>, 884 F.2d 306, 311 (7th Cir. 1989) ("every person actively partaking in, lending aid to, or ratifying or adopting such acts is liable equally with the party itself performing his acts [of trademark infringement]"); <u>Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.</u>, 955 F.2d 1143, 1150 (7th Cir. 1992) (where defendant and a direct infringer have an apparent or actual partnership, or conspire with each other to infringe a trademark, both parties are jointly and severally liable); <u>Smithkline Beckman Corp. v. Pennex Products Co., Inc.</u>, 103 F.R.D. 539, 540 (E.D. PA. 1984)(same).

90.     Under Arizona law the elements for tortious interference with contractual relations and/or prospective business expectancy are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) intentional interference inducing or causing a breach or termination of the expectancy; (4) resulting in damage to the party whose relationship or expectancy has been disrupted; and (5) improper action on the part of the defendant. <u>Antwerp Diamond Exchange of America, Inc. v. Better Business, Bureau of Maricopa County, Inc.</u>, 130 Ariz. 523, 529-30, 637 P.2d 733, 740 (1981); <u>Wallace v. Casa Grande Union High School, District No. 82</u>, 143 Ariz. 419, 427, 909 P.2d 486, 494 (App. 1995); <u>Wagenseller v. Scottsdale Memorial Hospital</u>, 147 Ariz. 370, 386-88, 710 P.2d 1025 (1985); <u>Bar J Bar Cattle Co., Inc. v. Pace</u>, 158 Ariz. 481, 483, 763 P.2d 545 (1988).

91.     To maintain an action for breach of contract the non-breaching party has the burden of

--Page 51

145

proving the existence of the contract, its breach and resulting damages. <u>Graham v. Asbury</u>, 112 Ariz. 184, 185, 540 P.2d 656 (1975).

92.     If one party to a contract <u>first</u> breaches the agreement, the other party is excused from further performance. <u>See</u> <u>O'Day v. McDonnell Douglas Co.</u>, 959 P.2d 792, 795-98, 1998 WL 264772 (May 26, 1998); <u>Arizona Property and Casualty Insurance Guaranty Fund v. Helme</u>, 153 Ariz. 129, 137, 735 P.2d 451 (1987); <u>Coronado Company, Inc. v. Jacome's Dept. Store, Inc.</u>, 129 Ariz. 137, 141, 629 P.2d 553 (App. 1981) ("upon the independent breach of one party, the other party may treat the contract at an end. . .").

93.     It is not necessary for there to be an existing contractual or business relationship, since there can be a tortious interference even if the defendant induces or purposely causes a third person not to enter into or continue a business relation. <u>Edwards v. Anaconda Co.</u>, 115 Ariz. 313, 315, 565 P.2d 190, 192 (App. 1977); <u>Antwerp Diamond Exchange</u>, <u>supra</u>.

94.     After-acquired evidence of a prior material breach of contract is a complete defense to a breach of contract action if the defendant can demonstrate that it would have terminated the contract first had it known of the misconduct. <u>O'Day v. McDonnell Douglas Co.</u>, 959 P.2d 792, 1998 WL 264773 (May 26, 1998).

95.     A party that is seeking to recover damages for breach of contract, must make reasonable efforts to prevent or reduce their damages. Conversely, a defendant is entitled to an offset for any amounts that the plaintiff receives through reasonable mitigation efforts. <u>Coury Brothers Ranches v. Ellsworth</u>, 103 Ariz. 515, 446 P.2d 458 (1968); <u>Fairway Builders v. Malouf Towers Rental Co.</u>, 124 Ariz. 242, 603 P.2d 513, 526 (App. 1979).

96.     The doctrine of "unclean hands" is a complete defense which prohibits one party seeking judicial relief or remedy when that same party has acted in bad faith in connection with the same transaction being sued upon. In other words, the defense of unclean hands will apply if the inequitable

or bad faith conduct occurred in a transaction directly related to the matter before the court and affects

the relationship between the parties.  Smith v. Brimson, 52 Ariz. 360, 364-65, 80 P.2d 968, 969-70

(1938); American Credit Bureau, Inc. v. Carter, 11 Ariz.App. 145, 148, 462 P.2d 838, 841 (1969);

Phoenix Orthopedic Surgeons, Ltd. v. Peirs, 164 Ariz. 54, 59, 790 P.2d 752, 757 (App. 1989).

97.    The unclean hands doctrine is not confined to equitable actions, but is also available as a

defense in legal actions for breach of contract.  Unilogic, Inc. v. Burroughs Corp., 10 Cal.App.4th 612,

618-623, 12 Cal.Rptr.2d 741 (1992); Fiberboard Paper Products Corp. v. East Bay Union of

Machinists, 227 Cal.App.2d 675, 39 Cal.Rptr. 64 (1964).

98.    Recovery under the theory of quantum meruit occurs where services are performed

under an unenforceable contract, or where services are rendered in the absence of a contract.  Blueridge

Sewer Improvement District v. Lowry & Associates, Inc., 149 Ariz. 373, 375, 718 P.2d 1026, 1028

(App. 1986).

99.    The existence of a contract specifically governing the rights and obligations of each party

precludes recovery under a quantum meruit theory.  USLife Title Co. v. Gutkin, 152 Ariz. 349, 354,

732 P.2d 579, 585 (App. 1986); Brown v. Beck, 68 Ariz. 139, 143, 202 P.2d 528 (1949); Advance

Leasing & Crane Co., Inc. v. Dell Webb Corp., 117 Ariz. 451, 452, 573 P.2d 525 (1977) ("the doctrine

of quantum meruit has no application where an explicit contract exists").

100.    Any recovery under quantum meruit based upon the reasonable value of the services

performed by the plaintiff.  Murdock-Bryant Construction, Inc. v. Pearson, 146 Ariz. 57, 64-65, 703

P.2d 1206, 1213-14 (App. 1984).

101.    To establish a violation of Arizona's Racketeering Act, the Fallows must prove: (1) that

an Herbalife engage in a pattern of unlawful activity for the purpose of financial gain; (2) Herbalife's

pattern of unlawful activity caused the Fallows' damages; and (3) the Fallows' damages were a

reasonably foreseeable result of Herbalife's pattern of unlawful activity.  A.R.S. §  13-2314.04 (A).

--Page 53                            147

102.    The "pattern of unlawful activity" that you must find that Herbalife committed was either a "theft of services" or a "scheme to defraud" by Herbalife against the Fallows.

103.    Under Arizona's Racketeering Act, the Fallows must establish at least two different acts of racketeering that meet all of the following requirements: (1) the last act of racketeering must have occurred within 5 years of a prior act of racketeering; (2) the acts of racketeering must be related to each other or to a common external organizing principle, including the affairs of an enterprise; and (3) the acts of racketeering must be continuous or exhibit the threat of being continuous.  A.R.S. § 13-2314.04(S)(3)(a)(i-iii).

104.    A person or entity cannot be subjected to racketeering liability simply for committing two widely-separated and isolated acts.  H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 238-40 (1989); Com-Tech Associates v. Computer Associates International, Inc., 753 F.Supp. 1078, 1090 (E.D. N.Y. 1990); United States v. Indelicato, 865 F.2d 1370, 1381 (2nd Cir. 1989); see also Un*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 922 (7th Cir. 1992) (two acts of racketeering, although necessary to make a pattern, are not normally sufficient to establish a pattern).

105.    Did Clint Fallow and Mary Fallow breach their respective distribuotrship agreements by violating Herbalife rules as a result of the following acts by them or Dan Fallow?

    (1)     buying or selling product in violation of the Herbalife distributorship agreement;
    (2)     making medical, therapeutic, or curative claims about the Herbalife products;
    (3)     doing business in unopened countries,

## V.

## LIST OF WITNESSES INTENDED TO BE USED BY EACH PARTY DURING THE TRIAL

| Name of Witness | Witness for Plaintiffs ("P")/ Defendants ("D") | Type of Witness |
|---|---|---|

| | | |
|---|---|---|
| 1.   Lyle Adams*[1/] | D | Percipient |
| 2.   David Addis | P/D | Percipient |
| 3.   Linda Aldon* | D | Percipient |
| 4.   Vicki Atkins* | D | Percipient |
| 5.   John Bolsover | D | Percipient |
| 6.   Adam Dieter* | D | Percipient |
| 7.   Clint S. Fallow | P/D | Percipient |
| 8.   Daniel S. Fallow | P/D | Percipient |
| 9.   Mary Lynn Fallow | P/D | Percipient |
| 10.  Jackie Fisher | P/D | Percipient |
| 11.  William Gillespie | P/D | Percipient |
| 12.  Mary Habeeb | P | Percipient |
| 13.  William Haley | D | Percipient |
| 14.  Carol Hannah | P/D | Percipient |
| 15.  Dorothy Harvilik* | D | Percipient |
| 16.  Barstow "Bud" Hoffman | D | Percipient |
| 17.  Virginia Hoffman | D | Percipient |
| 18.  Mark Hughes**[1/] | P/D | Percipient |

[1/] Those witnesses designated with an A*≅ will appear via their admissible deposition testimony that the parties will select and designate as part of the Joint Pre-Trial Statement.

[2/] These witnesses designated with an A**≅ may appear live, or alternatively, through their previous deposition testimony.

| | | |
|---|---|---|
| 19. Mette Hyldgaard ** | D | Percipient |
| 20. Jeffrey Kichaven ** | D | Percipient |
| 21. Denni Linhart * | D | Percipient |
| 22. Edmund Lukavics** | D | Percipient |
| 23. Guy Mechlem | P | Expert |
| 24. Sherry Mejah | P | Percipient |
| 25. Natural World Custodian of Records | D | Percipient |
| 26. Gerald Nehra | P | Expert |
| 27. Mark Palin | P | Percipient |
| 28. Dave Peterman | P/D | Percipient |
| 29. Bruce Peters | P/D | Percipient |
| 30. Michele Peters ** | D | Percipient |
| 31. John Peterson ** | P/D | Percipient |
| 32. Susan Peterson ** | P/D | Percipient |
| 33. Sue Ricketts | P | Percipient |
| 34. Jay Riley | P/D | Percipient |
| 35. Tonni Riley | P/D | Percipient |
| 36. Patti Sabel | D | Percipient |
| 37. Kirk Scherer* | D | Percipient |
| 38. Shannon Swisher | P | Percipient |

| 39. Larry Thompson | P | Percipient |
|---|---|---|
| 40. David Weekly | D | Expert |
| 41. Thomas R. Wotruba, Ph.D. | D | Expert |

Notwithstanding the designation of each witness listed in the above table as a witness for Plaintiffs, a witness for Defendants, or both, each party reserves the right to call any witness on the list.

## VI.

## LIST OF EXHIBITS THE PARTIES INTEND TO USE AT TRIAL

The Exhibit List and objections thereto are attached hereto as Exhibit A.

## VI.

## DEPOSITION PORTIONS INTENDED TO BE USED AT TRIAL

The parties will offer the following deposition portions to be presented trial. Each party reserves the right to present that portion designated by the other party. Objections are stated following the designation. The parties will present the deposition by videotape testimony when available.

A.     Lyle Adams

       1.     Designations by the Fallows

             (See "Counterdesignations", infra)

       2.     Designations by Herbalife

             Page 3: lines 15 - 21
             Page 7: lines 10 - 17
             Page 8: lines 8 - 15
             Page 9: lines 7 - 25
             Page 10: lines 10 - 23
             Page 11: line 6 thru page 17: line 23
             Page 17: line 25 thru page 22: line 6
             Page 23: line 10 thru page 24: line 1
             Page 29: line 2 thru page 34: line 18
             Page 37: line 19 thru page 38: line 10

       3.     Counterdesignations by the Fallows

             Page 7: line 18 thru page 8: line 7
             Page 8: line 16 thru page 9: line 6

--Page 57

Page 10: lines 1 thru 10

4.   Counterdesignations by Herbalife

5.   Fallows' Objections to Herbalife's Designations and Counterdesignations

Page 9: line 22 thru line 25
        [Plaintiff's objection: foundation]
Page 11: line 12 thru 16
        [Plaintiff's objection: non-responsive]
Page 11: line 17 thru 21
        [Plaintiff's objection: leading]
Page 11: line 25 thru page 12: line 14
         [Plaintiff's objection: relevance]
Page 14: line 5 thru 9
        [Plaintiff's objection: improper lay opinion; leading; foundation]
Page 14: line 20 thru page 17: line 6
        [Plaintiff's objection: relevance; hearsay; leading]
Page 19: line 21 thru page 20: line 1
        [Plaintiff's objection: foundation]
Page 20: line 12 thru page 21: line 15
        [Plaintiff's objection: foundation; hearsay]
Page 23: line 10 thru page 28: line 1
        [Plaintiff's objection: foundation; hearsay]
Page 29: line 6 thru line 24
        [Plaintiff's objection: hearsay; foundation]
Page 31: line 20 thru page 32: line 8
        [Plaintiff's objection: leading]
Page 33: line 4 thru page 34: line 18
        [Plaintiff's objection: hearsay; foundation]
Page 37: line 19 thru page 38: line 10
        [Plaintiff's objection: foundation; leading]

6.   Herbalife's Objections to Fallows' Designations and Counterdesignations

B.   Vickie Atkins

1.   Designations by the Fallows

(See "Counterdesignations", infra)

2.   Designations by Herbalife

Page 2: lines 22 - 24
Page 12: lines 3 - 18
Page 13: lines 3 - 9, 14 thru Page 14: line 9
Page 17: line 5 thru page 21: line 24
Page 23: line 11 thru page 25: line 1
Page 27: line 13 thru page 29: line 16

3.   Counterdesignations by the Fallows

--Page 58

152

Page 2: lines 22-24
Page 3: lines 8-11
Page 8: lines 15 thru page 9: line 15
Page 10: line 12 thru page 11: line 15
Page 12: lines 3-18
Page 13: lines 3-9, 14 thru page 14: line 9
Page 16; lines 15-17
Page 17: line 5 thru page 21: line 24
Page 21: line 25 to page 23: line 10
Page 23: line 11 thru page 25: line 1
Page 25: lines 3-21
Page 27: lines 13 thru page 29: line 16
Page 33: line 1 thru page 34: line 5
Page 34: line 19 thru page 36: line 25
Page 37: line 11 thru page 39: line 19
Page 39: line 24 thru page 40: line 6
Page 44: line 16 thru page 45: line 2
Page 46: lines 16-19
Page 46: line 25 thru page 47: line 18
Page 48: line 8 thru page 49: line 17

4.     Counterdesignations by Herbalife

5.     Fallows' Objections to Herbalife's Designations and Counterdesignations

Page 12: lines 3 - 18
        [Plaintiffs objection: Page 12 lines 15-18: leading, misstates testimony]
Page 13: lines 3 - 9, 14 thru Page 14: line 9
        [Plaintiffs objection: Page 13 lines 2-9, 14: leading, misstates testimony]
Page 17: line 5 thru page 21: line 24
        [Plaintiffs? Objection: Page 21 lines 6-11: leading, lacks foundation]]
Page 23: line 11 thru page 25: line 1
        [Plaintiffs Objection: Page 24 lines 4-13: hearsay, no testimony by witness]
Page 27: line 13 thru page 29: line 16
        [Plaintiffs objection: hearsay, relevance]

6.     Herbalife's Objections to Fallows' Designations and Counterdesignations

Page 35: ln. 8 through p. 36 ln. 2
        [Objection: relevance (Rule 402); prejudicial (Rule 403)]
Page 39: ln. 15 through p. 40: ln. 6
        [Objection: relevance (Rule 402)]
Page 44: ln. 16 through page 45: ln. 2
        [Objection: relevance; contains only partial answer to question — answer
        continues through ln. 22]
Page 46: lns. 16-19
        [Objection: relevance]
Page 46: ln. 25 through p. 47: ln. 18
        [Objection: lack of foundation; relevance]
Page 48: ln. 8 through page 49: ln. 17
        [Objection: relevance]

C.      Adam Dieter

   1.      <u>Designations by the Fallows</u>

          (See "Counterdesignations", infra)

   2.      <u>Designations by Herbalife</u>

          Page 3: lines 9 - 18
          Page 11: lines 10 - 18
          Page 14: lines 1 - 3
          Page 30: line 8 thru page 35: line 20
          Page 36: line 18 thru page 42: line 9
          Page 43: line 4 thru page 45: line 11
          Page 45: line 23 thru page 47 : line 20
          Page 51: line 5 thru page 52: line 1
          Page 52: line 17 thru  page 53: line 15
          Page 53: line 19 thru page 54: line  2
          Page 54: line 10 thru page 56: line 10
          Page 57: line 1 thru page 59: line 15
          Page 60: line 17 thru page 62: line  4
          Page 63: line 6 thru page 67: line 14
          Page 69: line 16 thru page 70: line 18
          Page 71: lines 13 - 25
          Page 72: line 13 thru page 74: line 16
          Page 80: lines 13 - 19
          Page 86: lines 5 - 10
          Page 87: lines  2 - 20
          Page 90: line 10 thru page 91: line 23
          Page 106: lines 1 - 11
          Page 116: line 18 thru page 117: line 5
          Page 125: lines 6 – 23
          Page 129: line 17 - page 130: line 13

   3.      <u>Counterdesignations by the Fallows</u>

          Page 11: lines 10-18
          Page 36: lines 4-9
          Page 40: lines 13-19
          Page 43: lines 4-17
          Page 58: lines 5-12
          Page 75: lines 3-9
          Page 77: lines 15-18
          Page 81: lines 1-7
          Page 100: lines 13-18
          Page 104: lines 8-15
          Page 106: lines 1-11
          Page 109: lines 11-21
          Page 113: lines 9-19
          Page 115: lines 7-22

   4.      <u>Counterdesignations by Herbalife</u>

          Page 75: lns. 11-14

**154**

Page 104: ln. 17 through p. 105: ln. 16

5.  **Fallows' Objections to Herbalife's Designations and Counterdesignations**

Page 30: line 8 thru page 35: line 20
  [Plaintiff's objections: Page 31 line 4: lacks foundation; page 34 line 1:
  compound]]
Page 36: line 18 thru page 42: line 9
  [Plaintiff's objections: Page 36 line 18: lacks foundation, vague; Page 38 line 15:
  lacks foundation, hearsay, vague; Page 39 line 17: lacks foundation; Page 39 line
  25 thru page 40 line 4: lacks foundation, leading; Page 41 line 21: vague]
Page 43: line 4 thru page 45: line 11
  [Plaintiff's objection: Page 43 line 4: vague, leading, calls for speculation; Page
  43 line 19: relevance]
Page 45: line 23 thru page 47 : line 20
  [Plaintiff's objection: Page 47 line 4: vague, leading, calls for speculation; Page
  47 line 16: vague, leading]
Page 52: line 17 thru  page 53: line 15
  [Plaintiff's objection: Page 53 line 11: compound, lacks foundation, leading]
Page 54: line 10 thru page 56: line 10
  [Plaintiff's objection: Page 56 line 4: lacks foundation, leading, compound]
Page 57: line 1 thru page 59: line 15
  [Plaintiff's objection: Page 59 line 3: leading, calls for speculation]
Page 60: line 17 thru page 62: line  4
  Page 61 line 13: lacks foundation]
Page 63: line 6 thru page 67: line 14
  [Plaintiff's objection: Page 64 line 2: leading, hearsay, lacks foundation, no
  testimony by witness; Page 64 ln 18: vague, compound; Page 65 line 20 thru
  page 66 line 4: no testimony by witness, vague; page 66 lines 15-17:
  misstatement of former testimony]
Page 69: line 16 thru page 70: line 18
  [Plaintiff's objection: Page 70 lines 7-10: compound, leading, vague, lacks
  foundation]
Page 71: lines 13 - 25
  [Plaintiff's objection: no testimony by witness]
Page 72: line 13 thru page 74: line 16
  [Plaintiff's objection: Page 73 lines 18-24: vague, compound, leading]
Page 87: lines  2 - 20
  [Plaintiff's objection: compound]
Page 90: line 10 thru page 91: line 23
  [Plaintiff's objection: Page 90 lines 15-17: assumes facts not in evidence;
  improper hypothetical of lay witness]

6.  **Herbalife's Objections to Fallows' Designations and Counterdesignations**

Page 81: lns. 1-7
[Objection: hearsay]
Page 104: lns. 8-15
[Objection: relevance; does not designate question, only answer]
Page 109: lns. 11-21
[Objection: relevance; does not designate question, only answer]
Page 113: lns. 9-19
[Objection: relevance; does not designate question, only answer]
Page 115: lns. 7-22
[Objection: incomplete answer, witness' answer continues through ln. 24]

--Page 61                          155

D.     Jackie Hartman Fisher

     1.     <u>Designations by the Fallows</u>

Page 5: lines 10 thru 23
Page 8: line 24 thru Page 12: line 8
Page 12: line 13 thru page 14: line 17
Page 16: lines 17 thru 23
Page 23: line 25 thru page 35: line 22
Page 37: line 22 thru 33: line 13
Page 40: line 20 thru page 41: line 7
Page 42: line 24 thru page 43: line 10
Page 56: line 13 thru page 58: line 10
Page 63: line 21 thru page 64: line 21
Page 77: lines 8 thru 20
Page 79: line 21 thru 80: line 1
Page 81: line 16 thru page 82: line 1
Page 88: line 3 thru page 88: line 2
Page 91: line 13 thru page 99: line 2
Page 99: line 19 thru page 100: line 25
Page 102: line 5 thru page 105: line 16
Page 106: line 4 thru page 107: line 24
Page 108: line 6 thru page 111: line 8
Page 112: line 7 thru page 113: line 9
Page 116: line 19 thru page 117: line 22
Page 120: line 18 thru page 121: line 15
Page 122: line 23 thru page 123: line 15
Page 124: line 14 thru page 125: line 24
Page 127: lines 1 thru 25
Page 128: line 6 thru page 130: line 20
Page 131: line 24 thru page 132: line 13
Page 133: line 4 thru page 133: line 25
Page 138: line 11 thru page 139: line 3
Page 139: line 14 thru page 140: line 10
Page 140: line 23 thru page 142: line 19
Page 144: line 13 thru page 145: line 22
Page 147: line 19 thru page 150: line 3
Page 151: lines 3 thru 12
Page 151: line 23 thru page 153: line 11
Page 154: line 1 thru page 156: line 5
Page 158: line 22 thru page 161: line 14
Page 162: lines 6 thru 21
Page 164: line 8 thru page 166: line 17
Page 169: line 16 thru page 170: line 2
Page 171: line 1 thru page 172: line 23
Page 173: line 1 thru page 176: line 6
Page 176: line 22 thru page 180: line 5
Page 182: line 6 thru page 184: line 13
Page 185: line 5 thru page 186: line 18
Page 187: line 3 thru page 188: line 23
Page 189: lines 5 thru 18

     2.     <u>Designations by Herbalife</u>

3.   Counterdesignations by the Fallows

      (See "Designations", supra)

4.   Counterdesignations by Herbalife

      Page 35: ln. 23 through p. 37: ln. 21
      Page 43: ln. 11 through p. 50: ln. 15
      Page 59: lns. 8-20
      Page 65: ln. 9 through p. 68: ln. 11
      Page 70: ln. 2 through p. 71: ln. 25
      Page 72: ln. 18 through p. 73: ln. 19
      Page 76: ln. 2 through p. 74: ln. 4
      Page 77: ln. 2 through p. 79: ln. 11
      Page 80: lns. 5-22
      Page 82: lns. 2 through 12
      Page 84: ln. 23 through p. 88: ln. 2
      Page 101: lns. 1-6
      Page 111: lns. 8-22
      Page 113: ln. 10 through p. 115: ln. 23
      Page 117: ln. 25 through p. 118: ln. 5
      Page 128: lns. 1-5
      Page 132: lns. 14-20
      Page 134: ln. 5 through p. 138: ln. 10
      Page 139: lns. 5-12
      Page 142: ln. 2 through p. 144: ln. 3
      Page 150: ln. 16 through p. 151: ln. 2
      Page 156: ln. 9 through p. 158: ln. 2
      Page 160: ln. 16 through p. 161: ln. 6
      Page 162: lns. 6-21
      Page 164: ln. 8 through p. 167: ln. 23
      Page 168: ln. 23 through p. 169: ln. 14
      Page 172: lns. 24-25
      Page 180: ln. 6 through p. 181: ln. 9

5.   Fallows' Objections to Herbalife's Designations and Counterdesignations

      (TO FOLLOW)

6.   Herbalife's Objections to Fallows' Designations and Counterdesignations

      Page 5: lns. 5-23
      Page 10: lns. 19-23
      [Objection: attorney-client privilege; work product]
      Page 8: ln. 24 through p. 12: ln. 8
      [Objection: relevance; attorney-client privilege; work product; prejudice
      Page 37: ln. 22 through p. 38: ln. 13
      [Objection: relevance; subsequent measures (Rule 407)
      Page 40: ln. 20 through p. 41: ln. 7
      [Objection: relevance; incomplete and irrelevant hypothetical]
      Page 42: ln. 24 through p. 43: ln. 10
      [Objection: relevance; incomplete and irrelevant hypothetical]
      Page 88: lns. 3-20

--Page 63                    157

[Objection: misstates testimony; vague and ambiguous]
Page 91: ln. 13 through p. 99: ln. 2
[Objection: relevance; subsequent measures — witness is being examined on 1997 rules
          which are not at issue]
Page 120: ln. 18 through p. 121: ln. 15
[Objection: relevance]
Page 133: ln. 4 through p. 133: ln. 25
[Objection: relevance; irrelevant attorney discussion on record]
Page 176: ln. 22 through p. 180: ln. 5
[Objection: relevance, lacks foundation]
Page 187: ln. 3 through p. 188: ln. 23]
[Objection: attorney client privilege]

E. William Gillespie

    1.    <u>Designations by the Fallows</u>

        Page 10:line 10 thru Page 11: 10
        Page 13:line 2 thru 8
        Page 19:line 21 thru Page 27: line 25
        Page 29:line 6 thru Page 50: line 3
        Page 54:line 1 thru Page 57: line 6
        Page 59:line 7 thru Page 69: line 2
        Page 75:line 6 thru Page 76: line 7
        Page 76:line 18 thru Page 78 line 14
        Page 81:line 23 thru Page 83: line 10
        Page 89: line 18 thru Page 94: line 10
        Page 99: line 4 thru Page 100: line12
        Page 102: line 6 thru Page 109; line 23
        Page 112: line 9 thru Page 113: line 13
        Page 115: line 22 thru Page 118: line 5
        Page 125: line 2 thru 17
        Page 127: line 3 thru Page 128: line 2
        Page 132: line 5 thru Page 135: line 13
        Page 137: line 20 thru Page 146: line 17
        Page 147: line 25 thru Page 148: line 5
        Page 148: line 11 thru Page 150: line 15
        Page 151: line 17 thru Page 152: line 3
        Page 153: line 1 thru Page 155: line 8
        Page 161: line 22 thru Page 163: line 12
        Page 167: line 20 Page 170: line 11
        Page 170: line 20 thru Page 171: line 11
        Page 173: line 2 thru Page 175: line 25

    2.    <u>Designations by Herbalife</u>

        (See "Counterdesignations", infra)

    3.    <u>Counterdesignations by the Fallows</u>

        (See "Designations", supra)

    4.    <u>Counterdesignations by Herbalife</u>

Page 6: lns. 9 through 12
Page 11: ln 11 through page 13: ln 8
Page 28: ln. 1 through page 29: ln. 1
Page 50 ln. 4 through 53: ln. 25
Page 69 ln. 3 through page 74: ln. 11
Page 78: ln. 15 through page 79: ln. 5
Page 83: ln. 11 through page 86: ln. 20
Page 87: ln. 15 through page 89: ln. 17
Page 94: ln. 11 through page 98: ln. 25
Page 100: ln. 13 through page 101: ln. 24
Page 109: ln. 22 through page 112: ln. 2
Page 113: lns. 14 through 25
Page 115: lns. 9 through 18
Page 118: ln. 7 through page 120: ln. 16
Page 125: ln. 8 through page 126: ln. 23
Page 128: ln. 3 through page 132: ln. 3
Page 135: lns. 14 through 16
Page 146: ln. 18 through page 147: ln. 15
Page 150: ln. 15 through page 151: ln. 16
Page 152: lns. 4 through ln. 25
Page 157: ln. 7 through page 158: ln. 25
Page 163: ln. 13 through page 166: ln. 1
Page 170: lns. 12 through 19
Page 171: ln. 12 through page 173: ln. 1

5.  <u>Fallows' Objections to Herbalife's Designations and Counterdesignations</u>

    (TO FOLLOW)

6.  <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

    Page 19: ln. 21 through p. 21: ln. 1
        [Objection: relevance, prejudice]
    Page 32: lns. 7 through 24
        [Objection: attorney-client privilege]
    Page 145: ln. 24 through page 146: ln. 17
        [Objection: hearsay; misstates witness' prior statements]
    Page 173: ln. 14 through page 175: ln. 25
        [Objection: relevance, lack of foundation; hearsay]

F.  Carol Hannah

1.  <u>Designations by the Fallows</u>

    Page 6: lines 10 thru 11
    Page 9: lines 16 thru page 13: line 11
    Page 14: line 1 thru page 19: line 8
    Page 19: line 19 thru page 20: line 8
    Page 20: line 23 thru page 23: line 19
    Page 24: lines 16 thru 18
    Page 25: line 3 thru page 29: line 12
    Page 29: lines 17 thru 21
    Page 30: line 3 thru Page 36: line 1
    Page 36: line 13 thru page 42: line 21

--Page 65                    159

Page 44: lines 3 thru 11
Page 45: lines 4 thru 13
Page 46: line 6 thru page 52: line 6
Page 52: line 22 thru page 55: line 23
Page 56: lines 8 thru 10
Page 57: line 1 thru page 58: line 3
Page 58: line 16 thru page 59: line 3
Page 59: line 16 thru page 60: line 5
Page 61: line 19 thru page 62: line 25
Page 63: line 14 thru page 64: line 21
Page 65: line 9 thru page 70: line 8
Page 71: line 5 thru page 72: line 3
Page 73: line 11 thru page 75: line 16
Page 78: lines 1 thru 5
Page 80: line 15 thru Page 81: line 25
Page 85: lines 2 thru 18
Page 86: lines 7 thru 12
Page 94: line 13 thru page 97: line 24
Page 99: line 25 thru page 100: line 7
Page 100: line 23 thru page 101: line 21
Page 103: line 13 thru page 105: line 4
Page 105: line 10 thru page 107: line 9
Page 107: line 20 thru page 107: line 24
Page 110: lines 3 thru 24
Page 111: line 8 thru page 113: line 10
Page 113: line 15 thru page 115: line 7
Page 118: line 25 thru page 120: line 2
Page 121: line 13 thru page 122: line 12
Page 125: line 6 thru page 126: line 16
Page129: line 25 thru page 130: line 13
Page 132: lines 12 thru 19
Page 133: line 11 thru page 134: line 18
Page 135: lines 4 thru 24
Page 136: line 16 thru page 137: line 18
Page 138: line 3 thru page 140: line 9
Page 140: line 25 thru page 142: line 23
Page 146: line 21 thru page 151: line 6
Page 152: lines 16 thru 19
Page 156: line 11 thru page 157: line 25
Page 160: lines 3 thru 10
Page 167: line 3 thru page 170: line 11
Page 171: line 8 thru page 172: line 3
Page 173: line 4 thru page 175: line 8
Page 178: lines 1 thru 12
Page 181: line 2 thru page 184: line 11
Page 185: line 10 thru page 190: line 4

2. <u>Designations by Herbalife</u>

(See "Counterdesignations", infra)

3. <u>Counterdesignations by the Fallows</u>

(See "Designations", supra)

4.    Counterdesignations by Herbalife

Page 29: ln. 10
Page 36: lns. 2-6
Page 42: ln. 22 through p. 44: ln. 2
Page 44: ln. 12 through page 45: ln. 3
Page 58: lns. 4-15
Page 65: lns. 2-8
Page 70: ln. 9 through p. 71: ln. 4
Page 72: ln. 4 through p. 73: ln. 3
Page 76: ln. 22 through p. 77: ln. 25
Page 79: ln. 7 through p. 80: ln. 3
Page 82: ln. 1 through p. 84: ln. 3
Page 85: ln. 19 through p. 86: ln. 6
Page 87: ln. 13 through p. 88: ln. 14
Page 97: ln. 25 through p. 100: ln. 22
Page 102: ln. 6 through p. 104: ln. 5
Page 108: ln. 12 through p. 110: ln. 2
Page 115: ln. 8 through p. 118: ln. 24
Page 120: ln. 3 through p. 121: ln. 12
Page 122: ln. 5 through p. 123: ln. 17
Page 124: ln. 7 through p. 125: ln. 5
Page 126: ln. 17 through p. 129: ln. 23
Page 130: lns. 14-21
Page 132: ln. 20 through p. 133: ln. 10
Page 135: ln. 19 through p. 136: ln. 15
Page 140: lns. 10-24
Page 161: ln. 7 through p. 162 ln. 7
Page 165: ln. 14 through p. 167: ln. 2
Page 170: ln. 12 through p. 171: ln. 17
Page 172: ln. 3 through p. 173: ln. 3
Page 175: lns. 9-14
Page 178: ln. 15 through p. 181: ln. 1
Page 184: ln. 12 through p. 185: ln. 9

5.    Fallows' Objections to Herbalife's Designations and Counterdesignations

(TO FOLLOW)

6.    Herbalife's Objections to Fallows' Designations and Counterdesignations

Page 25: lns. 3-15
[Objection: lack of foundation; hearsay]
Page 29: lns. 8-12
[Objection: lack of foundation; hearsay; relevance]
Page 36: ln. 13 through p. 42: ln. 21
[Objection: relevance; hypothetical]
Page 57: ln. 1 through p. 58: ln. 6
[Objection: incomplete designation; answer continues through p. 58, ln. 15]
Page 85: lns. 2-18
[Objection: relevance]
Page 86: lns. 7-12
[Objection: relevance]
Page 94: ln. 13 through p. 97: ln. 24
[Objection: lack of foundation]

--Page 67                                 161

Page 105: ln. 10 through p. 107 ln. 9
[Objection: lack of foundation]
Page 146: ln. 21 through p. 151: ln. 6
[Objection: relevance; subsequent measures]
Page 152: lns. 16-19
[Objection: relevance; subsequent measures re: 1997 rules]
Page 181: ln. 2 through p. 184: ln. 11
[Objection: lack of foundation; irrelevant hypothetical]
Page 185: ln. 10 through p. 190: ln. 4
[Objection: lack of foundation; irrelevant hypothetical]

G.   Dorothy Harvilik

   1.   Designations by the Fallows

      Page 12: lines 2-17
      Page 15: lines 4-7
      Page 18: lines 13-23
      Page 21: lines 14-20
      Page 29: lines 10-13
      Page 37: lines 21-25
      Page 38: lines 4-16
      Page 42: lines 23-25
      Page 43: lines 1-9
      Page 51: lines 3-7

   2.   Designations by Herbalife

      Page 4: lines 7 - 9
      Page 11: line 22 thru page 12: line 23
      Page 14: line 16 thru page 15: line  3
      Page 16: line 14 thru page 17: line 13
      Page 21: line 21 thru page 22: line  22
      Page 28: line 12 thru page 29: line 18
      Page 30: lines 15 - 22
      Page 35: line 7 thru page 36: line 7
      Page 44: line  11 thru page 46: line 2
      Page 49: line 25 thru page 50: line 14
      Page 50: line 23 thru page 51: line 2

   3.   Counterdesignations by the Fallows

      (See "Designations", supra)

   4.   Counterdesignations by Herbalife

      Page 20: ln. 25 through p. 26: ln. 13

   5.   Fallows' Objections to Herbalife's Designations and Counterdesignations

      Page 16: line 14 thru page 17: line 13
         [Plaintiff's objection: Page 17 lines 5 thru 8: assumes facts not in evidence,
         foundation]
      Page 18: lns. 13-23

[Plaintiff's objection: lack of foundation]
Page 35: line 7 thru page 36: line 7
[Plaintiff's objection: assumes facts not in evidence, foundation]
Page 37: lns. 21-25
[Plaintiff's objection: lack of foundation]
Page 38: lns. 4-16
[Plaintiff's objection: lack of foundation]

6.   Herbalife's Objections to Fallows' Designations and Counterdesignations

Page 18: lns. 13-23
[Objection: lack of foundation]
Page 37: lns. 21-25
[Objection: lack of foundation]
Page 38: lns. 4-16
[Objection: lack of foundation]

H.   Mark Hughes

1.   Designations by the Fallows

Page 16: line 21 thru page 17: line 7
Page 20: line 7 thru page 20: line 13
Page 20: line 17 thru page 21: line 7
Page 21: line 15 thru page page 23: line 9
Page 23: line 13 thru page 26: line 3
Page 20: line 1 thru page 28: line 16
Page 29: line 13 thru page 30: line 4
Page 30: line 13 thru page 33: line 21
Page 34: line 22 thru page 36: line 15
Page 37: lines 9 thru 15
Page 42: line 24 thru page 43: line 5
Page 43: lines 14 thru 24
Page 45: line 25 thru page 46: line 15
Page 51: lines 15 thru 21
Page 53: lines 4 thru 11
Page 54: lines 9 thru 12
Page 56: lines 22 thru 25
Page 57: lines 12 thru 14
Page 58: lines 17 thru 24
Page 59: lines 8 thru 11
Page 60: line 17 thru page 63: line 13
Page 64: line 9 thru page 65: line 24
Page 71: line 13 thru page 72: line 21
Page 73: line 14 thru page 74: line 14
Page 75: lines 2 thru 5
Page 82: line 15 thru page 83: line 25
Page 84: line 14 thru page 84: line 20
Page 85: line 6 thru page 86: line 1
Page 87: line 13 thru page 89: line 10
Page 91: line 10 thru page 92: line 14
Page 93: lines 11 thru 21
Page 95: lines 3 thru 21
Page 97: line 13 thru page 98: line 3
Page 99: line 2 thru page 100: line 7

Page 101: line 15 thru page 102: line 1
Page 102: lines 11 thru 19
Page 104: line 21 thru page 108: line 5
Page 110: line 4 thru page 111: line 3
Page 111: line 24 thru page 118: line 8
Page 122: lines 12 thru 18
Pages 123: lines 1 thru 9
Page 124: line 6 thru page 125: line 16
Page 126: line 15 thru page 1126: line 21
Page 133: line 1 thru page 135: line 16
Page 140: line 16 thru page 141: line 1
Page 142: line 8 thru page 144: line 10
Page 144: line 21 thru page 145: line 16
Page 145: lines 20 thru 23
Page 146: lines 7 thru 12
Page 149: lines 3 thru 14

2.      Designations by Herbalife

Page 6: lines 11 - 23
Page 10: lines  6 - 12
Page 13: line  3 thru page 16: line 12
Page 16: lines 21 - 25
Page 17: lines 10 - 12
Page 17: line 23 thru page 19: line 23
Page 20: line 7 thru page 23: line 20
Page 26: lines 1 - 3
Page 26: line 25 thru page 27: line 15
Page 30: lines 19 thru page 31: line 13
Page 33: line 24 thru page 34: line 16
Page 35: line 21 thru page 36: line 10
Page 36: lines 16 - 22
Page 37: line  23 thru page 40: line 12
Page 41: lines 13 - 20
Page 42: lines 1 - 15
Page 43: lines  6 - 13
Page 44: line 5 thru page 45: line 24
Page 47: line  2 thru page 48: line 18
Page 49: lines  5 - 20
Page 51: lines 11 - 14
Page 51: line 22 thru page 52: line 21
Page 54: line 13 thru page 55: line 8
Page 56: lines 2 - 21
Page 57: lines  1 - 11
Page 57: line 15 thru page 58: line 16
Page 58: line 25 thru page 59: line 7
Page 68: line 25 thru page 71: line  12
Page 73: lines 14 - 20
Page 74: line  15 thru page 75: line 1
Page 76: line 10 thru page 77: line 15
Page 78: line 16 thru page 79: line 1
Page 79: line 21 thru page 80: line 4
Page 80: line 14 thru page 81: line 6
Page 81: line 12 thru page 82: line 14
Page 83: line  11 thru page 85: line 14

—Page 70                                          **164**

Page 92: line 15 thru page 93: line 10
Page 94: line 8 thru page 95: line 2
Page 95: line 22 thru page 97: line 12
Page 98: lines 4 - 25
Page 99: lines 1 - 19
Page 100: line 8 thru page 101: line 14
Page 103: line 14 thru page 104: line 10
Page 119: line 7 thru page 122: line 11
Page 122: lines 19 - 25
Page 123: line 10 thru page 124: line 16
Page 127: line 4 thru page 129: line 16
Page 137: line 8 thru page 138: line 15
Page 140: lines 2 - 15
Page 141: line 25 thru page 142: line 3
Page 142: lines 8 - 12
Page 142: lines 19 - 24
Page 143: line 14 thru page 144: line 23
Page 145: line 17 thru page 146: line 6
Page 148: line 11 thru page 149: line 2

3.   <u>Counterdesignations by the Fallows</u>

     (See "Designations", supra)

4.   <u>Counterdesignations by Herbalife</u>

     (See "Designations", supra)

5.   <u>Fallows' Objections to Herbalife's Designations and Counterdesignations</u>

     Page 20: line 7 thru page 23: line 20
          [Plaintiff's objection: Page 22 lines 24-25: lack of personal knowledge]
     Page 37: line 23 thru page 40: line 12
          [Plaintiff's objection: Oage 40 lines 11-12: non-responsive]
     Page 44: line 5 thru page 45: line 24
          [Plaintiff's objection: Page 45 lines 23-24: lack of personal knowledge]
     Page 47: line 2 thru page 48: line 18
          [Plaintiff's objection: hearsay]
     Page 51: line 22 thru page 52: line 21
          [Plaintiff's objection: Page 52 lines 1-21: hearsay]
     Page 54: line 13 thru page 55: line 8
          [Plaintiff's objection: hearsay, lack of personal knowledge]
     Page 74: line 15 thru page 75: line 1
          [Plaintiff's objection: hearsay]
     Page 92: line 15 thru page 93: line 10
          [Plaintiff's objection: Page 93 lines 3-5: speculation, no personal knowledge]
     Page 99: lines 1 - 19
          [Plaintiff's objection: page 99 lines 1-5: hearsay]
     Page 143: line 14 thru page 144: line 23
          [Plaintiff's objection: page 143 lines 14-18: hearsay]

6.   <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

     Page 16: line 21 thru page 17: line 7
          [overlaps with Herbalife's designation: P. 16:21-25]

[Herbalife's objection re P. 16:26 - 17:7: relevance]

Page 20: line 7 thru page 20: line 13
    [overlaps with Herbalife's designation: P. 20:7 - 23:20]

Page 21: line 15 thru page 23: line 9
    [overlaps with Herbalife's designation: P. 20:7 - 23:20]

Page 23: line 13 thru page 28: line 16
    [overlaps with Herbalife's designation: P. 20:7 - 23:20 and P. 26:1-3]
    [Herbalife's objection re P. 28: 1 - 16: Larry Thompson?s position with the company is irrelevant. Further, unless the plaintiffs make Thompson's position relevant as well as communications with him relevant, the reasons for his leaving the company are irrelevant. Further, it is hearsay for the witness to discuss conversation between Larry Thompson and others when witness made clear that he was not a party to conversation.]

Page 29: line 13 thru page 30: line 4
    [Herbalife's objection: Hearsay. Further, to leave out page 30, lines 5 - 9, is misleading in that those lines indeed make it clear that the witness? testimony is pure hearsay.]

Page 30: line 13 thru page 33: line 21
    [overlaps with Herbalife's designation: P. 30:10 - 31:13]

Page 34: line 22 thru page 36: line 15
    [overlaps with Herbalife's designation: P. 35:21 - 36:10]

Page 43: lines 14 thru 24
    [Herbalife's objection: There is no testimony from the witness.]

Page 51: lines 15 thru 21
    [Herbalife's objection: Standing alone, the questions and answers are incomplete.]

Page 60: line 17 thru page 63: line 13
    [Herbalife's objections: Comment by attorneys which are not questions are not relevant for the jury. Further, reference to Larry Thompson is based upon hearsay. Witness also is testifying as to what he believed was on John Peterson's mind. Further the testimony is speculative. Also, the designation cuts off in the middle of a question.]

Page 73: line 14 thru page 74: line 14
    [overlaps with Herbalife's designation: P. 73:14 - 20]

Page 82: line 15 thru page 83: line 25
    [overlaps with Herbalife's designation: P. 83:11 - 85:14]

Page 84: line 14 thru page 84: line 20
    [overlaps with Herbalife's designation: P. 83:11 - 85:14]

Page 87: line 13 thru page 89: line 10
    [Herbalife's objection: no objection, except that comments of attorneys are irrelevant.]

Page 95: lines 3 thru 21
    [Herbalife's objection: Witness' testimony regarding "goof up" was clearly intended to be a joke.]

Page 97: line 13 thru page 98: line 3
    [Herbalife's objection: This designation includes comments by attorneys which are not questions, and are therefore irrelevant for the jury.]

Page 104: line 21 thru page 108: line 5
    [Herbalife's objection: This designation includes comments by attorneys which are not questions, and are therefore irrelevant for the jury.]

Page 110: line 4 thru page 111: line 3
    [Herbalife's objection: This designation includes comments by attorneys which are not questions, and are therefore irrelevant for the jury.]

Page 111: line 24 thru page 118: line 8
    [Herbalife's objection: This designation includes comments by attorneys which

--Page 72

are not questions, and are therefore irrelevant for the jury.  Also, the form of the questions was vague and ambiguous.  Further, the designation contains questions which the questioner withdrew.  Finally, the Court needs to rule on the pending motion to strike which is referenced in the transcript.]

Page 124: line 6 thru page 125: line 16
[overlaps with Herbalife's designation: P. 123:10 - 124:16]
Page 133: line 1 thru page 135: line 16
[Herbalife's objection: irrelevant.]
Page 142: line 8 thru page 144: line 10
[overlaps with Herbalife's designation: P. 142:9 - 14; 143:14 -144:23]
[Herbalife's objection: discussion between attorneys is irrelevant for the jury.]
Page 144: line 21 thru page 145: line 16
[overlaps with defendants? designation: P. 143:14 - 144:23]
Page 145: lines 20 - 23
[overlaps with defendants? designation: P. 145:17 - 146:6]
Page 149: lines 3 thru 14
[Herbalife's objection: This designation includes comments by attorneys which are not questions, and are therefore irrelevant for the jury.]

I.    Mette Hyldgaard

1.    Designations by the Fallows

(See "Counterdesignations", infra)

2.    Designations by Herbalife

Page 4: lines  20 - 21
Page 5: lines 10 - 13
Page 37: lines  7 -9
Page 44: lines  9 - 21
Page 45: line 4 thru page 50: line 21
Page 53: line 3 thru page 54: line 11
Page 57: line 11 thru page 59: line  11
Page 60: lines 3 - 25
Page 89: lines 11 - 18
Page 91: line 10 thru page 92: line  21
Page 94: line 9 thru page 96: line 5
Page 96: lines 21 - 24
Pages 98: lines 2 - 6
Page 98: line 20 thru page 100: line 25
Page 103: line 4 - thru page 104: line 23
Page 105: line  22 - thru page 108: line 15
Page 109: line 14 thru page 116: line 6
Page 125: line 23 thru page 126: line 11

3.    Counterdesignations by the Fallows

Page 5: lines 14 thru 18
Page 5: line 22 thru page 7: line 10
Page 10: line 16 thru page 11: line 25
Page 12: line 24 thru page 14: line 5
Page 14: line 22 thru page 15: line 22
Page 16: line 7 thru page 17: line 7
Page 18: line 13 thru page 28: line 21

**167**

--Page 73

Page 30: line 19 thru page 33: line 8
Page 34: line 10 thru page 35: line 2
Page 35: line 24 thru page 36: line 3
Page 36: line 7 thru page 37: line 2
Page 37: line 10 thru Page 39: line 19
Page 40: line 11 thru page 41: line 7
Page 42: line 1 thru page 44: line 8
Page 44: line 22 thru page 45: line 3
Page 50: line 22 thru page 51: line 12
Page 51: line 24 thru page 53: line 2
Page 54: lines 12-13
Page 55: line 10 thru page 57: line 10
Page 61: line 13 thru line 18
Page 62: line 6 thru page 63: line 25
Page 66: line 4 thru line 9
Page 71: line 3 thru line 23
Page 72: line 20 thru page 73: line 17
Page 79: line 4 thru page 80: line 23
Page 85: line 22 thru line 24
Page 109: line 3 thru line 9
Page 117: line 5 thru line 7
Page 120: line 6 thru page 121: line 6

4. <u>Counterdesignations by Herbalife</u>

5. <u>Fallows' Objections to Herbalife's Designations and Counterdesignations</u>

Page 91: line 10 thru page 92: line 21
   [Plaintiffs objection: Page 91 line 24 thru page 92 line 21: foundation; no
   personal knowledge]
Page 94: line 9 thru page 96: line 5
   [Plaintiffs objection: hearsay, foundation; relevance]
Page 96: lines 21 - 24
   [Plaintiffs objection: vague and ambiguous]
Pages 98: lines 2 - 6
Page 98: line 20 thru page 100: line 25
   [Plaintiffs objection: Page 99 line 23 thru page 100 line 7: relevance; improper lay
   opinion; foundation]
Page 103: line 4 - thru page 104: line 23
   [Plaintiffs objection: Page 104 lines 5 thru 11: relevance]
Page 109: line 14 thru page 116: line 6
   [Plaintiffs objection: Page 111 lines 22 thru 25: leading; foundation;
   relevance; Page 112 lines 4 thru 8: foundation; relevance; Page 113 lines 9 thru
   18: foundation; legal opinion; relevance; Page 114 line 12 thru 116 line 6:
   hearsay; relevance]
Page 125: line 23 thru page 126: line 11

6. <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

H.   Jeffery Kichaven

1. <u>Designations by the Fallows</u>

(See "Counterdesignations", infra)

--Page 74                                    168

2. <u>Designations by Herbalife</u>

Page 6: lines 7 - 10
Page 7: lines 12 thru page 8: line 5
Page 9: line 3 thru page 23: line 6
Page 24: line 1 thru page 39: line 21
Page 42: line 22 thru page 54: line 25
Page 62: line 24 thru page 66: line 24
Page 73: line 9 thru page 78: line 11
Page 86: line 12 thru page 89: line 4
Page 88: line 24 thru page 89: line 24
Page 64: line 1 thru page 65: line 17
Page 68: lines 8 - 20

3. <u>Counterdesignations by the Fallows</u>

Page 39: line 22 thru page 42: line 21
Page 57: line 20 thru page 58: line 9
Page 68: line 21 thru page 69: line 10
Page 78: line 12 thru page 79: line 21
Page 81: line 23 thru page 83: line 4
Page 90: line 6 thru page 95: line 9

4. <u>Counterdesignations by Herbalife</u>

5. <u>Fallows' Objections to Herbalife's Designations and Counterdesignations</u>

Page 28: line 1 thru 3
        [Plaintiff's objection:  use of word "story."]
Page 29: line 7 thru page 30: line 12
        [Plaintiff's objection:: leading, form of question]
Page 42: line 22 thru page 43: line 8
        [Plaintiff's objection:  leading]
Page 46: line 25 thru page 54: line 25
        [Plaintiff's objection:  foundation; hearsay]

6. <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

K. Deni Linhart

1. <u>Designations by the Fallows</u>

(See "Counterdesignations", infra)

2. <u>Designations by Herbalife</u>

Page 2: lines  22 -24
Page 6: lines 25 - thru page 9: line 1
Page 9: lines 23 - 25
Page 11: lines 1 - 17
Page 12: lines  3 - 7, 15 - thru page 13: lines 8, 13 - 15
Page 12: line 15 thru page 13: line 15

--Page 75                          **169**

3.   <u>Counterdesignations by the Fallows</u>

Page 11: lines 18 thru page 12: line 2
Page 15: line 6 thru page 16: line 18
Page 19: line 20 thru page 21: line 7

4.   <u>Counterdesignations by Herbalife</u>

5.   <u>Fallows' Objections to Herbalife's Designations and Counterdesignations</u>

6.   <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

Page 19: ln. 20 through p. 21: ln. 17
[Objection: relevance; prejudice]

L.   Edmund Lukavics

1.   <u>Designations by the Fallows</u>

(See "Counterdesignations", infra)

2.   <u>Designations by Herbalife</u>

Page 4: lines 7 - 9
Page 12: lines 9 - 19
Page 13: lines 2 - 10
Page 29: lines 6 - 24
Page 58: line 7 thru page 59: line 1

3.   <u>Counterdesignations by the Fallows</u>

Page 12: lines 20 thru page 13: line 1
Page 13: lines 11 thru page 14: line 6
Page 30: lines 11 thru 13
Page 38: line 16 thru page 40: line 9
Page 57: line 15 thru line 25

4.   <u>Counterdesignations by Herbalife</u>

5.   <u>Fallows' Objections to Herbalife's Designations and Counterdesignations</u>

6.   <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

Page 12: ln. 20 through p. 13: ln. 4
[Objection: relevance]
Page 13: ln. 11 through p. 14, ln. 6

--Page 76                        **170**

[Objection: hearsay; lack of foundation; improper character testimony; prejudicial]
Page 38: ln. 16 through page 40: ln. 9
[Objection: lack of foundation; hearsay; relevance; hearsay]
Page 57: lns. 15-25
[Objection: relevance; hearsay]

M.     David Peterman

    1.     Designations by the Fallows

       (See "Counterdesignations", infra)

    2.     Designations by Herbalife

Page 9: lines 10 - 13
Page 15: lines 10 thru page 16: line 1
Page 20: lines 4 - 8
Page 20: lines 12 - 19
Page 30: lines 9 - 11
Page 30:  23 thru page 31: line 14
Page 32: lines 3 thru page 33: line 10
Page 39: lines 6 - 25
Page 47: line 18 thru page 49: line 22
Page 53: line 15 thru page: 56: line 15
Page 57: lines 3 - 15
Page 61: lines 16 – 22
Page 63: lines 6 - 19
Page 65: lines 4 - 12
Page 66: line 11 thru page 69: line 19
Page 74: lines 2 thru page 77: line 6
Page 78: line 3 thru page 79: line 14
Page 81: line 7 thru page 82: line 25
Page 83: lines 17 - 25
Page 87: lines 12 - 17
Page 89: lines 5 thru page 91: line 16
Page 95: line 11 thru page 97: line 10
Page 100: line 19 thru page 101: line 18
Page 102: line 25 thru page 104: line 3
Page 104: line 16 thru 105: line 19
Page 106: line 8 thru page 107: line 9
Page 107:  line 15 thru page 108: line 7+
Page 109: lines 6 - 12
Page 110: line 21 thru page 111: line 21
Page 113: line 17 thru page 116: line 6
Page 119: line 9 thru page 121: line 8
Page 121:  line 16 thru page 122: line 2
Page 124: line 11 thru page 125: line 17
Page 126: line 6 thru page 128: line 15
Page 129: lines 3 - 23
Page 1301: line 24 thru page 135: line 2
Page 138: line 24 thru page 140: line 2
Page 140: line 12 thru page 141: line 12
Page 145: line 13 thru page 146: line 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 147: lines 4 - 8
Page 148: line 17 thru page 150 line 1
Page 150: line 19 thru page 152: line 25
Page 153: lines 12 thru 24
Page 154: lines 8 - 18
Page 155: line 17 thru page 156: line 17
Page 156: line 24 thru page 160: line 20
Page 161: line 12 thru page 162: line 6
Page 163: line 10 - 23
Page 165: line 16 thru page 166: line 22
Page 168: line 25 thru page 171: line 10
Page 173: line 14 thru page 175: line 1
Page 181: line 5 thru page 182: line 3
Page 182:  line 10 thru page 183:  line 3
Page 183:  line 3, line 24 thru page 184: line 11
Page 186: line 14 thru page 189: line 23
Page 191: lines 1 - 22
Page 195:  line 22 thru page 196: line 8
Page 200: line 4 thru page 201: line 4
Page 202: lines 13 – 23
Page 222: line 6 thru page 227: line 6
Page 230: line 20 thru page 232: line 14
Page 243: line 21 thru page 245: line 12
Page 246: line 8 thru page 256: line 4
Page 256: line 22 thru page 268: line 14
Page 268: line 19 thru page 274: line 20
Page 277: lines 6 – 11
Page 283: line 1 thru page 288: line 3

3.   Counterdesignations by the Fallows

Page 16: line 2 thru page 17: line 4
Page 20: line 9 thru page 20: line 12
Page 20: line 20 thru page 21: line 10
Page 31: lines 15 thru 23
Page 33: line 11 thru page 34: line 4
Page 40: lines 1 thru 12
Page 56: line 16 thru page 56: line 24
Page 61: line 23 thru page 63: line 5
Page 64: line 1 thru page 66: line 9
Page 77: line 6 thru page 78: line 2
Page 84: line 1 thru page 85: line 20
Page 87: line 18 thru page 88: line 10
Page 94: line 7 thru page 95: line 10
Page 99: line 11 thru page 100: line 8
Page 101: line 20 thru page 102: line 23
Page 109: line 13 thru page 110: line 20
Page 116: line 7 thru page 119: line 4
Page 123: line 24 thru page 124: line 10
Page 128: line 7 thru page 129: line 1
Page 130: lines 7 thru 23
Page 138: lines 5 thru 18
Page 140: lines 3 thru 11
Page 141: lines 13 thru 19
Page 142: line 17 thru page 144: line 19

Page 153: lines 1 thru 11
Page 162: line 7 thru page 163: line 9
Page 166: line 23 thru page 168: line 4
Page 183: lines 4 thru 9
Page 201: lines 5 thru 22
Page 277: line 21 thru page 279: line 7

4.    Counterdesignations by Herbalife

Page 100: lns. 9-18
Page 183: lns. 10-23

5.    Fallows' Objections to Herbalife's Designations and Counterdesignations

Page 15: lines 10 thru page 16: line 1
     [Plaintiff's objection: relevance]
Page 30:  23 thru page 31: line 14
     [Plaintiff's objection: hearsay]
Page 32: lines 3 thru page 33: line 10
     [Plaintiff's objection: Page 32 lines 15-16: argumentative]
Page 47: line 18 thru page 49: line 22
     [Plaintiff's objection: page 48 line 11: argumentative]
Page 61: lines 16 – 22
     [Plaintiff's objection: relevance]
Page 74: lines 2 thru page 77: line 6
     [Plaintiff's objection: page 74 line 2: hearsay; Page 74 line 25 thru page 76 line 1:
     compound, vague]
Page 78: line 3 thru page 79: line 14
     [Plaintiff's objection: Page 78 line 17: hearsay]
Page 95: line 11 thru page 97: line 10
     [Plaintiff's objection: Page 95 line 11: lacks foundation]
Page 100: line 19 thru page 101: line 18
     [Plaintiff's objection: page 101 line 12: argumentative]
Page 104: line 16 thru 105: line 19
     [Plaintiff's objection: Page 104 line 16: compound]
Page 110: line 21 thru page 111: line 21
     [Plaintiff's objection: Page 110 line 21: hearsay]
Page 126: line 6 thru page 128: line 15
      [Plaintiff's objection: Page 128 lines 1, line 8: vague, compound]
Page 1301: line 24 thru page 135: line 2
     [Plaintiff's objection: Page 133 line 1: hearsay; line 24: hearsay]
Page 138: line 24 thru page 140: line 2
     [Plaintiff's objection: Page 138 line 24: hearsay]
Page 145: line 13 thru page 146: line 1
     [Plaintiff's objection: Page 145 line 13: vague; line 20: vague]
Page 148: line 17 thru page 150 line 1
     [Plaintiff's objection: Page 150 line 1: hearsay]
Page 156: line 24 thru page 160: line 20
     [Plaintiff's objection: Page 157 line 1: hearsay; line 8: hearsay]
Page 168: line 25 thru page 171: line 10
     [Plaintiff's objection: Page 169 line 9: speculation]
Page 181: line 5 thru page 182: line 3
     [Plaintiff's objection: relevance]
Page 183:  line 3, line 24 thru page 184: line 11

--Page 79                           173

[Plaintiff's objection: relevance]
Page 186: line 14 thru page 189: line 23
    [Plaintiff's objection: hearsay]
Page 202: lines 13 – 23
    [Plaintiff's objection: Page 202 line 17: compound]
Page 222: line 6 thru page 227: line 6
    [Plaintiff's objection: Page 222 line 13: argumentative; Page 223 line 1: vague;
    Page 225 line 16 thru page 227 line 6: hearsay]
Page 243: line 21 thru page 245: line 12
    [Plaintiff's objection: hearsay]
Page 246: line 8 thru page 256: line 4
    [Plaintiff's objection: hearsay]
Page 256: line 22 thru page 268: line 14
    [Plaintiff's objection: Page 256 line 22 thru page 263 line 2: hearsay; Page 2674
    line 21: hearsay; Page 265 line 7: hearsay; Page 265 line 14 thru page 268 line 4:
    hearsay]
Page 268: line 19 thru page 274: line 20
    [Plaintiff's objection: hearsay]
Page 277: lines 6 – 11
    [Plaintiff's objection: hearsay]
Page 283: line 1 thru page 288: line 3
    [Plaintiff's objection: hearsay, relevance]

6.    <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

Page 16: ln. 2 through p. 17: ln. 4
[Objection: relevance]
Page 20: ln. 20 through p. 21: ln. 10
[Objection: hearsay]
Page 40: lns. 1-12
[Objection: relevance]
Page 56: ln. 16 through p. 56: ln. 24
[Objection: speculation; lack of foundation]
Page 87: ln. 18 through p. 88: ln. 10
[Objection: hearsay; lack of foundation; improper lay opinion]
Page 99: ln. 11 through p. 100: ln. 8
[Objection: lack of foundation; relevance]
Page 101: ln. 20 through p. 102: ln. 23
[Objection: objected to by plaintiffs' counsel; question withdrawn]
Page 117: ln. 20 through p. 118: ln. 22
[Objection: lack of foundation]
Page 138: lns. 5- 18
[Objection: lack of foundation; hearsay]
Page 140: lns. 3-11
[Objection: relevance]
Page 153: lns. 1-11
[Objection: lack of foundaton]
Page 201: lns. 5-22
[Objection: hearsay; lack of foundation]
Page 277: ln. 21 through p. 279: ln. 7
[Objection: hearsay; this part of designation is an out of court statements of third party
witnesses being played on audiotape]

M.    Michele Peters

--Page 80

1. Designations by the Fallows

   (See "Counterdesignations", infra)

2. Designations by Herbalife

   Page 5: lines 10 - 20
   Page 9: line 12 thru page 12: lines 6
   Page 12: line 18 thru page 16: line 3
   Page 18: line 13 thru page 21: line 13
   Page 22: line 23 thru page 24: line 10
   Page 22: line 17 thru page 28: line 7
   Page 32: line 24 thru page 37: line 16
   Page 38: lines 11 - 21

3. Counterdesignations by the Fallows

   Page 12: lines 7 thru 17
   Page 37: line 17 thru line 23
   Page 38: lines 3 thru 10
   Page 40: line 1 thru page 41: line 10
   Page 46: line 15 thru page 51: line 9
   Page 52: lines 14 thru 18
   Page 53: line 14 thru page 56: line 2
   Page 57: line 5 thru line 18
   Page 60: line 6 thru page 61: line 20
   Page 62: line 17 thru line 24
   Page 66: line 2 thru page 67: line 17
   Page 68: line 11 thru page 70: line 7
   Page 68: line 14 thru page 74: line 14
   Page 75: line 75(?) thru page 79: line 21
   Page 80: line 14 thru line 17

4. Counterdesignations by Herbalife

5. Fallows' Objections to Herbalife's Designations and Counterdesignations

   Page 12: line 18 thru page 16: line 3
        [Plaintiffs objection: hearsay; relevance]
   Page 18: line 13 thru page 21: line 13
        [Plaintiffs objection: Page 12 lines 18-23: vague, assumes facts not in evidence;
        page 13 lines 4-9: vague, assumes facts not in evidence, lacks foundation; page
        18 line 21 thru page 21 line 13: hearsay; Page 18 line 13 thru page 21 line 13:
        relevance]
   Page 22: line 17 thru page 28: line 7
        [Plaintiffs objection: Page 23 line 17 thru page 24 line 10: hearsay;
        relevance;Page 24 line 17 thru page 26 line 18: hearsay; All: hearsay, relevance]
   Page 32: line 24 thru page 37: line 16
        [Plaintiffs objection: Page 32 line 24 thru page 33 line 10: hearsay; relevance;
        Page 36 line 21 thru page 37 line 16: hearsay; relevance;

6. Herbalife's Objections to Fallows' Designations and Counterdesignations

--Page 81

175

Page 12: lns. 12-17
[Objection: relevance]
Page 40: ln. 1 through p. 41: ln. 10
[Objection: relevance, or else add remainder of page]
Page 46: ln. 15 through p. 48: ln. 25
[Objection: relevance; prejudice]
Page 52: lns. 14-18
[Objection: relevance]
Page 53: ln. 14 through p. 54: ln. 15
[Objection: relevance; prejudice]
Page 60: ln. 6 through p. 61: ln. 20
[Objection: relevance]
Page 68: ln. 11 through p. 74: ln. 14
[Objection: relevance]
Page 75: ln. 5 through p. 79: ln. 21
[Objection: relevance]
Page 80: lns. 14-17
[Objection: relevance]

M.   Samuel Peters

   1.   <u>Designations by the Fallows</u>

        (See "Counterdesignations", infra)

   2.   <u>Designations by Herbalife</u>

        Page 5: lines 10 - 12, 16 - 23
        Page 7: line 24 thru page 8: line  17
        Page 10: line 1 thru page 13: line  11

   3.   <u>Counterdesignations by the Fallows</u>

        Page 8: line 18 thru line 25
        Page 10: line 7 thru page 13: line 11
        Page 36: line 5 thru page 37: line 5
        Page 39: line 1 thru page 40: line 4

   4.   <u>Counterdesignations by Herbalife</u>

   5.   <u>Fallows' Objections to Herbalife's Designations and Counterdesignations</u>

        Page 10: line 1 thru page 13: line 11
             [Plaintiff's Objection: page 11 lines 15-16 leading, assumes facts not in evidence;
             page 12 lines 11-14: compound, speculation]

   6.   <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

        Page 39: ln. 1 through p. 40: ln. 4
        [Objection: relevance; hearsay]

--Page 82

M.    John Peterson

     1.    <u>Designations by the Fallows</u>

       (See "Counterdesignations", infra)

     2.    <u>Designations by Herbalife</u>

       Page 4: lines 20 - 21
       Page 8: line 22 thru page 9: line 1
       Page 14: line 11 thru page 15: line 6
       Page 77: line 3 thru page 78: line 16
       Page 79: line 6 thru page 82: line 4
       Page 82: line 17 thru page 83: line 6
       Page 83: line 24 thru page 84: line 5
       Page 84: line 16 thru page 88: line 22
       Page 91: lines 7 - 16
       Page 101: lines 5 - 19
       Page 103: lines 2 - 13
       Page 104: lines 4 - 10
       Page 105: line 19 thru page 106: line 19
       Page 107: line 7 thru page 108: line 13
       Page 109: lines 13 - 22
       Page 112: line 13 thru page 113: line 5
       Page 114: lines 2 - 10
       Page 117: lines 16 - 21
       Page 118: line 17 thru page 119: line 4
       Page 126: line 12 thru page 127: line 6
       Page 126: lines 17 - 22
       Page 149: line 9 thru page 150: line 25
       Page 156: line 23 thru page 158: line 19
       Page 163: line 24 thru page 165: line 13
       Page 170: line 5 thru page 171: line 4
       Page 172: lines 4 - 25
       Page 176: line 13 thru page 179: line 8
       Page 179: line 24 thru page 180: line 7
       Page 183: line 1 thru page 184: line 12
       Page 185: line 23 thru page 186: line 5
       Page 187: lines 1 - 14
       Page 188: lines 13 - 16
       Page 190: line 5 thru page 193: line 14
       Page 194: line 14 thru page 195: line 3
       Page 195: lines 17 – 23
       Page 196: line  15 thru page 197: line  12
       Page 197: line 23 thru page 199: line 23
       Page 200: line 9 thru page 203: line 13
       Page 204: line 21 thru page 206: line 7
       Page 208: line 2 thru page 209: line 4
       Page 210: line  6 thru page 212: line 2
       Page 212: line 21 thru page 213: line 12
       Page 217: line 24 thru page 223: line 6
       Page 235: line 21 thru page 236: line  3
       Page 254: lines 7 – 16
       Page 256: lines 20 thru page 258: line 6
       Page 264: line 17 thru page 266: line  4

3.   Counterdesignations by the Fallows

Page 10 line 19 to line 21
Page 12 line  7 to page 13 line 3
Page 13 line 17 to page 14 line 1
Page 15 line 22 to page 16 to line 11
Page 16 line 20 to page 16 line 11
Page 18 line 17 to line 18
Page 20 line 8 to line 23
Page 20 line 8 to line 23
Page 22 line 1 to line 3
Page 23 line 2 to line 14
Page 24 line 3 to line 21
Page 26 line 1 to line 23
Page 27 line 9 to line 10
Page 30 line 11 to line 13
Page 31 line 2 to line 5
Page 35 line 10 to line 12
Page 37 line 16 to line 23
Page 38 line 22 to page 38 line 2
Page 38 line 22 to page 40 line 2
Page 56 line 9 to line 14
Page 62 line 8 to line 10
Page 64 line 2 to page 65 line 11
Page 63 line 13 to line 24
Page 66 line 7 to page 66 line 18
Page 68 line 16 to line 17
Page 68 line 20 to line 25
Page 70 line 1 to line 20
Page 72 line 2 to line 16
Page 73 line 6 to line 25
Page 76 line 9 to line 23
Page 78 line 23 to line 25
Page 79 line 16 to page 82 line 9
Page 83 line 7 to line 24
Page 90 line 9 to line 21
Page 91 line 20 to line 24
Page 93 line 23 to page 94 line 1
Page 95 line 5 to line 25
Page 96 line7 to line 16
Page. 98 line 11 to line 21
Page 99 line 13 to line 25
Page 109 line 14 to page 110 line 10
Page 113 line 10 to line 17
Page 114 line 20 to line 22
Page 117 line 20 to line 22
Page 117 line 16 to page 118 line 16
Page 122 line 20 to page 123 line 14
Page 123 line 23 to line 25
Page 128 line 6 to line 25
Page 129 line 15 to page 130 line 13
Page 131 line 11 to line 17
Page 133 line 10 to page 134 line 18
Page 137 line 4 to line 18

--Page 84

Page 138 line 5 to page 141 line 6
Page 147 line 3 to line 12
Page 147 line 23 to page 148 line 4
Page 155 line 20 to page 156 line 8
Page 162 line 1 to line 8
Page 167 line 15 to line 23
Page 169 line 11 to line 17
Page 174 line 23 to page 175 line 11
Page 180 line 10 to page 181 line 6
Page 182 line 21 to line 25
Page 195 line 4 to line 16
Page 200 line 1 to line 9
Page 207 line 8 to line 19
Page 215 line 6 to page 217 line 10
Page 224 line 10 to page 227 line 17
Page 228 line 3 to line 10
Page 228 line 13 to page 229 line 20
Page 235 line 3 to line 10
Page 236 line 1 to 238 line 8
Page 238 line 20 to page 240 line 16
Page 241 line 19 to page 244 line 8
Page 244 line 22 to page 245 line 6
Page 246 line 1 to page 247 line 15
Page 249 line 10 to line 21
Page 251 line 11 to page 253 line 12
Page 258 line 7 to line 9
Page 259 line 21 to page 260 page 6
Page 260 line 19 to page 262 line 19

4.   Counterdesignations by Herbalife

Page 37: ln. 24 through p. 38: ln. 9
Page 154: ln. 3 through p. 155: ln. 16

5.   Fallows' Objections to Herbalife's Designations and Counterdesignations

Page 84: line 16 thru page 88: line 22
     [Plaintiffs Objection: Page 85 line 25 thru page 86 line 3: hearsay]
Page 156: line 23 thru page 158: line 19
     [Plaintiff's objection: Page 157 lines 1-3, 11, 20- 24: vague, lacks foundation,
     speculation, lack of personal knowledge]
Page 163: line 24 thru page 165: line 13
     [Plaintiff's objection: Page 164 lines 23-24: lack of personl knowledge,
     compound]
Page 170: line 5 thru page 171: line 4
     [Plaintiff's objection: Page 171 line 3: speculation]
Page 176: line 13 thru page 179: line 8
     [Plaintiff's objection: Page 176 lines 13-16: leading; lines 21-22: vague; Page 178
     lines 20-23: compound, speculation]
Page 185: line 23 thru page 186: line 5
     [Plaintiff's objection: Page 186 lines 1-5: non-responsive answer]
Page 190: line 5 thru page 193: line 14
     [Plaintiff's objection: Page 190 line 5: leading; Page 193 lines 2-14: relevance]

Page 195: lines 17 – 23
    [Plaintiff's objection: relevance]
Page 197: line 23 thru page 199: line 23
    [Plaintiff's objection: Page 198 lines 2-7: hearsay; line 20: vague,
    mischaracterizes evidence, misleading; Page 199 lines 6-10: compound, calls for
    legal conclusion]
Page 200: line 9 thru page 203: line 13
    [Plaintiff's objection: relevance]
Page 204: line 21 thru page 206: line 7
    [Plaintiff's objection: page 201 lines 21-24: leading; Page 205 lines 8-11:
    compound; Page 205 line 14 thru page 206 line 7: hearsay]
Page 208: line 2 thru page 209: line 4
    [Plaintiff's objection: Page 208 lines 2-6: compound]
Page 210: line  6 thru page 212: line 2
    [Plaintiff's objection: Page 210 line 14 thru page 211 line 1: hearsay, confusing,
    compound]
Page 212: line 21 thru page 213: line 12
    [Plaintiff's objection: relevance]
Page 217: line 24 thru page 223: line 6
    [Plaintiff's objection: Page 219 line 25 thru page 220 line 13: relevance; page 221
    line 9 thru page 222 line 6: non-responsive; Page 223 lines 1-6: non-responsive.
Page 254: lines 7 – 16
    [Plaintiff's objection: Page 254 lines 9-16: hearsay, lack of personal knowledge]
Page 256: lines 20 thru page 258: line 6
    [Plaintiff's objection: Page 256 lines 21-25: lack of personal knowledge, hearsay]
Page 264: line 17 thru page 266: line  4
    [Plaintiff's objection: relevance]

    6.   <u>Herbalife's Objections to Fallows' Designations and Counterdesignations</u>

Page 10: lns. 19-21
[Objection: relevance]
Page 12: ln. 7 through p. 13: ln. 3
[Objection: relevance]
Page 13: ln. 17 through p. 14 ln. 1
[Objection: relevance; contains only partial answer to question -- answer continues to ln.
7]
Page 15: ln. 22 through p. 16: ln. 11
[Objection: relevance; contains only partial answer — answer continues on to ln. 19]
Page 16: ln. 20 through p. 16: ln. 11
[Objection: relevance; speculation; contains only partial answer — answer continues
through p. 17, ln. 24]
Page 18: lns. 17-18
[Objection: relevance; lack of foundation; speculation; contains only partial answer to
question asked]
Page 20: lns. 8-23
[Objection: relevance; lack of foundation; speculation; contains only partial answer to
question asked]
Page 22: lns. 1-3
[Objection: relevance; lack of foundation; speculation; contains only partial answer to
question asked]
Page 23: lns. 2-14
[Objection: relevance; lack of foundation; speculation; contains only partial answer to

question asked]
Page 24: lns. 3-21
[Objection: relevance; lack of foundation; speculation]
Page 26: lns.1-23
[Objection: relevance; lack of foundation]
Page 27: lns. 9-10
[Objection: relevance; incomplete answer — witness' full answer continues through ln. 21]
Page 30: lns. 11-13
[Objection: relevance]
Page 31: lns. 2-5
[Objection: relevance; incomplete designation]
Page 35: lns. 10-12
[Objection: relevance]
Page 38: lns. 22 through p. 38: ln. 2
[Objection: unintelligible and incomplete designation]
Page 38: ln. 22 to page 40: ln. 2
[Objection: relevance; lack of foundation; designation ends in middle of a question]
Page 56: lns. 9-14
[Objection: lack of foundation; contains only partial answer — answer continues through line 16]
Page 64: ln. 2 through p. 65: ln. 11
[Objection: relevance]
Page 63: lns. 13-24
[Objection: relevance, designation starts with witness' answer - incomplete designation]
Page 66: lns. 7-18
[Objection: lack of foundation]
Page 68: lns. 16-17
[Objection: relevance; lack of foundation; designation starts with witness' answer]
Page 70: lns. 1-20
[Objection: relevance; lack of foundation; designation starts with witness' answer]
Page 72: lns. 2-16
[Objection: relevance, lack of foundation; designation
Page 73: lns. 6-25
[Objection: relevance; contains only partial answer — answer continues through p. 74: ln. 2]
Page 76: lns. 9-23
[Objection: relevance; incomplete designation]
Page 78: lns. 23-25
[Objection: relevance; designation starts in middle of witness' answer]
Page 90: lns. 9-21
[Objection: relevance: designation starts in middle of witness' answer]
Page 91: lns. 20-24
[Objection: relevance; incomplete designation of answer]
Page 93: ln. 23 through p. 94: ln. 1
[Objection: relevance; incomplete designation of question]
Page 95: lns. 5-25
[Objection: relevance; incomplete designation of question]
Page 96: lns. 7-16
[Objection: relevance]
Page 98: lns. 11-21
[Objection: relevance]
Page 109: ln. 14 through p. 110: ln. 10
[Objection: incomplete designation; witness' answer continues through p. 110, ln. 12]
Page 113: lns. 10-17

--Page 87

**181**

[Objection: relevance; incomplete designation; question not designated ]
Page 114: lns. 20-22
[Objection: incomplete designation; witness' answer continues through p. 115, ln. 5]
Page 122: ln. 20 through p. 123: ln. 14
[Objection: incomplete designation; witness' answer continues through ln. 18]
Page 123: lns. 23-25
[Objection: incomplete designation; only question marked]
Page 128: lns. 6-25
[Objection: incomplete designation; starts with answer and ends in middle of another answer]
Page 133: ln. 10 through p. 134: ln. 18
[Objection: relevance]
Page 138: ln. 5 through p. 141: ln. 6
[Objection: relevance; hearsay]
Page 147: lns. 3-12
[Objection: lack of foundation; speculation; improper opinion]
Page 147: ln. 23 through p. 148: ln. 4
[Objection: lack of foundation; witness admits speculating in answer]
Page 167: lns. 15-23
[Objection: incomplete designation; no answer designated]
Page 174: ln. 23 through p. 175: ln. 11
[Objection: lack of foundation]
Page 180: ln. 10 through p. 181: ln. 6
[Objection: lack of foundation]
Page 182: lns. 21-25
[Objection: lack of foundation]
Page 200: lns. 1-9
[Objection: lack of foundation; incomplete designation]
Page 207: lns. 8-19
[Objection: unintelligible and incomplete designation]
Page 215: ln. 6 through p. 217: ln. 10
[Objection: unintelligible and incomplete designation]
Page 236: ln. 1 through p. 238: ln. 8
[Objection: relevance; lack of foundation]
Page 238: ln. 20 through p. 240: ln. 16
[Objection: lack of foundation]
Page 241: ln. 19 through p. 244: ln. 8
[Objection: relevance]
Page 244: ln. 22 through p. 245: ln. 6
[Objection: speculation; lack of foundation]
Page 246: ln. 1 through p. 247: ln. 15
[Objection: relevance]
Page 249: lns. 10-21
[Objection: incomplete designation]
Page 251: lns. 11 through p. 253: ln. 12
[Objection: hearsay; lack of foundation; speculation]
Page 259: ln. 21 through p. 260: ln. 6
[Objection: speculation; lack of foundation]

M.   Susan Peterson

    1.   <u>Designations by the Fallows</u>

        (See "Counterdesignations", infra)

--Page 88                                    **182**

2.   Designations by Herbalife

Page 4: lines 20 - 21
Page 12: lines 3 - 5
Page 12: line 25 thru page 13: line 20
Page 16: line 4 thru page 18: line 9
Page 21: line 23 thru page 26: line 18
Page 42: lines 16 thru page 43: line 24
Page 46: lines 21 thru page 48: line 16
Page 49: line 8 thru page 64: line 3
Page 65: line 7 thru page 67: line 2
Page 67: line 21 thru page 79 line 8
Page 94: line 24 thru page 96: line 4

3.   Counterdesignations by the Fallows

Page 12 line 5 to line 24
Page 15 line 3 to page 16 line 4
Page 18 line 10 to line page 19 line 2
Page 29 line 10 to page 32 line 21
Page 33 line 11 to page 34 line 5
Page 44 line 9 to page 34 line 5
Page 44 line 9 to line 25
Page 58 line 8 to line 24
Page 64 line 5 to line 10
Page 67 line 3 to line 12
Page 81 line 13 to page 82 line 8
Page 84 line 10 to line 20
Page 86 line 8 to line 17
Page 87 line 1 to line 8
Page 87 line 12 to page 88 line 7
Page 88 line 10 to line 25
Page 89 line 19 to line 7
Page 90 line 8 to page 91 line 9 .
Page 91 line 14 to line 15
Page 92 line 7 to 14
Page 92 line 18 to page 93 line 3
Page 93 line 17 to page 94 line 12

4.   Counterdesignations by Herbalife

Page 34: lns. 6-22
Page 93: lns. 4-16

5.   Fallows' Objections to Herbalife's Designations and Counterdesignations

Page 42 line 20 to page 43 line 20 leading, lacks foundation
Page 45 line 17 to page 46 line 6 leading, lacks foundation, compound questions
Page 46 line 21 to line 25 leading, lacks foundation
Page 47 line 1 to page 48 line 17 leading, lacks foundation
Page 50 line 6 to line 9: relevance, leading, lacks foundation
Page 50 line 8 to page 51 line 1: relevance, leading, lacks foundation
Page 51 line 2 to line 18 relevance, leading, lacks foundation
Page 52 line 19 to page 53 line 1: relevance, hearsay
Page 53 line 13 to line 18: relevance, lacks foundation

Page 53 line 19 to line 23: leading, lacks foundation
Page 59 line 15 to line 23: leading, lacks foundation, compound question
Page 60 line 22 to page 61 line 2: leading, lacks foundation, compound questions
Page 63 line 20 to page 64 line 6: leading, lacks foundation, compound questions
Page 65 line 18 to line 25: leading, lacks foundation, compound questions
Page 66 line 21 to line 23: leading; lacks foundation, hearsay
Page 69 line 17 to line 24: leading, lacks foundation
Page 71 line 13 to 1 7: leading, lacks foundation
Page 73 line 18 to 1 9: leading, lacks foundation
Page 75 line 5 to page 76 line 2: leading, lacks foundation
Page 76 line 14 to line 25: leading, lacks foundation
Page 77 line 6 to line 14: leading, lacks foundation
Page 94 line 24 to page 95 line 7: leading, lacks foundation
Page 95 line 8 to page 96 line 4: leading, lacks foundation

6.  Herbalife's Objections to Fallows' Designations and Counterdesignations

Page 12: lns. 5-24
[Objection: lack foundation; speculation]
Page 15: ln.3 through p. 16: ln. 4
[Objection: relevance; speculation]
Page 18: ln. 10 through p. 19: ln. 2
[Objection: lacks foundation; speculation]
Page 44: ln. 9 through p. 34: ln. 5
[Objection: unintelligible and incomplete designation]
Page 44: lns.9-25
[Objection: incomplete designation; leaves off in middle of question]
Page 86: lns.8-17
[Objection: incomplete designation; answer continues through ln. 20]
Page 87: lns. 1-8
[Objection: relevance]
Page 88: lns. 10-25
[Objection: relevance]
Page 89: lns. 19-7
[Objection: incomplete designation]
Page 90: ln. 8 through p. 91: ln. 9
[Objection: lack of foundation; speculation]
Page 91: lns. 14-15
[Objection: lack of foundation; speculation]
Page 94: lns. 2-12
[Objection: lack of foundation; speculation]

R.  Kirk Scherer

1.  Designations by the Fallows

Page 11: line 10 thru line 16
Page 12: line 1 thru Page 13: line 4
Page 17:line 6 thru Page 18 line 13
Page 21:line 15 thru Page 22: line 3
Page 29:line 8 thru line 19
Page 31:line 1thru line 8
Page 35:line 12 thru Page 36: line 2
Page 37: line 15 thru Page 40:line 21
Page 53:line 14 thru line 18

Page 56:line 12 thru Page 57: line 18
Page 65:line 8 thru Page 66: line 8
Page 68: line 12 thru Page 69: line 14
Page 74:line 6 thru Page 76: line 25
Page 77: line 19 thru Page 81: line 14
Page 82:line 6 thru Page 83: line 17
Page 84:line 11thru Page 86: line 8
Page 87:line 11 thru Page 88 line 6
Page 89:line 5 thru line 11
Page 91:line 1 thru Page 92: line 4
Page 93:line 17 thru Page 94: line 7
Page 100: line 5 thru Page 101: line 13
Page 105: line 14 line 23

2.  Designations by Herbalife

Page 4: lines 15 - 17
Page 11: lines 10 - 14
Page 19: lines 18 - 22
Page 20: line 8 thru page 21: line  4
Page 22: lines 5 - 9
Page 26: lines 11 - 15
Page 34: line 14 thru page 35: line 10
Page 37: lines 2 - 6
Page 53: line 14 thru page 54: line 7
Page 92: line  23 thru page 94: line 7

3.  Counterdesignations by the Fallows

(See "Designations", supra)

4.  Counterdesignations by Herbalife

Page 18: ln. 9 through p. 19: ln. 1
Page 29: line 20 through page 30: line1
Page 104: line 24 through page 105: line 12

5.  Fallows' Objections to Herbalife's Designations and Counterdesignations

Page 19: lines 18 - 22
    [Plaintiff's objection: Page 19 lines 18-21: vague]
Page 26: lines 11 - 15
    [Plaintiff's objection: page 26 lines 11-14: assumes facts not in evidence]
Page 34: line 14 thru page 35: line 10
    [Plaintiff's objection: page 34 line 18: vague, calls for speculation; page 34 line
    22: vague, compound question]]
Page 53: line 14 thru page 54: line 7
    [Plaintiff's objections: page 53 lines 19-20: vague, calls for speculation]

6.  Herbalife's Objections to Fallows' Designations and Counterdesignations

Page 21 line 15 thru Page 22: line 3
[Objection: hearsay]
Page 31: line 1 thru line 8
[Objection: incomplete designation; question not designated]

--Page 91                          **185**

Page 56: line 12 thru Page 57: line 18
[Objection: lack of foundation; speculation]
Page 65: line 8 thru Page 66: line 8
[Objection: relevance; attorney argument]
Page 68: line 12 thru Page 69: line 14
[Objection: relevance; attorney argument]
Page 74: line 6 thru Page 76: line 25
[Objection: relevance]
Page 77: line 19 thru Page 81: line 14
[Objection Page 77: line 19 through Page 78: lack of foundation]
Page 82: lines 6 thru 17
[Objection: hearsay]
Page 84: line 1 thru Page 86: line 8
[Objection: relevance; prejudice]
Page 87: line ll thru Page 88: line 6
[Objection: hearsay; lack of foundation; speculative]
Page 89: line 5 thru line 11
[Objection: unintelligible and incomplete designation; references only
attorney discussion on record]
Page 91: line 1 thru Page 92: line 4
[Objection: hearsay; lack of foundation; speculative]
Page 105: line 14 line 23

RESPECTFULLY SUBMITTED this _____ day of October, 1998.

WARNICKE & LITTLER, P.L.C.

By_____
      Thomas E. Littler
      2020 N. Central Ave, Fifth Floor
      Phoenix, Arizona 85004
      Attorneys for Plaintiffs and Counterdefendants

PAUL, HASTINGS, JANOFSKY & WALKER L.L.P.

By _____ ,
      Matthew A. Hodel
      Sean A. O'Brien
      695 Town Center Drive, 17th Floor
      Costa Mesa, CA 92626
      Attorneys for Defendants and Counterclaimants

SNELL & WILMER, L.L.P.

By _____
      Joel P. Hoxie
      Craig Marquiz
      One Arizona Center
      Phoenix, Arizona 85004-0001

--Page 92

**ORIGINAL** of the foregoing
hand delivered this _____
day of October, 1998, to

The Honorable William B. Schafer, III
Judge of the Superior Court
201 W. Jefferson
Phoenix, Arizona 85003

**COPY** of the foregoing mailed/
hand delivered/telefaxed this
_____ day of October, 1998,
to:

Robert Shely, Esq.
Bryan Cave
Two N. Central Ave., Ste. 2200
Phoenix, Arizona 85004
Attorneys for Rileys

By _____

# EXHIBIT "A"

JOINT TRIAL EXHIBIT LIST

| Plaintiffs' codes: | Defendants' codes: | |
|---|---|---|
| V=vague reference | F=foundation | M=pending mtn |
| R=relevance | R=relevance | P=prejudice |
| H=hearsay | C=improper character evidence | |
| F=foundation | H=hearsay | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| | **Deposition' Exhibits 1 - 299** | | |
| 1 | 04/11/97 facsimile transmission and letter from Sean O=Brien to Thomas E. Littler | R, H | |
| 2 | 04/28/97 facsimile transmission and 04/22/97 letter from Sean A. O=Brien to Thomas E. Littler | R, H | |
| 3 - 12 | [Exhibits intentionally left blank.] | | |
| 13 | Herbalife Career Book; 1986 version | | R |
| 14 | 05/25/95 sworn statement signed by Dave and Sharon Peterman | H | |
| 15 | 12/12/91 Hawaii Certificate of Marriage re Mary Fallow and Dan Fallow | R, F, H | |
| 16 | 04/22/84 Herbalife Distributorship Application signed by Clint S. Fallow | | |
| 17 | 11/15/86 Herbalife Distributor Application for Clint S. Fallow | | |
| 18 | 12/31/86 Herbalife Supervisor=s Application for Clint S. Fallow | | |
| 19 | 1991 U.S. Tax Return for Clint S. Fallow | R | |
| 20 | [Exhibit intentionally left blank.] | | |
| 21 | 04/08/91 Herbalife Distributorship Application for Daniel S. Fallow | | |
| 22 | 05/17/91 Herbalife Distributorship Application for Kurt Ketzer | | |
| 23 | 1991 U.S. Tax Return for Dan and Mary Fallow | R | |
| 24 | Nuvo Riche Annual Report and Certificate of Disclosure for year ending 12/31/91 | | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 25 | 1991 U.S. Tax Return for S Corporation Nuvo Riche | R | |
| 26 | 04/16/92 Herbalife Distributorship Application for C. S. Fallow (signed by Dave Peterman) | | |
| 27 | 04/30/92 Supervisor Application for C. S. Fallow (signed by Dave Peterman) | | |
| 28 | 11/23/92 Change of Address form re C. S. Fallow distributorship | | |
| 29 | 01/16/89 Divorce Decree re Mary Fallow and Daniel Fallow | | |
| 30 | [Exhibit intentionally left blank.] | | |
| 31 | 06/30/94 letter from Jackie Hartman, Herbalife, to Dave Peterman re dual distributorship penalty | | |
| 32 | 07/28/94 letter from James C. Bartlett, Hash, O=Brien & Bartlett, to David Addis | | |
| 33 | 07/17/94 draft letter facsimile transmission from J. Bartlett to D. Peterman | | |
| 34 | 07/18/94 inter-office correspondence from C. Hannah to Holoit and Scala | | |
| 35 | 04/27/94 handwritten letter from Dan to Dave | | |
| 36 | Executed Agreement (undated) among P. Goodwin, M. Garbenfeldt, C. Frick, D. Fallow and K. Kristensen | | |
| 37 | 08/13/95 fax from C. Frick to J. Bolsover with attached letter dated 04/10/94 | F, H, R | |
| 38 | 04/10/94 letter from C. Frick to M. Hughes | F, H, R | |
| 39 | 08/13/95 fax from C.Frick to J. Bolsover (5-page version) | F, H. R | |
| 40 | 08/13/95 fax from C. Frick to J. Bolsover (9-page version) | F, H, R | |
| 41 | 05/02/93 letter from M. Hyldgaard to J. Rohn; attached is handwritten letter to Dan Fallow | | |
| 42 | Transcript of first audiotaped telephone conversation between D. Fallow and D. Peterman; and D. Addis and D. Peterman (April 1996) | F, H, | |

-- Page 2

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 43 | Transcript of second audiotaped telephone conversation between D. Fallow and D. Peterman (April 1996) | F, H | |
| 44 | 04/29/97 Amended Complaint | | |
| 45 | [Exhibit intentionally left blank.] | | |
| 46 | 12/17/92 Signature Card for account at First Interstate Bank of Idaho - Clint Fallow, Dan Fallow and Mary Fallow | | |
| 47 - 49 | [Exhibits intentionally left blank.] | | |
| 50 | CBSI New Employee Checklist for Clint Fallow | R | |
| 51 | [Exhibit intentionally left blank.] | | |
| 52 | 04/25/92 Herbalife Distributorship Application signed by C. S. Fallow (signed by Clint Fallow) | | |
| 53 | 01/22/93 Tabulator Team Production Bonus Application for C. S. Fallow (signed by Clint Fallow) | | |
| 54 | [Exhibit intentionally left blank.] | | |
| 55 | Arizona State University transcripts for Clint Fallow | R | |
| 56 | 08/00/93 letter from Clint Fallow to Dan Fallow | R | |
| 57 | 07/06/94 letter from J. Hartman to C.S. Fallow re dual distributorship penalty | | |
| 58 | 04/18/94 Memorandum from J. Hartman to C. Hannah re dual distributorship investigation | | |
| 59 | 05/09/94 (mis-dated) inter-office correspondence from J. Hartman to M. Hughes re dual distributorship investigation | | |
| 60 | 05/23/94 Memorandum from J. Hartman to S. Faulkner and C. Hannah re dual distributorship investigation | | |
| 61 | Transcript of audiotaped telephone conversation between Dan Fallow and Mark Hughes (June 1994) | F | |
| 62 | First page of 01/16/89 Decree of Divorce re Mary Fallow and Dan Fallow sent to Jackie Hartman | | |
| 63 | Herbalife International Royalty Override/Ten Customer | | |

-- Page 3

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| | Documentation Form for C.S. Fallow dated 12/01/93 | | |
| 64 | 07/06/94 Fax from Dan Fallow to Bill (Gillespie) | | |
| 65 | 09/09/94 fax from Dan Fallow to Bill (Gillespie) | | |
| 66 | 03/16/95 letter from J. White, Shutts & Bowen, to D. Addis | F, H, R | |
| 67 | 05/03/95 letter from J. White to D. Addis | F, H, R | |
| 68 | 03/10/95 letter from Dan Fallow to D. Addis | | |
| 69 | 1992 U.S. Tax Return for Clint S. Fallow | R | |
| 70 | 1993 U.S. Tax Return for Clint S. Fallow | R | |
| 71 | 1995 U.S. Tax Return for Clint S. Fallow | R | |
| 72 | Herbalife Form 1099 for Clint Fallow for years 1992 – 1995 | | |
| 73 | Contract of Sale re Clint Steven Fallow dated 09/14/91 | | |
| 74 | [Exhibit intentionally left blank.] | | |
| 75 | 03/11/92 Assignment of Lien re promissory note executed by Clint S. Fallow | | |
| 76 | 04/27/94 Notice of Substitution of Trustee re trust deed executed by Clint S. Fallow | | |
| 77 | Notice of Trustee=s Sale dated 05/11/94 | | |
| 78 | Trustee=s Deed dated 08/17/94 | | |
| 79 | 08/29/94 letter from Department of Veterans Affairs to Clint Fallow | | |
| 80 | [Exhibit intentionally left blank.] | | |
| 81 | First Interstate Bank statements re account for Clint Fallow and Mary Fallow - account no. 14-097511; 02/03/93 - 12/04/96 | R | |
| 82 | Wells Fargo Bank statements re account for Clint Fallow and Mary Fallow - account no. 14097511; 11/08/96 - 12/16/96 | R | |
| 83 | Panhandle State Bank statements re account for Mary | R | |

-- Page 4

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| | Fallow - account no. 1042986; 12/18/92 - 10/18/96 | | |
| 84 | Bank of America bank statement for Daniel S. Fallow and All American Health & Nutrition, 09/30/94 - 11/29/94 and 07/12/96 - 08/12/96 | R | |
| 85 | Herbalife royalty checks from Germany payable to C.S. Fallow distributorship (1993 - 1995) | | |
| 86 | Herbalife royalty checks from Germany payable to C.S. Fallow distributorship (1993) | | |
| 87 | Herbalife royalty checks from England payable to C.S. Fallow (1993 - 1995) | | |
| 88 | Herbalife U.S. royalty checks payable to C.S. Fallow | | |
| 89 | Herbalife U.S. royalty checks payable to C.S. Fallow | | |
| 90 | Herbalife U.S. royalty checks payable to C.S. Fallow | | |
| 91 | Herbalife U.S. royalty checks payable to C.S. Fallow | | |
| 92 | Herbalife U.S. royalty checks payable to C.S. Fallow | | |
| 93 | Herbalife print-outs re product orders made by C.S. Fallow distributorship | | |
| 94 | Plaintiffs= Initial Disclosure Statement dated 10/07/96 | | |
| 95 | 10/27/93 ANC forms, ARequest for Technical Assistance≅ | | |
| 96 | 12/22/93 Handwritten letter from Dan and Craig to Kent Kristensen | | |
| 97 - 99 | [Exhibits intentionally left blank.] | | |
| 100 | 10/28/86 Resignation Statement signed by Ed and Tonni Lukavics | | |
| 101 | [Exhibit intentionally left blank.] | | |
| 102 | 01/19/88 letter from Dan and Mary Fallow to Herbalife re Ed Lukavics dual distributorship | R | |
| 103 | [Exhibit intentionally left blank.] | | |
| 104 | 02/17/88 Herbalife dual distributorship finding re Ed Lukavics | R | |

-- Page 5

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 105 | [Exhibit intentionally left blank.] | | |
| 106 | 08/08/96 affidavit signed by Mary Fallow | | |
| 107 | [Exhibit intentionally left blank.] | | |
| 108 | 09/26/87 Marriage Certificate for Dan and Mary Fallow | R | |
| 109 | 04/13/84 Herbalife Distributorship Agreement signed by Dan and Mary Fallow | | |
| 110 | Decree of Dissolution of Marriage, Judgment against Daniel S. Fallow and Judgment Lien, dated 07/10/87 re Dan and Melinda Fallow | R, F | |
| 111 | Trial Memorandum of Respondent-Wife Melinda K. Fallow, dated 01/19/87 | R, F, H | |
| 112 | Court of Appeals Memorandum Decision re Appeal from Superior Court of Maricopa County Cause No. DR-191532, re Melinda Fallow and Dan Fallow, dated 05/24/88 | R, F, H | |
| 113 | Complaint filed in Maricopa County Superior Court, Case No. CV 87-38811, re Dan Fallow v. Arnett Cab Service, dated 12/30/87 | R, F, H | |
| 114 | Amended Complaint filed in Maricopa County Superior Court, Case No. CV 87-38811, re Dan Fallow v. Arnett Cab Service, dated 10/27/89 | R, F, H | |
| 115 | Reporter=s Transcript of Proceedings, Maricopa County Superior Court Case No. CV 87-38811, re Dan Fallow v. Arnett Cab Service, dated 09/26/89: Trial Testimony of Mary Lynn Fallow | R, H | |
| 116 | [Exhibit intentionally left blank.] | | |
| 117 | Herbalife Distributor Applications signed up by Dan Fallow in 12/97 | | |
| 118 | Herbalife Distributorship Application for Kathy McCrea dated 10/31/88 | R, F | |
| 119 | Herbalife Distributorship Application for Carmen Alvarez dated 05/05/89 | R, F | |
| 120 | Herbalife Distributorship Application for Antonio Guzman dated 05/15/89 | R, F | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 121 | Hotel Prim (Mexico) receipts, dated May and June 1989 | R, F | |
| 122 | 07/08/89 receipts for video rental at Century Video (Mexico) | R, F | |
| 123 | Hotel Emporio (Mexico) receipt, dated July 1989 | R, F | |
| 124 | United Airlines ticket and boarding passes for Mary Fallow re travel between Spokane, WA and Mexico City | R, F | |
| 125 | United Airlines tickets for Dan and Mary Fallow from Mexico City to Spokane, WA dated 08/28/89 | R, F | |
| 126 | Herbalife Distribution Application for Pat Lewis dated 12/25/89 | R, F | |
| 127 | Herbalife Distribution Applications for: Laurie Greene dated 05/---/91; Gae Greene dated 06/27/91; Kurt Ketzer dated 05/12/91; Richard Harp dated 05/14/91; Lynn MacDonald dated 05/19/91; Terri Stalls dated 05/15/91 | R, F | |
| 128 | 03/24/92 letter from Dan Fallow to Carol Hannah, Herbalife, re complaint about Rileys | | |
| 129 | 03/29/93 letter from Mary Fallow ATo whom it may concern≅ re complaint about Rileys | | |
| 130 | 03/22/94 letter from Mary Fallow to David Addis re Rileys | | |
| 131 -132 | [Exhibits intentionally left blank.] | | |
| 133 | 04/07/92 Distributor Contact Sheet containing handwritten notes by Jackie Fisher re telephone conversation with Dan Fallow re Rileys | F, H | |
| 134 | Herbalife Distributor Application for Deni Linhart dated 06/29/92 | R | |
| 135 | Herbalife Distributor Application for Vicki Atkins dated 09/10/92 | R | |
| 136 | [Exhibit intentionally left blank.] | | |
| 137 | Herbalife Distributor Application for Cindy Welker dated 12/14/85 | R, F | |
| 138 | Herbalife Distributor Application for Carol Dreier dated 07/27/86 | R, F | |
| 139 | AThe Bulletin Board≅ from Spud Press for the weeks of | R, F, H | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| | 06/17/96; 07/01/96; and 07/15/96 | | |
| 140 | Petition to Modify Divorce Decree filed 01/23/90 by Dan Fallow re marriage of Dan Fallow and Melinda Fallow with Exh. A - C | R | |
| 141 | Complaint for Divorce filed 12/14/89 re marriage Mary Lynn Fallow and Dan Fallow | R | |
| 142 | Acceptance of Service dated 12/19/88 re marriage of Mary Lynn Fallow and Dan Fallow | R | |
| 143 | Affidavit of Default filed 01/16/89 re marriage of Mary Lynn Fallow and Dan Fallow | R | |
| 144 | Deed filed 11/29/88 re property at 4355 Pine Street Loop, Sandpoint, Idaho sold to Dan and Mary Fallow | R | |
| 145 | Deed of Trust filed 11/29/88 re property at 4355 Pine Street Loop, Sandpoint, Idaho | R | |
| 146 | 11/15/88 Residential Loan Application executed by Mary Fallow and Dan Fallow | R | |
| 147 | Decree of Divorce filed 01/19/89 re marriage of Mary Lynn Fallow and Dan Fallow | | |
| 148 | Bill of Sale dated 04/16/90 re Dan Fallow transfer of 25% of Herbalife income to Mary Lynn Fallow | | |
| 149 | 10/26/89 Home Insulation Promissory Note and Mortgage for borrowers Dan and Mary Fallow | R | |
| 150 | Plaintiff=s Answers to Non-Uniform Interrogatories dated 06/16/89 re matter of Dan Fallow v. Arnett Cab Service, et al. | R | |
| 151 | 04/25/94 letter from John and Susan Peterson to Mark Hughes re dual distributorship | | |
| 152 | 12/07/87 Letter to Herbalife Records Department from Dan Fallow and Mary Fallow | | |
| 153 | 01/14/91 Tabulator Team Production Bonus Application signed by Mary L. Fallow | | |
| 154 | Herbalife Ethical Distributor Practices sent out 12/94 | | |
| 155 | Herbalife print-outs re orders placed by Mary Fallow distributorship | | |
| | | | |

-- Page 8

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 156 | Herbalife International Deutschland product order forms and receipt for products re Mary Fallow distributorship; 06/08/92 Herbalife Distributorship Application form for Reinhold Schmidt | F, R, H | |
| 157 | 02/18/92 Herbalife International AKreditnota≅ for products sold re Mary Fallow distributorship | F, R, H | |
| 158 | Herbalife German royalty checks payable to Mary Fallow distributorship between 1992 and 1996 | F, R, H | |
| 159 | Notice of Filing Original Verification of Amended Complaint dated 07/24/97 re Clint S. Fallow, et al. v. Herbalife International, Inc., et al.; Maricopa County Superior Court Case No. CV 96-03558 | F, R, H | |
| 160 | 06/30/94 letter from Jackie Hartman, Herbalife, to Dan Fallow re dual distributorship penalty | | |
| 161 | [Exhibit intentionally left blank.] | | |
| 162 | Avis Rent a Car rental agreement dated 02/22/93 for Craig Frick | F, R, H | |
| 163 | 11/02/93 letter from Dorothy Harvilik, ANC, to Dan Fallow with enclosure | | |
| 164 | 11/16/93 letter from Dan Fallow to Andy (sic)  Dieter | | |
| 165 | 12/09/93 facsimile transmission to ANC from Dan Fallow | | |
| 166 | 12/14/93 Confidentiality Agreement between Dan Fallow and ANC | R | |
| 167 | 12/13/93 facsimile transmission from Dan Fallow to ANC | | |
| 168 | 01/04/94 ANC Requests for Further Project Work for Dan Fallow | R, H, F | |
| 169 | 02/09/94 facsimile transmission from Dan Fallow to Jackie Hartman enclosing fax from Craig Frick to Dan Fallow re resignation from HEG | H, F, R | |
| 170 | Articles of Incorporation of Nuvo Riche, Inc. dated 01/11/85 | R | |
| 171 | 1985 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 172 | 1987 U.S. Income Tax Return for Dan and Mary Fallow | R | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 173 | 1987 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 174 | 1988 U.S. Income Tax Return for Dan and Mary Fallow | R | |
| 175 | 1988 Arizona State Corporation Commission Annual Report and Certificate of Disclosure for Nuvo Riche, Inc. | R | |
| 176 | 1989 Arizona State Corporation Commission Annual Report and Certificate of Disclosure for Nuvo Riche, Inc. | R | |
| 177 | 1990 U.S. Income Tax Return for Dan and Mary Fallow | R | |
| 178 | 1991 U.S. Income Tax Return for Dan and Mary Fallow (duplicate of 23) | R | |
| 179 | 1991 U.S. Income Tax Return for Nuvo Riche, Inc. (duplicate of 25) | R | |
| 180 | 1992 U.S. Income Tax Return for Dan and Mary Fallow | R | |
| 181 | 1992 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 182 | 1993 U.S. Income Tax Return for Dan and Mary Fallow | R | |
| 183 | 1993 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 184 | 1995 U.S. Income Tax Return for Dan and Mary Fallow | R | |
| 185 | 1995 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 186 | Western Savings business signature card for Dan and Mary Fallow dba Picture Perfect Art dated 05/19/90 | R | |
| 187 | Bank of America bank statement for Dan and Mary Fallow dba Picture Perfect Art for period 01/23/93 - 02/19/93 | R | |
| 188 | Bank of America bank statement for Dan and Mary Fallow dba Picture Perfect Art for period 07/22/94 - 08/18/94 | R | |
| 189 | Panhandle State Bank bank statement for Health and Body Builders and Mary Fallow for periods 12/01/95 - 11/29/96 | R | |
| 190 | Herbalife U.S. royalty checks payable to Mary Fallow (endorsed by Dan Fallow) | | |
| 191 - 193 | [Exhibits intentionally left blank.] | | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 194 | 02/10/90 Letter from Jim and Bobbie Kugeler to ADear Distributor≅; attached is copy of envelope addressed to Herbalife | | H,F,R |
| 195 | 10/28/86 Statement signed by Ed Luakvics | | |
| 196 | Genesis 2000 brochure | | |
| 197 | Excerpt from 10/85 Herbalife Journal re Lukavics family | | R,H,F |
| 198 | Copy of photograph of Herbalife distributors, including Tonni Lukavics, Ed Lukavics, Mary Fallow and Dan Fallow | | R |
| 199 - 201 | [Exhibits intentionally left blank.] | | |
| 202 | 03/12/90 Handwritten Letter from Susan Peterson to Herbalife re T. Riley | | H,F,R |
| 203 | 06/18/90 Letter from Herbalife Distributor Administration to Jay and Tonni Riley | | |
| 204 | Handwritten note to Larry Thompson from Keith Lombardo dated approx. 1990 | | H,F,R |
| 205 | 10/24/90 Letter from Kendall C. Reed, Herbalife, to Tonni and Jay Riley | | |
| 206 | Rileys= blank Tabulator Team Bonus Application | | |
| 207 | 10/11/90 and 11/12/90 Herbalife Inter-Office Correspondence memos from Jackie Hartman to Patti Pedraza re Riley checks; Herbalife product order reports | | |
| 208 | 10/21/93 handwritten note re telephone call from Dan Fallow   [written by A. Dieter] | | |
| 209 | [duplicate of 163] | | |
| 210 | Handwritten list of names and addresses re HEG members | F,H | |
| 211 | 12/10/93 handwritten notes re telephone conversation with Dan Fallow (written by A. Dieter) | | |
| 212 | Drawing of AHerbs for Life≅ | | |
| 213 | 01/12/93 facsimile transmission from Dan Fallow to Adam (ANC) re Poland National Food and Nutrition Institute | | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 214 | 12/10/93 facsimile transmission from Kirk Scherer, ANC, to Dan Fallow | | |
| 215 | 12/10/93 facsimile transmission from Kirk Scherer, ANC, to Dan Fallow | | |
| 216 | Declaration of Daniel S. Fallow dated 02/15/94 -- with exhibits | H | |
| 217 | One page of undated handwritten notes entitled AAdam Projects≅ | F, H | |
| 218 | 12/11/93 facsimile transmission from Dan Fallow to Kent Kristensen | | |
| 219 | 12/22/93 facsimile transmission from Dan Fallow and Craig Frick to Kent Kristensen (duplicate of Exh. No. 96) | | |
| 220 | 12/16/93 handwritten memo from Dennis Blair, Independent Business Products to Kirk; AHerbal Way of Life≅ label samples attached | F, H, R | |
| 221 | Copy of AHerb & Life≅ product label | F, R, H | |
| 221A | 12/22/93 letter from Kent Kristensen to Adam Dieter, ANC | | |
| 222 | 01/04/94 facsimile transmission from Kirk Scherer to Kent Kristensen | | H, R, F |
| 223 | 01/20/94 facsimile transmission from Kirk Scherer to Kent Kristensen | | H, R, F |
| 224 | 02/04/94 ANC Memo from Kirk Scherer to Paul Goodwin, Herbalife European Group | | H, R |
| 225 | [duplicate of 168] | | |
| 226 | Two pages of undated handwritten notes [partially those of Dorothy Harvilik=s] | | |
| 227 | Two photographs of AMail Boxes, Etc.≅ located at 1431 S. Argonne Road, Spokane, WA | R, F | |
| 228 | Reporter=s Transcript of Proceedings dated September 27, 1989, Direct Examination of Dan Fallow, in the matter of Dan Fallow v. Arnett Cab Service, Maricopa County Superior Court Case No. CV 87-38811 | R, H | |
| | | | |

-- Page 12

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 229 | One page of handwritten notes [Dan Fallow=s handwriting] | | |
| 230 | Two pages of handwritten notes [Dan Fallow=s handwriting] | | |
| 231 | [incomplete duplicate of 140] | | |
| 232 | Settlement Agreement between Dan Fallow and Melinda Fallow dated 08/28/90; Satisfaction of Judgment filed 10/09/90 in re the marriage of Daniel S. Fallow and Melinda K. Fallow | R, H | |
| 233 | Notice of Receipt of Child Support Payment from Daniel. S. Fallow dated 09/25/90 in re the marriage of Daniel S. Fallow and Melinda K. Fallow | F, H, R | |
| 234 | [duplicate of 229] | | |
| 235 | 12/28/93 handwritten note of resignation from Dan Fallow to Herbalife of Russia | | |
| 236 | 12/29/95 facsimile transmission from R. Warnicke, Warnicke & Littler to Mark Hughes and David Addis | F, H, R | |
| 237 - 250 | [Exhibits intentionally left blank.] | | |
| 251 | Clint's lineage report | | |
| 252 | 07/27/94 Herbalife confidential memo from Mark Hughes to John and Susan Peterson re C.S. Fallow Distributorship | | |
| 253 | 07/27/94 facsimile transmission from Susan Peterson to Rebecca, Carol Hannah=s office, attaching letter from Mette Hyldgaard | F, H, R | |
| 254 | 04/25/94 handwritten note from Mette to Dan | F, H, R | |
| 255 | 04/27/94 and 04/28/94 handwritten letters from Dan Fallow to Metta (sic) | H, R | |
| 256 | Undated letter from Dan Fallow to Mette Hyldgaard | | |
| 257 | Telephone messages re: Susan Peterson | | R, H |
| 258 | 05/03/94 memo from Jackie Hartman to Carol Hannah re C.S. Fallow Adjustments | | |
| 259 | Downline chart | | R,P |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| | | | |
| 260 | Downline checklist | | |
| 261 | Michele and Sam Peters' letter | | H, P, F, R |
| 262 | 01/19/94 facsimile transmission from Al DeCambra to Jackie Hartman | | |
| 263 | Draft of Dan Fallow Declaration [02/14/94] | | |
| 264 | Draft of Dan Fallow Declaration [02/15/94] | | |
| 265 | 03/10/94 handwritten notes re telephone conversation with D. Addis and p. Berman [handwriting of J.Kichaven] | H, F | |
| 266 | Intentionally left blank | | |
| 267 | B. Peters chart | | |
| 268 | Royalty statement | | |
| 269 | Weekly's work papers | F,R | |
| 270 | Weekly generated document re 'Analysis of Dan and Mary Fallow's Financial Interest in Nuvo Riche' | F,R | |
| 271 | Weekly generated document re "Analysis of Gross Herbalife Income Never Reported from Fallow Distributorships" | F,R | |
| 272 | Weekly generated document re chart "Analysis of Gross Herbalife Income Never Reported from Fall Distributorships" | F,R | |
| 273 | Weekly generated chart re 'monthly Herbalife income paid to Dan/Mary Fallow distributorship | F,R | |
| 274 | Weekly generated document re 'Detail listing of income paid to the Dan/Mary Distributorship' | F,R | |
| 275 | Weekly generated document re 'Detail Listing of Income Paid to John and Susan Peterson 4/92 through 12/96 | F,R | |
| 276 | Weekly generated document re 'Retail Sales Analysis – C.S.Fallow' | F,R | |
| 277 | Weekly generated document re 'Dan Fallow Special Project Income' | F,R | |
| 278 | Weekly generated document re 'Detail Listing of Income paid to the C.S.Fallow Distributorship' | F,R | |
| 279 | Weekly generated document re 'Monthly Herbalife Income Paid to the C.S.Fallow Distributorship before Dual Distributorship Penalty Payments' | F,R | |
| 280 | Weekly generated document re 'Analysis of Gross C.S. Fallow Herbalife Income Never Reported on Clint Fallow's Tax Returns' | F,R | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 281 | Chart of exhibit 280 | F,R | |
| 282 | Weekly generated 'Retail Sales Analysis – Dan/Mary Fallow Distributorship' | F,R | |
| 283 | Wotruba depo exhibit | F,R | |
| 284 | Wotruba depo exhibit | F,R | |
| 285 | Wotruba depo exhibit | F,R | |
| 286-299 | Exhibits Marked At Deposition of MLM Expert | | |
| | **Plaintiffs' Exhibits 300 - 700** | | |
| 301 | Herbalife Career Book 1984 Version | | R |
| 302 | Herbalife Career Book 1990 Version | | |
| 303 | Herbalife Career Book 1993 Version | | |
| 304 | Herbalife Career Book 1994 Version | | |
| 305 | Herbalife Career Book 1997 Version | | R,H,P,S |
| 306 | Herbalife Annual Report for 1991 | | R,H,P |
| 307 | Herbalife Annual Report for 1992 | | R,H,P |
| 308 | Herbalife Annual Report for 1993 | | R,H,P |
| 309 | Herbalife Annual Report for 1994 | | R,H,P |
| 310 | Herbalife Annual Report for 1995 | | R,H,P |
| 311 | Herbalife Annual Report for 1996 | | R,H,P |
| 312 | Herbalife Annual Report for 1997 | | R,H,P |
| 313 | Herbalife Sales volume reports for Mette Hyldgaard | | R |
| 314 | Herbalife Sales volume reports for Mary L. Fallow | | |
| 315 | Herbalife Sales volume reports for Tonni Riley | | R |
| 316 | Herbalife Sales volume reports for Jay Riley | | R |
| 317 | Herbalife Sales volume reports for C.S.Fallow | | |
| 318 | Securities and Exchange Commission Form 10-K for 1996 | | R,H,P |
| 319 | Securities and Exchange Commission Form 10-K for 1995 | | R,H,P |
| 320 | Securities and Exchange Commission Form 10-K for 1994 | | R,H,P |
| 321 | Securities and Exchange Commission Form 10-K for 1993 | | R,H,P |
| 322 | Securities and Exchange Commission Form 10-K for 1992 | | R,H,P |
| 323 | Securities and Exchange Commission Form 10-K for 1991 | | R,H,P |
| 324 | Securities and Exchange Commission Form 10-K for 1997 | | R,H,P |
| 325 | Herbalife Royalty Override, Commission statements for Tonni Riley | | R |
| 326 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1988 | | |
| 327 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1989 | | |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 328 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1990 | | |
| 329 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1991 | | |
| 330 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1992 | | |
| 331 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1993 | | |
| 332 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1994 | | |
| 333 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1995 | | |
| 334 | Herbalife Royalty Override, Commission statements for Mary Fallow for year 1996 | | |
| 335 | Herbalife Royalty Override, Commission statements for Dan Fallow and Mary Fallow for year 1985 | | |
| 336 | Herbalife Royalty Override, Commission statements for Dan Fallow and Mary Fallow for year 1987 | | |
| 337 | Herbalife Royalty Override, Commission statements for Dan Fallow and Mary Fallow for year 1988 | | |
| 338 | Herbalife Royalty Override, Commission statements for Clint Fallow for year 1992 | | |
| 339 | Herbalife Royalty Override, Commission statements for Clint Fallow for year 1993 | | |
| 340 | Herbalife Royalty Override, Commission statements for Clint Fallow for year 1994 | | |
| 341 | Herbalife Royalty Override, Commission statements for Clint Fallow for year 1995 | | |
| 342 | Herbalife Journals for year 1983 | | R,F, H,C,M |
| 343 | Herbalife Journals for year 1984 | | R,F, H,C,M |
| 344 | Herbalife Journals for year 1985 | | R,F, H,C,M |
| 345 | Herbalife Journals for year 1986 | | R,F, H,C,M |
| 346 | Herbalife Journals for year 1987 | | R,F, H,C,M |
| 347 | Herbalife Journals for year 1988 | | R,F, H,C,M |
| 348 | Herbalife Journals for year 1989 | | R,H,C,M |
| 349 | Herbalife Journals for year 1990 | | R,F,H,C,M |
| 350 | Herbalife Journals for year 1991 | | R,F,H,C,M |
| 351 | Herbalife Journals for year 1992 | | R,F,H,C,M |
| 352 | Herbalife Journals for year 1993 | | R,F,H,C,M |
| 353 | Herbalife Journals for year 1994 | | R,F,H,C,M |
| 354 | Herbalife Journals for year 1995 | | R,F,H,C,M |
| 355 | Herbalife Journals for year 1996 | | R,F,H,C,M |
| 356 | Herbalife Journals for year 1997 | | R,F,H,C,M |
| 357 | Herbalife Journals for year 1998 | | R,F,H,C,M |

-- Page 16

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 358 | Video re Herbalife with John Peterson | | R,F,H,C,M |
| 359 | Video re Herbalife International Chairman | | R,F,H,C,M |
| 360 | Video re John and Susan Peterson | | R,F,H,C,M |
| 361 | Video re John Peterson in house with Hyldgaard | | R,F,H,C,M |
| 362 | Herbalife promotional re Extravaganza 1995 & new countries open | | R,F,H,C,M |
| 363 | Pictures Herbalife production bonus winner Sept 1984 | | R,F,H,C,M |
| 364 | Pictures Herbalife production bonus winner July 1984 | | R,F,H,C,M |
| 365 | Gold medallion | | R,F,H,C,M |
| 366 | Award pin | | R,F,H,C,M |
| 367 | Herbalife certificate May 1984 | | R,F,H,C,M |
| 368 | Herbalife promo tape in distributor kit (audio) | | R,F,H,C,M |
| 369 | Lose Weight Now …..button | | R,F,H,C,M |
| 370 | Millionaire school certificate Aug 1987 | | R,F,H,C,M |
| 371 | Certificate President School (Herbalife) | | R,F,H,C,M |
| 372 | President workshop notebook | | R,F,H,C,M |
| 373 | Internal Herbalife document dated August 1992 "Distributors who failed to renew to be non'distributors" | | R,F |
| 374 | Memo from Hartman dated 2/16/89 re dual distributorships | | |
| 375 | Cans of product | | |
| 376 | Genesis 2000 product advertisement | | |
| 377 | Memo from Patti Sabel dated 2/24/94 to Hartman re 'it(Rileys) should probably be investigated' H-1082-1086 | | |
| 378 | Deposition transcription of Mark Hughes in McCormick case | | H,R,F,C,M,P |
| 379 | Inter-office memos dated 8/23/84 from Barbara Rickerman to (1) D.R. Supervisors and (2) D.R. Reps w/ batestamps H11230 – H11232 | | R,F |
| 380 | Letter dated 4/25/94 from Hyldgaard to Dan Fallow re 'Remember that I'm your first line now!' | | H,R |
| 381 | Letter from Michele and Sam Peters to Hughes re video of Lifetronics meeting | | H,R |
| 382 | Outline from Supervisor School with notes handwritten by Mary Fallow | | F,R,H |
| 383 | Indented Lineage report for Mary Fallow | | R |
| 384 | Indented Lineage report for C.S. Fallow | | R |
| 385 | Pleadings, depositions, exhibits in Herbalife v. McCormick (including cross-complaint) | | H,R,C,M,P |
| 386 | Pleadings, depositions, exhibits in Fobair v. Herbalife | | H,R,C,M,P |
| 387 | Geneology Report for Genesis 2000 | | H,F,R |
| 388 | Check copies for distributors in Genesis 2000 | | H,F,R |
| 389 | Royalty Reports for Genesis 2000 | | H,F,R |
| 390 | 1099s for Tonni Riley issued on behalf of Herbalife | | |
| 391 | Promissory Note for $10,000 for monies loaned to Genesis from Habeeb | | H,R |
| 392 | Letter signed by Fisher sent to Zitting re investigation of dual distributorship | | H,R,C,M |
| 393 | Letter marked received by Jay Hartman 4/28/94 | | H,R,C,M |

| Exh. No. | Description | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|
| 394 | March 1996 Herbalife Greetings to Distributors | | H,R,C,M |
| 395 | Herbalife Responses in McCormick lawsuit | | H,R,C,M,P |
| 396 | Herbalife distributorship application for Tonni Lukavics dated 10/19/87 H-1078 | | |
| 397 | May 3 1994 letter from Mette Hyldgaard to Petersons re calls and further help | | |
| 398 | H/w items requested by Dan Fallow and agreed upon by David Addis bate stamp F000309 | | |
| 399 | Letter from Herbalife to Shannon Swisher Aug 24 1992 | | R |
| 400 | Herbalife advertisement used by Clint Fallow | | H,R |
| 401 | Letter to 'Dear Sirs' from Dan and Mary Fallow re Lukavics | | |
| 402 | Herbalife distributorship application for Ed Lukavics dated 12/21/87 | | |
| 403 | Letter to Ed Lukavics from Petty E. Turner w/ records | | |
| 404 | Herbalife distributorship application for Ed Lukavics dated 11/30/93 | | |
| 405 | Court of Appeal Memorandum Decision in Dan Fallow divorce dated 5/24/88 | | |
| 406 | Herbalife investigation of Clint Fallow sponsoring | | |
| 407 | Dan Fallow calendar pages w/ phone numbers | | H,R |
| 408 | Oct 24 1996 letter to Clint, Mary, and Dan Fallow from Herbalife suspending their distributorships | | |
| 409 | June 10 1997 letter to Dan, Mary, and Clint Fallow from Herbalife w/ an accounting of withheld earnings for suspended distributorships | | |
| 410 | 12/05/88 policy for requests for reassignment/purchase of distributorship H-0010 thru H-0013 | | H,R,M,F |
| 411 | Defendant Herbalife Responses to Plaintiffs' First set of Interrogatories | | |
| 412 | Herbalife Supplemental Disclosure Statement dated Oct 6, 1998 w/ 1099s C.S. Fallow and Mary Fallow for 1996 | | |
| 413 | Herbalife's Supplemental Response to non-uniform Interrogatory 1 dated Oct 6, 1998 | | |
| 414 | Herbalife's disclosure re non-expert witness testimony at trial | | |
| 415 | Herbalife's Responses to Plaintiffs' second request for Production of Documents | | |
| 416 | Herbalife's Responses to Plaintiffs' first request for Production of Documents | | |
| 417 | Herbalife's Responses to Plaintiffs' first set of Requests for Admission | | |
| 418 | Herbalife's Disclosure Statement | | |
| 419 | Herbalife's Supplemental Disclosure Statement (1st) | | |
| 420 | Herbalife's Supplemental Disclosure Statement (2nd) | | |
| 421 | Kirk Hartman declaration dated Oct 9, 1995 | | H,F,P,R,M |
| 422 | Statement of earnings prepared by Herbalife for Mary Fallow and Clint Fallow | | |
| 423 | Dan Fallow Expenses listed and faxed to Gillespie 12/12/94 | | |

-- Page 18

| Exh. No. | Description | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|
| 424 | Documents generated by and relied upon by Fallow expert witness Guy Mechlem | | | M |
| 425 | Documents generated by and relied upon by Fallow expert witness Nehra | | | |
| 426 | Sept 17 1993 | Letter testimonial H-2304 | Mark Hughes Paul Goodwin | H, R, F |
| 427 | Oct 19 1993 | Facsimile H-2300 ; someone selling Herbalife not valid distr. | Chris Smith Al Decambra Denise Neve | |
| 428 | Oct 20 1993 | Letter "stumbled across a firm | Compliance dept | |
| 429 | Oct 20 1993 | Cellular Nutrition article by Katzin H-2306 | Global Health | H, R, F |
| 430 | Oct 21 1993 | h/w notes of telcon with Dan | ANC Dan Fallow | |
| 431 | Oct 28 1993 | Information reports | Compliance dept. | |
| 432 | Nov 3 1993 | Denmark distributor contract | Compliance dept. | H, R, F |
| 433 | Nov 5 1993 | Letter "getting sick" H-2401-2402 | Mark Hughes Paul Goodwin | H, R, F |
| 434 | Nov 22 1993 | Letter "I am working…wish to speak with you" H-2400 | Paul Goodwin Mark Hughes | H, R, F |
| 435 | Dec 10 1993 | Letter | Poland gov't Adam Dieter | H,R,F |
| 436 | Dec 10 1993 | Confidentiality agreement | ANC Poland gov't | |
| 438 | Dec 10 1993 | Letter | Poland gov't Dan Fallow Adam Dieter | |
| 440 | Dec 13 1993 | purchase order | ANC Nutra Sweet Co. | H, R, F |
| 441 | Dec 16 1993 | Memo pricing for labels H-4200 | Kent Kristensen Independent Business Products | H, R, F |
| 442 | Dec 16 1993 | Letter | Adam Dieter Poland gov't | |
| 443 | Dec 17 1993 | Facsimile | Dan Fallow Adam Dieter | |
| 444 | Dec 22 1993 | Letter | Poland gov't Adam Dieter | H, R, F |
| 445 | Dec 22 1993 | Letter H-4107-4111 "Dan …has served his purpose" | Adam Dieter Kent Kristensen | H, R, F |
| 446 | Dec 22 1993 | Letter | Adam Dieter Kirk Scherer Kent Kristensen | H, R, F |
| 447 | Dec 28 | Facsimile | Milbergs | H, R, F |

| Exh. No. | Description | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|
| | 1993 | | Scherer | |
| 448 | Dec 29 1993 | Memo with notation "Bill G." from Norman Friedman | Bill Gillespie | H, R, F |
| 449 | Dec 29 1993 | Letter H-4092-4093 | Kirk Scherer Kent Kristensen | H, R, F |
| 450 | Dec 29 1993 | Facsimile | Milbergs Kirk Scherer | H, R, F |
| 451 | Dec 30 1993 | Letter | Kent Kristensen Kirk Scherer | H, R, F |
| 452 | Dec 30 1993 | bill of lading | Kent Kristensen Adam Dieter | H, R, F |
| 453 | Dec 30 1993 | Confidentiality agreement H-4173-4174 | ANC Adam Dieter Kent Kristensen | H, R, F |
| 454 | Dec 31 1993 | bill of lading | Kent Kristensen Adam Dieter | H, R, F |
| 456 | | H/w notes of telcon with Dan Fallow H-2196 | ANC | H, R, F |
| 457 | Jan 3 1994 | Shipping instr.H-3864 | ANC | H, R, F |
| 458 | Jan 3 1994 | Invoice | ANC | H, R, F |
| 459 | Jan 4 1994 | Facsimile memo w/ labels | Kent Kristensen Kirk Scherer | H, R, F |
| 460 | Jan 4 1994 | Facsimile | Kirk Scherer Kent Kristensen | H, R, F |
| 461 | Jan 4 1994 | Facsimile memo | Adam Dieter Kent Kristensen | H, R, F |
| 462 | Jan 5 1994 | Letter H- | Kent Kristensen ANC | H, R, F |
| 464 | Jan 6 1994 | Meeting report H-2243 – 2245 | Compliance Dept | H, R, F |
| 465 | Jan 6 1994 | Facsimile | Bengt Nilsson ANC | H, R, F |
| 466 | Jan 7 1994 | Facsimile | Kirk Scherer Adam Dieter Kent Kristensen | H, R, F |
| 467 | Jan 7 1994 | Invoice | Kent Kristensen Gregg T. Stokes design agency | H, R, F |
| 468 | Jan 7 1994 | Letter H-4080 | Bengt Nilsson Kirk Scherer | H, R, F |
| 469 | Jan 7 1994 | Facsimile | Kirk Scherer Bengt Nilsson | H, R, F |
| 470 | Jan 10 1994 | Memo re Denmark co. doing business as "Herbalife" H-3088-3090 | Carol Hannah Chris Pair Jackie Hartman David Addis Shlutz | H, R, F |

| Exh. No. | Description | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|
| 471 | Jan 11 1994 | Facsimile memo H-3909 | Bengt Nilsson Kirk Scherer | | H, R, F |
| 472 | Jan 11 1994 | Facsimile | Bengt Nilsson Kirk Scherer | | H, R, F |
| 473 | Nov 22 1993 | Label drafts w/ handwriting to Paul Goodwin H-4211 | | | |
| 474 | Jan 11 1994 | Letter H-4071-4076 | Kent Kristensen Kirk Scherer | | H, R, F |
| 475 | Jan 11 1994 | Letter H-3829 | Lt Gov of NV ANC Poland gov't | | H, R, F |
| 476 | Jan 12 1994 | Facsimile of investigation report H-2319-2346 | Jackie Hartman Al Decambra | | |
| 477 | Jan 12 1994 | Facsimile re formulas H-4146 – 4148 | Bengt Nilsson Kirk Scherer | | H, R, F |
| 478 | Jan 12 1994 | Letter | Kirk Scherer | | H, R, F |
| 479 | Jan 13 1994 | Memo re KK situation/ suspending distributors H-2596 | Jackie Hartman David Addis Carol Hannah Mark Hughes Al Decambra | | |
| 480 | Jan 13 1994 | Facsimile meeting report H-3119-3133; 2721 | Henrik Jagd Compliance Dept Al Decambra | | |
| 481 | Jan 13 1994 | Letter H-2543 – 2551 | Jackie Hartman Mark Hughes Carol Hannah David Addis Craig Frick Paul Goodwin Garbenfeldt Kent Kristensen Dan Johansen Lillian Kuntz Preben Andersen Flemming Dall Rolf Andersen Dagfinn Ring | | |
| 482 | Jan 13 1994 | Invoice H-4060 | ANC Kent Kristensen | | H, R, F |
| 483 | Jan 13 1994 | Letter H-4068 | Kent Kristensen Kirk Scherer | | H, R, F |
| 484 | Jan 13 1994 Jan 14 1994 | Phone messages H-3003 | David Addis | | |
| 485 | Jan 14 1994 | Letter w/ invoice for | Kirk Scherer | | H, R, F |

| Exh. No. | Description | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|
| | | label bate stamp H-4060 –4062 | Raits V. Milbergs | | |
| 486 | Jan 17 1994 | Information paper | Al Decambra Chris Weaver Mette Hyldgaard | | |
| 487 | Jan 17 1994 | Facsimile letter re ship prod to KK H-4048 | Kirk Scherer Bengt Nilsson | | H, R, F |
| 488 | Jan 18 1994 | bill of lading H-3856 1st shipment | Kirk Scherer | | H,R,F |
| 489 | Jan 18 1994 | bill of lading | ANC | | H,F,R |
| 490 | Jan 18 1994 | Picking ticket H-3858 | Kent Kristensen ANC | | H,F,R |
| 491 | Jan 18 1994 | Order list H-3859 | ANC | | H,F,R |
| 492 | Jan 18 1994 | Order list w/ notes H-3860 | ANC | | H,F,R |
| 493 | Jan 18 1994 | Facsimile H- | Kirk Scherer Leandro w/ Air Express Int'l | | H,F,R |
| 494 | Jan 18 1994 | Facsimile | Kirk Scherer Kent Kristensen | | H, R, F |
| 495 | Jan 18 1994 | Letter | Kirk Scherer Kent Kristensen | | H, R, F |
| 496 | Jan 18 1994 | Memo H-2362 | David Addis Mercedes Aguirre Jackie Hartman | | |
| 498 | Jan 18 1994 | Label review H-3847-3850 | | | |
| 499 | Jan 18 1994 | bill of lading H-3857 | ANC | | H,R,F |
| 500 | Jan 19 1994 | Memo | Kirk Scherer Kent Kristensen | | H, F, R |
| 501 | Jan 19 1994 | facsimile w/ invoice | ANC Kirk Scherer Kent Kristensen | | H, F, R |
| 502 | Jan 19 1994 | facsimile letter | Craig Frick Kirk Scherer | | H,F,R |
| 503 | Jan 20 1994 | Facsimile memo w/ attachments H-2686 – 2691 | Kirk Scherer Kent Kristensen | | H,F,R |
| 504 | Jan 19 1994 | Memo H-4038 | Kent Kristensen Kirk Scherer | | H,F,R |
| 505 | Jan 20 1994 | Memo H-2950-2951 | Craig Frick Kent Kristensen Mercedes Aguirre | | H,F,R |
| 506 | Jan 20 1994 | Facsimile | Craig Frick Kirk Scherer | | H,F,R |
| 507 | Jan 17 1994 | Report H-2272 – 2288; | Al Decambra | | |

| Exh. No. | Description | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|
| | | 2733-2749;2487-2500 | Jackie Hartman | | |
| 508 | Jan 21 1994 | bill of lading H-3869 – 3873 | ANC | | H,R,F |
| 509 | Jan 21 1994 | Letter H-4028 re questions regarding new formula | Kirk Scherer Paul Goodwin | | H,F,R |
| 510 | Jan 22 1994 | Facsimile cover sheet | Paul Goodwin Kirk Scherer | | H,F,R |
| 511 | Jan 25 1994 | Facsimile w/ spec sheets | Kent Kristensen Adam Dieter | | H,F,R |
| 512 | Jan 25 1994 | Facsimile | Kirk Scherer John Laseen w/ AIC/LAX | | H,F,R |
| 513 | Jan 25 1994 | Letter to Hartman from DeCambra re status update H-2665 – 2685 | | | H,F,R |
| 514 | Jan 25 1994 | Letter H-4160 & 4025; billing by ANC for management & consulting services re: registration, importation, labeling & packaging specs | Kent Kristensen ANC | | H,F,R |
| 515 | Jan 26 1994 | Facsimile w/ invoice H-4018 – 4019 | Kirk Scherer Kent Kristensen | | H,F,R |
| 516 | Jan 26 1994 | Facsimile w/ credit application | Johan Laseen w/ AIC/LAX Kirk Scherer | | H,F,R |
| 517 | Jan 28 1994 | Meeting report H-3202 – 3209,2242 | Al Decambra Patti Sabel Jackie Hartman | | |
| 518 | Jan 28 1994 | facsimile report H-2173 – 2180 | Bob Adams Tony Murdoch Amy Balderson | | H,R,F |
| 519 | Jan 28 1994 | h/w note | Adam Dieter Paul Goodwin | | H,R,F |
| 520 | Jan 28 1994 | facsimile | Jackie Hartman Al Decambra | | |
| 521 | Jan 29 1994 | Investigative report H-2560 – 2562 | Compliance Dept | | |
| 522 | Jan 30 1994 | Facsimile memo re sweetener to us H-3960 | Adam Dieter Paul Goodwin | | H,R,F |
| 523 | Jan 30 1994 | Letter | Paul Goodwin Adam Dieter Kirk Scherer | | H,R,F |
| 524 | Jan 31 1994 | Letters re Kent Kristensen H-2563 thru H-2576 | Jackie Hartman Gunn Randi Erikson | | |
| 525 | Jan 31 1994 | h/w list HEG inventory | | | H,R,F |

-- Page 23

| Exh. No. | Description | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|
| | | H-4012 | | | |
| 526 | Feb 1 1994 | facsimile information | Al Decambra Jackie Hartman | | |
| 527 | | Affidavits of Jacqueline Fisher produced by Herbalife in this lawsuit | | | |

**211**

-- Page 24

| Exh. No. | Description | | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|---|
| 528 | | Affidavits of Patti R. Sabel produced by Herbalife in this lawsuit | | | | |
| 529 | | Affidavits of William Gillespie produced by Herbalife in this lawsuit | | | | |
| 530 | | All other affidavits produced by Herbalife in this lawsuit | | | | |
| 531 | Feb 1 1994 | letter | Kent Kristensen Mercedes Aguirre | 2577 | | R |
| 532 | Feb 1 1994 | memo | David Addis Mercedes Aguirre | 2948 | | R |
| 533 | Feb 1 1994 | facsimile letters | Al Decambra Jackie Hartman | 3024 | | R |
| 534 | Feb 2 1994 | letter | Kent Kristensen Mercedes Aguirre | 2295 | | R |
| 535 | Feb 2 1994 | facsimile letter | Kent Kristensen David Addis | 2943-2946 | | H,R,F |
| 536 | Feb 2 1994 | letter | David Addis Kent Kristensen Mercedes Aguirre | 3009 3010 | | R |
| 537 | Feb 2 1994 | facsimile letter | Flemming Toft Distr relations | 3838 3839 | | H,F,R |
| 538 | Feb 2 1994 | letter | Kent Kristensen ANC Kirk Scherer | 4011 | | H,F,R |
| 539 | Feb 6 1994 | letter + samples | Weaver Compliance | 2483-2486 | | R |
| 540 | Feb 7 1994 | letter | Jackie Hartman | 2553 | | H,F,R |
| 541 | Feb 7 1994 | information paper | Compliance Dept | 2554-2559 2088 2089 | | H,F,R |

212

| Exh. No. | Description | | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|---|
| 543 544 Unident | Feb 7 1994 | h/w notes | | 2858 | | H,F,R |
| 545 | Feb 7 1994 | letter | Kent Kristensen David Addis | 2936 | | |
| 546 | Feb 9 1994 | facsimile letter | Dan Fallow Craig Frick | 1569 1570 | | |
| 547 | | distributorship application + marketing plan for Herbalife Russia | | 2859-2863 | | |
| 548 | | h/w notes | | 2864 | | |
| 549 | Feb 9 1994 | letter | Craig Frick Kent Kristensen David Addis | 2298 | | |
| 550 | Feb 10 1994 | facsimile information report | Al Decambra | 2292-2294 2893 2894 2878-2886 2895-2904 2289 2290 3973 2529-2534 2143 | | |
| 551 | | | | | | |
| 552 | Feb 10 1994 | facsimile | Dan Fallow Jackie Hartman | 2887-2892 | | |
| 553 | Feb 11 1994 | letter | David Addis Kent Kristensen Craig Frick | 2932 | | |
| 554 | Feb 12 1994 | h/w letter | Paul Goodwin Kirk Scherer | 4152 4151 4150 | | |
| 555 | Feb 14 1994 | h/w notes | | 2822 2823 | | |
| 556 | Feb 14 1994 | h/w notes | | 1904 | | |
| 557 | Feb 14 1994 | declaration | | 935-951 | | |
| 558 | Feb 16 1994 | memo | David Addis | 2928-2931 | | |
| 559 | Feb 16 1994 | information paper | Al Decambra | 2266-2267 | | |
| 560 | Feb 16 1994 | memo | Al Decambra Jackie Hartman | 2120-2142 | | |
| 561 | Feb 22 1994 | letter | Craig Frick | 1510 | | |

-- Page 26

| Exh. No. | Description | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|
| | | | David Addis | | |
| 562 | Feb 22 1994 | information report | compliance dept | 2184-2191 2210-2215 | |
| 563 | Feb 24 1994 | H/w notes | | 2503 | |
| 564 | Feb 24 1994 | h/w notes | | 2772 | |
| 565 | Feb 25 1994 | letter | David Addis | 2811-2821 | |
| 566 | Mar 1 1994 | h/w notes | | 3821 | |
| 567 | | list of finished product testing | | 3822 3823 | |
| 568 | Mar 2 1994 | memo | William Gillespie Al Decambra | 1569 | |
| 569 | Mar 5 1994 | series of orders | Dan Fallow David Addis | 1517-1521 | |
| 570 | Mar 7 1994 | memo | Jackie Hartman Al Decambra | 2203-2209 | |
| 571 | Mar 8 1994 | memo | David Addis Jackie Hartman | 3182-3191 | |
| 572 | Mar 10 1994 | h/w notes | David Addis Patti Berman | | |
| 573 | Mar 15 1994 | check | Dan Fallow | 192 | |
| 574 | Mar 15 1994 | check w/ purchase order | Dan Fallow | 1952-1953 | |
| 575 | Mar 17 1994 | letter | | 2996-2997 | |
| 576 | Apr 20 1994 | facsimile memo | Carol Hannah | 2099-2107 | |
| 577 | | shipping info | | 1552 | |
| 578 | Mar 28 1994 | h/w notes | Dan Fallow | 2501 | |
| 579 | Apr 4 1994 | facsimile | Patti Sabel | 2773-2781 | |
| 580 | Apr 7 1994 | check | Dan Fallow | 278 0964-0966 | |
| 581 | Apr 14 1994 | letter | Knut Ring | 2988-2989 | |
| 582 | Apr 29 1994 | memo | Jackie Hartman Patti Berman | 552-557 | |
| 583 | May 3 1994 | facsimile memo | Al Decambra | 2095-2097 | |
| 584 | May 7 1994 | price list | William Gillespie | 194 | |
| 585 | May 9 1994 | inquiry | | 679-683 | |
| 586 | May 13 1994 | information report | Patti Berman Jackie Hartman Al Decambra | 2083-2084 | |
| 587 | May 13 1994 | information report | Jackie Hartman | 2067-2087 | |

-- Page 27              214

| Exh. No. | Description | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|
| | | | Al Decambra | | |
| 588 | May 25 1994 | protest against registration | | 2983-2985 | |
| 589 | June 1 1994 | facsimile | Dan Fallow David Addis | 961-963 | |
| 590 | June 4 1994 | facsimile | Compliance | 2971-2976 | |
| 591 | June 6 1994 | facsimile | Dan Fallow Roxane Romans | 652-654 | |
| 592 | June 6 1994 | facsimile | Al Decambra | 2056-2066 | |
| 593 | June 9 1994 | facsimile | William Gillespie | 8155 | |
| 594 | June 10 1994 | facsimile | William Gillespie | 8156 | |
| 595 | June 13 1994 | memo | William Gillespie | 1570 | |
| 596 | June 13 | report | | 2053-2055 | |
| 597 | June 13 1994 | facsimile | Jackie Hartman | 1572-1577 | |
| 598 | June 24 1994 | memo | William Gillespie | 1578 | |
| 599 | June 29 1994 | memo | William Gillespie | 1579 | |
| 600 | June 1994 | h/w contract | Dan Fallow David Addis | 967 968 229 273 | |
| 601 | July 6 1994 | memo | William Gillespie | 8157 8158 | |
| 602 | July 18 1994 | check | Dan Fallow | 1958 1959 1868 1547-1562 | |
| 603 | July 20 1994 | bill of lading | Dan Fallow Craig Frick | 1568 1567 | |
| 604 | July 20 1994 | information report | Henrik Jagd Compliance dept | 2020-2026 | |
| 605 | July 25 1994 | facsimile | Craig Frick Dan Fallow | 1585 | |
| 606 | July 27 1994 | facsimile letter | Dan Fallow Mogens Garbenfeldt | 1601 1602 1528 | |
| 607 | | | | | |
| 608 | Aug 94 –Aug 94 – Aug 95 | | | | |
| 609 | Aug 1 1994 | facsimile memo | Dan Fallow William | 1584 | |

| Exh. No. | Description | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|
| | | | Gillespie | | |
| 610 | Aug 2 1994 | memo | William Gillespie | 1588-1598 | |
| 611 | Aug 3 1994 | memo | | 1599 | |
| 612 | Aug 10 1994 | letter | Dan Fallow Mark Hughes | 200 201 1522 1523 | |
| 613 | Aug 16 1994 | facsimile | Mogens Garbenfeldt Dan Fallow | 955 | |
| 614 | Aug 17 1994 | facsimile | Berman David Addis | 1603-1606 | |
| 615 | Aug 17 1994 | check | Dan Fallow | 1885 1884 1929 1930 1962 1963 | |
| 616 | Aug 19 1994 | memo | | 1607 | |
| 617 | Aug 20 1994 | memo | Berman | 2525 | |
| 618 | Aug 22 1994 | memo | | 1608 | |
| 619 | Aug 23 1994 | memo | William Gillespie | 1621 | |
| 620 | Aug 23 1994 | facsimile report | William Gillespie | 1609-1620 | |
| 621 | Aug 25 1994 | memo | | 1622 | |
| 622 | Aug 26 1994 | memo | William Gillespie | 1624 | |
| 623 | Aug 26 1994 | facsimile memo | William Gillespie | 1625 | |
| 624 | Aug 27 1994 | facsimile report | William Gillespie | 1626-1637 | |
| 625 | Aug 28 1994 | memo | | 1640 | |
| 626 | Aug 29 1994 | memo | | 1655 1656 | |
| 627 | Aug 29 1994 | facsimile | David Addis William Gillespie | 1499-1506 | |
| 628 | Aug 29 1994 | facsimile | Dan Fallow William Gillespie | 1657 | |
| 629 | Aug 30 1994 | facsimile | Dan Fallow William Gillespie | 211 | |
| 630 | Aug 31 1994 | facsimile | David Addis William Gillespie | 1658 | |
| 631 | Aug 31 1994 | facsimile report | Henrik Jagd | 2027-2050 | |

-- Page 29

| Exh. No. | Description | | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|---|
| 632 | Sept 1 1994 | memo | | | 1683 1684 | |
| 633 | Sept 1 1994 | facsimile | William Gillespie Craig Frick | | 1682 | |
| 634 | Sept 6 1994 | memo | | | 1685 | |
| 635 | Sept 6 1994 | check | Dan Fallow | | 1886 1889 1964 1965 | |
| 636 | Sept 7 1994 | facsimile | William Gillespie Dan Fallow | | 1686 | |
| 637 | Sept 7 1994 | memo | | | 1687 | |
| 638 | Sept 9 1994 | memo | | | 1691 | |
| 639 | Sept 9 1994 | facsimile | Berman Jackie Hartman | | 2523 2524 | |
| 640 | Sept 9 1994 | h/w letter | Dan Fallow William Gillespie | | 218 219 | |
| 641 | Sept 9 1994 | facsimile | William Gillespie | | 1692 1553 1693 | |
| 642 | Sept 9 1994 | letter | David Addis Kent Kristensen | | 1688 1689 1690 | |
| 643 | Sept 10 1994 | memo | | | 1694 | |
| 644 | Sept 12 1994 | facsimile | Dan Fallow | | 183 | |
| 645 | Sept 13 1994 | memo | | | 1694 (a) | |
| 646 | Sept 15 1994 | memo | William Gillespie | | 1695 | |
| 647 | Sept 15 1995 | memo | William Gillespie | | 1696 | |
| 648 | Sept 19 1995 | memo | William Gillespie | | 1701 | |
| 649 | Sept 19 1994 | facsimile | Dan Fallow William Gillespie | | 1702-1706 | |
| 650 | Sept 19 1994 | facsimile | William Gillespie | | 1699 1700 | |
| 651 | Sept 20 1994 | facsimile | Dan Fallow William Gillespie | | 1709 1710 | |
| 652 | Sept 20 1994 | memo | William Gillespie | | 1711 | |
| 653 | Sept 23 1994 | shipping quotes | Dan Fallow | | 2101-2108 | |
| 654 | Sept 27 1994 | check | Dan Fallow | | 1968 | |

-- Page 30

| Exh. No. | Description | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|
| | | | | 1969 1925 1926 1891 | |
| 655 | Sept 27 1994 | shipping forms | | 1718 221 222 | |
| 656 | Sept 30 1994 | facsimile | Dan Fallow William Gillespie | 1719 1720 | |
| 657 | Oct 3 1994 | memo | William Gillespie | 1722 | |
| 658 | Oct 4 1994 | facsimile | Kent Kristensen William Gillespie | 1551 | |
| 659 | Oct 4 1994 | facsimile | Craig Frick Mark Hughes | 3795-3797 | |
| 660 | Oct 5 1994 | memo | William Gillespie | 1724 | |
| 661 | Oct 6 1994 | check | Dan Fallow | 1970 1971 1893 1923 1924 | |
| 662 | Oct 6 1994 | facsimile | William Gillespie Kent Kristensen | 1727 | |
| 661 | Oct 7 1994 | facsimile | William Gillespie Kent Kristensen | 1726 | |
| 662 | Oct 7 1994 | facsimile report | William Gillespie | 1728 1729 1730 | |
| 663 | Oct 7 1994 | mail box application | William Gillespie | 1731 1732 | |
| 664 | Oct 11 1994 | facsimile | William Gillespie Kent Kristensen | 1745-1750 | |
| 665 | Oct 12 1994 | facsimile | Kent Kristensen William Gillespie | 1735-1743 | |
| 666 | Oct 12 1994 | memo | William Gillespie | 1744 | |
| 667 | Oct 13 1994 | memo | William Gillespie | 1751 | |
| 668 | Oct 17 1994 | check | Dan Fallow | 1921 | |

| Exh. No. | Description | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|
| | | | | 1922 1890 1972 1973 | |
| 669 | Oct 18 1994 | memo | Dan Fallow Craig Frick | 1549 | |
| 670 | Oct 18 1994 | facsimile | William Gillespie Kent Kristensen | 1752 | |
| 671 | Oct 19 1994 | memo | William Gillespie | 1784 1785 | |
| 672 | Oct 24 1994 | memo | William Gillespie | 1754 | |
| 673 | Oct 25 1994 | facsimile | William Gillespie | 1756-1764 | |
| 674 | Oct 31 1994 | facsimile | William Gillespie | 1772 1773 1774 | |
| 675 | Nov 2 1994 | memo | William Gillespie | 1781 | |
| 676 | Nov 3 1994 | facsimile | William Gillespie Kent Kristensen | 1782 | |
| 677 | Nov 14 1994 | facsimile | Dan Fallow William Gillespie | 225 226 227 1783 | |
| 678 | Nov 15 1994 | memo | William Gillespie | 1780 | |
| 679 | Nov 16 1994 | facsimile | Kent Kristensen William Gillespie | 1775 | |
| 680 | Nov 16 1994 | summary of compliance activity | Al Decambra David Addis | 1798 1801 1803 | |
| 681 | Nov 21 1994 | facsimile | William Gillespie Kent Kristensen | 1816 | |
| 682 | Nov 22 1994 | travel authorization form | William Gillespie | 1894 1895 | |
| 683 | Nov 28 1994 | memo | William Gillespie | 1818 | |
| 684 | Nov 28 1994 | check | Dan Fallow | 1976 1977 1917 1918 | |

| Exh. No. | Description | | | | Plaintiff's Objection | Defendants' Objection |
|---|---|---|---|---|---|---|
| 685 | Dec 2 1994 | memo | William Gillespie | 1820 | | |
| 686 | Dec 8 1994 | memo | William Gillespie | 1822 | | |
| 687 | Dec 10 1994 | facsimile report | William Gillespie | 1810-1813 | | |
| 688 | Dec 12 1994 | memo | William Gillespie | 1824 | | |
| 689 | Dec 16 1994 | facsimile | Dan Fallow William Gillespie | 230 | | |
| 690 | Dec 23 1994 | facsimile | William Gillespie | 1826 | | |
| 691 | Dec 31 1994 | memo | Dan Fallow | 231 | | |
| 692 | Jan 2 1995 | memo | William Gillespie | 1827 | | |
| 693 | Jan 6 1995 | facsimile | Dan Fallow William Gillespie | 1836 1837 | | |
| 694 | Jan 12 1995 | check | Dan Fallow | 1979 1903 1904 1905 | | |
| 695 | Jan 23 1995 | memo | William Gillespie | 1838 | | |
| 696 | Feb 6 1995 | facsimile | William Gillespie | 1870 | | |
| 697 | Feb 9 1995 | facsimile | David Addis Dan Fallow | 237 | | |
| 698 | Feb 27 1995 | incident report | William Gillespie | 1901 1902 | | |
| 699 | Mar 10 1995 | letter | David Addis Dan Fallow | 255 256 | | |

| | Defendants' Exhibits 701 – 1000 | | |
|---|---|---|---|
| 701 | H-0004 - 7: Herbalife Records Administration, Distributor Changes Section, Reassignment/Purchase of Distributorships -- 1986 Procedures | R,H,F | |
| 702 | H-0010 - 12: Herbalife Records Administration Policy -- 1988 Policy re Requests for Reassignment/Purchase of Distributorship | R,H,F | |
| 703 | H-0013: Distributor Administration Policy -- 1988 Policy re Distributor Resignations | R,H,F | |
| 704 | H-8152 - 53: Herbalife Dual Distributorship policy (no date) | R,H,F | |

| | | | |
|---|---|---|---|
| 705 | H-0023: Records Administration Policy: 1988 Policy re Dual Distributorships | R,H,F | |
| 706 | H-0024: 02/10/89 Memo from J. Hartman to C. Pair re AMeeting with Mark≡ re distributor rule issues | R,H,F | |
| 707 | H-0025: 02/16/89 Memo from J. Hartman to C. Pair re Dual Distributorships | R,H,F | |
| 708 | H-0026: Records Administration Policy -- 02/16/89 Revised Policy re Dual Distributorships | R,H,F | |
| 709 | H-0027: Records Administration Policy -- 03/09/89 Policy re Dual Distributorships | R,H,F | |
| 710 | H-0028 - 29: Distributor Administration Policy -- 05/19/94 Policy re Dual Distributorships | R,H,F | |
| 711 | H-0030: 03/24/94 Memo from Monica Evans to World-Wide Distributor Relations Supervisors re Policy Revision for renewal fee/resignation | R,H,F | |
| 712 | H-0039-41: Ethical Distributor Practices (date omitted) | R,H,F | |
| 714 | H-0042 - 44: Ethical Distributor Practices (no date) | R,H,F | |
| 715 | H-0047 - 49: Ethical Policies and Procedures (no date) | R,H,F | |
| 716 | H-0050 - 56: 1992 Herbalife International Distributor Relations/Records Policies and Procedures for International Distribution Centers, Section One, Table of Contents | R,H,F | |
| 717 | H-0057 - 69: Table of Contents for Herbalife Regulatory compliance Enforcement Procedures for Advertising, Ethical and Refund Violations and pp. 33 - 43 re violations of the trademark/trade name rules | R,H,F | |
| 718 | H-0548: 04/25/94 Memo from J. Hartman to C. Hannah re Dan Fallow | H | |
| 719 | H-0558 - 563: 04/26/94 Letter from R. Romans to Bonner County Recorders Office; enclosed is a copy of the Mary and Dan Fallow divorce decree | R,H,F | |
| 720 | H-0565 - 67: 05/03/94 Memo from J. Hartman to C. Hannah re C.S. Fallow adjustments | H | |
| 721 | H-0568 - 69: 05/09/93 Memo from J. Hartman to M. Hughes re Dan Fallow Distributorship | H | |
| 722 | H-0570: 05/12/94 Memo from J. Hartman to M. Hughes | H | |

| | | |
|---|---|---|
| | re C.S. Fallow/Frick | |
| 723 | H-0571 - 0572: 05/23/94 Memo from J. Hartman to S. Faulkner and C. Hannah re C.S. (Dan) Fallow | H |
| 724 | H-0573: 05/26/94 Memo from J. Hartman to M. Hughes enclosing organizational charts (not attached) | |
| 725 | H-0577: 05/26/94 Memo from J. Hartman to John and Susan Peterson | |

| | | |
|---|---|---|
| 726 | H-0578 - 79: List of C.S. Fallow distributors contacted re sponsorship, 05/13 - 17/94 | |
| 727 | H-0583: 06/30/94 Memo from J. Hartman to V. Wilson re C.S. Fallow dual distributorship | H,R |
| 728 | H-0624: 03/21/88 Letter from D. Fallow and M. Fallow to Herbalife Records Department re resignation | |
| 729 | H-0625 - 26: 04/14/88 Letters from Herbalife Records Administration to D. Fallow and M. Fallow | |
| 730 | H-0651: Herbalife distributorship print-out re C.S. Fallow and J. Fisher handwritten notes (date is 1994) | |
| 731 | H-0656 - 0661: J. Fisher handwritten notes | F,H |
| 732 | H-0662 - 0668: Herbalife documents re C.S. Fallow distributorship adjustments | |
| 733 | H-0669 - 0675: 05/03/94 Memo from J. Hartman to C. Hannah with handwritten notes on attachment | |
| 734 | H-0673 - 75: 07/14/94 Herbalife print-out re transfer of C.S. Fallow earnings | |
| 735 | H-0724: 01/16/95 Herbalife print-out re transfer of C.S. Fallow earnings | |
| 736 | H-0725 - 31: Copies of 6 Herbalife U.S. royalty checks payable to C.S. Fallow, 06/93 -- 12/93; deposited in Idaho | |
| 737 | H-0732 - 37: Copies of 5 Herbalife U.S. royalty checks payable to C.S. Fallow, 07/92 - 04/93, deposited in Arizona and Idaho | |
| 738 | H-0738 - 41: Copies of 3 Herbalife U.S. royalty checks payable to C.S. Fallow, 03/93 - 04/94, deposited in Idaho | |
| 739 | H-0742 - 44: Copies of 2 Herbalife U.S. royalty checks payable to C.S. Fallow, 01/20/93 and 09/15/93, | |

| | | | |
|---|---|---|---|
| | deposited in Idaho | | |
| 740 | H-0745 - 51: Copies of 5 Herbalife U.S. royalty checks payable to C.S. Fallow, 08/92 - 05/93, deposited in Idaho | | |
| 741 | H-0752 - 56: 1993 Herbalife Lineage Report for C.S. Fallow | | |
| 742 | H-0829 - 38: Documents regarding German distributor Reinhold Schmidt | F,H,R | |
| 743 | H-0956: 02/06/95 Memo from Jennifer to Bill Gillespie re phone call from Dan Fallow | | |
| 744 | H-0964 - 66: 04/08/94 Letter from M. Farrington to D. Fallow enclosing Herbalife check for $7,000 | | |
| 745 | H-0981 - 86: Various reports re organization and lineage of HEG | F,H,R | |
| 746 | Various Fallow telephone records (1993-1995) Batestamp nos. F003169 – F003478) | F, R | |
| 747 | EXHIBITS INTENTIONALLY LEFT BLANK | | |
| 748 | H-1547, 1548, 1555, 1556, 1561, 1562: Excerpts from 01/31/93 facsimile transmission from D. Fallow to B. Gillespie | | |
| 749 | H-1569: 03/02/94 Memo from B. Gillespie to A. DeCambra re HEG update | | |
| 750 | H-1570: 02/14/95 Memo from B. Gillespie to File re 06/13/94 interview of D. Fallow | | |
| 751 | H-1580 - 81: 07/05/94 Memo from B. Gillespie to File re Fallow phone interview | | |
| 752 | H-1582: 07/18/94 B. Gillespie notes re telephone conversation with D. Fallow | | |
| 753 | H-1583: 07/25/94 notes re telephone call from D. Fallow | | |
| 754 | H-1584: First page of fax dated 08/01/94 from D. Fallow to B. Gillespie | | |
| 755 | H-1585: 08/01/94 B. Gillespie notes re telephone call to D. Fallow | | |
| 756 | H-1586: 08/02/94 B. Gillespie notes re telephone call from D. Fallow | | |
| 757 | H-1607: 08/19/94 B. Gillespie notes re telephone call from D. Fallow | | |
| | | | |

| 758 | H-1608: 08/22/94 B. Gillespie notes re telephone call with D. Fallow | | |
|---|---|---|---|
| 759 | H-1609 - 1620: Facsimile transmission from Henrik Jagd to B. Gillespie | | |
| 760 | H-1621: 08/23/94 Memo from B. Gillespie to A. Carey re Denmark Surveillance | | |
| 761 | H-1625: 08/26/94 Memo from B. Gillespie to Henrig | | |
| 762 | H-1640: 08/28/94 B. Gillespie notes re return phone call to D. Fallow | | |
| 763 | H-1646 - 53: 08/29/94 Memo from B. Gillespie to D. Addis attaching two facsimiles from D. Fallow | | |
| 764 | H-1655 - 56: 08/29/94 B. Gillespie notes re return phone call to D. Fallow | | |
| 765 | H-1683 - 84: 09/01/94 B. Gillespie notes re two telephone calls from D. Fallow | | |
| 766 | H-1685: 09/06/94 B. Gillespie notes re telephone call from D. Fallow | | |
| 767 | H-1687: 09/07/94 B. Gillespie notes re telephone call from D. Fallow | | |
| 768 | H-1688: 08/09/94 (approx.) Letter from K. Kristensen to D. Addis | | |
| 769 | H-1691: 09/09/94 B. Gillespie notes re telephone call from Dan Fallow | | |
| 770 | H-1694A: 09/13/94 B. Gillespie notes re telephone call to D. Fallow | | |
| 771 | H-1695, 1696, 1711, 1781: 02/14/95 and 02/15/95 Memos from B. Gillespie to File | | |
| 772 | H-1810 - 13: 12/10/94 Facsimile from Henrik Jagd to B. Gillespie with attachments | | |
| 773 | H-1814, 1818, 1820, 1824, 1827: 02/16/95 memos from B. Gillespie to File | | |
| 774 | H-1819: 12/02/94 facsimile transmission from D. Fallow to B. Gillespie | | |
| 775 | H-1825: 12/16/94 facsimile transmission from B. Gillespie to D. Fallow | | |
| 776 | H-1832 - 35: 01/04/95 facsimile transmission from B. | | |

| | | | |
|---|---|---|---|
| | Gillespie to D. Fallow | | |
| 777 | H-1838: 01/23/95 Memo from B. Gillespie to File | | |
| 778 | H-1884 - 95; 1903 - 79: Documents re D. Fallow travel expenses/fees and Herbalife checks re same | | |
| 779 | [Exhibit intentionally left blank.] | | |
| 780 | H-2196: J. Hartman notes dated 02/94 | | |
| 781 | H-2268 - 2269: 01/13/94 Memo from R. Romans to A. DeCambra re Denmark violators with attached letter to Craig Frick | F | |
| 782 | H-2291: 01/25/94 Memo from J. Hartman to S. Faulkner re activities of HEG | | |
| 783 | H-2296: Organization Chart showing HEG violators | | |
| 784 | H-2468-2474: Herbalife trademark documents | | |
| 785 | H-2501, 2503, 2526: P. Berman (Sabel) notes re telephone conversation with D. Fallow | F | |
| 786 | H-2665; 2680 - 85: 01/25/94 Memo from A. DeCambra to J. Hartman (Fisher); includes one attachment of organizational diagrams | F,H | |
| 787 | H-2702: 01/18/94 Memo from M. Aguirre to D. Addis | | |
| 788 | H-2733 - 50: 01/21/94 Memo from A. DeCambra to J. Hartman (Fisher) with attachments | | |
| 789 | H-2822 - 23: 02/14/94 notes from P. Berman (Sabel) re telephone call with C. Frick | | |
| 790 | H-2854 - 57: 02/16/94 Memo from M. Farrington to D. Addis re conference call notes | H | |
| 791 | H-2831: 02/16/94 Memo from A. DeCambra to J. Hartman (Fisher) without enclosures | | |
| 792 | H-2842: 02/16/94 excerpt from facsimile transmission containing summary of telephone conversation between Paul Goodwin and Bob Exler on 01/28/94 | | |
| 793 | H-2865 - 72: 02/08/94 Facsimile transmission from Dick Marconi to P. Berman (Sabel) | | |
| 794 | H-2887 - 92: 02/10/94 facsimile transmission from D. Fallow to J. Hartman (Fisher) | H,F,R | |

-- Page 38

225

| | | | | |
|---|---|---|---|---|
| 795 | H-3091 - 3118: 01/12/94 facsimile transmission from A. DeCambra to J. Hartman (Fisher) | | | |
| 796 | H-3135 - 72: 01/19/94 Memo from A. DeCambra to J. Fisher with attachments | | | |
| 797 | H-3182 - 91: 03/08/94 Memo from J. Hartman (Fisher) to D. Addis re distributor terminations; letters to distributors are attached | | | |
| 798 | [Exhibit intentionally left blank.] | | | |
| 799 | H-8154 - 57: 06/08/94 and 06/09/94 Memos from B. Gillespie to File | | | |
| 800 | H-8159 - 61: 1994 1040EZ U.S. Tax Return for Clint S. Fallow dated 04/13/95 | R | | |
| 801 | H-8162 - 69: 1990 1040 U.S. Tax Return for Dan and Mary Fallow dated 04/03/91 (duplicate of 177) | R | | |
| 802 | H-8170 - 74: 1991 1040 U.S. Tax Return for Dan and Mary Fallow dated 03/12/92 (duplicate of 23 and 178) | R | | |
| 803 | H-8175: Fees and Costs in the ANC Litigation/HEG Investigation (no date) | R,H,F | | |
| 804 | H-8176: 07/07/94 Memo from J. Hartman (Fisher) to Michael Hughes | | | |
| 805 | H-8193 - 8203: 1991 1120S Tax Return for Nuvo Riche, Inc. dated 03/14/92 (duplicate of 25 and 179) | R | | |
| 806 | H-8222 - 32: 1989 1120S Tax Return for Nuvo Riche, Inc. dated 03/12/90 | R | | |
| 807 | TS000233 - 240: excerpt from respondent=s brief in appeal of jury verdict re Dan Fallow v. Arnett Cab | R,H,F | | |
| 808 | TS000392 - 415: excerpt from transcript of plaintiff=s opening statement re Dan Fallow v. Arnett Cab | R,H,F | | |
| 809 | TS000754 - 779: excerpt from transcript of plaintiff=s closing statement re Dan Fallow v. Arnett Cab | R,H,F | | |
| 810 | Color photographs of Herbalife products and counterfeit products    610 A-E | F,R | | |
| 811 | Videotape of 1993 Dan Fallow Denmark presentation (H-8411) | F,R | | |
| 812 | Transcript of videotape of 1993 Dan Fallow Denmarrk presentation | F,R | | |
| 813 | H-3034 - 3043: 01/13/94 letters from J. Fisher | | | |

-- Page 39

| | | | |
|---|---|---|---|
| | suspending distributorships of HEG members | | |
| 814 | H-8247 - 8395: Natural World manual | F,R | |
| 815 | H-8396 - 8397: Herbalife Distributor Application for Mary Habeeb dated 03/01/89 and Herbalife general inquiry report | R,F | |
| 816 | H-8398 - 8399: Herbalife Distributor Application for Michael Ricks dated 10/06/82 and list of deleted distributors | | |
| 817 | H-8400 - 8401: Herbalife Distributor Application for Edward Ricks dated 08/13/95 | | |
| 818 | H-8402 - 8403: Herbalife Distributor Application for James Kugeler dated 09/20/84 and Herbalife general inquiry report | | |
| 819 | H-8404 - 8410: Natural World pay stubs for D. Fallow | R,F | |
| 820 | H-8412: Herbalife Distributor Application for V. Hoffman | R | |
| 821 | H-8414: Herbalife Distributor Application for M. Johnson | R | |
| 822 | H-8416 - 18: Herbalife 1099 form for D. Fallow, 1994 and special projects payment information | R | |
| 823 | H-8420 - 8427: Natural World downline for Fallows | R | |
| 824 | H-8428 - 8429: Excerpt from Network Marketing magazine, September 1998 | R,F,H | |
| 825 | H-11233 - 11255: Herbalife General Inquiry Reports | F,R | |
| 826 | H-11256 - 11260: Herbalife 1099 forms, 1996, for C.S. Fallow and Mary Fallow | R | |
| 827 | H-0213 - 0214: Excerpt dated 02/15/85 from Herbalife Career Book | | |
| 828 | H-0584: Phone message dated 06/30 for Jackie Hartman from Dan Fallow | | |
| 829 | H-0585 - 0588: Tables of Earnings (1992 - 1994) | H,F | |
| 830 | H-0603: 07/19/94 Memo from Michael Hughes to David Addis re C.S. Fallow royalty override earnings | H,F | |
| 831 | H-0604: 07/07/94 Memo from Jackie Hartman to Michael Hughes re adjustments for C.S. Fallow case | | |

| 832 | H-1639: 08/27/94 handwritten letter from Dan to Bill | | |
|---|---|---|---|
| 833 | H-1682: 09/01/94 Fax Message from Craig Frick to Bill Mulcahy | | |
| 834 | H-1701: 02/14///95 Memo from Bill Gillespie to File | | |
| 835 | H-1753: 02/15/95 Memo from Bill Gillespie to File | | |
| 836 | H-2300 -2315: October 1993 facsimile transmission and enclosure from Denise Mede to Al DeCambra | | |
| 837 | H-6578: First page of C.S. Fallow indented lineage report (02/96) | | |
| 838 | H-6604: First page of Mary Fallow indented lineage report (02/96) | | |
| 839 | H-3785 - 3797: Miscellaneous Craig Frick correspondence (1994 - 1995) | | |
| 840 | H-8410: Dan and Mary Fallow Natural World distributorship application dated 12/28/97 | R | |
| 841 | H-11240 - 11243: 1992 - 1998 Mary Fallow distributorship points and earnings summaries | | |
| 842 | H-11236 - 11239: 1992 - 1998 John and Susan Peterson distributorship points and earnings summaries | | |

| 843 | H-11252 -11255: 1992 - 1998 C.S. Fallow distributorship points and earnings summaries | | |
|---|---|---|---|
| 844 | Herbalife Career Book dated 1992 | | |
| 845 | H-8220: Video excerpt of Dan and Mary Fallow testimonial at AOpportunity Showcase≅ on 07/10/85 | | |
| 846 | H-8221: Video excerpt of Dan and Mary Fallow testimonial at 02/20/88 Herbalife 8th Anniversary Extravaganza | | |
| 847 | H-3805 - 3807: 3/90 Maricopa County child support print-out re payment history for payer Daniel Fallow | R,F,H | |
| 848 | F001037: Audiotape of telephone conversation between Dan Fallow and John Peterson (July 1994) | | |
| 849 | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 1 | | |
| 850 | | | |

| | | | | |
|---|---|---|---|---|
| | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 2 | | |
| 851 | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 3 | | |
| 852 | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 4 | | |
| 853 | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 5 | | |
| 854 | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 6 | | |
| 855 | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 7 | | |
| 856 | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 8 | | |
| 857 | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 9 | | |
| 858 | | Audiotape of telephone conversations entitled Warnicke and Littler Exhibit 10 | | |
| 859 | | Transcripts of excerpts of various taped telephone conversations between Dan Fallow and others on produced taped conversations | F | |
| 860 | | Herbalife=s First Set of Requests for Admission to Plaintiff Daniel S. Fallow dated November 14, 1997 | | |
| 861 | | Plaintiff Daniel S. Fallow=s Supplemental Responses to Herbalife=s First Set of Requests for Admission dated February 25, 1998 | | |
| 862 | | Herbalife=s First Set of Requests for Admission to Plaintiff Clint S. Fallow dated November 14, 1997 | | |
| 863 | | Plaintiff Clint S. Fallow=s Supplemental Responses to Herbalife=s First Set of Requests for Admission dated November 14, 1997 | | |
| 864 | | 1986 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 865 | | 1988 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 866 | | 1990 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 867 | | 1994 U.S. Income Tax Return for Nuvo Riche, Inc. | R | |
| 868 | | 1984 U.S. Income Tax Return for Dan Fallow | R | |

-- Page 42

| | | | |
|---|---|---|---|
| 869 | 1985 U.S. Income Tax Return for Dan Fallow | R | |
| 870 | 1986 U.S. Income Tax Return for Dan Fallow | R | |
| 871 | 1984 U.S. Income Tax Return for Fallow Realty | R | |
| 872 | 1994 U.S. Income Tax Return for Dan and Mary Fallow | R | |
| 873 | Declaration of Daniel S. Fallow dated August 27, 1998 | | |
| 874 | Declaration of Clint S. Fallow dated August 18, 1996 | | |
| 875 | Declaration of Clint S. Fallow dated August 27, 1996 | | |
| 876 | Declaration of Mary L. Fallow dated August 18, 1996 | | |
| 877 | Declaration of Mary L. Fallow dated August 27, 1998 | | |
| 878 | Separate Statement of Controverting Facts in Support of Clint Fallow=s Response to Herbalife=s Motion for Summary Judgment on His Claims dated 09/18/98 | | |
| 879 | Plaintiff=s Clint Fallow=s and Mary Fallow=s Separate Statement of Facts in Support of Plaintiff=s Motion for Summary Judgment on Defendant Herbalife=s Counterclaims dated 08/26/98 | | |
| 880 | Controverting Statement of Facts in Support of Mary Fallow=s Response to Defendant=s Motion for Partial Summary Judgment as to Mary Fallow dated 09/17/98 | | |
| 881 | Mary S. Fallow=s Statement of Facts in Support of Her Motion for Partial Summary Judgment dated 08/27/98 | | |
| 882 | Plaintiff Dan Fallow=s Separate Statement of Facts in Support of Plaintiff=s Motion for Partial Summary Judgment on defendant Herbalife=s Counterclaims dated 08/27/98 | | |
| 883 | 09/08/98 letter from Sean O'Brien to Thomas Littler including attachments | | |
| 884 | 09/15/98 letter from Sean O'Brien to Thomas Littler including attachments | | |
| 885 | Affidavit of David Peterman dated 09/16/98 | | |
| 886 | 1 Can of Herbalife Formula 1, Vanilla | | |
| 887 | 1 Can of counterfeit Herbalife Formula 1, Vanilla | | |
| 888 | Graphic re Herbalife | V | |
| 889 | Graphic re dual distributorship | V | |
| 890 | Graphic re Peterson/Fallow/Peterman | V | |
| 891 | Graphic re letter | V | |
| 892 | Graphic re letter | V | |
| 893 | Graphic re deposition testimony | V | |
| 894 | Graphic re deposition testimony | V | |

-- Page 43

| 895 | Graphic re timeline | V | |
|---|---|---|---|

# EXHIBIT D

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2             IN AND FOR THE COUNTY OF MARICOPA

3

4    CLINT S. FALLOW, MARY LYNN        )
     FALLOW, and DANIEL S. FALLOW,     )
5                                      )
              Plaintiffs,              )
6                                      )
          vs.                          )   CV96-03558
7                                      )
     HERBALIFE INTERNATIONAL, INC., a )
8    Nevada corporation, TONNI and JAY)
     RILEY, husband and wife,          )
9                                      )
              Defendants.              )
10   _____)

11                     Phoenix, Arizona
12              November 19 and 23, 1998

13
        BEFORE:   THE HONORABLE WILLIAM J. SCHAFER III
14                   Superior Court Judge

15

16
          REPORTER'S TRANSCRIPT OF EXCERPTS OF
17     DAY NOS. 15 AND 16 OF JURY TRIAL PROCEEDINGS

18
          ("Revised" Volume 12, Pages 2632-2856)
19

20

21

22                              COPY

23                              BEVERLEE CAPERTON, CSR, RPR
                                Official Court Reporter
24
     PREPARED FOR:
25   SNELL & WILMER

```
 1    APPEARANCES:

 2         For the Plaintiffs:

 3              Ronald E. Warnicke, Esq.
                Thomas E. Littler, Esq.
 4              Ellen Davis, Esq.
                WARNICKE & LITTLER, P.L.C.
 5              2020 North Central, Fifth Floor
                Phoenix, Arizona 85004-4506
 6
           For the Defendant Herbalife:
 7
                Joel P. Hoxie, Esq.
 8              Craig Marquiz, Esq.
                SNELL & WILMER, L.L.P.
 9              One Arizona Center
                Phoenix, Arizona 85004-0001
10
                Matthew A. Hodel, Esq.
11              Sean A. O'Brien, Esq.
                PAUL, HASTINGS, JANOFSKY & WALKER, L.L.P.
12              695 Town Center Drive, 17th Floor
                Costa Mesa, California 92626
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    other party from receiving the benefits of their

2    agreement."

3              (Discussion off the record between co-counsel.)

4              MR. LITTLER:  "Good faith and fair dealing," do

5    you see that here in either the contract with Dan Fallow

6    or the contract with -- that Dan made with David Addis?

7    Do you see "good faith"?  Are they treating them fairly?

8    Or are they simply trying to crush these small

9    distributors and then suspend them in October '96, once

10   again without any complaint from any distributor.  They

11   want you to do that.

12             And the evidence was substantial when you are

13   suspended, you can't buy product anymore, you can't

14   qualify for the bonus, you can't get all royalties that

15   you are entitled to.  So that's not good faith and fair

16   dealing.

17             What would have happened if Tonni had been

18   terminated.  First, you heard evidence -- and it's messy

19   and ugly -- but you heard evidence that I thought was

20   pretty powerful.  Remember Mr. Mechlem telling you his

21   investigation showed that Mr. Peterman had a 50 to 60

22   million dollar organization -- I'm sorry -- 50 to 60

23   million dollar organization, right -- and he made two and

24   a half million dollars.  Do you remember that?  He got a

25   million dollar bonus for that year.  Fifty to sixty

1   million dollars.  Mary Fallow's distributorship in 1996

2   was 37 million of that.  He made two and a half million

3   bucks -- 59,000 distributors, 4600 supervisors, all

4   flowing from Mary Fallow, that's their organization.

5           And what would Mary have earned if they

6   terminated the Rileys.  Now you heard some evidence about

7   the problems getting documentation from Herbalife.  They

8   didn't have it.  Even though their own expert said, "I had

9   no trouble getting documents and had unfettered access to

10  them," I don't have the information.  They had to get it

11  for me.  Mr. Peters testified in the deposition that we

12  read for you that, you know, we can't run those scenarios,

13  we can't provide that information.  We can't go back and

14  do things in years past."  So we can't because they

15  wouldn't give us that information or couldn't give us that

16  information.  We can't come up with exact figures.

17          So what did Mr. Mechlem do for you to try to

18  help you understand what Mary Fallow would have earned if

19  Tonni Riley had been terminated.  Well, first, we have got

20  the actual income that she received.  Now 1996 and 1997,

21  obviously, it's not going to be as much because it's going

22  down because she was suspended in 1996.  But we know that

23  she's made 106,019.  This is from Mr. Weekly, their

24  expert.  There's some change in the figures here because

25  of the conversion rates, but we know she was making

**235**

1    approximately a hundred thousand dollars a year during

2    these years.  We know that.  That's what she actually

3    earned.

4           Now what did Mr. Mechlem tell you about what he

5    could determine.  Remember when he said what he did, he

6    went through the royalty reports that Mary did get.  He

7    went through the indented lineage report, which is these

8    three volumes that had information for one year, the only

9    year we could get.  He went through the production bonus

10   statements, which show the people on the Tab Team Bonus,

11   that were paid to Mary.  It doesn't show the people that

12   blocked her out because they were at four percent.  So he

13   could make a calculation for these years that she lost

14   475,000 because Tonni Riley wasn't terminated in 1992.

15   That's the known.  We know that.

16           What we don't know is if Mary Fallow had

17   reached Presidents Team member -- or had become a

18   Presidents Team member and entitled to the additional two

19   percent and entitled to the Presidents Team Bonus, what

20   she would have made, because we can't get those numbers.

21   We do know she had a 37 million organization.  So do we

22   take two percent of that 37 million?  I don't think that

23   would be fair, but some number of that 37 million would be

24   fair because we know that she would have made an

25   additional two percent of that entire downline because she

1    would have made six percent now instead of four percent.

2    And we know that.  We just can't calculate what that is.

3    We have to use what we do have.  We have to use the

4    information we do have, which is she would have made an

5    additional percentage, less than two percent but an

6    additional percentage of that entire $37 million through

7    these years, we know that.

8            So how do we calculate these damages.  How do

9    we figure out what she would have made.  We just have to

10   take what we do know, $37 million organization in 1996.

11   We know that John Peterson had a 50 to 60 million dollar

12   organization and made 2.5 million.  Think about that

13   calculation for a second.  We know she would have gotten

14   an additional 475,000 for these years.  We just know that.

15   We know she was making approximately I'd say an average of

16   about ninety to a hundred thousand dollars for these years

17   would have continued, what we knew.  If you added another

18   80,000, she would have made another hundred and seventy to

19   hundred eight thousand in the next 15 years that

20   Mr. Mechlem testified.  We know that.

21           We also know that she would have been a

22   Presidents Team member so she would have gotten the

23   Presidents Team Bonus and we know she had 14 Presidents

24   Team members in her downline.  We know that.  I believe

25   there was testimony that the Presidents Team Bonus is

**237**

1   about a hundred thousand per Presidents Team member.

2   Mr. Peterson got a million dollar bonus with the number of

3   Presidents Team members he has.  How much would Mary have

4   got if she had been a Presidents Team member.  So we know

5   Mary would have gotten about a hundred -- probably another

6   $475,000 for these years.

7            And then going down to the future, we know she

8   would have got at least another 480,000 a year, plus the

9   Presidents Team Bonus, plus that additional two percent of

10  that $37 million organization, which you would be fair to

11  compute back to maybe one percent.  That's what we know.

12  That's what we know.  It goes down another 15 years.  It's

13  too bad we don't know the rest of the information, too bad

14  Herbalife didn't give it to us.  It's too bad we couldn't

15  put it up.  But this is what we know and this is enough to

16  calculate damages.

17           Let's talk about Dan's salary claim for a

18  second.  When Dan worked for Herbalife from May 10th to

19  the end of 1994, beginning of 1995, at the beginning he

20  was working only for their agreement to terminate the

21  Rileys and cover expenses.  But when Mr. Gillespie wanted

22  to keep him going and keep him going, they agreed to pay

23  him a salary of $1500 a week.  Fifteen hundred dollars a

24  week.

25           Now Mr. Gillespie says:  "It was only a

C E R T I F I C A T E

       I HEREBY CERTIFY that the Jury Trial

proceedings taking place on November 19 and 23, 1998,

contained in this "Revised" Volume 12 are part of the

shorthand record made by me thereof, and that the

foregoing pages constitute a full, true, and correct

transcript of said shorthand record, all done to the best

of my skill and ability.


       Dated at Phoenix, Arizona, this 12th day of

January, 2000.

                         _____
                         BEVERLEE CAPERTON, CSR, RPR
                         Official Court Reporter to
                         Hon. William J. Schafer IIi
                         East Court Building, #614
                         Phoenix, Arizona 85003
                         (602) 506-2917